### UNITED STATES DISTRICT COURT
### FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>BENJAMIN WEY,<br>NEW YORK GLOBAL GROUP,<br>TIANYI WEI,<br>MICHAELA WEY,<br>ROBERT NEWMAN,<br>WILLIAM UCHIMOTO, and<br>SEREF DOGAN ERBEK,<br><br>Defendants,<br><br>and<br><br>ADVANTAGE CONSULTANTS, LTD.,<br>YORK CAPITAL MANAGEMENT, LTD.,<br>FOUR TONG INVESTMENTS, LTD.,<br>STRONG GROWTH CAPITAL, LTD.,<br>MEDIAN ASSETS INVESTMENTS, LTD., and<br>HAN HUA, LTD.,<br><br>Relief Defendants. | Civil Action No. 15-7116<br>ECF CASE<br>(Jury Trial Demanded) |

### COMPLAINT

Plaintiff United States Securities and Exchange Commission (the "Commission"), alleges for its Complaint as follows:

### SUMMARY OF ALLEGATIONS

1.     This case arises out of Defendants' multi-million dollar, cross-border fraudulent scheme to obtain and profit from undisclosed, controlling ownership interests in several China-based companies that were clients of Defendant Benjamin Wey and his company, Defendant

New York Global Group ("NYGG").  Those companies include Deer Consumer Products, Inc., CleanTech Innovations, Inc., and SmartHeat, Inc. (collectively the "NYGG Clients").

2.      Benjamin Wey and NYGG recruited the NYGG Clients by offering to assist them in becoming United States issuers through mergers with publicly-traded, domestic shell companies.  Unbeknownst to the NYGG Clients and the investing public, however, from 2005 to at least July 2015 (the "Relevant Period"), Defendants were engaged in a fraudulent scheme that allowed Benjamin Wey, his sister, Defendant Tianyi Wei, and his wife, Defendant Michaela Wey, to secretly take and profit from control of the NYGG Clients using a network of foreign nominees.

3.      Benjamin Wey, with the involvement of the other Defendants, directed all aspects of the fraudulent scheme, the first step of which involved using nominees controlled by him, his sister, and/or his wife to obtain clandestine control of a shell company.  After secretly acquiring control of the shell company, Benjamin Wey—working closely with attorney Defendant Robert Newman—arranged for one of the NYGG Clients to reverse merge with the shell company Benjamin Wey and some of his family members directly or indirectly owned.  Neither Benjamin Wey nor Newman, who was ostensibly serving as counsel for the NYGG Clients, disclosed that Benjamin Wey, Tianyi Wei, and Michaela Wey ultimately owned and controlled those shell companies.  Following the mergers, Benjamin Wey, Tianyi Wei, and Michaela Wey directly or indirectly held beneficial ownership interests exceeding five percent in the NYGG Clients.  They divided the shares representing those interests among nominees they controlled and deposited the shares in numerous brokerage accounts around the world to evade the reporting requirements of the federal securities laws.

4. Concealing his family's beneficial ownership of the shells and of the NYGG Clients also allowed Benjamin Wey, with the assistance of Newman and NYGG, to convince the management of the NYGG Clients to enter into "lock-up" agreements that prevented the officers and directors of the NYGG Clients from trading their shares, typically for over three years. Because the management of the NYGG Clients held most of the shares that were not owned and controlled by Benjamin Wey, Tianyi Wei, and Michaela Wey, the lock-up agreements had the effect of giving Benjamin Wey, Tianyi Wei, and Michaela Wey control over the vast majority of the NYGG Clients' publicly-traded shares. This control allowed Benjamin Wey, with the assistance of his Swiss broker, Defendant Seref Dogan Erbek, and others to manipulate the market for those securities and profit from the scheme.

5. Throughout the Relevant Period, Benjamin Wey and others working with him, including Newman and another attorney, Defendant William Uchimoto, misled underwriters, NASDAQ, and others by presenting a false version of their activities and involvement with NYGG Clients and nominees.

6. Uchimoto, for example, facilitated the scheme and helped to maximize its profits by assisting Benjamin Wey in fraudulently obtaining or maintaining listings for the NYGG Clients on the NASDAQ. At the time the NYGG Clients sought listings, the NASDAQ required applicants to have a minimum of 300 shareholders who each owned 100 shares or more, *i.e.*, "round-lot shareholders." To meet this requirement, Benjamin Wey, with the assistance of Uchimoto and others, fraudulently inflated the shareholder base of the NYGG Clients by causing nominees that Benjamin Wey and his family members controlled to distribute shares of the NYGG Clients, at no cost, to dozens of their friends, family members, employees, and business associates, including Uchimoto and Newman, in round-lot increments of 100 to 300 shares.

Some shares were never delivered to the round-lot shareholders, and some were transferred back to nominees, again at no cost, once the NASDAQ listing was obtained.   Other round-lot shareholders were never even aware that shares had been temporarily transferred into their names.

7.      Similarly, Benjamin Wey, with the assistance of Erbek and others, used control over the NYGG Clients to manipulate their share price.

8.      Then, with the assistance of Newman, who represented the NYGG Clients but was actually controlled by Benjamin Wey and NYGG, Benjamin Wey again made material misstatements and omissions to NASDAQ about the nature of his affiliation with certain nominees and NYGG Clients.

9.      Newman also participated in the scheme by causing filings to be made with the Commission that he knew or was reckless in not knowing contained false statements and fraudulently misled an investment bank that underwrote offerings for some of the NYGG Clients.

10.     Through this scheme, Benjamin Wey, Tianyi Wei, and Michaela Wey received millions of dollars in illicit profits.   The proceeds of sales of the securities and other profits from the scheme were deposited in various nominee brokerage and bank accounts and transferred around the world to mask their sources.   Millions of dollars of those funds were then returned to the United States via transfers from accounts that were at least nominally controlled by Tianyi Wei to accounts in the name of Benjamin Wey's wife, Michaela Wey.   Benjamin and Michaela Wey used the proceeds to fund NYGG's operations and their lavish lifestyle.

11.     Uchimoto and Newman received fees as a result of Benjamin Wey directing the NYGG Clients to retain them to provide legal services.

4

12.     By this conduct, Benjamin Wey, Tianyi Wei, Robert Newman, William Uchimoto, and NYGG violated, and Tianyi Wei, Michaela Wey, Robert Newman, William Uchimoto, and Seref Dogan Erbek aided and abetted others' violations of, the antifraud and disclosure provisions of the federal securities laws.

<u>JURISDICTION AND VENUE</u>

13.     This Court has jurisdiction over this action pursuant to Section 22(a) of the Securities Act of 1933 (the "Securities Act") [15 U.S.C. § 77v(a)] and Sections 21(d), 21(e), and 27 of the Securities Exchange Act of 1934 (the "Exchange Act") [15 U.S.C. §§ 78u(d), 78u(e), and 78aa] and 28 U.S.C. § 1331.

14.     Venue is proper in this Court pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Section 27 of the Exchange Act [15 U.S.C. § 78aa] because certain of the acts, practices, transactions, and courses of business constituting the violations alleged herein occurred within this judicial district.

15.     In connection with the transactions, acts, practices, and courses of business alleged in this Complaint, Defendants have directly or indirectly made use of the means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange.

<u>DEFENDANTS</u>

16.     **Benjamin Wey** (also known as Benjamin Wei and Tianbing Wei), born in 1971, was, at all times relevant to this action, the founder and principal of NYGG.  Benjamin Wey exercised ultimate decision-making authority and control over NYGG.  He was an associated person of registered broker-dealers from 1999 to 2002.  During the Commission's investigation that led to this action, Benjamin Wey invoked his Fifth Amendment privilege against self-

incrimination, refusing to answer questions substantively during sworn testimony or produce documents responsive to the Commission's investigative subpoena. He resides in New York, New York.

17.    **New York Global Group ("NYGG")** is a Delaware corporation headquartered in New York, New York, with a second office located in Beijing, China.

18.    Benjamin Wey established NYGG to guide Chinese companies through the processes of raising capital in U.S. markets and going public, often through reverse mergers with publicly-traded shell companies. The services Benjamin Wey and NYGG provided to the NYGG Clients included handpicking accountants, auditors, directors, and attorneys for the companies; finding shell companies for and facilitating reverse mergers; and advising the NYGG Clients regarding financing transactions.

19.    In addition to these advertised and disclosed services, Benjamin Wey and NYGG, with the involvement of Tianyi Wei, Michaela Wey, Newman, and Uchimoto, engaged in deceptive conduct to obtain and profit from undisclosed, controlling ownership interests in the NYGG Clients and increase the value of the NYGG Clients' securities, thereby increasing the value of the significant holdings of those securities by Benjamin Wey, Tianyi Wei, and Michaela Wey.

20.    **Tianyi Wei** (also known as Sarah Wei), born in 1970, is Benjamin Wey's sister and an employee and manager of NYGG's office in Beijing, China. Tianyi Wei resides in China.

21.    Tianyi Wei participated in the scheme by, among other things, acting as a nominee for holdings in the NYGG Clients and serving as an officer or shareholder of several of the off-shore nominees used to mask her beneficial ownership of the NYGG Clients, along with

that of Benjamin Wey.  Accounts in the names of Tianyi Wei and nominees for which she was listed as a controlling person engaged in manipulative trading in shares of Deer and CleanTech. Tianyi Wei received profits from the illicit trading; and she transferred millions of dollars of those illegal profits to nominee accounts around the world in furtherance of the scheme and to the United States for the enrichment of Benjamin Wey and Michaela Wey.

22.     **Michaela Wey**, born in 1975, is Benjamin Wey's wife and an attorney licensed to practice in New York.  During the Commission's investigation that led to this action, Michaela Wey invoked her Fifth Amendment privilege against self-incrimination, refusing to answer questions substantively during sworn testimony or produce documents responsive to the Commission's investigative subpoena.  She resides in New York, New York.

23.     Michaela Wey held trading authority over Swiss brokerage accounts in the names of her family members and other nominees who held warrants or large positions in the shares of the NYGG Clients.  The Swiss broker for these accounts, Erbek, was contacted by a cellular telephone registered to Michaela Wey.  Michaela Wey also engaged in deceptive conduct to conceal the scheme, including knowingly failing to file required public filings that would have disclosed her greater-than-five-percent ownership of the NYGG Clients.  In addition, she received the proceeds of the fraud into her personal account and claimed the proceeds—many millions of dollars—as untaxable gifts from a foreign person on her personal tax returns.

24.     **Robert Newman**, born in 1953, is an attorney licensed to practice in New York. He resides in Irvington, New York.

25.      Benjamin Wey directed the NYGG Clients to hire Newman as their corporate counsel.  In that role, among other things, Newman knowingly or recklessly took actions that deceived others about Benjamin Wey's and Tianyi Wei's association with the nominees and the

NYGG Clients.  Although Newman knew that Benjamin Wey was a corporate insider of the NYGG Clients, he made filings with the Commission and sent letters to NASDAQ that were materially false and misleading concerning Benjamin Wey's relationships with those clients and the nominees.

26.     **William Uchimoto**, born in 1955, is an attorney licensed to practice in Pennsylvania, where he resides.

27.     Uchimoto was retained by two NYGG Clients, SmartHeat and Deer, to assist them in obtaining listings on the NASDAQ.  During the Relevant Period, among other things, Uchimoto engaged in deceptive conduct to create the appearance that SmartHeat had met NASDAQ's minimum shareholder requirements for listing.

28.     **Seref Dogan Erbek,** born in 1962, was, at all relevant times, an employee of a firm based in Geneva, Switzerland that provided "financial and fiduciary services" for several nominees controlled by Benjamin Wey, Tianyi Wei, and Michaela Wey.

29.     In furtherance of the fraudulent scheme, Erbek was instrumental in executing manipulative trades in Deer and CleanTech.  Among other things, he also knowingly assisted Benjamin Wey, Tianyi Wei, and Michaela Wey in structuring their holdings in the NYGG Clients to evade securities reporting requirements and concealing their control of the NYGG Clients.

## THE NOMINEES

30.     The network of corporate and individual nominees employed by Benjamin Wey, Tianyi Wei, and Michaela Wey is described in detail below and includes the following entities and individuals:   Advantage Consultants, Ltd.; York Capital Management, Ltd.; Four Tong Investments, Ltd.; Strong Growth Capital, Ltd.; Median Assets Investments, Ltd.; Han Hua, Ltd.;

Guo Sheng, Ltd.; Futmon Holding, Ltd.; Bicornio Real Estate SA; Roosen Commercial Corporation; Wolf Enterprises, Ltd.; Harlesden Assets, Ltd.; Finchley International Investments, Ltd.; Michaela Wey's father; Michaela Wey's mother; Michaela Wey's sister; and Tianyi Wei's then-minor child (collectively the "Nominees").

**Relief Defendant Nominees**

31.     **Advantage Consultants, Ltd. ("ACL")** is a limited liability corporation incorporated in the British Virgin Islands.  From at least August 2007 until at least November 2008, Tianyi Wei was the director, sole owner, and signatory for at least one bank account in the name of ACL and ACL's corporate actions.  An electronic copy of an unsigned letter dated in 2009 from Tianyi Wei to Erbek, recovered during the execution of judicially-authorized search warrants at the offices of NYGG and Benjamin Wey's and Michaela Wey's residence (the "Search Warrants"), granted Benjamin Wey trading authority over at least one account in the name of ACL administered by Erbek.   Records of ACL's account holdings, including a spreadsheet that tracked ACL's and other Nominees' holdings of the NYGG Clients, were also recovered during the execution of the Search Warrants.  ACL received over $4 million as a result of the fraudulent conduct alleged herein.

32.     **York Capital Management, Ltd. ("York Capital")** is a limited liability corporation incorporated in the British Virgin Islands.  According to incorporation documents, Tianyi Wei was its sole owner and signatory during the Relevant Period.  Records indicate that Benjamin Wey possessed signature authority over York Capital's domestic brokerage account during the Relevant Period.  An electronic version of an unsigned letter dated in 2009 from Tianyi Wei to Erbek, recovered during the execution of the Search Warrants, granted Benjamin Wey trading authority over at least one account in the name of York Capital administered by

Erbek.  A spreadsheet that tracked York Capital's and other Nominees' holdings of the NYGG Clients was also recovered during the execution of the Search Warrants.  York Capital received over $15 million as a result of the fraudulent conduct alleged herein.

33.  **Four Tong Investments, Ltd. ("Four Tong")** is a limited liability corporation incorporated in the Turks and Caicos Islands.  According to incorporation and bank account opening documents, Tianyi Wei was the sole owner, director, and signatory for Four Tong during the Relevant Period.  Four Tong received over $4 million as a result of the fraudulent conduct alleged herein.

34.  **Strong Growth Capital, Ltd. ("Strong Growth")** is a limited liability corporation incorporated in the British Virgin Islands.  According to incorporation documents, an entity owned by Tianyi Wei was the owner of Strong Growth during the Relevant Period.  An electronic copy of an unsigned letter dated in 2009 from Tianyi Wei to Erbek, recovered during the execution of the Search Warrants, granted Benjamin Wey trading authority over at least one account in the name of Strong Growth administered by Erbek.  A spreadsheet that tracked Strong Growth's and other Nominees' holdings of the NYGG Clients was also recovered during the execution of the Search Warrants.  Strong Growth received over $30 million as a result of the fraudulent conduct alleged herein.

35.  **Median Assets Investments, Ltd. ("Median")** is a limited liability corporation incorporated in the British Virgin Islands.  According to incorporation documents, Tianyi Wei's domestic partner, who was a high-level employee of the Beijing office of NYGG, was Median's sole owner; and Tianyi Wei possessed signature authority for its bank account.  Median received nearly $2 million as a result of the fraudulent conduct alleged herein.

36.     **Han Hua, Ltd. ("Han Hua")** is a limited liability corporation incorporated in the British Virgin Islands.  According to transfer agent records and account opening documents, Tianyi Wei was the beneficial owner and signatory for the entity's corporate actions and at least one account in its name.  Han Hua received equities worth over $5 million as a result of the fraudulent conduct alleged herein.

**Other Nominee Entities**

37.     **Guo Sheng, Ltd. ("Guo Sheng")** is a limited liability corporation incorporated in the Bahamas.  According to transfer agent records and corporate resolutions, Tianyi Wei was Guo Sheng's owner and sole signing officer.

38.     **Futmon Holding, Ltd. ("Futmon")** is a limited liability corporation incorporated in the British Virgin Islands.  During the Relevant Period, Futmon maintained at least one brokerage account that was controlled by Benjamin Wey and administered on his behalf by Erbek.  An unsigned letter dated in 2009 from Tianyi Wei to Erbek, recovered during the execution of the Search Warrants, granted Benjamin Wey trading authority over at least one account in the name of Futmon administered by Erbek.  A spreadsheet that tracked Futmon's and other Nominees' holdings of the NYGG Clients was also recovered during the execution of the Search Warrants.

39.     **Bicornio Real Estate S.A. ("Bicornio")** is incorporated in the British Virgin Islands.  A letter to Erbek dated October 14, 2008, recovered during the execution of the Search Warrants, granted Michaela Wey authority over at least one account in the name of Bicornio administered by Erbek.  A spreadsheet that tracked Bicornio's and other Nominees' holdings of the NYGG Clients was also recovered during the execution of the Search Warrants.

40.     **Roosen Commercial Corp. ("Roosen")** is incorporated in the British Virgin Islands.  A letter to Erbek dated October 14, 2008, recovered during the execution of the Search Warrants granted Michaela Wey authority over at least one account in the name of Roosen administered by Erbek.  A spreadsheet that tracked Roosen's and other Nominees' holdings of the NYGG Clients was also recovered during the execution of the Search Warrants.

41.     **Wolf Enterprises, Ltd.  ("Wolf")** is a limited liability company incorporated in the British Virgin Islands.  During the Relevant Period, Wolf maintained at least one brokerage account that was controlled by Benjamin Wey and administered on his behalf by Erbek.  A spreadsheet that tracked Wolf's and other Nominees' holdings of the NYGG Clients was recovered during the execution of the Search Warrants.

42.     **Harlesden Assets, Ltd. ("Harlesden")** is a limited liability company incorporated in the United Kingdom.  A corporate resolution dated December 2005 listed Tianyi Wei as the chairman and CEO of Harlesden.

43.     **Finchley International Investments, Ltd. ("Finchley")** is a limited liability corporation incorporated in the British Virgin Islands.  A corporate resolution dated September 2006 listed Tianyi Wei as the chairman of Finchley.

## THE NYGG CLIENTS

44.     **SmartHeat, Inc. ("SmartHeat")**, a China-based manufacturer of heating panel technology, became a publicly-traded, U.S. issuer through an NYGG-facilitated reverse merger with a shell company, Pacific Goldrim Resources, Inc., on April 14, 2008.  The shares of Pacific Goldrim Resources, Inc. became registered pursuant to Section 12 of the Exchange Act on January 30, 2008.  At various times, SmartHeat traded on the NASDAQ under the ticker symbol, "HEAT."

45.     **Deer Consumer Products, Inc. ("Deer")**, a China-based manufacturer of kitchen appliances, became a publicly-traded, U.S. issuer through an NYGG-facilitated reverse merger with a shell company, Tag Events Corporation, on September 3, 2008.  The shares of Tag Events Corporation became registered pursuant to Section 12 of the Exchange Act on April 29, 2009. At various times, Deer traded on the NASDAQ under the ticker symbol, "DEER."

46.     **CleanTech Innovations, Inc. ("CleanTech")**, a China-based manufacturer of windmills, became a publicly-traded, U.S. issuer through an NYGG-facilitated reverse merger with a shell company, Everton Capital Corporation, on July 2, 2010.  The shares of Everton Capital Corporation became registered pursuant to Section 12 of the Exchange Act on December 2, 2008.  At various times, CleanTech traded on the NASDAQ under the ticker symbol, "CTEK."   NASDAQ delisted CleanTech in December 2010—soon after it was originally listed—for its failure to disclose a financing deal that occurred just before its listing, and in which Benjamin Wey played a significant role.  The Commission set aside the decision to delist on July 22, 2013, based on NASDAQ's failure to provide evidence that it had specifically requested all documentation about Benjamin Wey-related financing transactions.  In late 2014, CleanTech merged with a small American technology company and became 6D Global Technologies Inc., which is currently traded on the NASDAQ under the ticker symbol, "SIXD."

### DEFENDANTS' DECEPTIVE CONDUCT
### TO CONCEAL AND PROFIT FROM CONTROL OF THE NYGG CLIENTS

47.     To execute their fraudulent scheme, Defendants used several forms of deceptive conduct and devices, including setting up and exercising control over a network of foreign Nominees; using Nominees to gain undisclosed control of shell companies and the NYGG Clients that engaged in reverse merger transactions with the shells; making materially misleading statements and omissions in connection with financing transactions and applications for

NASDAQ listings; engaging in stock giveaways to create the illusion of a shareholder base for certain of the NYGG Clients; manipulating the market for the securities of certain of the NYGG Clients; and structuring the securities holdings of the Nominees and intentionally failing to file required Commission filings to avoid disclosure of beneficial ownership.

**Creating and Controlling a Network of Nominees**

48.     Benjamin Wey, Tianyi Wei, and Michaela Wey utilized a network of foreign Nominees to secretly obtain control over the NYGG Clients.  In addition to using the Nominees that were corporate entities, Benjamin Wey caused the NYGG Clients to issue shares in the names of NYGG employees and his, Tianyi Wei's, and Michaela Wey's relatives.  Those shares were then deposited into accounts controlled by Benjamin Wey, Tianyi Wei, and Michaela Wey.

49.     Although Tianyi Wei and others ostensibly controlled the securities holdings and bank and brokerage accounts of the Nominees, Benjamin Wey and Michaela Wey, directly or through the actions of others:  (1) exercised investment authority over the shares issued to the Nominees; (2) closely tracked the Nominees' stock holdings; (3) directed others in matters pertaining to the Nominees; and (4) personally enriched themselves with fees paid to the Nominees and proceeds from the sale of shares held in accounts in the names of Tianyi Wei and the Nominees.

50.     On or about July 3, 2007, Benjamin Wey, with the assistance of Tianyi Wei, opened an account at a brokerage firm located in the United States ("Broker 1") in Tianyi Wei's name.  The account held shares of the NYGG Clients.  During 2007 through 2009, most of the online trading in the Broker 1 account did not originate from China, where Tianyi Wei lived and worked.  Instead, the trading came from an IP address at NYGG's office in New York, where Benjamin Wey worked and was principal.

14

51.     In or about March 2008, Benjamin Wey, with the assistance of Tianyi Wei, opened another account at another brokerage firm located in the United States ("Broker 2") in the name of Tianyi Wei. From in or about April 2008 through in or about July 2010, Benjamin Wey called Broker 2 by telephone to place all trade orders for shares of the NYGG Clients in the account. In or about October 2008, Tianyi Wei signed a written grant of authority allowing Benjamin Wey to trade in the account. All conversations with Broker 2 about the disposition of shares or funds in the account were with Benjamin Wey, not Tianyi Wei.

52.     In July 2010, Benjamin Wey transferred the entire contents of the Broker 2 account to a new account he opened at a brokerage firm located in the United States ("Broker 3") in the name of Tianyi Wei. During 2010, Benjamin Wey traded heavily in the shares of Deer in the Broker 3 account. Again, all conversations with Broker 3 about the disposition of shares or funds in the account were with Benjamin Wey, not Tianyi Wei.

53.     From 2007 through 2009, Benjamin Wey opened, and traded in, additional accounts at a brokerage firm located in New Jersey ("Broker 4"). He opened these accounts in the names of Michaela Wey's sister and two other Nominees, Strong Growth and York Capital. As with the brokerage accounts opened in his sister Tianyi Wei's name, Benjamin Wey directed the trading in the accounts through telephone calls to Broker 4's trading desk.

54.     Beginning in at least 2009, Benjamin Wey, Tianyi Wei, and Michaela Wey hired and paid Erbek to open and maintain brokerage accounts in Switzerland in the names of various Nominees (the "Swiss Accounts"). The Swiss Accounts held shares of the NYGG Clients.

55.     During execution of the Search Warrants, spreadsheets entitled "Portfolio" were found. These spreadsheets tracked holdings in Swiss brokerage accounts of shares of the NYGG Clients, including accounts in the names of ACL, York Capital, Strong Growth, Futmon,

Bicornio, Roosen, Wolf, Michaela Wey's sister and father, and Tianyi Wei. The spreadsheets reflected holdings worth approximately $118 million.

56.     On numerous occasions during at least 2010 and 2011, emails containing instructions for trading in NYGG Clients' stocks and the allocation of assets among brokerage accounts held by some of the Nominees, including ACL, Strong Growth, Futmon, and Roosen, were sent by Benjamin Wey or someone else at his direction and recovered during execution of the Search Warrants. In addition, during this same period, numerous telephone calls were placed to Erbek's firm from cell phones registered in the names of Benjamin Wey and Michaela Wey.

57.     Account numbers, wire transfer instructions, data regarding stock holdings, and additional information regarding foreign bank accounts in the names of Tianyi Wei and various Nominees, including ACL, York Capital, Strong Growth, and Four Tong, were also recovered during execution of the Search Warrants.

58.     From 2008 through 2012—either directly or through Newman or an NYGG employee—Benjamin Wey repeatedly directed the NYGG Clients' transfer agent to transfer shares to and from various Nominees. On various occasions, Benjamin Wey also instructed the transfer agent, either directly or through Newman, to send share certificates in the names of some of the Nominees to Benjamin Wey for him to distribute among the Nominees rather than sending them to the Nominees' addresses of record. Benjamin Wey also gave shares of Deer and SmartHeat held by Tianyi Wei, her then-minor child, and Wolf to friends and business associates as gifts or bonuses. As described in detail in paragraphs 82 through 90 below, Wey's gifting of shares inflated the shareholder counts of Deer and SmartHeat; shareholder counts that he, with the help of others as discussed herein, fraudulently used to facilitate applications by Deer and SmartHeat for listings on the NASDAQ.

59.     Benjamin Wey also profited from the Nominees' holdings by causing the NYGG Clients to pay approximately $11 million in fees to some of the Nominees, including ACL, Four Tong, Strong Growth, and Median, without disclosing his relationship to these entities.  These fees were purportedly for services related to private placements and secondary offerings, though it does not appear that they actually provided any meaningful services.  Moreover, as explained below in paragraphs 111 through 114, Benjamin Wey, Tianyi Wei, and Michaela Wey received even larger profits from sales of shares of the NYGG Clients by the Nominees' brokerage accounts.

**Using Nominees to Obtain Secret Control of the NYGG Clients**

60.     As discussed above, the NYGG Clients were Chinese companies that engaged NYGG to help them obtain access to the U.S. equity markets.  Benjamin Wey, NYGG employees, and Newman helped them accomplish this by arranging reverse mergers between NYGG's clients and U.S. shell companies.  As part of the fraudulent scheme, Benjamin Wey, acting in concert with Tianyi Wei and Newman, obtained secret control of the shell companies and later the publicly-traded shares of each company that emerged from the reverse merger.  Wey did this by:  (1) locating publicly-traded shell companies; (2) clandestinely purchasing the shell companies by arranging ownership in the names of certain individuals affiliated with Benjamin Wey, NYGG, and Tianyi Wei; and (3) arranging transfers of shares from the shell companies' original shareholders to Nominees controlled by Benjamin Wey, Tianyi Wei, and Michaela Wey.  After Benjamin Wey, Tianyi Wei, and Michaela Wey obtained significant interests in the shell companies, Benjamin Wey, employees at NYGG working at his direction, and Newman facilitated reverse mergers between the shell companies and the NYGG Clients.

61.     As a result of the reverse mergers, the management of the Chinese operating companies that had retained NYGG and reverse merged with an NYGG-provided shell company received a majority of the shares of the newly-formed NYGG Clients.

62.     However, by virtue of their ownership interests in the shell companies, the Nominees also received large amounts of the publicly-traded shares of the newly-formed public companies as a result of the mergers.  Through their control of the Nominees, Benjamin Wey, Tianyi Wei, and Michaela Wey retained undisclosed control of more than ten percent of the shares of the NYGG Clients that emerged from the reverse mergers.

63.     To cement control over trading in the market for the NYGG Clients' shares, Benjamin Wey, with the assistance of Newman (who purportedly represented the NYGG Clients) and others, convinced the management of the NYGG Clients to enter into three-year lock-up agreements that prevented the companies' officers and directors from selling their shares.  Benjamin Wey represented to the NYGG Clients' management that the lock-ups were necessary to instill confidence in the investing public.  Once the companies' management signed the lock-up agreements, Benjamin Wey, Tianyi Wei, and Michaela Wey, through the Nominees they controlled, held the vast majority of the NYGG Clients' freely-trading shares.  This domination of the shares of the NYGG Clients available for trading allowed Benjamin Wey, Tianyi Wei, and Michaela Wey, with the assistance of Erbek and Newman, to manipulate the market for those issuers.

64.     The events surrounding the reverse merger that resulted in the creation of CleanTech is an example of this aspect of the fraudulent scheme.  The Chinese operating company that became CleanTech retained NYGG to assist it in the process of going public in the United States.

65.     At Benjamin Wey's direction, Newman, who was hired to represent the Chinese operating company, located a publicly-traded shell company, Everton Capital Corporation ("Everton") for the purpose of a reverse merger.   Newman negotiated the purchase price of Everton with its owners.   Benjamin Wey then approved the purchase price.   Funds for the purchase were then wired into Newman's attorney trust account from a bank account maintained in the name of Four Tong.   In or about April 2009, Newman completed the purchase of Everton by transferring funds from his trust account to accounts for the benefit of Everton's shareholders.

66.     Concurrently, Newman instructed the shell company's transfer agent to transfer 5,000,000 shares of Everton from its original President to a person purported to be Everton's new CEO, President, CFO, Treasurer, and Secretary.   According to a Form 8-K Everton filed with the Commission in July 2010, the purported CEO was a 29-year-old "independent business consultant" from China who had purchased 90.89 percent of Everton's outstanding common stock.   Nominees controlled by Benjamin Wey, Tianyi Wei, and Michaela Wey held most of the remaining 9.11 percent of the shares.   Although he represented Everton, Newman never met the purported CEO and received his biographical information for Commission filings from Benjamin Wey.   All communications between Newman and the purported CEO were either conducted through Benjamin Wey or via an email address Benjamin Wey provided to Newman.

67.     In connection with the reverse merger, the purported CEO later signed an agreement to have the Everton shares in his name cancelled in exchange for a just a fraction of a penny per share, well below their actual value.   The remaining shareholders in the shell company—almost exclusively Nominees—retained their shares of Everton and, as a result, they became beneficial owners of more than ten percent of the shares of CleanTech following the merger.

68.     During the CleanTech reverse merger, Newman provided legal representation for both the shell company, Everton, and the Chinese operating company without receiving a waiver of conflicts from either party.  Newman's dual representation also was not disclosed in the July 2, 2010 Form 8-K filed with the Commission or in the merger agreement that was filed as an exhibit to the Form 8-K.

**Material Misstatements and Omissions to Conceal Control of the Nominees and, thereby, the NYGG Clients**

69.     In furtherance of the scheme, Benjamin Wey and Newman attempted to conceal Benjamin Wey's relationship with the various Nominees and the NYGG Clients through material misrepresentations and omissions of material facts necessary to make the statements not misleading.

70.     One example of this involved another NYGG client, AgFeed Inc. ("AgFeed") that had become a publicly-traded, U.S. issuer through an NYGG-facilitated reverse merger between two Chinese animal husbandry companies and a shell company on October 31, 2006.  Benjamin Wey informed an attorney for AgFeed ("AgFeed Attorney") that Four Tong was to receive $300,000 as a "finder's fee" for a transaction.  The AgFeed Attorney advised that if Benjamin Wey—as a consultant to the company and an insider—received fees, then those fees had to be publicly disclosed in Commission filings.  Benjamin Wey falsely denied to the AgFeed Attorney that he was affiliated with Four Tong in any way.  At the insistence of the AgFeed Attorney, Benjamin Wey also signed a certification wherein he falsely represented that he had no affiliation with Four Tong.

71.     Shortly after he was asked to sign the certification, Benjamin Wey attempted to terminate the AgFeed Attorney's representation.  The AgFeed Attorney protested that only AgFeed's management had the authority to fire him.  Soon thereafter, the AgFeed Attorney

received an email from AgFeed management firing him.  Uchimoto was then hired by AgFeed to replace the AgFeed Attorney.

72.     Benjamin Wey similarly failed to disclose his conflicts of interest in April 2009, when he persuaded SmartHeat to hire ACL to provide strategic business consulting services for SmartHeat.  SmartHeat agreed to pay ACL $3.9 million in connection with the November 2009 public offering of SmartHeat's stock in the United States.

73.     The primary underwriter for the SmartHeat offering asked what, if any, affiliation Benjamin Wey had to ACL, in an effort to determine how to properly disclose the fee to ACL in SmartHeat's offering materials.  In addition, the primary underwriter asked ACL to execute a certification representing, among other things, that ACL was comprised solely of non-U.S. persons (the "Certification") because of restrictions on foreign broker dealers soliciting U.S. investors.   The primary underwriter also pressed both Benjamin Wey and Newman for information about the identities of ACL's owners.

74.      Benjamin Wey falsely told the primary underwriter that neither he nor NYGG had any affiliation with ACL.  Benjamin Wey did not disclose that Tianyi Wei, who was his sister and an NYGG manager in Beijing, had served as the sole director and owner of ACL.

75.     Newman, who also knew that Benjamin Wey was affiliated with ACL, also misled the primary underwriter by directing its employee to contact a person in China who Benjamin Wey claimed was ACL's CFO.  The purported CFO of ACL falsely denied that ACL had any contacts in the United States, but later failed to respond to the primary underwriter's request that he execute the Certification affirming this representation.

76.     Eventually Benjamin Wey directed the primary underwriter to Erbek as a contact person for ACL.   Erbek then directed the primary underwriter to a Bahamian consulting

company that Erbek identified as ACL's sole director.  At the primary underwriter's request, Erbek procured signatures from the Bahamian consulting company on the Certification.

77.     Benjamin Wey and Newman continued to knowingly misrepresent and conceal Benjamin Wey's affiliation with ACL in connection with a December 2009 capital financing for Deer.  In connection with that financing, Deer paid ACL fees of $3,795,765.  For this transaction, Deer used the same primary underwriter that SmartHeat had used for its November 2009 public financing, discussed above.  The primary underwriter conducted similar due diligence relating to ACL's role in the Deer offering as it did in connection with the SmartHeat offering.  As part of that due diligence, the primary underwriter had ACL execute a certification that repeated the representations made in the SmartHeat offering Certification, including that ACL was comprised solely of non-U.S. persons.

78.     Benjamin Wey's misrepresentations, aided by Newman, caused the offering documents for the Deer and SmartHeat public offerings to be materially misleading by failing to disclose Benjamin Wey's affiliation with ACL.  Had the primary underwriter known that it had been misled regarding Benjamin Wey's affiliation with ACL, it would not have agreed to underwrite the deals.

79.     Newman continued to assist Benjamin Wey in concealing Benjamin Wey's true role in the fraudulent scheme.  For instance, in 2011, Newman misled NASDAQ about Benjamin Wey's relationship with Deer and SmartHeat.  Early that year, NASDAQ sent letters to Newman, as counsel for Deer and SmartHeat, asking the companies to disclose "any and all relationships, past or present, between the Compan[ies]" and Benjamin Wey, Tianyi Wei, NYGG, Strong Growth, and others.  After discussing with Benjamin Wey how to respond, Newman signed and sent letters to NASDAQ that failed to disclose that Benjamin Wey

controlled substantial holdings of Deer and SmartHeat through the Nominees, including Strong Growth. Instead, Newman described a limited relationship that included introducing underwriters to Deer and SmartHeat and being acquainted with officers or directors of Deer and SmartHeat.

80.    At the time he wrote the letters to NASDAQ, Newman knowingly or recklessly misled NASDAQ about Benjamin Wey's ownership interest in Deer and SmartHeat. Beyond the limited relationship Newman described to NASDAQ, Newman also knew that Benjamin Wey and NYGG had significantly more involvement with Deer and SmartHeat, including conducting financial modeling, choosing their lawyers and accountants, reviewing drafts of their Commission filings, identifying and recommending individuals to serve as their directors, advising as to pending litigation, and discussing non-public information with a company officer.

81.    Benjamin Wey also personally misled NASDAQ, knowing that his statements were misleading. In late 2010, NASDAQ delisted CleanTech based in part on CleanTech's failure to disclose Benjamin Wey's involvement in a December 2010 financing in which Strong Growth, Han Hua, and Roosen received shares of CleanTech. During CleanTech's appeal of NASDAQ's delisting determination, Benjamin Wey submitted a letter to NASDAQ, dated June 30, 2011, in which he made false and misleading statements in order to conceal his financial stake in CleanTech's December 2010 offering. For example, Benjamin Wey wrote, "[n]either I nor NY Global has any beneficial ownership of the securities issued in the financing." This was a false statement because of Benjamin Wey's, Tianyi Wei's, and Michaela Wey's ownership and control of Strong Growth, Han Hua, and Roosen. Benjamin Wey also falsely claimed in the letter that NYGG's Beijing and New York offices were "separately owned and operated." He also stated that the Beijing office was run by an NYGG employee, who Benjamin Wey failed to

disclose was Tianyi Wei's domestic partner.  In fact, Benjamin Wey ran both offices, and Tianyi Wei's domestic partner was an NYGG employee who reported to Benjamin Wey.  Benjamin Wey also described Han Hua as an "Asian investment fund" when, in fact, it was a Nominee that Tianyi Wei owned.

## Misrepresentations and Other Deceptive Conduct to Obtain NASDAQ Listings for Deer and SmartHeat

82.     After the reverse mergers, securities of the NYGG Clients traded in the over-the-counter markets and in very low volumes.  Accordingly, they could not be sold in significant quantities until a more liquid market developed.  If a company is able to obtain a listing on the NASDAQ, its investor interest and liquidity generally increase significantly.  Thus, to maximize profits from the scheme, Benjamin Wey, with the assistance of Uchimoto, fraudulently obtained listings for Deer and SmartHeat on the NASDAQ.

83.     In 2008 and 2009, when SmartHeat and Deer, respectively, sought to be listed on the NASDAQ, that exchange's Rule 4310(c)(6) required an applicant to have at least 300 "round-lot shareholders," defined as shareholders owning at least 100 shares of common stock. At the time of their applications, neither SmartHeat nor Deer had a sufficient number of round-lot shareholders to qualify for a listing on the NASDAQ.  Benjamin Wey, with the assistance of Tianyi Wei and Uchimoto, therefore artificially inflated the number of shareholders for Deer and SmartHeat by gifting shares in round-lot increments to dozens of Benjamin Wey's friends, family members, business associates, and others (the "Gifted Shareholders").

84.     In furtherance of the scheme, Benjamin Wey directed the transfer agent for Deer and SmartHeat to transfer shares held by Tianyi Wei, her then-minor child, and Nominee Wolf to the Gifted Shareholders in increments of 100 to 300 shares. Through this deceptive conduct,

Benjamin Wey was able to create the illusion that Deer and SmartHeat possessed the requisite shareholder base for listing on the NASDAQ.

85.     For many of the Gifted Shareholders, the shares arrived unexpectedly and with an accompanying letter or card from Benjamin Wey stating that the shares were a gift or bonus.  In other instances, Benjamin Wey told the Gifted Shareholders about the shares in person.  In some instances, the Gifted Shareholders never received the shares and did not know they owned shares of Deer or SmartHeat.   One example involved an acquaintance of Benjamin Wey and the acquaintance's wife.  According to stock certificates and powers of attorney purportedly signed by them, Benjamin Wey's acquaintance and his wife each held 100 shares of Deer, which they subsequently transferred to Tianyi Wei.  However, neither the acquaintance nor his wife knew that they ever owned shares of Deer, and they believed that the signatures on the stock certificates and powers of attorney were forged.

86.     Uchimoto's attorney billing invoices from 2008 and 2009 reflect his extensive communications with Benjamin Wey regarding the shareholder count for SmartHeat's application to become listed on the NASDAQ.  In addition, Uchimoto and his wife were among the recipients of round-lot shares from Benjamin Wey.  Newman also received Deer shares as a round-lot shareholder.

87.     In connection with their NASDAQ listing applications, SmartHeat and Deer reported to NASDAQ that they had more than 300 round-lot shareholders in September 2008 and June 2009, respectively.   NASDAQ staff, however, evaluated the applications to determine whether the companies had sufficient investor bases and trading interest to provide the liquidity necessary to promote fair and orderly markets.  NASDAQ generally does not count gifted shares toward the minimum shareholder requirement because they do not establish necessary trading

interest.  Accordingly, to ascertain the trading interest of numerous shareholders with "round-lots" – many with exactly 100 shares – NASDAQ asked Uchimoto, as SmartHeat's and Deer's listing counsel, about the circumstances by which those shareholders received shares.

88.     In responding to NASDAQ's questions, Uchimoto made misleading statements including that, "my spouse and I, among others, own 100 shares each, which were gifted to us by a social friend in China who is a shareholder and is not an affiliate of the Company."  Uchimoto subsequently told NASDAQ that Tianyi Wei was the one "who gifted the shares."  Uchimoto, however, later admitted that he had briefly met Tianyi Wei one time in an airport, thus making his statement to NASDAQ that the shares came from Tianyi Wei on the basis of a social relationship misleading.  Uchimoto later claimed that the social friend he referred to in his initial statement to NASDAQ was Benjamin Wey; but in that case, his statement to NASDAQ was still false, as Benjamin Wey was at all relevant times "an affiliate of the Company."

89.     NASDAQ informed Uchimoto that it did not count gifted shares toward its minimum shareholder requirement.  Uchimoto then proposed to Benjamin Wey a plan to have the previously-gifted shares deposited into brokerage accounts (a process which is sometimes referred to as "putting shares in street name").  The result of putting the round-lot shares in street name was that those shares were then aggregated, and it was no longer evident in the records NASDAQ used to verify whether its minimum shareholder requirements were met that many of the shareholders held only 100 share lots.  This had the effect of disguising the holdings of individual Gifted Shareholders.

90.     Uchimoto then informed NASDAQ that his clients had satisfied the round-lot shareholder requirement without counting the Gifted Shareholders, when, in fact, the Gifted Shareholders were still included in the shareholder count to meet NASDAQ's requirement.  The

ruse worked, and NASDAQ approved the listings of SmartHeat and Deer on January 29, 2009, and July 16, 2009, respectively.

**Manipulating the Market for Deer and CleanTech Securities**

91.     As part of the fraudulent scheme to illegally profit from his control of the NYGG Clients, Benjamin Wey, with the assistance of Erbek, Newman, Tianyi Wei, and Michaela Wey, manipulated the market for the securities of Deer and CleanTech.

92.     In the summer of 2010, Benjamin Wey, with the assistance of Newman, Tianyi Wei, and Michaela Wey, manipulated the price of Deer stock in connection with a stock repurchase program.  This manipulation allowed Benjamin Wey and Tianyi Wei to profit by liquidating significant positions in Deer held by Tianyi Wei and a Nominee that she and Benjamin Wey controlled while the stock repurchase plan orchestrated by Benjamin Wey supported the share price.

93.     Deer initiated the repurchase program upon Benjamin Wey's recommendation and his assurance that the company would not have to spend any money to fund it.  Funding for the stock repurchase program ostensibly came from the exercise of warrants held by various Nominees that entitled them to purchase Deer stock.  These Nominees included ACL, Strong Growth, Bicornio, Roosen, Futmon, and Wolf.  Benjamin Wey, however, used the Nominees interchangeably, and in fact, the funds to purchase the Deer shares pursuant to those Nominees' exercise of warrants were provided only by Strong Growth and Tianyi Wei.

94.     To effectuate the stock repurchase program, Benjamin Wey instructed Newman to open a brokerage account in Deer's name to enable Benjamin Wey and Newman to execute the market repurchases.  Newman opened the account and held trading authority over it.

95.     The funds provided by Strong Growth and Tianyi Wei were transferred to Newman's trust account, and Newman then transferred those proceeds to the brokerage account he controlled to use for repurchase of Deer's stock.    Newman knew that Tianyi Wei was Benjamin Wey's sister and an employee of NYGG and that Benjamin Wey and NYGG "advised" Deer, but Newman did not question why Tianyi Wei was involved in funding Deer's stock repurchase program.

96.     Pursuant to Deer's stock repurchase program, in June 2010, Deer's brokerage account expended $6,951,478 for nineteen repurchases of Deer stock.  This exact amount was transferred from the Strong Growth and Tianyi Wei accounts through the Newman trust account and into the brokerage account Newman established at Benjamin Wey's direction to fund the stock repurchase.

97.     During this period, as Deer was repurchasing its own shares in the market, foreign brokerage accounts in the names of Strong Growth and Tianyi Wei sold at least 640,000 shares of Deer for over $5.5 million in proceeds.  The average daily closing price for Deer was $8.75 in June 2010, the month during which the company was repurchasing its shares.  In contrast, the daily average for May 2010 was $8.33, and the daily average for July 2010 was $7.93.  The result of the stock repurchase scheme was that while Tianyi Wei and Strong Growth, a Nominee controlled by Benjamin Wey and Tianyi Wei, were selling hundreds of thousands of shares of Deer stock, the stock repurchase plan recommended by Benjamin Wey and funded by Tianyi Wei and Strong Growth using warrants owned by Nominees helped to maintain Deer's share price.

98.     Benjamin Wey arranged for the shares purchased pursuant to the warrant exercise to be divided and distributed among Nominees in amounts that did not match the number of

warrants that each Nominee possessed or exercised.  On or about July 28, 2010, pursuant to Benjamin Wey's instructions, Newman requested issuance of 1,000,000 shares to Strong Growth; 400,000 to ACL; and 351,610 to Guo Sheng.  Both Strong Growth and ACL received more shares than they were entitled to receive based on their possession and exercise of warrants, and Guo Sheng received shares even though it held no warrants at all.  Those shares were actually from the exercise of warrants owned by Bicornio and Roosen, two Nominees for which Michaela Wey exercised investment authority.  The interchangeability of these Nominees — which were supposedly independent and distinct investors — for purposes of exercising warrants and issuing shares, demonstrates that Benjamin Wey and his associates controlled all of them and treated them as parts of a whole.

99.    Another example of market manipulation was aimed at achieving and maintaining a share price above $5.00 for NYGG Client, CleanTech.  In July 2010, the first trades in CleanTech securities involved a match trade of 1,000 shares purchased by a Broker 2 account in the name of Tianyi Wei from a foreign brokerage account maintained in the name of Guo Sheng, a Nominee for which Tianyi Wei was listed as the owner and signatory.  The purchase price of $5.10 was 70 percent higher than CleanTech's recent $3.00 offering price; however, nothing had occurred between the offering and this first sale on the secondary market to justify the price increase.  Soon thereafter, Benjamin Wey touted the 70-percent increase in an email to potential investors.

100.    Similarly, a February 2011 email recovered during execution of the Search Warrants and sent from Benjamin Wey or someone else at his direction to Erbek revealed an intention to maintain the share price of CleanTech at $5.00.  It read, "Dogan, Cleantech just traded at $4.50 per share.  Please make sure the trader buys the stock at $5 per share, stay at $5

per share bid price, not less.  Please make sure this happens right away."  Trading records for the Swiss accounts managed by Erbek show purchases on February 7, 2011, of CleanTech shares in 100 to 198 share tranches at $4.86 and $4.93.  These purchases were part of Benjamin Wey's effort to drive the stock's price upward.

101.    Another example of market manipulation of the NYGG Issuers involving Benjamin Wey occurred from on or about October 14, 2010, through on or about November 10, 2010, when the Swiss Accounts held in the names of some of the Nominees acted in concert to maintain the price for Deer above $11.00 per share.  Maintaining Deer's share price above $11.00 was significant because, on December 10, 2009, Deer conducted a public offering of 6,000,000 shares at a stock price of $11.00 per share.  In an October 14, 2010 email to the primary underwriter for the offering, Benjamin Wey touted the quality of the companies he advised, including Deer, which he noted was "trading at $11.40 last trade, above the offering price of $11 in December 2009."  At the time, Benjamin Wey and NYGG were trying to secure an underwriter for a financing for CleanTech.

102.    During that time, those Nominee accounts sold at least 1,167,590 shares of Deer for a profit at prices between $11.40 and $12.00.  On eight occasions, however, when the price of Deer dropped to $11.00, the account temporarily reversed course and purchased large amounts of Deer shares.  These purchases constituted a significant amount of the day's volume of trading in the stock.  These trades appear to have been aimed at and had the effect of supporting the share price of Deer at $11.00.

**Using Nominees to Avoid Required Public Disclosure of Control of the NYGG Clients**

103.    Beneficial owners of greater than five percent of a securities issuer's outstanding shares are legally required to report their total securities holdings for that issuer on Schedules

13D or 13G filed with the SEC.  Beneficial owners of greater than ten percent of an issuer's outstanding shares are required to report all trading of that issuer's securities, regardless of the size of the trade, by filing Forms 3, 4, or 5 with the Commission.  These filing requirements apply both to any single investor (whether an individual and entity) and to two or more investors acting as a group for the purpose of acquiring, holding, or disposing of securities of an issuer.

104.    Benjamin Wey, Tianyi Wei, and Michaela Wey, with the assistance of Erbek, structured the Nominees' holdings in an effort to ensure that no one entity or individual ever held a greater-than-five-percent beneficial ownership interest in any NYGG Client to avoid triggering the beneficial ownership disclosure requirements.  Specifically, on or about July 21, 2010, an email sent from Benjamin Wey or someone else at his direction to Erbek directed Erbek to:

> allocate on your end [in the Swiss accounts Erbek managed]:
> 1) Strong[Growth]: 1,000,000 shares. 2) A[CL]: 400,000 shares.
> 3) Y[ork Capital]: 351,610 shares.  Since five percent limit at each
> account is 1.6 million . . . the above will be fine.

Another email sent by Benjamin Wey or someone else at his direction to Erbek on or about September 20, 2010, explained that, "Under SEC filing requirements, any individual or entity owning more than five percent of a company's total outstanding shares must file SEC 13D or 13G forms."

105.    By virtue of their control over the Nominees, Benjamin Wey, Michaela Wey, and Tianyi Wei, at various times throughout the Relevant Period, individually and collectively held more than five percent of the public equity of the NYGG Clients.

106.    Benjamin Wey possessed investment authority over all the Nominees at various times during the Relevant Period.  Tianyi Wei, by virtue of her and her minor-child's holdings and her position as sole shareholder, officer, and director of many of the Nominee entities, held beneficial ownership of more than five percent of the shares of the NYGG Clients at various

times during the Relevant Period.  Michaela Wey, by virtue of her control over shares held by accounts in the names of her family members and at least two Nominees, Bicornio and Roosen, held beneficial ownership of more than five percent of the shares of Deer and SmartHeat at various times during the Relevant Period.

107.    Benjamin Wey, Tianyi Wei, Michaela Wey, and the Nominees they controlled were also sufficiently interrelated that they constituted a group for the purposes of the filing requirements of Exchange Act Section 13(d) and Regulation 13D-G thereunder.  Nonetheless, Benjamin Wey, Michaela Wey, and Tianyi Wei repeatedly failed to file the required Schedules 13D or 13G.

108.    Only twice did Benjamin Wey instruct Newman to file Schedules 13D, and both times, the filings were materially false.  A February 2010 schedule for Futmon, filed by Newman, failed to correctly state that Benjamin Wey and Tianyi Wei were beneficial owners of the shares of Deer described in the disclosure.  An April 2010 schedule that reported Tianyi Wei as the sole beneficial owner of shares of Deer was materially false and misleading as it underreported shares in Tianyi Wei's name and did not include shares of Deer held by Nominee entities for which she was sole shareholder, officer, or director.

109.    At times during the Relevant Period, Benjamin Wey and Tianyi Wei possessed greater than ten percent beneficial ownership of the NYGG Clients.  Neither Benjamin Wey nor Tianyi Wei filed the forms required by Section 16(a) of the Securities Act to initially disclose their ten percent beneficial ownership or to report their trading of shares of the NYGG Clients.

110.    The repeated failures to file required public disclosures of beneficial ownership were a knowing or reckless part of the fraudulent scheme.  Benjamin Wey, Tianyi Wei, and Michaela Wey knew or were reckless in not knowing their obligations under the federal

securities laws as beneficial owners of greater than five percent of the outstanding shares of the NYGG Clients. Likewise, Benjamin Wey and Tianyi Wei knew or were reckless in not knowing their obligations as greater than ten percent of the outstanding shares of the NYGG Clients to report their holdings and any changes in those holdings on Forms 3, 4 and 5, public documents filed with the Commission. Benjamin Wey, Tianyi Wei, and Newman also knew or were reckless in not knowing that the two Schedule 13D filings Newman made at Benjamin Wey's direction for Futmon and Tianyi Wei were materially false. Benjamin Wey, Tianyi Wei, Michaela Wey, and Newman also knew or were reckless in not knowing that the investing public routinely used such disclosures to, among other things, gauge the sentiment of public companies' insiders and large shareholders about those companies' financial condition and prospects, thereby relying on them in making investment decisions.

**Profiting from Hidden Control of the NYGG Clients**

111.    Benjamin Wey and his associates profited from their scheme in numerous ways. For instance, Benjamin Wey, Tianyi Wei, and Michaela Wey profited from the scheme by their receipt of millions of dollars in fees paid to some of the Nominees by the NYGG Clients and profits from sales of shares of the NYGG Clients. Nominees obtained undisclosed fees and additional shares of the NYGG Clients in connection with private placements and other financings facilitated by Benjamin Wey and NYGG. In total, the NYGG Clients paid fees totaling at least $11,312,074 to ACL, Strong Growth, Four Tong, and Median Assets, for services purportedly related to private placements and secondary offerings. There is no evidence that these Nominees provided any services to the NYGG Clients. Benjamin and Michaela Wey used the fees paid to these Nominees to, among other things, fund the operations of NYGG's New York office.

112.    Benjamin Wey, Tianyi Wei, and Michaela Wey also illegally profited from their control of the Nominees through the sales of shares of the NYGG Clients in the Nominees' brokerage accounts.  After sending the sales proceeds to foreign bank accounts in the names of various Nominees to mask their origin, Benjamin Wey or Michaela Wey would direct Tianyi Wei to transfer at least a portion of the money back to the United States.  Michaela Wey falsely described these massive transfers of cash as "gifts from a foreign person" in her tax filings.  In fact, the money was illegal profits from the fraudulent scheme, not gifts from Benjamin Wey's sister.

113.    For example, from on or about October 12 through on or about October 30, 2009, Benjamin Wey called Broker 4 and placed orders to sell 354,902 shares of Deer stock from the Strong Growth brokerage account; the sale generated proceeds of $4,413,679.  On or about November 24, 2009, Benjamin Wey caused $4,413,830 to be wired from the Strong Growth account at Broker 4 to a bank account in Hong Kong in the name of Strong Growth.  On or about December 8, 2009, $3,500,000 was transferred from Strong Growth's Hong Kong bank account to another Hong Kong bank account in the name of Tianyi Wei.  Soon thereafter, on or about December 10, 2009, Michaela Wey received in her personal checking account $3,300,000 from the Tianyi Wei Hong Kong account.

114.    The $3.3 million transfer was one of several multi-million dollar "gifts" made to Michaela Wey that were used to fund large real estate purchases and remodel those properties, among other things.  Moreover, approximately $3 million in transfers from accounts in the name of Tianyi Wei to accounts held for the Ben Wey Family Trust were used to buy whole life insurance for Benjamin Wey's and Michaela Wey's family members.  In all, Benjamin Wey and Michaela Wey obtained tens of millions of dollars in profits from the fraudulent scheme, of

which at least $19 million was sent from Tianyi Wei to Michaela Wey's personal account as "gifts." Tianyi Wei retained large portions of the proceeds as well.

## FIRST CLAIM FOR RELIEF

### Violations of Section 10(b) and Rule 10b-5 of the Exchange Act
(Against Defendants Benjamin Wey, NYGG, Tianyi Wei, Newman, and Uchimoto for Violations of Rule 10b-5(a) and(c) and Against Defendants Benjamin Wey, NYGG, Newman, and Uchimoto for Violations of Rule 10b-5(b))

115.    Paragraphs 1 through 114 are realleged and incorporated herein by reference.

116.    Through the conduct described above, Benjamin Wey, Tianyi Wei, Newman, Uchimoto, and NYGG violated Section 10(b) of the Exchange Act [15 U.S.C § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

117.    Benjamin Wey, Tianyi Wei, Newman, Uchimoto, and NYGG, in connection with the purchase or sale of any security by use of the means or instrumentalities of interstate commerce, the mails, or any facility of any national securities exchange, directly or indirectly, knowingly or recklessly: (a) employed a device, scheme, or artifice to defraud; (b) made an untrue statement of material fact or omitted a material fact necessary to make the statement not misleading; or (c) engaged in an act, practice, or course of business which operated or would operate as a fraud or deceit.

118.    By reason of the forgoing, Benjamin Wey, NYGG, Tianyi Wei, Newman, and Uchimoto have violated, and unless enjoined will again violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## SECOND CLAIM FOR RELIEF

**Violations of Section 20(e) of the Exchange Act:**
**Aiding and Abetting Violations of Section 10(b) of the Exchange Act and Rule 10b-5**
**(Against Defendant Tianyi Wei)**

119.   Paragraphs 1 through 114 are realleged and incorporated herein by reference.

120.   Through the conduct described above, Benjamin Wey and NYGG, in connection with the purchase or sale of any security by use of the means or instrumentalities of interstate commerce, the mails, or any facility of any national securities exchange, directly or indirectly, knowingly or recklessly: (a) employed a device, scheme, or artifice to defraud; (b) made an untrue statement of material fact or omitted a material fact necessary to make the statement not misleading; or (c) engaged in an act, practice, or course of business which operated or would operate as a fraud or deceit in violation of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

121.   Tianyi Wei knowingly or recklessly provided substantial assistance to Benjamin Wey and NYGG in their violations of Section 10(b) of the Exchange Act and Rule 10b-5. Pursuant to Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)], Tianyi Wei is deemed to be in violation of Section 10(b) of the Exchange Act and Rule 10b-5 to the same extent as Benjamin Wey and NYGG, and unless enjoined, will again aid and abet violations of those provisions.

## THIRD CLAIM FOR RELIEF

**Violations of Section 20(e) of the Exchange Act:**
**Aiding and Abetting Violations of Section 10(b) of the Exchange Act and Rule 10b-5**
**(Against Defendants Michaela Wey, Newman, Uchimoto, and Erbek)**

122.   Paragraphs 1 through 114 are realleged and incorporated herein by reference

123.   Through the conduct described above, Benjamin Wey, NYGG, and Tianyi Wei, in connection with the purchase or sale of any security by use of the means or instrumentalities of

interstate commerce, the mails, or any facility of any national securities exchange, directly or indirectly, knowingly or recklessly: (a) employed a device, scheme, or artifice to defraud; (b) made an untrue statement of material fact or omitted a material fact necessary to make the statement not misleading; or (c) engaged in an act, practice, or course of business which operated or would operate as a fraud or deceit in violation of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

124.    Michaela Wey, Newman, Uchimoto, and Erbek knowingly or recklessly provided substantial assistance to Benjamin Wey, NYGG, and Tianyi Wei in their violations of Section 10(b) of the Exchange Act and Rule 10b-5.

125.    Pursuant to Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)], Michaela Wey, Newman, Uchimoto, and Erbek are deemed to be in violation of Section 10(b) of the Exchange Act and Rule 10b-5 to the same extent as Benjamin Wey, NYGG, and Tianyi Wei, and unless enjoined, will again aid and abet violations of those provisions.

## FOURTH CLAIM FOR RELIEF

**Violations of Section 20(a) of the Exchange Act: Controlling Person Liability for NYGG's Violations of Section 10(b) of the Exchange Act and Rule 10b-5
(Against Defendant Benjamin Wey)**

126.    Paragraphs 1 through 114 are realleged and incorporated by reference herein.

127.    Through the conduct described above, NYGG, in connection with the purchase or sale of any security by use of the means or instrumentalities of interstate commerce, the mails, or any facility of any national securities exchange, directly or indirectly, knowingly or recklessly: (a) employed a device, scheme, or artifice to defraud; (b) made an untrue statement of material fact or omitted a material fact necessary to make the statement not misleading; or (c) engaged in an act, practice, or course of business which operated or would operate as a fraud or deceit in

violation of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

128.    When NYGG violated Section 10(b) of the Exchange Act and Rule 10b-5, Benjamin Wey directly or indirectly controlled NYGG.    Benjamin Wey was therefore a "controlling person" within the meaning of Section 20(a) of the Exchange Act [15 U.S.C. § 78t(a)] with regard to NYGG.

129.    As alleged above, Benjamin Wey was a culpable participant in, and directly or indirectly induced the acts constituting, NYGG's violations of the Exchange Act, and did not act in good faith.

130.    By reason of the foregoing, Benjamin Wey is jointly and severally liable with and to the same extent as NYGG for its violations of Section 10(b) of the Exchange Act and Rule 10b-5 and, unless enjoined, will again act as a "controlling person" in connection with such violations.

## FIFTH CLAIM FOR RELIEF

**Violations of Section 17(a) of the Securities Act**
**(Against Defendants Benjamin Wey, NYGG, Tianyi Wei, Newman, and Uchimoto for Violations of 17(a)(1) and(3) and Against Defendants Benjamin Wey, NYGG, Newman, and Uchimoto for Violations of 17(a)(2))**

131.    Paragraphs 1 through 114 are realleged and incorporated herein by reference.

132.    Through the conduct described above, Benjamin Wey, NYGG, Tianyi Wei, Newman, and Uchimoto, directly or indirectly, in the offer or sale of any security by use of the means or instrumentalities of interstate commerce, the mails, or any facility of any national securities exchange, (a) knowingly or recklessly employed a device, scheme, or artifice to defraud; (b) knowingly, recklessly, or negligently obtained money or property by means of untrue statements of material fact or omissions of material fact necessary to make the statements

not misleading; and (c) knowingly, recklessly, or negligently engaged in a transaction, practice, or course of business which operated or would operate as a fraud or deceit on the purchaser.

133.    By reason of the foregoing, Benjamin Wey, NYGG, Tianyi Wei, Newman, and Uchimoto have violated, and unless enjoined will again violate, Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

## SIXTH CLAIM FOR RELIEF

### Violations of Section 15(b) of the Securities Act:
### Aiding and Abetting Violations of Section 17(a) of the Securities Act
### (Against Defendant Tianyi Wei)

134.    Paragraphs 1 through 114 are realleged and incorporated herein by reference.

135.    Through the conduct described above, Benjamin Wey and NYGG, directly or indirectly, in the offer or sale of any security by use of the means or instrumentalities of interstate commerce, the mails, or any facility of any national securities exchange, (a) knowingly or recklessly employed a device, scheme, or artifice to defraud; (b) knowingly, recklessly, or negligently obtained money or property by means of untrue statements of material fact or omissions of material fact necessary to make the statements not misleading; and (c) knowingly, recklessly, or negligently engaged in a transaction, practice, or course of business which operated or would operate as a fraud or deceit on the purchaser in violation of Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

136.    Tianyi Wei knowingly or recklessly provided substantial assistance to Benjamin Wey and NYGG in their violations of Section 17(a) of the Securities Act.

137.    Pursuant to Section 15(b) of the Securities Act [15 U.S.C. § 77o(b)], Tianyi Wei is deemed to be in violation of Section 17(a) of the Exchange Act to the same extent as Benjamin Wey and NYGG, and unless enjoined, will again aid and abet violations of that provision.

## SEVENTH CLAIM FOR RELIEF

**Violations of Section 15(b) of the Securities Act:
Aiding and Abetting Violations of Section 17(a) of the Securities Act
(Against Defendants Michaela Wey, Newman, Uchimoto, and Erbek)**

138.    Paragraphs 1 through 114 are realleged and incorporated herein by reference.

139.    Through the conduct described above, Benjamin Wey, NYGG, and Tianyi Wei, directly or indirectly, in the offer or sale of any security by use of the means or instrumentalities of interstate commerce, the mails, or any facility of any national securities exchange, (a) knowingly or recklessly employed a device, scheme, or artifice to defraud; (b) knowingly, recklessly, or negligently obtained money or property by means of untrue statements of material fact or omissions of material fact necessary to make the statements not misleading; and (c) knowingly, recklessly, or negligently engaged in a transaction, practice, or course of business which operated or would operate as a fraud or deceit on the purchaser in violation of Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

140.    Michaela Wey, Newman, Uchimoto, and Erbek knowingly or recklessly provided substantial assistance to Benjamin Wey, NYGG, and Tianyi Wei in their violations of Section 17(a) of the Securities Act.

141.    Pursuant to Section 15(b) of the Securities Act [15 U.S.C. § 77o(b)], Michaela Wey, Newman, Uchimoto, and Erbek are deemed to be in violation of Section 17(a) of the Exchange Act to the same extent as Benjamin Wey, NYGG, and Tianyi Wei, and unless enjoined, will again aid and abet violations of that provision.

## EIGHTH CLAIM FOR RELIEF

**Violations of Section 13(d) of the Exchange Act and Rule 13d-1 thereunder**
**(Against Defendants Benjamin Wey, Tianyi Wei, and Michaela Wey)**

142.    Paragraphs 1 through 114 are realleged and incorporated herein by reference.

143.    Pursuant to Section 13(d) of the Exchange Act and Regulation 13D-G thereunder, persons who directly or indirectly acquire beneficial ownership of more than 5 percent of the outstanding shares of a class of voting equity securities registered under Section 12 of the Exchange Act are required to file a Schedule 13D or, in limited circumstances, a Schedule 13G. These filing requirements apply both to individuals and to two or more persons who act as a group for the purpose of acquiring, holding, or disposing of securities of an issuer.

144.    Benjamin Wey acquired and held beneficial ownership of more than five percent of shares in Deer from on or about April 29, 2009, to on or about September 20, 2010; SmartHeat, from January 30, 2008, to on or about May 27, 2009; and CleanTech on or about March 22, 2010, to on or about April 15, 2010, and from on or about December 13, 2010, until at least July 27, 2015.

145.    Tianyi Wey acquired and held beneficial ownership of more than five percent of shares in Deer from on or about April 29, 2009, to on or about April 13, 2010, and from on or about May 18, 2010, to on or about September 14, 2010; SmartHeat, from on or about January 30, 2008, to on or about May 19, 2009; and CleanTech from on or about March 22, 2010, to on or about April 15, 2010, from on or about December 13, 2010, to on or about September 28, 2014, and from on or about October 7, 2014, to on or about July 27, 2015.

146.    Michaela Wey was a beneficial owner of more than five percent of shares in Deer, from on or about May 28, 2009, to on or about June 9, 2009, and from on or about September 25, 2009, to on or about October 1, 2009, and from on or about October 5, 2009, to on or about

October 7, 2009; and SmartHeat, from on or about January 30, 2008, to on or about April 13, 2008.

147.   Benjamin Wey, Tianyi, Wei, and Michaela Wey and the Nominees they controlled were sufficiently interrelated that they constituted a group for the purposes of Exchange Act Section 13(d) and the Regulation 13D-G filing requirements.

148.   Accordingly, Benjamin Wey, Tianyi Wei, and Michaela Wey were each under an obligation to file with the Commission true and accurate reports with respect to their ownership of the securities of the NYGG Clients, including those held by the Nominees they controlled, pursuant to Exchange Act Section 13(d) and Rule 13d-1 thereunder, and failed to do so.

149.   By reason of the foregoing, Benjamin Wey, Tianyi Wei, and Michaela Wey violated, and, unless enjoined and restrained will continue to violate, Section 13(d) of the Exchange Act [15 U.S.C. § 78m(d)] and Rule 13d-1 thereunder [17 C.F.R. § 240.13d-1].

## NINTH CLAIM FOR RELIEF

**Violations of 20(e) of the Exchange Act:**
**Aiding and Abetting Violations of Section 13(d)**
**of the Exchange Act and Rule 13d-1 thereunder**
**(Against Defendant Tianyi Wei)**

150.   Paragraphs 1 through 114 are realleged and incorporated herein by reference.

151.   Through the conduct described above, Benjamin Wey violated Section 13(d) of the Exchange Act [15 U.S.C. § 78m(d)] and Rule 13d-1 thereunder [17 C.F.R. § 240.13d-1].

152.   Tianyi Wei knowingly or recklessly provided substantial assistance to Benjamin Wey in his violations of Section 13(d) of the Exchange Act and Rule 13d-1.

153.   Pursuant to Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)], Tianyi Wei is deemed to be in violation of Section 13(d) of the Exchange Act and Rule 13d-1 thereunder to the

same extent as Benjamin Wey, and unless enjoined, will again aid and abet violations of those provisions.

## TENTH CLAIM FOR RELIEF

### Violations of 20(e) of the Exchange Act:
### Aiding and Abetting Violations of Section 13(d)
### of the Exchange Act and Rule 13d-1 thereunder
### (Against Defendant Michaela Wey, Newman, and Erbek)

154.   Paragraphs 1 through 114 are realleged and incorporated herein by reference.

155.   Through the conduct described above, Benjamin Wey and Tianyi Wei violated Section 13(d) of the Exchange Act [15 U.S.C. § 78m(d)] and Rule 13d-1 thereunder [17 C.F.R. § 240.13d-1].

156.   Michaela Wey, Newman, and Erbek knowingly or recklessly provided substantial assistance to Benjamin Wey and Tianyi Wei in their violations of Section 13(d) of the Exchange Act and Rule 13d-1.

157.   Pursuant to Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)], Michaela Wey, Newman, and Erbek are deemed to be in violation of Section 13(d) of the Exchange Act and Rule 13d-1 thereunder to the same extent as Benjamin Wey and Tianyi Wei, and unless enjoined, will again aid and abet violations of those provisions.

## ELEVENTH CLAIM FOR RELIEF

### Violations of Section 16(a) of the Exchange Act and Rules 16a-2 and 16a-3 thereunder
### (Against Defendants Benjamin Wey and Tianyi Wei)

158.   Paragraphs 1 through 114 are realleged and incorporated herein by reference.

159.   Pursuant to Exchange Act Section 16(a) and Rules 16a-2 and 16a-3 thereunder, persons who are beneficial owners of greater than 10 percent of an issuer's securities registered under the Exchange Act are required to file timely and accurate Forms 3, 4, and 5 with the Commission disclosing information about their holdings and trading in the issuer's securities.

160.   Benjamin Wey was the beneficial owner of more than ten percent of shares in Deer from on or about April 29, 2008, to on or about April 13, 2010, and from on or about July 10, 2010, to on or about September 13, 2010; in SmartHeat from on or about January 30, 2008, to on or about May 11, 2008, and from on or about May 15, 2008, to on or about May 17, 2009; and in CleanTech from on or about March 22, 2010, to on or about April 15, 1010, from on or about December 13, 2010, to on or about September 28, 2014, and from on or about October 7, 2014, to at least on or about July 27, 2015.

161.   Tianyi Wei was the beneficial owner of more than ten percent of shares in Deer from on or about May 8, 2008, to on or about May 11, 2009, from on or about June 10, 2010, to on or about June 18, 2009, from on or about September 25, 2009, to on or about November 12, 2009, from on or about November 17, 2009, to on or about December 16, 2009, and from on or about July 26, 2010, to on or about July 28, 2010; SmartHeat from on or about January 30, 2008, to on or about April 13, 2008, and from on or about June 5, 2008, to on or about April 26, 2009; and in CleanTech from on or about October 10, 2013, to on or about September 28, 2014, and from on or about October 7, 2014, to at least on or about July 27, 2015.

162.   Accordingly, Benjamin Wey and Tianyi Wei were each under an obligation to file with the Commission true and accurate reports with respect to their ownership of the securities of the NYGG Clients, including those held by the Nominees they controlled, pursuant to Exchange Act Section 16(a) and Rules 16a-2 and 16a-3 thereunder and failed to do so.

163.   By reason of the foregoing, Benjamin Wey and Tianyi Wei each has violated, and unless enjoined and restrained will continue to violate, Section 16(a) of the Exchange Act [15 U.S.C. § 78p(a)] and Rules 16a-2 and 16a-3 thereunder [17 C.F.R. §§ 240.16a-2 and 240.16a-3].

**PRAYER FOR RELIEF**

WHEREFORE, the Commission respectfully requests that this Court enter a judgment:

A.       Finding that Defendants violated the federal securities laws and the Commission rules alleged in this Complaint;

B.       Permanently restraining and enjoining Defendants Benjamin Wey, NYGG, Tianyi Wei, Newman, and Uchimoto from violating Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5] thereunder and Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)]; Defendants Tianyi Wei, Michaela Wey, Newman, Uchimoto, and Erbek from violating Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)] and Section 15(b) of the Securities Act [15 U.S.C. § 77o(b)]; Defendant Benjamin Wey from violating Section 20(a) of the Exchange Act [15 U.S.C. § 78t(a)]; Defendants Benjamin Wey, Tianyi Wei, and Michaela Wey from violation Section 13(d) of the Exchange Act [15 U.S.C. § 78m(d)] and Rule 13d-1 [17 C.F.R. § 240.13d-1] thereunder; and Defendants Benjamin Wey and Tianyi Wei from violating Section 16(a) of the Exchange Act [15 U.S.C. § 78p(a)] and Rules 16a-2 and 16a-3 [17 C.F.R. §§ 240.16a-2 and 240.16a-3] thereunder.

C.       Ordering Defendants to disgorge all illegal profits obtained as a result of their fraudulent misconduct, acts, or courses of conduct described in this Complaint, and to pay prejudgment interest thereon;

D.       Imposing civil monetary penalties on Defendants pursuant to Section 20(d)(2) of the Securities Act [15 U.S.C. § 77t (d)(2)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)]; and

E.      Granting such equitable relief as may be appropriate or necessary for the benefit of investors pursuant to Section 21(d)(5) of the Exchange Act [15 U.S.C. § 78u(d)(5)].


Dated:   September 10, 2015


Respectfully submitted,

Derek Bentsen (DB8369)
UNITED STATES SECURITIES AND
EXCHANGE COMMISSION
100 F St., N.E.
Washington, D.C. 20549-5985
202-551-6426
BentsenD@sec.gov