**BAKER & M^cKENZIE**

Baker & McKenzie LLP

452 Fifth Avenue
New York, NY 10018
United States

Tel: +1 212 626 4100
Fax: +1 212 310 1600
www.bakermckenzie.com

**Asia Pacific**
Bangkok
Beijing
Brisbane
Hanoi
Ho Chi Minh City
Hong Kong
Jakarta*
Kuala Lumpur*
Manila*
Melbourne
Seoul
Shanghai
Singapore
Sydney
Taipei
Tokyo
Yangon

**Europe, Middle East
& Africa**
Abu Dhabi
Almaty
Amsterdam
Antwerp
Bahrain
Baku
Barcelona
Berlin
Brussels
Budapest
Cairo
Casablanca
Doha
Dubai
Dusseldorf
Frankfurt/Main
Geneva
Istanbul
Jeddah*
Johannesburg
Kyiv
London
Luxembourg
Madrid
Milan
Moscow
Munich
Paris
Prague
Riyadh*
Rome
St. Petersburg
Stockholm
Vienna
Warsaw
Zurich

**Latin America**
Bogota
Brasilia**
Buenos Aires
Caracas
Guadalajara
Juarez
Lima
Mexico City
Monterrey
Porto Alegre**
Rio de Janeiro**
Santiago
Sao Paulo**
Tijuana
Valencia

**North America**
Chicago
Dallas
Houston
Miami
New York
Palo Alto
San Francisco
Toronto
Washington, DC

* Associated Firm
** In cooperation with
Trench, Rossi e Watanabe
Advogados

March 09, 2016

<u>**Via ECF**</u>

The Honorable P. Kevin Castel
United States District Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

Re:   *SEC v. Wey, et al.*, 15-cv-7116 (PKC)

Dear Judge Castel:

We represent defendant Doğan Erbek in the above-referenced action. An initial pretrial conference is scheduled for April 29, 2016 at 12:30 p.m. Pursuant to Section 4.A. of Your Honor's Individual Practices, we respectfully request the Court's permission to file a motion to: (1) dismiss the Amended Complaint ("Complaint" or "Cplt.") pursuant to Fed. R. Civ. P. 12(b)(6), for failure to state a claim upon which relief can be granted, and Rule 9(b), for failure to allege fraud with the required specificity; (2) preclude the SEC from seeking civil penalties with respect to any alleged conduct that occurred prior to September 10, 2010 and which therefore falls outside the applicable statute of limitations; and (3) dismiss any claim for aiding and abetting violations of the Securities Act of 1933 based on conduct that preceded July 21, 2010.

Mr. Erbek awoke on September 11, 2015 to learn the shocking news that he had been charged with participating in a scheme to commit securities fraud. Specifically, the SEC alleged that he aided and abetted Benjamin Wey and his co-defendants in a scheme to manipulate the market for certain securities publicly traded on the NASDAQ, and to violate the antifraud and disclosure provisions of the federal securities laws.[1] Notwithstanding a more than four-year investigation in which a broad array of investigative tools was employed, including testimonial subpoenas, search warrants and forensic examination of digital storage devices, the evidence to support the conclusory allegations against Mr. Erbek is patently insufficient to support these charges. As a consequence, the Complaint should be dismissed.

---

[1] The Complaint alleges that Mr. Erbek aided and abetted violations of: (i) Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §78j(b) ("Section 10b"), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5 ("Rule 10b-5"), in violation of Section 20(e) of the Exchange Act, 15 U.S.C. § 78t(e) ("Section 20(e)") ("Third Claim") (Cplt. ¶¶ 122-25); (ii) Section 17(a) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. § 77q(a) ("Section 17(a)") , in violation of Section 15(b) of the Securities Act, 15 U.S.C. § 77o(b) ("Section 15(b)") ("Seventh Claim") (Cplt. ¶¶ 138-41); and (iii) Section 13(d) of the Exchange Act, 15 U.S.C. § 78m(d) ("Section 13(d)") and Rule 13d-1 promulgated thereunder, 17 C.F.R. § 240.13d-1 ("Rule 13d-1"), in violation of Section 20(e) ("Tenth Claim") (Cplt. ¶¶ 154-57).

**BAKER & MCKENZIE**

## Background

Mr. Erbek provides fiduciary services to clients through a Swiss entity, EST, S.A. ("EST"). (Cplt. ¶ 28). According to the Complaint, Mr. Erbek was hired to open and maintain brokerage accounts in Switzerland in the names of certain unspecified corporate and/or individual "nominees." (*See* Cplt. ¶¶ 30-35, 54). The Complaint does not allege that Mr. Erbek or EST is an owner (beneficial or otherwise) of any client company, nor does it allege that Mr. Erbek or EST had any discretion to direct their affairs. Rather, the Complaint alleges that Mr. Erbek took direction from the beneficial owner(s) of its clients and those granted powers of attorney by the beneficial owner(s). (*See* Cplt. ¶¶ 3, 23, 38-40, 100, 104). We respectfully request that the Court also take judicial notice of the facts that: (i) EST is a member in good standing of, and is regulated by, the Association Romande des Intermediaires Financiers ("ARIF"), which is a self-regulatory organization recognized by the Swiss Financial Market Supervisory Authority (FINMA);[2] (ii) "[a]ny financial intermediary who wishes to become a member of ARIF must enjoy a good reputation in respect of his professional activity and guarantee compliance with the obligations under the MLA and under ARIF's Articles of Association, Self-regulation Rules and Directives";[3] and (iii) EST is subject to regular audits by ARIF.[4][5] Notably, the Complaint does not allege that either EST or Mr. Erbek, prior to the filing of the instant action, have ever had a blemish on their record of compliance with all applicable laws and regulations, nor does the Complaint allege that Mr. Erbek has been the subject of any regulatory action during his nearly 30 years in business.

## I.
## THE SEC'S CLAIMS MUST BE DISMISSED
## PURSUANT TO RULES 12(b)(6) AND 9(b)

To survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6), the SEC's Complaint must contain sufficient factual detail to "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Allegations phrased as legal conclusions need not be accepted as true. *Id.* at 555. Claims that are merely possible or conceivable are subject to dismissal under Rule 12(b)(6). *Ashcroft v. Iqbal*, 556 U.S. 662, 680 (2009). However, since the allegations against Mr. Erbek in the Complaint are all based on allegations of fraud, they must meet Rule 9(b)'s heightened standard of particularity. *Rombach v. Chang*, 355 F.3d 164, 171 (2d Cir. 2004) (applying Rule 9(b) to claims brought under Sections 11 and 12(a)(2) of the Securities Act); *see also* Fed. R. Civ. P. 9(b). Rule 9(b) allows knowledge to be averred generally; however, "we must not mistake the relaxation of Rule 9(b)'s specificity requirement regarding

---

[2] *See* http://arif.axone.ch/en/liste_des_membres.cfm?letter=E, attached hereto as Exhibit A.
[3] *See* http://www.arif.ch/Docs%20permanents/Depliant_E_impr.pdf, attached hereto as Exhibit B.
[4] *See* Articles of Association of ARIF at p. 3;
http://www.arif.ch/Docs%20permanents/Statuts%20ARIF_E.pdf, attached hereto as Exhibit C.
[5] The court "may judicially notice a fact that is not subject to reasonable dispute because it . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b)(2).

BAKER & M^cKENZIE

condition of mind for a 'license to base claims of fraud on speculation and conclusory allegations.'" *Acito v. IMCERA Grp.*, 47 F.3d 47, 52 (2d Cir. 1995). When a complaint asserts claims against more than one defendant, "[c]ourts are especially vigilant in applying Rule 9(b)." *Scone Invs., L.P. v. Am. Third Mkt. Corp.*, 97 Civ. 3802, 1998 U.S. Dist. LEXIS 5903, at *12 (S.D.N.Y. Apr. 27, 1998). "To this end, a complaint may not rely on blanket references to the acts of all of the defendants without identifying the nature of each defendant's participation in the fraud." *Id.* at *12.

For each of the aiding and abetting claims in the Complaint, the SEC must allege facts supporting a plausible inference of: "(1) the existence of a securities law violation by the primary (as opposed to the aiding and abetting) party; (2) 'knowledge' of this violation on the part of the aider and abettor; and (3) 'substantial assistance' by the aider and abettor in the achievement of the primary violation." *SEC v. Apuzzo*, 689 F.3d 204, 206 (2d Cir. 2012) (citations omitted) (in the context of aiding and abetting an alleged violation of Section 10(b)); *see also SEC v. Wyly*, 950 F. Supp. 2d 547, 561 (2013) (applying this standard to aiding and abetting violations of Section 13(d)). "Substantial assistance means that the aider and abettor 'consciously assisted the commission of the [primary violation] in some active way.'" *Id.* at 562-63 (quoting *Apuzzo*, 689 F.3d at 212 n.8).

To adequately plead *scienter* under Rule 9(b), the SEC must "'allege facts that give rise to a strong inference of fraudulent intent.'" *SEC v. Landberg*, 836 F. Supp. 2d 148, 154 (S.D.N.Y. 2011) (Castel, J.) (quoting *Novak v. Kasaks*, 216 F.3d 300, 306 (2d Cir. 2000)). The SEC may do so "'either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness.'" *Id.* (quoting *Novak*, 216 F.3d at 307). In the absence of evidence of motive, the SEC "'must produce a stronger inference of recklessness.'" *SEC v. Syron*, 934 F. Supp. 2d 609, 631 (S.D.N.Y. 2013) (quoting *Kalnit v. Eichler*, 246 F.3d 131, 138-39 (2d Cir. 2001)). Recklessness may be shown by demonstrating "deliberate illegal behavior" or conduct that is an "extreme departure from the standards of ordinary care." *Novak*, 216 F.3d at 308.

The SEC attempts to mask the paucity of evidence against Mr. Erbek by peppering the Amended Complaint with conclusory assertions about Mr. Erbek's alleged knowledge or *scienter*.[6] The remainder of this letter evaluates those allegations following the organizational structure established in the Complaint.[7]

---

[6] Any alleged violations that occurred before the July 21, 2010 effective date of the Dodd-Frank Wall Street Reform and Consumer Protection Act require the SEC to show that Mr. Erbek acted with actual knowledge. *SEC v. Aronson*, 11 Civ. 7033, 2013 U.S. Dist. LEXIS 114687, at *35 (S.D.N.Y. Aug. 6, 2013). Regardless of the date of alleged violations, we maintain that Mr. Erbek acted with neither knowledge of, nor reckless disregard for, any alleged primary violations of the securities laws.

[7] We do not discuss those sections of the Complaint that either fail to refer to Mr. Erbek or simply incorporate by reference factual allegations set forth in other paragraphs. (*See* Cplt. ¶¶ 13-15, 44-46, 82-90, and pp. 45-46).

BAKER & McKENZIE

### A.   Summary of Allegations (¶¶ 1-12)

The Complaint alleges that Benjamin Wey ("Wey") directed a "multi-million dollar, cross-border fraudulent scheme to obtain and profit from undisclosed, controlling ownership interests in several China-based companies" and a scheme to "manipulate the market for those securities and profit from the scheme." (Cplt. ¶¶ 1, 3, 4).  The Complaint further alleges that Wey accomplished this "with the involvement of the other Defendants," and "with the assistance of his Swiss broker, Defendant Seref Dogan Erbek." (Cplt. ¶¶ 3-5, 7).  According to the Complaint, Mr. Erbek aided and abetted violations committed by others. (Cplt. ¶ 12).  In contrast to certain other defendants, this section of the Complaint does not include a single specific fact or example to support its conclusory allegations that Mr. Erbek "aided and abetted" Wey, or was "involve[d]" in the alleged scheme.

### B.   Defendants (¶¶ 16-29)

The Complaint alleges that "Michaela Wey [(Benjamin Wey's wife)] held trading authority over Swiss brokerage accounts in the names of her family members and other nominees who held warrants or large positions in the shares of the NYGG Clients.  The Swiss broker for these accounts, Erbek, was contacted by a cellular telephone registered to Michaela Wey." (Cplt. ¶ 23).

Mr. Erbek is described as a provider of financial and fiduciary services "for several nominees controlled by Benjamin Wey, Tianyi Wei, and Michaela Wey." (Cplt. ¶ 28).  The Complaint further alleges that:

> In furtherance of the fraudulent scheme, Erbek was instrumental in executing manipulative trades in Deer and CleanTech.  Among other things, he also knowingly assisted Benjamin Wey, Tianyi Wei, and Michaela Wey in structuring their holdings in the NYGG Clients to evade securities reporting requirements and concealing their control of the NYGG Clients.

(Cplt. ¶ 29).  This section of the Complaint provides no factual basis to support the allegations that Mr. Erbek:  (i) knew of the existence of a scheme to execute manipulative securities transactions; (ii) was "instrumental" to anything; (iii) knew of any scheme to evade securities reporting requirements; or  (iv) "knowingly assisted" in such a scheme.  The allegations are purely conclusory.  Similarly, there are no facts alleged to support the implicit allegation that Mr. Erbek knew that anyone with whom he did business was a "nominee" in an illicit scheme or that Benjamin Wey, Tianyi Wei and Michaela Wey exercised control over such illicit nominees.

BAKER & McKENZIE

### C.     The Nominees (¶¶ 30-43)

In the descriptions of four "Relief Defendant Nominees" or "Other Nominee
Entities," the Complaint alleges that electronic copies of unsigned letters dated in 2009
from Tianyi Wei to Erbek, recovered during the execution of judicially-authorized search
warrants at the offices of NYGG and Benjamin and Michaela Wey's residence, granted
Benjamin Wey trading authority over at least one account in the names of Advantage
Consultants, Ltd., York Capital Management, Ltd., Strong Growth Capital, Ltd., and
Futmon Holding, Ltd. (the "Letters"). (Cplt. ¶¶ 31, 32, 34, 38).  The Complaint fails to
allege that: (i) Mr. Erbek ever received or was otherwise even aware of the existence of
the Letters in any form (signed or unsigned); (ii) any of the Letters was ever executed; or
(iii) any action was ever taken by Mr. Erbek, on the basis of the Letters.  The existence of
unsigned and unused letters on a computer in New York is insufficient to support the
allegations leveled against Mr. Erbek.

The Complaint also alleges that other letters granting Michaela Wey authority
over at least one account in the name of Bicornio and one account in the name of Roosen,
both of which were administered by Erbek, were recovered during the execution of the
above-described search warrants. (Cplt. ¶¶ 39-40).  The Complaint does not identify the
author(s) of those letters, nor does it identify the beneficial owner(s) of the Bicornio and
Roosen accounts.  In the absence of that missing information, it is impossible to
determine what inference, if any, may be drawn from the existence of such letters of
authorization, and they add nothing to the other conclusory allegations about Mr. Erbek.
Finally, the Complaint alleges that Mr. Erbek administered a brokerage account on behalf
of Wey in the name of Wolf Enterprises, Ltd. (Cplt. ¶ 41); however, the Complaint fails
to allege that Mr. Erbek ever took any specific action with respect to Wolf or the Wolf
account which he allegedly "administered."

### D.     Defendants' Deceptive Conduct:
###        Creating and Controlling a Network of Nominees (¶¶ 47-59)

Mr. Erbek is mentioned twice in this section of the Complaint.  First, the
Complaint alleges that, "[b]eginning in at least 2009, Benjamin Wey, Tianyi Wei, and
Michaela Wey hired and paid Erbek to open and maintain brokerage accounts in
Switzerland in the names of various Nominees (the 'Swiss Accounts'). The Swiss
Accounts held shares of the NYGG Clients." (Cplt. ¶ 54).  The Complaint further alleges
that during at least 2010 and 2011, "numerous telephone calls were placed to Erbek's firm
from cell phones registered in the names of Benjamin and Michaela Wey." (Cplt. ¶ 56).
No inference of knowledge of Wey's alleged securities fraud schemes on the part of Mr.
Erbek permissibly may be drawn from these innocuous facts.  There is nothing inherently
unlawful about assisting with the opening of bank accounts in Switzerland; indeed, that's
one of the things that ARIF-regulated financial intermediaries do.  Moreover, there is no
allegation about who placed any of the "numerous" telephone calls, whether Mr. Erbek
received any of the calls, how long the calls lasted, what was discussed during any of the
calls, how they related to the other allegations in the Complaint, or any specific action

that was taken as a result of any such telephone call. In light of the fact that Michaela Wey was married to Benjamin Wey and the allegations that Michaela Wey had trading authority over certain accounts "administered" by Mr. Erbek (*see* Cplt. ¶¶ 39-40), it is wholly unremarkable that Mr. Erbek's firm would have received calls from cell phones registered in the names of Michaela Wey and her husband, Benjamin. These factual allegations, even when considered in conjunction with the rest of the Complaint, are insufficient to support an inference of Mr. Erbek's knowing participation in Wey's alleged securities fraud schemes.

**E.      Using Nominees to Obtain Secret Control of the NYGG Clients (¶¶ 60-68)**

This section of the Complaint alleges that Wey used nominees to obtain secret control of the NYGG Clients that were taken public with the assistance of Mr. Wey and his company. The sole reference to Mr. Erbek in this section of the Complaint is the conclusory allegation that, "[t]his domination of the shares of the NYGG Clients available for trading allowed Benjamin Wey, Tianyi Wei, and Michaela Wey, with the assistance of Erbek and Newman, to manipulate the market for those issuers." (Cplt. ¶ 63). The Complaint does not allege that Mr. Erbek knew about that scheme, nor does it describe what "assistance" he provided. In sum, this section of the Complaint is devoid of facts to support an inference that Mr. Erbek knowingly participated in a scheme to manipulate the market.

**F.      Material Misstatements and Omissions to Conceal Control
of the Nominees and, Thereby, the NYGG Clients (¶¶ 69-81)**

This section of the Complaint alleges that Wey failed to disclose conflicts of interest in connection with the underwriting of certain public offerings. One such alleged conflict related to Advantage Consultants, Ltd. -- one of the companies for which Erbek and EST allegedly provided services. (*See* Cplt. ¶ 31). The sole allegation pertaining to Erbek in this section of the Complaint states:

> Eventually, Benjamin Wey directed the primary underwriter to Erbek as a contact person for ACL. Erbek then directed the primary underwriter to a Bahamian consulting company that Erbek identified as ACL's sole director. At the primary underwriter's request, Erbek procured signatures from the Bahamian consulting company on the Certification [indicating that ACL did not have any contacts in the United States].

(Cplt. ¶¶ 75-76). The Complaint does not allege that Mr. Erbek knew that Wey had any conflict of interest with respect to ACL or that he had failed to disclose any such conflict. By contrast, the Complaint made specific allegations that defendant Robert Newman was aware of the purported conflict. (See Cplt. ¶¶ 75, 77, 80). The failure to make an analogous allegation with respect to Mr. Erbek speaks volumes. Moreover, there is no allegation that Mr. Erbek did anything wrong in connection with this transaction. For example, there is no allegation that the Bahamian consulting company was not, in fact,

BAKER & McKENZIE

the sole director of ACL, nor is there an allegation that Mr. Erbek caused that director to say or do anything that he knew to be false or fraudulent.[8]

G.    **Manipulating the Market for Deer and CleanTech Securities (¶¶ 91-102)**

The Complaint makes the conclusory allegation that, "[a]s part of the fraudulent scheme to illegally profit from his control of the NYGG Clients, Benjamin Wey, with the assistance of Erbek, Newman, Tianyi Wei, and Michaela Wey, manipulated the market for the securities of Deer and CleanTech." (Cplt. ¶ 91).  Aside from that bare assertion of "assistance," the only time Erbek is mentioned is in paragraph 100:

> Similarly, a February 2011 email recovered during execution of the Search Warrants and sent from Benjamin Wey or someone else at his direction to Erbek revealed an intention to maintain the share price of CleanTech at $5.00.  It read, 'Dogan, Cleantech just traded at $4.50 per share.  Please make sure the trader buys the stock at $5 per share, stay at $5 per share bid price, not less.  Please make sure this happens right away.' Trading records for the Swiss accounts managed by Erbek show purchases on February 7, 2011, of CleanTech shares in 100 to 198 share tranches at $4.86 and $4.93.  These purchases were part of Benjamin Wey's effort to drive the stock's price upward.

Cplt. ¶ 100.

The Complaint invites the reader to draw the inference that Mr. Erbek received the cited email and acted upon it.  Fairly read, the email is nothing more than a limit order: a request to purchase shares of CleanTech at a price up to $5 per share.  That the email conveyed a limit order is evidenced by the allegations that shares were bought at prices below, but not exceeding, $5 per share.  (*Id.*).  The Complaint does not allege that Mr. Erbek knew that the instruction was being sent to him by Benjamin Wey either directly or indirectly.  Moreover, there is no allegation that Mr. Erbek knew of any plan to manipulate the price of CleanTech stock or to "drive the stock's price upward."  Basic economic theory and market reality dictate that any purchase order places upward pressure on the price of a security.  Therefore, there can be nothing *per se* illegal or even inherently suspicious about receiving an email seeking to execute a limit order.  In the absence of a non-conclusory allegation of either an underlying intent to manipulate or the knowing provision of assistance to an attempt to manipulate, the routine ministerial act of assisting with the execution a limit order simply cannot be a violation of the law.  Were it otherwise, brokers and others across the globe would regularly be subject to SEC securities fraud charges for executing routine trading instructions regardless of whether they were aware of the underlying motives for those instructions.

---

[8] It appears that Mr. Erbek's alleged actions in this regard occurred prior to December 2009 (*see* Cplt. ¶ 72); accordingly, for the reasons set forth in Parts II & III, *infra*, the SEC may neither seek civil penalties nor may it pursue a claim under Section 17(a) on the basis of these allegations.

Paragraphs 101-102 do not mention Mr. Erbek, but do mention activities in the "Swiss Accounts" which the SEC elsewhere alleges he was responsible for "maintain[ing]" (Cplt. ¶ 54) or "manag[ing]" (Cplt. ¶ 100). Even assuming for purposes of the motion that Mr. Erbek had any such responsibility, the Complaint merely asserts that Benjamin Wey had a reason to maintain the price of Deer above $11 per share, and that there was a pattern of purchases and sales of Deer shares in those accounts that purportedly "appear to have been aimed at and had the effect of supporting the share price of Deer at $11.00." (Cplt. ¶ 102). Notably absent is any allegation that Mr. Erbek knowingly received any instruction from Benjamin Wey with respect to these purchases and sales (either directly or indirectly), let alone any allegation that he knew or had reason to know of Benjamin Wey's alleged ulterior motive with respect to such transactions. With the benefit of hindsight and fruits of more than four years of investigation, the SEC now asserts the weak claim that transactions in certain accounts that were established with Mr. Erbek's assistance "appear" to have been executed with the intent and effect of accomplishing one of Benjamin Wey's alleged objectives. There are no allegations that Mr. Erbek knew of or had access to any of the evidence on which the SEC rests this transparently weak conclusion. Such superficial allegations are plainly inadequate to meet the pleading requirements of Rules 12(b)(6) and 9(b).

## H.  Using Nominees to Avoid Required Public Disclosure of Control of the NYGG Clients (¶¶ 103-110)

The Complaint alleges that "Benjamin Wey, Tianyi Wei, and Michaela Wey, with the assistance of Erbek, structured the Nominees' holdings in an effort to ensure that no one entity or individual ever had a greater-than-five-percent beneficial ownership interest in any NYGG client to avoid triggering the beneficial ownership disclosure requirements." (Cplt. ¶ 104). The Complaint further alleges that Mr. Erbek received two emails "from Benjamin Wey or someone else at his direction." (*Id.*). One email, dated July 21, 2010, purportedly directed Mr. Erbek to allocate certain shares among various accounts to keep their respective holdings under five percent of the total outstanding shares. *Id.* The other email, dated September 20, 2010 stated that, "Under SEC filing requirements, any individual or entity owning more than 5% of a company's total outstanding shares must file SEC 13D or 13G forms." (*Id.*). It appears that the SEC would have the reader draw the conclusion from the existence of those two emails that Mr. Erbek knew what the SEC filing requirements were, knew that Benjamin Wey wanted to avoid those requirements, knew that it was wrong to "structure" holdings to avoid disclosure requirements, and took some action to help Wey achieve his goals. A close reading of the allegations of the Complaint -- and those that are conspicuously absent -- shows that there is no substance to the allegations made against Mr. Erbek.

First, the Complaint seemingly puts great weight on a July 21, 2010 email directing Mr. Erbek to allocate shares in an unspecified security among three separate accounts. (*See* Cplt. ¶ 29 (alleging that Mr. Erbek "knowingly assisted . . . [the] structuring [of] holdings . . . to evade securities reporting requirements . . . and

BAKER & M<sup>c</sup>KENZIE

conceal . . . control") and Cplt. ¶ 104).[9]  What the Complaint fails to allege is that Mr. Erbek took any action in response to that instruction.  In fact, the Complaint fails to allege that the allocation of shares described in the email was ever effected.  Even though the Complaint fails to allege a single affirmative act taken by Mr. Erbek in connection with this part of the alleged scheme, it nevertheless baldly asserts that it was carried out "with the assistance of Erbek." (Cplt. ¶ 104; *see also* Cplt. ¶¶ 12 ("aided and abetted"), 29 ("knowingly assisted")).  In essence, the SEC seeks to base securities fraud charges on the mere receipt of an email.[10]  If the SEC is permitted to charge a violation of the securities laws based solely on the receipt of an email like the one cited here, financial institutions across the globe will take note, and one may expect that markets would grind to a halt because no rational person would be willing to take the risk that they too could be charged by the SEC for being the unwitting recipient of an email sent at the direction of an unknown third party harboring an undisclosed intent to violate the securities laws.

Second, the sole supporting allegation for the knowledge that Mr. Erbek is implicitly alleged to have had about the SEC filing requirements is supported by an email that was not written until two months <u>after</u> the date of the instruction directing him to allocate shares among three accounts.  Leaving aside the fact that there is no allegation that any such allocation ever occurred, the September 20, 2010 email does not provide any evidence of Mr. Erbek's knowledge or state of mind at the time of the July 21, 2010 instruction.  If anything, the later email tends to support the inference that he lacked such knowledge until September 20; otherwise, why would the individual that he was "aiding and abetting" think that he needed to send the email?  Of course, the email, which refers to ownership, rather than "beneficial ownership" (*i.e.*, effective control regardless of formal ownership) appears to misstate the applicable regulations and is of dubious significance in any event.

Third, according to the Complaint, the statute and regulation at issue require any individual or entity with a greater-than-five-percent beneficial ownership interest to disclose that interest on an SEC form.  (Cplt. ¶ 103).  That requirement is not based on the number of shares held in any one account, or the shares held in the name of any one account holder; rather, according to the Complaint, the requirement is based on who the actual beneficial owner of the shares is, regardless of the name on the account or the beneficial ownership interest disclosed to the financial institution.[11]  Under Rule 13d-3,

---

[9] As with analogous allegations in other sections of the Complaint, there is no allegation that Mr. Erbek knew that the email he allegedly received came from Wey or that it was sent at Wey's direction, nor is there any support for the allegation that Mr. Erbek knew of the alleged scheme to hide Wey's identity from the investing public.

[10] To the extent the SEC may also seek to rely on the allegation that a spreadsheet tracking the allocation of holdings of certain securities was recovered during the execution of search warrants in New York (Cplt. ¶¶ 31, 32, 34, 38-41), we note that there is no allegation that Mr. Erbek received, saw, was aware of, or knew the purpose of, any such document.

[11] Rule 13d-1(a) requires that: " Any person who, after acquiring directly or indirectly the beneficial ownership of any equity security of a class which is specified in paragraph (i) of this section, is directly or indirectly the beneficial owner of more than five percent of the class shall, within 10 days after the acquisition, file with the Commission, a statement containing the information required by Schedule 13D (§

BAKER & MᶜKENZIE

what is important is who actually has control over the shares, and it is clear that the filing requirement exists for the beneficial owner(s) regardless of the number of accounts among which that interest is divided. For example, if the filing requirement were triggered by the beneficial ownership of 1 million shares of a security and an individual who exercised ultimate control over 1 million shares of that security deposited one share in each of 1 million separate accounts -- whether in his own name or in the names of multitudes of others, and whether in one financial institution or several -- that beneficial owner would still be required to disclose his ownership interest by filing an SEC disclosure form. Indeed, the very purpose of the regulation seems to be to render such "structuring" of holdings useless by placing the filing obligation squarely on the shoulders of the beneficial owner(s) rather than on the nominal owner(s) of securities. Accordingly, even if Mr. Erbek had allocated the shares as the July 21, 2010 email requested -- and, again, there is no allegation that he did so -- that action would have had no effect on any obligation of Benjamin Wey, Tianyi Wei and/or Michaela Wey to file SEC 13D or 13G forms related to their interests in certain stocks. The allegations do not set forth a *prima facie* violation of Section 13(d) and Rule 13d-1 and therefore should be dismissed.

Finally, the Complaint fails to allege that Erbek played any role in, or had any knowledge of, the alleged failures of Benjamin Wey, Tianyi Wei and Michaela Wey to comply with their obligations to file disclosure forms. The Complaint fails to allege that Erbek knew or was reckless in not knowing that: (i) Benjamin Wey, Tianyi Wei and Michaela Wey had an obligation to file any particular SEC forms; (ii) "the investing public routinely used such disclosures . . ., thereby relying on them in making investment decisions"; or (iii) Benjamin Wey, Tianyi Wei and Michaela Wey had failed to comply with SEC rules and regulations with respect to such filings. (*See* Cplt. ¶¶ 107-10). The SEC evidently made those allegations when it could -- having asserted them in a conclusory way against Benjamin Wey, Tianyi Wei, Michaela Wey and Robert Newman -- but studiously avoided making even such conclusory allegations against Mr. Erbek. (*See* Cplt. ¶ 110).

## I.      Profiting from Hidden Control of the NYGG Clients (¶¶ 111-14)

The Complaint does not allege that Mr. Erbek profited from any of the alleged schemes; it merely alleges that he was "paid . . . to open and maintain brokerage accounts in Switzerland in the names of various Nominees. . . ." (Cplt. ¶ 54). The Complaint does not allege how much Mr. Erbek was paid and does not allege that he received shares in any of the Nominees or that he profited from the purchase and sale of any of the securities at issue. In short, there are no allegations in the Complaint that provide a motive for Mr. Erbek to have knowingly aided and abetted the alleged fraud. In the

---

240.13d-101). 17 C.F.R. 240.13d-1(a). As set forth in Rule 13d-3, "For the purposes of sections 13(d) and 13(g) of the Act a beneficial owner of a security includes any person who, directly or indirectly, though any contract, arrangement, understanding, relationship, or otherwise has or shares: (1) Voting power which includes the power to vote, or to direct the voting of, such security; and/or, (2) Investment power which includes the power to dispose, or to direct the disposition of, such security." 17 C.F.R. 240.13d-3(a).

**BAKER & McKENZIE**

absence of any other evidence of knowledge of the existence of a securities fraud scheme, the alleged facts that Mr. Erbek: (i) received unspecified telephone calls that are not linked in any way to any action at all (let alone an action taken in furtherance of the alleged schemes); (ii) received email instructions upon which there is no allegation that he or anyone else acted; (iii) communicated a limit order to a financial institution; and (iv) obtained for an underwriter a document from the sole director of a company as to which there is no allegation regarding Mr. Erbek's awareness of its falsity, does not provide a scintilla of evidence of the kind of "deliberate illegal behavior" that is required to show recklessness. *See Novak*, 216 F.3d at 308.

*     *     *

In sum, the Complaint alleges numerous schemes directed by Benjamin Wey from which Wey, Tianyi Wei and Michaela Wey allegedly benefitted to the tune of millions of dollars. The few allegations in the Complaint that pertain to Mr. Erbek describe acts that are completely innocuous in the absence of knowledge about Wey's alleged illegal schemes. Mr. Erbek is alleged to have received telephone calls, trading instructions and emails. He is alleged to have put an underwriter in touch with the sole director of a company. He is alleged to have received an instruction to allocate shares among certain accounts -- something that would not have violated the law if it had been executed. Throughout, the Complaint conclusorily asserts that Mr. Erbek knew of Benjamin Wey's alleged schemes, and implicitly asserts that he knew that the communications he received came from, or were directed by, Benjamin Wey. The allegations contained in the Complaint do not support those inferences.

Mr. Erbek has suffered grievous damage to his reputation and business as a consequence of these unsupported allegations. If the pleading standards are to impose any burden at all on the SEC, this Complaint must be dismissed.[12]

**II.**<br>**THE SEC'S CLAIMS FOR CIVIL PENALTIES**<br>**ARISING FROM MR. ERBEK'S ALLEGED ACTIONS**<br>**PRIOR TO SEPTEMBER 10, 2010 ARE TIME-BARRED**

The SEC alleges that Mr. Erbek aided and abetted violations of Section 10(b), Section 17(a), and Section 13(d) of the Exchange Act. Because these statutes do not set forth a limitations period, the Court should apply 28 U.S.C. § 2462. Under 28 U.S.C. § 2462, civil penalties are subject to a five-year statute of limitations. *Gabelli v. SEC*, 133 S. Ct. 1216, 1220 & n.1, 185 L. Ed. 2d 297 (2013). In *Gabelli*, the Court held that a claim generally accrues "when it comes into existence," or "when the plaintiff has a complete and present cause of action." *Id.* at 1220. The limited exception to this (the "discovery rule") is not applicable in this case, as the government, rather than a defrauded victim, is bringing an enforcement action for civil penalties. *Id.* at 1221. The SEC filed

---

[12] Mr. Erbek reserves the right to raise additional bases for dismissal not outlined in this letter in his memorandum of law.

**BAKER & MᶜKENZIE**

its initial Complaint on September 10, 2015.  Accordingly, claims for civil penalties arising from Mr. Erbek's alleged actions prior to September 10, 2010 are time-barred.

## III.
## THE SEC'S CLAIMS ARISING FROM MR. ERBEK'S ALLEGED ACTIONS IN VIOLATION OF SECTION 15(b) PRIOR TO JULY 21, 2010 SHOULD BE DISMISSED BECAUSE CONGRESS HAD NOT CREATED A CAUSE OF ACTION FOR AIDING AND ABETTING VIOLATIONS OF THE SECURITIES ACT

The SEC alleges that Mr. Erbek violated Section 15(b) of the Securities Act by aiding and abetting violations of Section 17(a).  (Cplt. ¶¶ 140-141).  Prior to July 21, 2010, when Congress amended the Securities Act to grant a right of action to the SEC for aiding and abetting violations of the Securities Act, there was no such liability.[13]  All claims for aiding and abetting violations of the Securities Act based in conduct prior to July 21, 2010 must be dismissed; application of Section 15(b) would be an impermissibly retroactive application of Dodd-Frank.  *See Landgraf v. USI Film Products*, 511 U.S. 244, 280 (1994) (Where a statute would "increase a party's liability for past conduct, or impose new duties with respect to transactions already completed . . . our traditional presumption teaches that it does not govern absent clear congressional intent favoring such a result"); *Koch v. SEC*, 793 F.3d 147, 158 (D.C. Cir. 2015) (barring retroactive application by SEC of remedies created by Dodd-Frank because the statute "does not expressly authorize retroactive application").

\*       \*       \*

For the above-stated reasons, Mr. Erbek respectfully requests the following briefing schedule for Mr. Erbek's motion: (a) opening brief 14 days after the Court approves the filing of this motion; (b) opposition brief 14 days after Mr. Erbek files his opening brief; and (c) reply brief 7 days after any opposition is filed.

Respectfully submitted,

Marc Litt

Cc:        Counsel of Record (via ECF)

---

[13] The SEC requested that Congress expand "the SEC's statutory authority to allow the SEC to bring actions for aiding and abetting violations of the Securities Act" on October 16, 2009. *A Joint Report of the SEC and the CFTC on Harmonization of Regulation*, 92-93 (Oct. 16, 2009).  Congress amended the Securities Act on July 21, 2010.  Dodd-Frank, Pub. L. No. 111-203, 124 Stat. 1376 § 929M(a) (July 21, 2010) (codified at 15 U.S.C. § 77o(b)).