UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

UNITED STATES SECURITIES AND
EXCHANGE COMMISSION,

                Plaintiff,

       v.

BENJAMIN WEY,
NEW YORK GLOBAL GROUP,
TIANYI WEI,
MICHAELA WEY,
ROBERT NEWMAN,
WILLIAM UCHIMOTO, and
SEREF DOGAN ERBEK,

           Defendants,

     and

ADVANTAGE CONSULTANTS, LTD.,
YORK CAPITAL MANAGEMENT, LTD.,
FOUR TONG INVESTMENTS, LTD.,
STRONG GROWTH CAPITAL, LTD.,
MEDIAN ASSETS INVESTMENTS, LTD., and
HAN HUA, LTD.,

          Relief Defendants.

---

Civil Action No. 15-7116 (PKC)


**ECF CASE**

---

## DEFENDANT ROBERT NEWMAN'S MEMORANDUM OF LAW
## IN SUPPORT OF HIS MOTION TO DISMISS THE SECOND AMENDED COMPLAINT

 

**SERCARZ & RIOPELLE, LLP**
**810 Seventh Avenue, Suite 620**
**New York, NY  10019**
**(212) 586-4900**

*Attorneys for Defendant Robert Newman*

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ...................................................................................................1

FACTS......................................................................................................................................2

ARGUMENT

POINT I

ALL CLAIMS ACCRUING FIVE YEARS BEFORE THE SEPT. 10, 2015
COMMENCEMENT OF THIS ACTION MUST BE DISMISSED .............................................8

POINT II

THE SEC'S PROPOSED INJUNCTION IS PUNITIVE AND VIOLATES § 2462'S FIVE
YEAR LIMIT .........................................................................................................................10

POINT III

AIDER AND ABETTOR CLAIMS AND CLAIMS PREMISED ON "RECKLESS"
CONDUCT PREDATING JULY 21, 2010, MUST BE DISMISSED .........................................11

    A.    Aiding and Abetting Liability Under Section 15(b) of the Securities Act ............11

    B.    Aiding and Abetting and "Recklessness" Under Section 20(e) of the
        Exchange Act........................................................................................................12

POINT IV

THE SEC'S CLAIMS AGAINST NEWMAN ARE NOT PLEADED WITH THE
PARTICULARITY REQUIRED BY FEDERAL RULE OF CIVIL PROCEDURE 9(b)...........13

POINT V

NEWMAN JOINS IN HIS CO-DEFENDANTS' MOTIONS......................................................23

CONCLUSION ......................................................................................................................24

## **TABLE OF AUTHORITIES**

**Cases**

Gabelli v. SEC, 133 S.Ct. 1216 (2013) ................................................................................8, 9

In re Alstom SA Sec. Litig., 406 F. Supp.2d 433 (S.D.N.Y. 2005) ..............................................23

Koch v. S.E.C., 793 F.3d 147 (D.C. Cir. 2015)...........................................................................12

Landgraf v. USI Film Products, 511 U.S. 244 (1994)...................................................................12

Novak v. Kasaks, 216 F.3d 300 (2d Cir. 2000) .....................................................................14, 19

O'Brien v. National Property Analysts Partners, 936 F.2d 674 (2d Cir. 1991) ...........................14

S.E.C. v. Apuzzo, 689 F.3d 204 (2d Cir. 2012) .....................................................................12, 15

S.E.C. v. Aronson, 11 CV 7033 (JSR), 2013 WL 4082900 (S.D.N.Y. Aug. 6, 2013).................12

S.E.C. v. DiBella, 587 F.3d 533 (2d Cir. 2009) .........................................................................15

S.E.C. v. Espuelas, 908 F.Supp.2d 402 (S.D.N.Y. 2012)............................................................12

S.E.C. v. Grossman, 87 Civ. 1031, 1997 U.S. Dist. LEXIS 6225 (S.D.N.Y. May 6, 1997).........10

S.E.C. v. Jones, 476 F.Supp.2d 374 (S.D.N.Y. 2007)..................................................................10

S.E.C. v. Lee, 720 F. Supp.2d 3015 (S.D.N.Y. 2010).................................................................14

S.E.C. v. Pentagon Capital Management PLC, 725 F. 3d 279 (2d Cir. 2013) ...............................9

S.E.C. v. Price Waterhouse, 797 F. Supp. 1217 (S.D.N.Y. 1992)................................................10

S.E.C. v. Razmilovic, 738 F.3d 14 (2d Cir. 2013) ........................................................................7

S.E.C. v. Syron, 934 F.Supp. 2d 609 (S.D.N.Y. 2013) ...............................................................23

S.E.C. v. Wellshire Sec., Inc., 773 F. Supp. 569 (S.D.N.Y. 1991) ...............................................10

S.E.C. v. Wylly, 950 F.Supp.2d 547 (S.D.N.Y. 2013).................................................................10

Salinger v. Projectavision, Inc., 972 F. Supp. 222 (S.D.N.Y. 1997)...........................................14

Wexler v. First Manhattan Co., 902 F.2d 169 (2d Cir. 1990) ......................................................14

**Statutes**

28 U.S.C. § 2462 ....................................................................................................8, 9, 10

**Rules**

Federal Rule of Civil Procedure 9(b) ......................................................................1, 20

## PRELIMINARY STATEMENT

Defendant Robert Newman (the "Defendant" or "Newman") respectfully submits this memorandum of law in support of his motion to dismiss the Second Amended Complaint in this action. Newman is charged in Counts 1, 3, 5, 7, and 10 of the Second Amended Complaint, which allege a variety of violations of the securities laws against him as a principal, and as an aider and abettor.

As is demonstrated fully below, many of the Securities and Exchange Commission's ("SEC") claims for civil penalties and equitable relief relate to events that accrued more than five years before the SEC commenced this action. The SEC's claims with respect to those events are now time-barred. They must be dismissed.

Some of the SEC's claims purport to be claims against Newman for aiding and abetting liability. But many of those claims relate to events that occurred before Congress enacted Section 15(b) of the Securities Act in July 2010, creating aiding and abetting liability for the first time. To the extent the SEC's claims against for aiding and abetting liability against Newman relate to events prior to July 2010, they, too, must be dismissed.

The SEC's claims against Newman all sound in fraud, but the SEC does not plead its allegations with the particularity required by Federal Rule of Civil Procedure 9(b). The Second Amended Complaint does not plead adequate facts to give rise to a "strong inference" that the Defendant was a knowing participant in the alleged frauds, nor do the facts alleged support an inference that the Defendant acted with fraudulent intent. The Second Amended Complaint's general allegations that Newman "knowingly" aided and abetted the frauds of his co-defendants are insufficient. The claims pleaded against Newman must be dismissed on this basis as well.

Finally, Newman's co-defendants William Uchimoto ("Uchimoto") and Serek Erbek ("Erbek") will also be making motions to dismiss the claims against them. The SEC asserts many of those same claims against Newman. To the extent the arguments made by Uchimoto and Erbek apply to Newman, Newman joins in their motions, and the arguments made by Uchimoto and Erbek also weigh in favor of Newman's motion to dismiss the claims against him.

## FACTS

The Second Amended Complaint alleges[1] that Defendants Benjamin Wey, Michaela Wey and Tianyi Wei (collectively, the "Wey Defendants"), with the assistance of Newman and others, manipulated the market in the securities of Deer Consumer Products, Inc. ("Deer"), CleanTech Innovations, Inc. ("CleanTech"), SmartHeat, Inc. ("SmartHeat"), and AgFeed, Inc.[2]

According to the Second Amended Complaint, the Wey Defendants acquired a controlling interest in the free trading shares of Deer, CleanTech, SmartHeat and AgFeed through a series of reverse merger transactions, pursuant to which United States shell companies were merged with Chinese companies. Second Amended Complaint, ¶¶ 2-7, 60-68. The Second Amended Complaint charges that the free trading shares of the newly formed, public companies were controlled by the Wey Defendants through a series of nominee corporations, which never filed accurate Form 13Ds to disclose the Wey Defendants' beneficial ownership of more than 5% of the shares of Deer, CleanTech and SmartHeat. Id., at ¶¶ 8-9, 107-109. The SEC alleges that, because the Wey Defendants controlled the bulk of the free trading shares in Deer, CleanTech and SmartHeat, they were able to manipulate the price of the shares they controlled through their

---

[1] The following factual discussion assumes for the purposes of the following arguments, as it must, the truth of the allegations contained in the SEC's Second Amended Complaint.

[2] No claim is asserted against Newman in connection with the AgFeed transaction, and for that reason Newman will focus his arguments on the Deer, CleanTech and SmartHeat transactions.

trading activity, and, in the case of Deer, a stock buy-back program. Second Amended Complaint, ¶¶ 4, 49-59, 92-98. And the SEC alleges that the Wey Defendants earned millions of dollars in profits as a result of their price manipulations of the Deer, CleanTech and SmartHeat shares, as well as earning "fees" of many millions in dollars. Second Amended Complaint, ¶¶ 10, 59, 112-114.

With respect to Newman, the Second Amended Complaint alleges that he acted as an attorney in connection with the Deer, CleanTech and SmartHeat transactions. It pleads generally that Newman acted knowingly to further Mr. Wey's fraud, but apart from these general allegations of knowledge, it contains little specific factual content to support an inference that Newman was a knowing malefactor.

In order to bolster its allegations against Newman, the SEC alleges that Newman was not independent of "Wey and NYGG," and that "Newman's work for the NYGG Clients accounted for eighty to ninety percent of his law firm's business between 2009 and 2011, and at least fifty percent of his firm's business as late as 2012." Second Amended Complaint, ¶ 25. It alleges that Newman "shared office space with NYGG" and rented office space "in the building occupied by NYGG" at various points in time. Id. In the SEC's view, these facts support its general allegations that Newman "knowingly or recklessly" participated in the frauds described in the Second Amended Complaint. But the SEC does not plead facts to show how Newman became a knowing participant in the alleged fraud by virtue of his association with Mr. Wey. In the absence of specific factual assertions that establish Newman's knowledge of the alleged fraud, the SEC's allegations amount to innuendo and nothing more.

The specific allegations in the Second Amended Complaint establish nothing other than Newman acted as an attorney for companies referred to him by Mr. Wey. The acts done by

Newman are simply those of a diligent lawyer, doing his job, and they prove nothing about Newman's alleged scienter. For example, the Second Amended Complaint alleges that, at various times, Newman forwarded instructions from Defendant Benjamin Wey to transfer agents in connection with the transactions, asking them to send share certificates to Mr. Wey rather than directly to his nominees. Second Amended Complaint, ¶ 58. Given the fact that the alleged Nominees for whom Mr. Wey was acting as a consultant were all Chinese speakers and residents, there is nothing about Newman's actions that is suspect, or demonstrates that he knew of any fraudulent activity by others. As a Chinese speaker, Mr. Wey would be in the best position to gather information from the Chinese speakers to whom the shares at issue would be transferred and communicate that information to Newman, and Wey was also in the best position to deliver the shares at issue to his Chinese clientele.

Similarly, the Second Amended Complaint states that Newman counseled his clients at the Chinese operating companies that became Deer, CleanTech and SmartHeat to enter into lock-up agreements in connection with the shares in the American merged companies that resulted from the reverse merger transactions. Second Amended Complaint, ¶ 63. But such agreements are routine in going public transactions like reverse mergers. Lock up agreements are a typical way in which management demonstrates its commitment to the merged company. So there was nothing about Newman's actions in connection with the lock-up agreements that tends to show he was acting with knowledge that a fraud was afoot, or with any intention to further a fraud.

The SEC also alleges that Newman's communications with his Chinese clients in connection with Deer, CleanTech and SmartHeat were made through Mr. Wey in many instances. See, e.g., Second Amended Complaint, ¶ 66. Given the fact that Newman does not speak Chinese, it is not surprising that he would communicate with his clients through their

4

Chinese-speaking consultant, Mr. Wey, and the staff of NYGG.   Communicating through Chinese speaking consultants is a common practice for law firms working with public companies from China.

At paragraph 68, the Second Amended Complaint alleges that Newman provided representation to both the shell company that was purchased by the Chinese operating company that became CleanTech, and the Chinese operating company.   It also alleges that Newman did not receive a conflict waiver from either company.[3]   It also indicates that Newman negotiated the purchase price for the shell company with the shell company's owners, who were certainly sophisticated enough to know whether they needed counsel when negotiating the sale of the shell company.  Id., at ¶ 65.  And once the non-operating shell company was purchased by the Chinese operating company for the purpose of completing a reverse merger to take the Chinese operating company public, it is hard to see how there really was much of a conflict between the Chinese operating company and the shell company it owned.   Moreover, Newman's actions in maintaining an escrow account in connection with the purchase of the shell company were entirely ordinary, and the Second Amended Complaint does not contend otherwise.  Id.  So here again, there is nothing in the factual allegations that suggests Newman knew that a fraud was occurring when the CleanTech transaction proceeded as it did.

Newman is alleged to have directed the primary underwriter in the SmartHeat transaction to contact the person in China who was known by Newman to be the CFO of one of Defendant

---

[3]   The fact is that Newman was always retained by the Chinese operating company and paid by the Chinese operating company.  He was never retained by any of the shell companies that were purchased by the Chinese operating companies described in the Amended Complaint, and he was never paid by any of the shell companies for the work he did to make them acceptable merger candidates for his clients.  So all the work Newman did prior to the merger of the shell companies with the Chinese operating companies was done on behalf of, and pursuant to his retainer with, the Chinese operating companies.  And the Chinese operating companies ultimately paid him for that work.  Moreover, Newman requested and received written conflict waivers from CleanTech, after the transaction closed.  Mr. Newman did not represent the shell companies for Deer, SmartHeat or Agfeed.

Wey's alleged nominees. Id., at ¶ 75. Aside from the bald allegation that Newman "knew that Benjamin Wey was affiliated with ACL," there is nothing about this allegation that is unusual. Id. This allegation amounts to an assertion that Newman directed the underwriter to call a person who could – so far as Newman knew – confirm the facts represented to the underwriter. Newman's actions in this regard were entirely ordinary. Without the unsubstantiated allegation that he knew of Mr. Wey's affiliation with ACL, these allegations would amount to nothing other than a description of Mr. Newman doing what a responsible lawyer should do. And the same is true with respect to Newman's actions in assisting the underwriter in the SmartHeat transaction to obtain a certification from ACL that it was not affiliated with Mr. Wey. Id., ¶ 77. Absent the general assertion that this certification was a "knowing[] misrepresent[ation]," Newman's actions are entirely routine, and are consistent with his role as an attorney. Id.

The Second Amended Complaint alleges that Newman "knowingly or recklessly misled NASDAQ about Benjamin Wey's affiliation with Deer and SmartHeat." Id., at ¶ 80. But the basis for this purported knowledge – Mr. Wey's "conducting financial modeling, choosing their lawyers and accountants, reviewing drafts of their Commission filings" and etc., are nothing more than the actions of a consultant, assisting a foreign company to go public through a reverse merger, and providing information to underwriters in connection with funding. Id. Thus, Newman's transmission of letters to NASDAQ "that failed to disclose that Benjamin Wey controlled substantial holdings of Deer and SmartHeat through the Nominees," id. at ¶ 79, again presupposes that Newman knew the fact of Mr. Wey's use of the Nominees in connection with the Deer and SmartHeat transactions. In fact, Mr. Newman's actions are nothing more than the ordinary actions of an attorney responding to a regulator's inquiry.

Newman's actions in connection with the Deer stock repurchase program are consistent with his role as attorney for Deer. Id. at ¶¶ 94-95. Newman is alleged to have opened an escrow account and to have assisted in the distribution of shares when warrants for Deer stock were exercised. Id. at 94-95, 98. There is nothing inherently suspicious about these actions, given Newman's position as Deer's attorney and the requirements of broker dealers when dealing with a company with operations and executives in China.

Finally, Newman's actions in filing Schedules 13D for his clients were also normal and in accordance with his retainer agreement with the Chinese Operating Companies, but for the general allegation that Newman knew that the Nominee corporations were holding shares for the benefit of Benjamin Wey and Tianyi Wei. See Second Amended Complaint, ¶¶ 108-111. So there is nothing about Newman's actions themselves that demonstrates knowledge or recklessness in filing the Schedule 13D's, absent the allegation that he knew the schedules were false.

Consistent with his limited role as an attorney for the Chinese Operating Companies and resulting public companies, the SEC alleges that Newman benefitted from the Deer, CleanTech and SmartHeat transactions only by "receiv[ing] fees" for "legal services" actually performed.[4] Second Amended Complaint ¶ 11. Newman saw none of the claimed "millions of dollars in illicit profits" earned by others. Id. ¶ 10. Moreover, Newman is principally accused of "reckless" conduct in connection with many of the allegations, rather than being charged with knowing and willful conduct. Id. ¶ 9, 25, 80, 111. And he is charged with being an aider and abettor, rather than a principal violator of the securities laws, in many cases. Id. ¶¶ 60, 63, 65, 78-79.

---

[4] Newman opposes the SEC's request for disgorgement. Amended Complaint, Prayer for Relief C; S.E.C. v. Razmilovic, 738 F.3d 14, 32 (2d Cir. 2013) ("the district court rejected the SEC's contention that all of the salary and bonuses received by Razmilovic throughout his tenure at Symbol should be disgorged, finding that only so much of that compensation as resulted from the fraud should be disgorged").

## ARGUMENT

## POINT I

### ALL CLAIMS ACCRUING FIVE YEARS BEFORE THE SEPT. 10, 2015, COMMENCEMENT OF THIS ACTION MUST BE DISMISSED

28 U.S.C. § 2462 "sets a fixed date when exposure to [SEC] enforcement ... ends." Gabelli v. SEC, 133 S.Ct. 1216, 1221 (2013). The SEC commenced this action on Sept. 10, 2015. 15 CV 7116, ECF No. 1. But most of Newman's alleged misconduct occurred beyond "five years from the date when the claim first accrued." 28 U.S.C. § 2462. As here, "claim[s] based on fraud accrue" when "allegedly fraudulent conduct occurs" – not when discovered. Gabelli at 1220.

For example, in connection with the CleanTech transaction, the SEC avers that in "April 2009, Newman completed the purchase of Everton" thus creating CleanTech via reverse merger. Second Amended Complaint ¶ 65. It continues that Newman "[c]oncurrently ... instructed the shell company's transfer agent to transfer 5,000,000 shares." Id. ¶ 66. A purportedly false SEC "Form 8-K" was "filed with the Commission in July 2010." Id. Accordingly, the CleanTech claims[5] and associated prayers for relief must be dismissed. The allegedly fraudulent conduct in connection with CleanTech occurred more than five years prior to the filing of the Complaint in this action.

Similarly Newman allegedly aided Wey in causing "the offering documents for the Deer and SmartHeat public offerings to be materially misleading by failing to disclose Benjamin Wey's affiliation with" another company. Id. ¶ 78. The SEC argues that the underwriter "would

---

[5] The Amended Complaint's twelve counts fail to indicate which companies, transactions, or filings they relate to. Each count instead incorporates the same preceding 115 paragraphs, blending together numerous unrelated occurrences. Newman cannot prepare a defense where it is impossible to know which specific acts give rise to what claims. Accordingly, Newman moves to dismiss all counts. See, Point III.

not have agreed to underwrite the deals" had it known about "Wey's affiliation with" the other company. Id. But SmartHeat went "public" in "November 2009." Id. ¶ 72. Deer went "public" in "December 2009." Id. ¶ 77. The SEC further alleges that "[i]n the summer of 2010, [] Wey, with the assistance of Newman [and others], manipulated the price of Deer stock in connection with a stock repurchase program." Second Amended Complaint ¶ 92. It continues that Newman filed "materially false" 13D Schedules relating to Deer – one in "February 2010" and another in "September 2010." Id., ¶ 109. Again, the crux of the conduct giving rise to the claim occurred beyond the allowable, five year limitation period, and any claims based on conduct that is more than five years old should be dismissed.

The SEC is a "different kind of plaintiff ... liv[ing] in a state of constant investigation" Gabelli at 1222-23. As such, it has a far greater ability to discover and prosecute claims for violations of the securities laws than any private plaintiff, and the Courts have not hesitated to apply the limitations period set forth in 28 U.S.C. § 2462 against the SEC. The application of 28 U.S.C. § 2462 to this case requires that any claims for civil penalties based on acts pre-dating September 10, 2010, be dismissed. Indeed, the Courts have consistently held that "any [illicit] profit earned ... earlier than five years before the SEC instituted its suit against the defendants may not be included as part of the civil penalty." S.E.C. v. Pentagon Capital Management PLC, 725 F. 3d 279, 287 (2d Cir. 2013). Firm adherence to the five year limit prevents the SEC from thwarting the "the basic policies of all limitations provisions." Gabelli at 1221. In this case, the vast majority of the claims pleaded by the SEC relate to events and conduct that occurred well before the five year limitations period established by 28 U.S.C. § 2462.

Accordingly, all claims for civil penalties that accrued outside the five year limit must be dismissed.

9

## POINT II

### THE SEC'S PROPOSED INJUNCTION IS
### PUNITIVE AND VIOLATES § 2462'S FIVE YEAR LIMIT

28 U.S.C. "§ 2462 applies not only to "SEC actions seeking civil penalties," but also to "equitable relief" designed to "punish" instead of remedying a "past wrong" or "protect[ing] the public." S.E.C. v. Jones, 476 F.Supp.2d 374, 380-81 (S.D.N.Y. 2007). Here, the SEC seeks an injunction despite no "reasonable likelihood that [alleged] past wrong-doing will recur." Id. at 384. Instead, an injunction in this case would tend only "to stigmatize" and "significantly impair [Newman's] ability to pursue a career." Id. at 385. The courts "apply Section 2462['s time bar] where the injunctive relief sought is punitive in nature [rather than] remedial." S.E.C. v. Wylly, 950 F.Supp.2d 547, 558 (S.D.N.Y. 2013) (collecting cases).

The SEC has pled no facts suggesting that an injunction would "undo prior damage" or prevent "future harm" – especially where Newman was a minimal player, who is alleged to have recklessly followed another. Id. In these circumstances, the Court should apply 28 U.S.C. § 2462 to the SEC's claims for injunctive relief, and bar any such claims that accrued more than five years before the filing of the Complaint in this action.[6]

---

[6] The Court should also dismiss the SEC's claims for injunctive relief because there are no facts contained in the Second Amended Complaint that suggest Newman will continue to commit violations of the securities laws in the future. See, e.g., S.E.C. v. Grossman, 87 Civ. 1031, 1997 U.S. Dist. LEXIS 6225 (S.D.N.Y. May 6, 1997) (refusing to enjoin defendant with no history of securities violations); S.E.C. v. Price Waterhouse, 797 F. Supp. 1217 (S.D.N.Y. 1992) (injunction denied where no evidence of prior securities violations shown); S.E.C. v. Wellshire Sec., Inc., 773 F. Supp. 569 (S.D.N.Y. 1991).

## POINT III

### AIDER AND ABETTOR CLAIMS AND CLAIMS PREMISED ON "RECKLESS" CONDUCT PREDATING JULY 21, 2010, MUST BE DISMISSED

The SEC's Third Claim accuses "Newman" of "[a]iding and [a]betting" Wey and others "in their violations of Section 10(b) of the Exchange Act and Rule l0b-5" by providing them with "substantial assistance in their violations of Section 10(b)." Second Amended Complaint, Third Claim for Relief; ¶ 125. The Seventh Claim accuses "Newman" of "aiding and abetting" Wey and others "in their violations of Section 17(a) of the Securities Act," again by providing them with "substantial assistance in their violations of Section 17(a)." Second Amended Complaint, Seventh Claim for Relief; ¶ 141. The Tenth Claim accuses "Newman" of "[a]iding and [a]betting" Wey and others "in their violations of Section 13(d) of the Exchange Act and Rule 13d-1." Second Amended Complaint, Seventh Claim for Relief; ¶ 157.  Throughout the Second Amended Complaint, Newman is accused of recklessly aiding and abetting Mr. Wey's alleged fraud. Id. at ¶¶ 9, 25, 80, 110, 125, 141, 157.

#### A. Aiding and Abetting Liability Under Section 15(b) of the Securities Act

As demonstrated above, the majority of the conduct the SEC alleges against Newman occurred before "July 21, 2010" – the operative date on which the Dodd–Frank Wall Street Reform and Consumer Protection Act was passed.  Prior to the passage of the Dodd-Frank Act, there was no aiding and abetting liability under Section 15(b) of the Securities Act.  Therefore, the SEC's Seventh Claim for Relief against Newman, for aiding and abetting violations of the Securities Act must be dismissed, to the extent that claim relates to events prior to July 21, 2010.

The Courts have refused to apply the Dodd-Frank Act retroactively, because the statute does not "expressly authorize retroactive application." Koch v. SEC, 793 F.3d 147, 158 (D.C.

11

Cir. 2015).  And this Court should not apply the Dodd-Frank Act retroactively to impose aiding and abetting liability on Newman where there was none before, because the Courts presume that a retroactive creation of liability was not intended by Congress absent a clear congressional intent to create such a liability.  Landgraf v. USI Film Products, 511 U.S. 244, 280 (1994); Koch, supra, 793 F.3d at 157.  Congress did not express a clear intention that the "aiding and abetting" liability it created in the Dodd-Frank Act was to be applied retroactively.  Therefore, the relevant authorities require that any aiding and abetting claim based on conduct that occurred before July 21, 2010 be dismissed.

### B.   Aiding and Abetting and "Recklessness" Under Section 20(e) of the Exchange Act

It is well established that the Dodd-Frank Act "relaxed [the mens rea requirement] to embrace recklessness." S.E.C. v. Aronson, 11 CV 7033 (JSR), 2013 WL 4082900, *10-11 (S.D.N.Y. Aug. 6, 2013).  Prior to the enactment of the Dodd-Frank Act, "recklessness" was not a sufficient basis to hold a defendant liable for an aiding and abetting claim under Section 20(e) of the Exchange Act.   See S.E.C. v. Apuzzo, 689 F.3d 204, at 211 n. 6 (2d Cir. 2012). Accordingly, "an aiding-and-abetting claim under the pre-Dodd-Frank version of Section 20(e) requires a showing of actual knowledge." Aronson, supra, at *12; S.E.C. v. Espuelas, 908 F.Supp.2d 402, 409 n.4 (S.D.N.Y. 2012), quoting Apuzzo, supra, 689 F.3d  at 211 n. 6 ("In a case heard after the enactment of Dodd–Frank, the Second Circuit applied the actual knowledge standard, holding that the Dodd–Frank amendment does not apply ... apparently because the conduct at issue predated the amendment.").

In this case, the SEC's Third Claim for Relief alleges that Newman "knowingly or recklessly provided substantial assistance to Benjamin Wey, NYGG and Tianyi Wei in their violations of Section 10(b) of the Exchange Act and Rule 10b-5." Second Amended Complaint,

¶ 125. And the SEC's Tenth Claim for Relief alleges that Newman "knowingly or recklessly provided substantial assistance to Benjamin Wey and Tianyi Wei in their violations of Section 13(d) of the Exchange Act and Rule 13d-1." Second Amended Complaint, ¶ 157. Both of these claims must be dismissed as they are presently pleaded to the extent they are based on events prior to July 21, 2010, because they improperly allege liability based on Newman's alleged "recklessness."

Accordingly, Claims Three, Seven, and Ten must be dismissed.

## POINT IV

### THE SEC'S CLAIMS AGAINST NEWMAN ARE NOT PLEADED WITH THE PARTICULARITY REQUIRED BY FEDERAL RULE OF CIVIL PROCEDURE 9(b)

The SEC's Second Amended Complaint pleads a variety of claims against Newman, all of which sound principally in fraud. The SEC's First Claim for Relief charges that Newman directly violated Section 10(b) and Rule 10b-5 of the Exchange Act, by engaging in a scheme to defraud. Its Third Claim for Relief charges Newman with aiding and abetting Benjamin Wey's and Tianyi Wei's violations of Section 10(b) and Rule 10b-5 of the Exchange Act. The SEC's Fifth Claim for Relief charges Newman and others with knowingly, recklessly or negligently engaging in a fraudulent scheme in connection with a sale of securities. Its Seventh Claim charges Newman and others with aiding and the violations of Section 17 of the Securities Act committed by Wey, NYGG and Tianyi Wei. And the SEC's Tenth Claim for Relief charges Newman with aiding and Abetting Wey's and Tianyi Wei's knowing violation of Section 13(d) of the Exchange Act and Rule 13d-1, in furtherance of the fraudulent schemes alleged in the Second Amended Complaint.

13

To the extent these claims sound in fraud, they are subject to the heightened pleading requirements of Federal Rule of Civil Procedure 9(b).  See, e.g., S.E.C. v. Lee, 720 F. Supp.2d 3015, 325 (S.D.N.Y. 2010) (Rule 9(b) pleading requirements apply to Section 17(a) aiding and abetting claims).   The claims must be dismissed, because they fail to state particular facts that give rise to a strong inference that Newman knowingly and intentionally joined the fraudulent schemes alleged in the Second Amended Complaint.   For, while it is true that "intent" and "knowledge" "may be alleged generally" according to Rule 9(b), the Courts require plaintiffs to plead a factual basis which gives rise to a "strong inference" of fraudulent intent.  Novak v. Kasaks, 216 F.3d 300, 306 (2d Cir. 2000); O'Brien v. National Property Analysts Partners, 936 F.2d 674, 676 (2d Cir. 1991), quoting Wexler v. First Manhattan Co., 902 F.2d 169, 172 (2d Cir. 1990).  Thus, even though "Rule 9(b) permits scienter to be demonstrated by inference, this 'must not be mistaken for license to base claims of fraud on speculation and conclusory allegations.'"  Id.; and see Salinger v. Projectavision, Inc., 972 F. Supp. 222, 232-33 (S.D.N.Y. 1997).

Rule 9(b)'s heightened pleading requirement is particularly germane to this case, because Newman is charged primarily as an aider and abettor of Benjamin Wey's alleged frauds, and there is nothing in the Second Amended Complaint to suggest that Newman benefitted from the allegedly fraudulent transactions in any manner other than collecting routine legal fees.  Thus, there appears to be very little evidence that Newman had a motive to join in the alleged fraudulent scheme, because there is no allegation that Newman "benefitted in some concrete and personal way from the purported fraud," apart from his legal fees.  Novak, supra, 216 F.3d at 307-08.  In the absence of such evidence of motive, the SEC must allege facts to support a strong inference of conscious misbehavior or recklessness, in the form of "deliberate illegal behavior,"

14

or an "extreme departure from the standards of ordinary care." Id., at 308; and see S.E.C. v. Apuzzo, 689 F.3d 204, at 211-12 (2d Cir. 2012); S.E.C. v. DiBella, 587 F.3d 533, 536 (2d Cir. 2009). The SEC simply has not satisfied this standard in this case.

The SEC repeatedly alleges that Defendant Benjamin Wey acted in a "clandestine" manner, "secretly" acquiring control of shell companies, and "concealing" his ownership of them through nominees. Second Amended Complaint, ¶¶ 3, 4, 60. At other points, it alleges generally that "the Defendants used several forms of deceptive conduct and devices," Second Amended Complaint, ¶ 47, but it contains very few factual allegations tying Newman to the frauds alleged, apart from his ordinary work as a lawyer.

One of the principal weaknesses in the SEC's allegations is the SEC's apparent belief that Newman should have known the Wey Defendants were fraudsters. It appears to be the SEC's position that an attorney should do a heightened level of due diligence on his clients, his referral sources and his client's consultants and representatives throughout his relationships with them, to ensure that neither the clients nor any of their representatives are pulling the wool over the attorney's eyes, and defrauding the public.

In this regard, it is worth noting that, at the time of the events described in the Second Amended Complaint, Mr. Newman had no reason whatsoever to suspect that the Wey Defendants and the Chinese companies Mr. Wey represented were involved in illegitimate transactions. NYGG and Mr. Wey were experienced in taking Chinese companies public long before Mr. Wey introduced Mr. Newman to SmartHeat, Deer and CleanTech. Mr. Newman traveled to China and saw both his clients' operations and the operations of NYGG Asia; he communicated with his Chinese clients' English speaking staff, both through correspondence and orally, and through their consultant NYGG, including Mr. Wey and NYGG staff; and his clients

never gave Newman any reason to suspect the Wey Defendants' bona fides. In fact, Newman's clients were never themselves charged with any wrongdoing.

There is no allegation in the Second Amended Complaint that alleges any facts which would cause Newman to believe that any of the Wey Defendants controlled his clients through a series of nominees, or that, through his control of the Chinese companies, Mr. Wey or the Wey Defendants manipulated the prices of SmartHeat, CleanTech and Deer. The transactions themselves – by which Chinese companies were taken public through a reverse merger – were common and were encouraged by NASDAQ at the time of the events described in the Second Amended Complaint, and Newman had no reason to suspect there was anything illegitimate about the transactions his clients engaged in. The Second Amended Complaint pleads no facts known to Mr. Newman that might trigger suspicion on his part, of Mr. Wey or anyone else.

Under the circumstances, Mr. Newman was entirely justified in trusting what his clients told him and in carrying out their orders. He had no reason to question his clients' motives or directives, when they were communicated through Mr. Wey and NYGG staff. And the descriptions of Mr. Newman's actions in the Second Amended Complaint are consistent those of an attorney working to accomplish his clients' goals, with no inkling of any wrongdoing.

Moreover, the fact that Mr. Wey's transactions represented a large percentage of Newman's business at one point, and the fact that Mr. Newman worked in close physical proximity to Mr. Wey are simply no direct proof of Newman's mental state, and they are extremely weak circumstantial proof that Newman knowingly participated in the frauds alleged principally against Mr. Wey. In deciding whether the Second Amended Complaint's allegations are sufficient, the Court should ask itself how many in house attorneys have been prosecuted in cases where chief executive officers commit massive, protracted frauds. The answer is that in

house attorneys are rarely prosecuted in such circumstances, because even where 100% of an in house attorney's work is associated with and done at the request of the alleged principal malefactor, *that is no proof of knowing participation in a fraud.* Working down the hall from a malefactor is likewise no proof of an attorney's knowing participation in a fraud, and rarely results in a prosecution. And physical proximity is no basis for a finding of liability in this case, absent some specific allegations and proof to demonstrate Newman was a knowing participant in the fraud alleged in the Second Amended Complaint.

According to the SEC, much of the alleged fraud was apparently accomplished without any participation by Newman, and without his knowledge. For example, paragraphs 48 through 57 of the Second Amended Complaint allege that Defendants Benjamin Wey and Tianyi Wei established brokerage accounts in the names of numerous Chinese nominee companies, and that Defendant Benjamin Wey directed the trading activities in the accounts. There is no allegation in these paragraphs that Defendant Newman participated in establishing the brokerage accounts at issue, had anything to do with the trading in the accounts, or had any knowledge that the account holders were nominees for Benjamin Wey. The SEC contends that Newman may have had a role in the transfers of shares between the various nominee accounts, but it directly alleges only that Newman was a messenger, conveying Benjamin Wey's orders, without any knowledge that the transfers were part of a fraudulent scheme. Second Amended Complaint, ¶ 58. In fact, while it alleges that Benjamin Wey profited by collecting $11 million in fees for services that were never actually provided, Second Amended Complaint, ¶ 59, there is no allegation that Newman collected anything other than ordinary attorney's fees for services that were rendered.

At paragraph 60, the Second Amended Complaint alleges that Benjamin Wey, "acting in concert with Tianyi Wei and Newman," "obtained secret control" of the publicly-traded shares of

17

SmartHeat, Deer and CleanTech through a series of reverse merger transactions. However, this paragraph does not allege any facts to support an inference that Newman knew that the reverse merger transactions were part of a fraudulent scheme. Lacking is any allegation that Newman did anything in connection with the reverse merger transactions other than acting as counsel to one or more parties to the transactions. Instead, the SEC just alleges that Newman acted in concert with Benjamin Wey and Tianyi Wei, when he "facilitated reverse mergers between the shell companies and the NYGG Clients," without providing any meaningful detail as to what Newman did, and how his doing it demonstrates that he knew the transactions he was working on were in fact fraudulent. Second Amended Complaint, ¶ 60.

The Second Amended Complaint makes similar allegations at paragraph 63, where it alleges that Newman assisted Benjamin Wey to convince managers in the companies formed by the reverse mergers to enter into lock up agreements. Such lock up agreements are a frequent step in merger transactions involving small cap companies, and the SEC does not explain how or why Newman knew or should have known that the lock up agreements were part of a scheme to defraud. There is no factual allegation that supports an inference that Newman knew that the shareholders in the newly merged companies were nominees for Mr. and Mrs. Wey. Nor is there any factual information in the Second Amended Complaint to support any suggestion that Newman was aware that Mr. Wey, his sister and wife dominated and controlled the shares of the newly formed companies. To the contrary, the only activities attributed to Newman in this paragraph are the routine actions of an attorney in connection with reverse merger transactions.

The SEC also attempts to make much of the fact that Newman communicated through Mr. Wey with Chinese businessmen located in China. See, e.g., Second Amended Complaint, ¶ 66. But the fact is that Newman does not speak Chinese, and therefore often had to

18

communicate with his clients – who were Chinese – through their consultant, Mr. Wey, and other members of NYGG's staff. Mr. Newman also regularly communicated with his clients' own English-speaking staff. At the time of the communications, Newman had no reason to suspect that Mr. Wey was anything other than a legitimate business man, and Newman had no idea that Mr. Wey was controlling the free trading shares in the merged companies through a network of undisclosed nominees. And there are no allegations in the Second Amended Complaint to suggest that Newman knew or should have known that the transactions he was participating in were part of a fraudulent scheme. Instead, it describes Newman going about the business of forming public companies through the process of reverse mergers – exactly as he was retained to do. Second Amended Complaint, ¶ 65. Without more, these allegations are insufficient to sustain the SEC's burden to plead a factual basis which gives rise to a "strong inference" of Newman's fraudulent intent. Novak v. Kasaks, supra, 216 F.3d at 306.

In an attempt to allege some sort of misconduct by Newman so that some inference of fraudulent intent may be drawn against him, at paragraph 68 of the Second Amended Complaint, the SEC claims that "Newman provided representation for both the shell company, Everton, and the Chinese operating company without receiving a waiver of conflicts from either party." This allegation does nothing to further an inference that Newman acted with fraudulent intent, and betrays a naiveté about the transaction described. Once the shell company, Everton, was purchased for the purpose of the reverse merger, Everton didn't need any separate counsel because it was simply going to be merged out of existence. In fact at the time of the transactions cited by the SEC, the shares of Everton did not even trade on the markets. It was a non-trading shell company. The SEC itself posits that "Newman negotiated the purchase price of Everton with its owners," so Everton's owners represented themselves at the time the Everton shell

corporation was purchased by the Chinese corporation that became Clean Tech. Second Amended Complaint, ¶ 65. Once Clean Tech's predecessor owned 100% of Everton, what possible or material conflict could there be in Newman's representation of Everton in connection with its merger with Clean Tech? Clean Tech's and Everton's interests were the same, and there was no material conflict of interest in Newman's continuing representation of Clean Tech in closing the merger transaction.

The SEC's attempt to find some basis to infer Newman's fraudulent intent in connection with the SmartHeat transaction is even more tenuous. In connection with the SmartHeat transaction, it alleges that Newman "misled the primary underwriter by directing its employee to contact a person in China who Benjamin Wey claimed was ACL's CFO." Second Amended Complaint, ¶ 75. In other words, Newman directed the underwriter to the person in China who could answer the underwriter's due diligence questions. There are no facts stated in the Second Amended Complaint to suggest that Newman knew that Benjamin Wey was affiliated with ACL, or was fabricating the association of the contact person in China with ACL. Instead, the Second Amended Complaint is replete with factual allegations that tend to undermine an inference that Newman knew of Benjamin Wey's affiliation with ACL, including ACL's certification that it was "comprised solely of non-U.S. persons," and purported misstatements by Mr. Wey. Id., ¶¶ 73-74. The Second Amended Complaint simply alleges that Newman "knew that Benjamin Wey was affiliated with ACL" as an ipse dixit. Id., ¶ 75. Federal Rule of Civil Procedure 9(b) requires more than ipse dixits before scienter can be inferred however, and the Second Amended Complaint must therefore be dismissed.

The SEC's allegations against Newman in connection with the Deer transaction are quite similar to those made in connection with the SmartHeat transaction, and they are equally

inadequate. According to the Second Amended Complaint, Newman "caused the offering documents for Deer ... to be materially misleading by failing to disclose Benjamin Wey's affiliation with ACL," Id., ¶ 78. Not only does the Second Amended Complaint fail to allege sufficient facts linking Mr. Wey to ACL, it contains no factual allegations to support the bald assertion that Newman knew of Mr. Wey's affiliation with ACL.

A bare assertion that Newman knew of Mr. Wey's affiliation with ACL is not enough to satisfy the requirements of Federal Rule of Civil Procedure 9(b). Instead, the accusatory instrument must contain allegations that support a "strong inference" that Newman knew of Mr. Wey's affiliation with ACL. But there are no such allegations. The Second Amended Complaint's allegations relating to Deer should be dismissed.

The SEC's allegations concerning Newman's actions in connection with the Deer stock repurchase program are not sufficient to sustain the fraud claims either. See Second Amended Complaint, ¶¶ 93-95. In these paragraphs, Newman is described as doing a series of acts that furthered Deer's stock repurchase program, which was funded by warrants that had been previously disclosed in public filings numerous times. His actions were all consistent with his role as Deer's attorney, such as opening a brokerage account to receive the repurchased shares. Id., ¶¶ 94-95. The Complaint, which simply describes the acts that any attorney would perform in connection with a stock repurchase program with the officers of the company located in China, is not sufficient to sustain the SEC's fraud claims. The Second Amended Complaint does not contain factual allegations that support an inference that Newman knew that a fraud was afoot when he opened the brokerage account at issue, or that he intended to commit a fraud by acting as Deer's lawyer in connection with the stock repurchase program.

In a similar fashion, the Second Amended Complaint alleges that Newman was a knowing participant in fraudulent Schedule 13D filings, which purportedly failed to disclose Benjamin Wey's, Michaela Wey's and Tianyi Wei's beneficial ownership of shares in Deer and other NYGG clients held by nominee entities. Id., ¶¶ 107-110. But it contains no factual allegations to support any inference – let alone a "strong inference" -- that Newman knew that Mr. and Mrs. Wey and Ms. Wei owned shares through various nominees. In the absence of such specific factual allegations, the Second Amended Complaint's general assertions concerning the filing of 13D statements must be dismissed as to Newman. There is no basis to draw a "strong inference" that Newman had any idea that Mr. and Mrs. Wey and Ms. Wei controlled the shares at issue through a series of "Nominee entities." Id., ¶¶ 108-110.

Moreover, Newman *did not even represent* the shareholders in the transactions at issue – he represented the Chinese companies. Mr. Newman agreed to file 13Ds as an accommodation his clients made to large shareholders, a common practice for small companies to attract investors. As the lawyer for the Chinese companies, Mr. Newman had no obligation to file a 13D statement for any shareholder, and the Second Amended Complaint does not plead any such duty. An attorney representing a public company is not under any obligation to ensure its shareholders are properly notifying the company or the SEC of their holdings, as the SEC seems to suggest. The shareholders may have had a duty to file 13D forms, but Newman did not represent *them*, and the Second Amended Complaint does not assert that he did. See Second Amended Complaint, ¶ 25 ("Benjamin Wey directed the NYGG Clients [i.e., the Chinese Companies] to hire Newman as their corporate counsel"). In sum, there are no factual allegations contained in the Second Amended Complaint to support a "strong inference" that Newman knew Mr. Wey controlled the market in Clean Tech, SmartHeat and Deer through a

series of nominees, and that Newman knowingly misled the SEC, the NASDAQ or the investing public about that fact. Nor are there adequate factual allegations to support a strong inference that Newman intended to commit a fraud in connection with the Clean Tech, SmartHeat and Deer transactions. Instead, the Second Amended Complaint simply describes Newman doing the things an attorney would ordinarily do when acting as an attorney for corporate clients in connection with three reverse mergers and a stock repurchase program, and alleges that Newman knew of and intended to commit a fraud by doing these routine tasks. Such allegations are not sufficient under Rule 9(b).

**POINT V**

**NEWMAN JOINS IN
HIS CO-DEFENDANTS' MOTIONS**

Newman anticipates that his co-defendants Uchimoto and Erbek will make motions to dismiss the Second Amended Complaint. To the extent their arguments are applicable to Newman, those arguments are hereby incorporated by reference and Newman relies on them as additional grounds for the dismissal of the Second Amended Complaint in this action.

In particular, Newman joins in his co-defendant Uchimoto's motion to dismiss the SEC's claim under Section 17(a)(2) of the Securities Act, because he, like Mr. Uchimoto, received nothing from the transactions at issue other than ordinary legal fees. See, S.E.C. v. Syron, 934 F.Supp. 2d 609, 638-40 (S.D.N.Y. 2013). Newman also joins in Mr. Uchimoto's motion to dismiss the First and Fifth Claims pleaded against him on the ground that the Second Amended Complaint does not plead facts that adequately allege Newman engaged in any "deceptive scheme or course of conduct that went beyond the misrepresentations" alleged by the SEC. In re Alstom SA Sec. Litig., 406 F. Supp.2d 433, 475 (S.D.N.Y. 2005).

## **CONCLUSION**

For the reasons set forth above, Defendant Robert Newman respectfully requests that the

Second Amended Complaint be dismissed as to him in all respects and with prejudice.

Dated: August 26, 2016
      New York, NY

SERCARZ & RIOPELLE, LLP

By: _____

Roland G. Riopelle (RR-2950)
Robert Caliendo (RC-1515)
810 Seventh Avenue, Suite 620
New York, NY  10019
(212) 586-4900

*Attorneys for Defendant Robert Newman*

24