UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

UNITED STATES SECURITIES AND
EXCHANGE COMMISSION,

          Plaintiff,

      v.

BENJAMIN WEY,
NEW YORK GLOBAL GROUP,
TIANYI WEI,
MICHAELA WEY,
ROBERT NEWMAN,
WILLIAM UCHIMOTO, and
SEREF DOĞAN ERBEK,

          Defendants,

      and

ADVANTAGE CONSULTANTS, LTD.,
YORK CAPITAL MANAGEMENT, LTD.,
FOUR TONG INVESTMENTS, LTD.,
STRONG GROWTH CAPITAL, LTD.,
MEDIAN ASSETS INVESTMENTS, LTD., and
HAN HUA, LTD.,

          Relief Defendants.

Civil Action No. 15-7116 (PKC)

**ORAL ARGUMENT REQUESTED**

---

**DEFENDANT SEREF DOĞAN ERBEK'S MEMORANDUM OF LAW
IN SUPPORT OF HIS MOTION TO DISMISS THE SECOND AMENDED COMPLAINT**

BAKER & MCKENZIE LLP
452 Fifth Avenue
New York, NY 10018

*Attorneys for Defendant Seref Doğan Erbek*

August 26, 2016

# TABLE OF CONTENTS

I.    Preliminary Statement .................................................................................................1

II.   Statement of the Facts ................................................................................................2

      A.   The Allegations .................................................................................................2

           1.    The Alleged Scheme...............................................................................2

           2.    Erbek's Alleged Involvement ................................................................2

                 i.    Concealing Control of ACL ...........................................................3

                 ii.   Manipulating the Market for CleanTech Securities .........................4

                 iii.  Failure to File Schedule 13D ..........................................................4

III.  Argument......................................................................................................................5

      A.   The SEC's Claims Must Be Dismissed Pursuant To Rules 12(b)(6) And
           9(b) ...................................................................................................................5

      B.   The Complaint Fails to Adequately Plead Erbek's Scienter ...................................6

           1.    The Complaint Fails to Allege That Erbek Had Any Motive to
                 Commit Fraud ........................................................................................7

           2.    The Complaint Fails to Allege Facts Giving Rise to a Strong
                 Inference of Conscious Misbehavior or Recklessness ..............................8

      C.   The Complaint Fails to Adequately Allege Erbek's Awareness of,
           Involvement in, and Assistance to the Weys' Schemes ..........................................9

           1.    The Complaint Fails to Adequately Allege Erbek's Awareness of,
                 or Substantial Assistance in, Making Material Misstatements
                 and Omissions to Conceal Control of the Nominees and, Thereby,
                 the NYGG Clients ................................................................................10

                 i.    The Allegation Concerning the Certification is Fatally
                       Flawed ...........................................................................................10

                 ii.   An Entity is Not "Comprised" of its Controlling Party ................11

                 iii.  The Complaint Fails to Adequately Allege Erbek's
                       Knowledge of Wey's Control of ACL ...........................................12

                 iv.   Erbek's Ministerial Act Did Not Constitute Substantial
                       Assistance in Submitting a False Certification ..............................13

           2.    The Complaint Fails to Adequately Allege Erbek's Awareness of,

or Substantial Assistance in, the Alleged Manipulation ...........................14

    i.    The Allegedly Manipulative Order Was a Commonplace Limit Order ...................................................................................14

    ii.    The Complaint Fails to Adequately Allege Erbek's Knowledge of a Scheme to Manipulate ..........................................16

    iii.    The Complaint Does Not Adequately Allege Erbek's Substantial Assistance in a Manipulation Scheme .......................18

3.    The Complaint Fails to Adequately Allege Erbek's Awareness of, or Substantial Assistance in, a Violation of Section 13(d)...................19

    i.    The Alleged Scheme Is Not Unlawful ...........................................19

    ii.    The Allegations Concerning Erbek's Participation in a Section 13(d) Violation Are Insufficient .......................................20

D.    The SEC's Claims for Civil Penalties Arising from Erbek's Alleged Actions Prior to September 10, 2010 are Time-Barred .........................24

E.    Claims Arising From Actions in Violation of Section 15(b) Prior to July 21, 2010 Should Be Dismissed .............................................................24

IV.    CONCLUSION ....................................................................................................25

# TABLE OF AUTHORITIES

## CASES

*380544 Can., Inc. v. Aspen Tech., Inc.*,
  544 F. Supp. 2d 199 (S.D.N.Y. 2008) ....................................................................... 7
*Acito v. IMCERA Grp.*,
  47 F.3d 47 (2d Cir. 1995) ......................................................................................... 6
*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) .................................................................................................. 5
*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) .................................................................................................. 5
*Cellular S., Inc. v. J.P. Morgan Sec., Inc. (In re J.P. Morgan Auction Rate Secs. (ARS) Mktg.
  Litig.)*,
  No. 10 MG 2157, 2014 U.S. Dist. LEXIS 141022 (S.D.N.Y. Sept. 30, 2014) .......... 7
*Chambers v. Time Warner*,
  282 F.3d 147 (2d Cir. 2002) ................................................................................... 10
*Gabelli v. SEC*,
  133 S. Ct. 1216,185 L. Ed. 2d 297 (2013) ............................................................. 24
*Goplen v. 51job, Inc.*,
  453 F. Supp. 2d 759 (S.D.N.Y. 2006) ..................................................................... 13
*Harris v. Mills*,
  572 F.3d 66 (2d Cir. 2009) ....................................................................................... 5
*In re Alstom SA Sec. Litig.*,
  406 F. Supp. 2d 433 (S.D.N.Y. 2005) ....................................................................... 7
*In re AOL Time Warner, Inc. Sec. Litig.*,
  381 F. Supp. 2d 192 (S.D.N.Y. 2004) ..................................................................... 17
*In re Stac Elecs. Sec. Litig.*,
  89 F.3d 1399 (9th Cir. 1996) ................................................................................... 24
*Koch v. SEC*,
  793 F.3d 147 (D.C. Cir. 2015) ................................................................................ 25
*Landgraf v. USI Film Products*,
  511 U.S. 244, 280 (1994) ........................................................................................ 25
*Novak v. Kasaks*,
  216 F.3d 300 (2d Cir. 2000) ................................................................................. 6, 9
*Rombach v. Chang*,
  355 F.3d 164 (2d Cir. 2004) ............................................................................... 5, 24
*Scone Invs., L.P. v. Am. Third Mkt. Corp.*,
  97 Civ. 3802, 1998 U.S. Dist. LEXIS 5903 (S.D.N.Y. Apr. 27, 1998) .................... 6
*SEC v. Apuzzo*,
  689 F.3d 204 (2d Cir. 2012) ............................................................................... 9, 18
*SEC v. Aronson*,
  11 Civ. 7033, 2013 U.S. Dist. LEXIS 114687 (S.D.N.Y. Aug. 6, 2013) ................. 5
*SEC v. Cedric Kushner Promotions, Inc.*,
  417 F. Supp. 2d 326 (S.D.N.Y. 2006) ....................................................................... 8
*SEC v. Egan*, No. 13 Civ. 236 WHP, 994 F. Supp. 2d 558 (S.D.N.Y. 2014) ............. 7, 9

*SEC v. Espuelas*,
   579 F. Supp. 2d 461 (S.D.N.Y. 2008) .................................................................... 16
*SEC v. Landberg*,
   836 F. Supp. 2d 148 (S.D.N.Y. 2011) ...................................................................... 6
*SEC v. Morris*,
   No. H-04-3096, 2005 U.S. Dist. LEXIS 42106 (S.D. Tex. 2005) ........................... 16
*SEC v. Patel*,
   No. 07 Civ 39, 2009 U.S. Dist. LEXIS 90558 (D.N.H. 2009) ................................ 24
*SEC v. Power*,
   525 F. Supp. 2d 415 (S.D.N.Y. 2007) ...................................................................... 6
*SEC v. Sandifur*,
   No. C05-1631C, 2006 U.S. Dist. LEXIS 12243 (W.D. Wash. 2006) ...................... 20
*SEC v. Syron*,
   934 F. Supp. 2d 609 (S.D.N.Y. 2013) .................................................................. 6, 8
*SEC v. Treadway*,
   430 F. Supp. 2d 293 (S.D.N.Y. 2006) ...................................................................... 9
*SEC v. Wyly*,
   950 F. Supp. 2d 547 (2013) ...................................................................................... 9
*Shields v. Citytrust Bancorp, Inc.*,
   25 F.3d 1124 (2d Cir. 1994) ...................................................................................... 6
*United States v. Peoni*,
   100 F.2d 401 (2d Cir. 1938) .................................................................................... 18
*Vogel v. Sands Bros. & Co.*, 126 F. Supp. 2d 730 (S.D.N.Y. 2001) ........................... 7
*Woodward v. Metro Bank of Dallas*,
   522 F.2d 84 (5th Cir. 1957) .................................................................................... 13

**STATUTES**

15 U.S.C. § 77q(a) (Section 17(a)) ................................................................................ 24
15 U.S.C. § 78j (Section 10(b)) ................................................................................. 9, 24
15 U.S.C. § 78m(d) (Section 13(d)) ............................................................ 9, 19, 23, 24
15 U.S.C. § 78t(e) (Section 20(e)) .................................................................................. 1
Dodd-Frank Wall Street Reform and Consumer Protection Act of 1995, Pub. L. No.
   111-203 (July 21, 2010) ..................................................................................... 5, 25
Fed. R. Evid. 201(b)(2) .................................................................................................. 3

**OTHER AUTHORITIES**

*A Joint Report of the SEC and the CFTC on Harmonization of Regulation* (Oct. 16, 2009) ....... 25
OFFICE OF INVESTOR EDUCATION AND ADVOCACY, SEC. & EXCH. COMM'N, SEC PUB. NO.
   141, TRADING BASICS: UNDERSTANDING THE DIFFERENT WAYS TO BUY AND SELL STOCK
   (2011) .................................................................................................................... 15

**RULES**

Fed. R. Civ. P. 12(b) ............................................................................................. passim
Fed. R. Civ. P. 9(b) ............................................................................................... passim

Seref Doğan Erbek ("Erbek") respectfully submits this memorandum of law in support of his motion, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, to dismiss with prejudice the claims against him in the Second Amended Complaint ("Complaint" or "Cplt."). [1]

## I.   PRELIMINARY STATEMENT

Following a nearly five-year investigation, the United States Securities and Exchange Commission ("SEC") filed a sweeping Complaint alleging an international fraud scheme masterminded by Benjamin Wey ("Wey"). The Complaint alleges that certain professionals, including Seref Doğan Erbek ("Erbek"), aided and abetted this scheme. [2] The SEC's third attempt to allege facts sufficient to raise a strong inference of Erbek's recklessness or knowledge of the Weys' alleged fraud has failed, and therefore the Complaint should be dismissed with prejudice.

The Complaint is most notable for its material omissions. Among others, the Complaint fails to allege with requisite specificity that Erbek:

- had access to any facts that would have even alerted him to the possibility that his ministerial acts could have been part of a securities fraud scheme, let alone sufficient to infer his knowledge;
- knowingly participated in making any misrepresentations to anyone;
- had any discretion over any action that allegedly violated the securities laws; or
- had any monetary or other motive to participate in the scheme.

The Complaint attempts to paper over these critical gaps with conclusory allegations of Erbek "assisting," being "instrumental," or taking "knowing" action. Such conclusory allegations

---

[1] Erbek vigorously denies the SEC's allegations; the allegations set forth in the Complaint are presumed to be true solely for the purposes of the instant motion. *Holmes v. Grubman*, 568 F.3d 329, 335 (2d Cir. 2009) ("accepting all factual allegations in the complaint as true, and drawing all reasonable inferences in the plaintiff's favor" for the purpose of a motion to dismiss). Erbek joins in and adopts the arguments set forth in the memoranda of law filed on behalf of his co-defendants, to the extent not inconsistent with the arguments herein.

[2] Specifically, the Complaint alleges that Erbek aided and abetted violations of: (i) Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §78j(b) ("Section 10b"), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5 ("Rule 10b-5"), in violation of Section 20(e) of the Exchange Act, 15 U.S.C. § 78t(e) ("Section 20(e)") ("Third Claim") (Cplt. ¶¶ 123-26); (ii) Section 17(a) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. § 77q(a) ("Section 17(a)"), in violation of Section 15(b) of the Securities Act, 15 U.S.C. § 77o(b) ("Section 15(b)") ("Seventh Claim") (Cplt. ¶¶ 139-42); and (iii) Section 13(d) of the Exchange Act, 15 U.S.C. § 78m(d) ("Section 13(d)") and Rule 13d-1 promulgated thereunder, 17 C.F.R. § 240.13d-1 ("Rule 13d-1"), in violation of Section 20(e) ("Tenth Claim") (Cplt. ¶¶ 15558).

are legally insufficient and should not be credited by the Court. Accordingly, the Complaint fails

to meet the standards of Fed. R. Civ. P. 12(b) and 9(b) and should be dismissed with prejudice.

## II.     STATEMENT OF FACTS

### A.     The Allegations

#### 1.     The Alleged Scheme

According to the Complaint, Wey's business, NYGG, guided Chinese companies (the

"NYGG Clients") through the process of going public in the U.S., often through reverse mergers

with publicly-traded shell companies. (Cplt. ¶ 18). Wey, along with his wife and sister

(collectively, the "Weys"), (i) created and controlled a network of foreign nominee companies

(Cplt. ¶¶ 48-59); (ii) facilitated reverse mergers between Chinese operating companies and U.S.

shell companies (Cplt. ¶¶ 60-68); (iii) secretly obtained controlling interests in SmartHeat, Inc.

("SmartHeat"), Deer Consumer Products, Inc. ("Deer"), and CleanTech Innovations, Inc.

("CleanTech"), three post-merger entities, via a network of nominee companies that they secretly

controlled (Cplt. ¶¶ 47, 48, 60-68); (iv) improperly inflated the number of SmartHeat and Deer

shareholders by gifting shares to friends, family members, and business associates in an effort to

meet the NASDAQ listing requirements (Cplt. ¶¶ 82-90); (v) manipulated the market for Deer

and CleanTech securities (Cplt. ¶¶ 91-102); and (vi) failed to make required SEC filings that

would have revealed the Weys' ownership stake in and control over the NYGG entities (Cplt.

¶¶ 103-11). In addition to his sister, Tianyi Wei, three U.S.-licensed lawyers, Robert Newman,

William Uchimoto, and Wey's wife, Michaela are alleged to have assisted Wey.

#### 2.     Erbek's Alleged Involvement

Erbek provides fiduciary services to clients through his employer, a Swiss entity, EST, S.A. ("EST"). (Cplt. ¶ 28).[3] Erbek was hired to open and maintain brokerage accounts in Switzerland in the names of certain unspecified corporate and/or individual nominees and took direction from the beneficial owner(s) of its clients and those granted powers of attorney by the beneficial owner(s). (Cplt. ¶¶ 3, 23, 30-35, 38-40, 54, 100, 104). Erbek is described as "instrumental" to this allegedly complex, multi-year, international and "secret" (Cplt. ¶ 48) scheme; however, his alleged assistance amounts to but a few ministerial acts which do not support an inference of knowing or reckless wrongdoing.

### i.       Concealing Control of ACL

Wey made material misstatements and omissions in 2009 in an effort to conceal control of nominees and, thereby, the NYGG Clients. (Cplt. ¶¶ 72-81). When an underwriter asked Wey to sign a certification representing that Advantage Consultants, Ltd. ("ACL") was comprised solely of non-U.S. persons due to restrictions on foreign broker-dealers, Wey, with the assistance of Newman, misled the underwriter as to Wey's affiliation with ACL. (Cplt. ¶¶ 72-75). Newman allegedly knew that ACL was not comprised solely of non-U.S. persons because he had been informed in writing that ACL "was NYGG's BVI company." (Cplt. ¶ 72). Erbek allegedly assisted the underwriter in obtaining from ACL's sole director (a Bahamian corporation) a document certifying that ACL was "comprised solely of non-U.S. persons that are located outside the United States" (the "Certification"). (Cplt. ¶ 76). Without any explication, the

---

[3] We respectfully request that the Court also take judicial notice of the facts that: (i) EST is a member in good standing of, and is regulated by, the Association Romande des Intermédiaires Financiers ("ARIF"), which is a self-regulatory organization recognized by the Swiss Financial Market Supervisory Authority (FINMA). (See August 26, 2016 Declaration of Marc Litt ("Litt Decl.") at ¶ 2 and Ex. A); (ii) "[a]ny financial intermediary who wishes to become a member of ARIF must enjoy a good reputation in respect of his professional activity and guarantee compliance with the obligations under the MLA and under ARIF's Articles of Association, Self-regulation Rules and Directives" (see id. at ¶ 3 and Ex. B); and (iii) EST is subject to regular audits by ARIF. (See id. at ¶ 4 and Ex. C, pp. 1-2). The court "may judicially notice a fact that is not subject to reasonable dispute because it . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b)(2).

Complaint alleges that Erbek knew that the Certification was false "in numerous material respects, including the [above-quoted] statement." (Cplt. ¶ 76).

### ii.        Manipulating the Market for CleanTech Securities

The Complaint alleges that Erbek assisted in manipulating the market for securities of Deer and CleanTech. (Cplt. ¶ 91). The only reference to Erbek's alleged involvement in Deer stock manipulation is a conclusory allegation. *Id*. With regard to CleanTech, the Complaint alleges that, in February 2011, Erbek received an email sent by Benjamin Wey or someone else at his direction, which reflected "an intention to maintain the share price of CleanTech at $5.00," as part of Wey's larger scheme to "drive the stock's price upward." *Id.* Erbek "executed the orders as instructed in the email." *Id.* The Complaint does not allege the source of Erbek's knowledge of a scheme to drive up CleanTech's stock price other than the email, which reflects a run-of-the-mill limit order. Moreover, when the context of the email (which was deliberately omitted from the Complaint) is considered, it is clear that the Complaint mischaracterizes both the meaning of the email and Erbek's ministerial act of transmitting a client's instructions to a trader.

### iii.       Failure to File Schedule 13D

The Weys failed to file with the SEC forms showing their collective control over certain NYGG clients. (Cplt. ¶¶ 103-11). In 2010, Erbek allegedly assisted the Weys by helping to ensure that no nominee account held more than five percent of the total outstanding shares of any NYGG client. (Cplt. ¶ 104-05). Specifically, the Complaint alleges that Erbek received an email from an unidentified person ("Benjamin Wey or someone else at his direction") instructing him to allocate shares into three different accounts, and assuring him that it was appropriate to do so, because no account would breach a five percent limit. (Cplt. ¶ 104). The Complaint does not allege that Erbek ever executed the requested allocation and in fact does not allege that the

requested allocation of shares was ever executed at all. The Complaint references another

undated, but presumably subsequent, email from Erbek informing an unspecified recipient that

certain Deer stock would be deposited in an account so as to avoid breaching the five percent

limit. (*See* Cplt. ¶ 105). The Complaint does not allege that Erbek had any responsibility for

making the requisite SEC filings, and only conclusorily alleges that he was aware of the scheme

to conceal the Weys' ownership and control from the investing public.

## III.   ARGUMENT

### A.   The SEC's Claims Must Be Dismissed Pursuant To Rules 12(b)(6) And 9(b)

To survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6), the SEC's Complaint must

contain sufficient factual detail to "state a claim to relief that is plausible on its face." *Bell Atl.*

*Corp. v. Twombly*, 550 U.S. 544, 570 (2007). The SEC attempts to mask the paucity of evidence

against Erbek by peppering the Complaint with conclusory assertions about Erbek's alleged

knowledge or *scienter*.[4] Allegations phrased as legal conclusions, however, need not be accepted

as true. *Id.* at 555; *Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009) (citing *Ashcroft v. Iqbal*, 556

U.S. 662, 678 (2009) ("[A]lthough 'a court must accept as true all of the allegations contained in

a complaint,' that 'tenet' is inapplicable to legal conclusions' and '[t]hreadbare recitals of the

elements of a cause of action, supported by mere conclusory statements, do not suffice.'").

Claims that are merely possible or conceivable are subject to dismissal under Rule 12(b)(6).

*Ashcroft v. Iqbal*, 556 U.S. 662, 680 (2009). However, because the allegations against Erbek in

the Complaint are all "premised on averments of fraud," they must also meet Rule 9(b)'s

heightened standard of particularity. *Rombach v. Chang*, 355 F.3d 164, 171 (2d Cir. 2004)

---

[4] Any alleged violations that occurred before the July 21, 2010 effective date of the Dodd-Frank Wall Street Reform and Consumer Protection Act require the SEC to show that Erbek acted with actual knowledge. *SEC v. Aronson*, 11 Civ. 7033, 2013 U.S. Dist. LEXIS 114687, at *35 (S.D.N.Y. Aug. 6, 2013). Regardless of the date of alleged violations, we maintain that Erbek acted with neither knowledge of, nor reckless disregard for, any alleged primary violations of the securities laws.

(applying Rule 9(b) to claims brought under Sections 11 and 12(a)(2) of the Securities Act); *SEC v. Power*, 525 F. Supp. 2d 415, 423-424 (S.D.N.Y. 2007) (applying Rule 9(b) to reporting and recordkeeping violations under Exchange Act Section 13(a) and 13(b)(2)(A) and Rules 12b-20, 13a-1, 13a-13 and 13b2-1 where allegations were based on fraud); *see also* Fed. R. Civ. P. 9(b).

Rule 9(b) allows knowledge to be averred generally; however, one "must not mistake the relaxation of Rule 9(b)'s specificity requirement regarding condition of mind for a 'license to base claims of fraud on speculation and conclusory allegations.'" *Acito v. IMCERA Grp.*, 47 F.3d 47, 52 (2d Cir. 1995). Furthermore, "conclusory allegations—that Defendants 'knew but concealed' some things, or 'knew or were reckless in not knowing' other things—do not satisfy the requirements of Rule 9(b)." *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1129 (2d Cir. 1994). When a complaint asserts claims against more than one defendant, "[c]ourts are especially vigilant in applying Rule 9(b)." *Scone Invs., L.P. v. Am. Third Mkt. Corp.*, 97 Civ. 3802, 1998 U.S. Dist. LEXIS 5903, at *12 (S.D.N.Y. Apr. 27, 1998).

## B.   The Complaint Fails to Adequately Plead Erbek's Scienter

To adequately plead *scienter* under Rule 9(b), the SEC must "'allege facts that give rise to a strong inference of fraudulent intent.'" *SEC v. Landberg*, 836 F. Supp. 2d 148, 154 (S.D.N.Y. 2011) (Castel, J.) (quoting *Novak v. Kasaks*, 216 F.3d 300, 306 (2d Cir. 2000)). The SEC may do so "'either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness.'" *Id.* (quoting *Novak*, 216 F.3d at 307). In the absence of evidence of motive, the SEC "'must produce a stronger inference of recklessness.'" *SEC v. Syron*, 934 F. Supp. 2d 609, 631 (S.D.N.Y. 2013) (quoting *Kalnit*, 264 F.3d at 138-39). Recklessness may be shown by demonstrating "deliberate illegal behavior" or conduct that is an "extreme departure

from the standards of ordinary care." *Novak*, 216 F.3d at 308. "A complaint adequately pleads scienter only if a reasonable person would deem the inference of scienter both 'cogent' and 'at least as likely as any plausible opposing inference.'" *380544 Can., Inc. v. Aspen Tech., Inc.*, 544 F. Supp. 2d 199, 314 (S.D.N.Y. 2008) (quoting *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 323 (2007).

### 1.    The Complaint Fails to Allege That Erbek Had Any Motive to Commit Fraud

The Complaint does not contain any allegations as to Erbek's motive for jeopardizing his career and reputation in order to further the Weys' scheme. The Complaint does not allege that Erbek profited from any of the alleged schemes; it merely alleges that he was "paid . . . to open and maintain brokerage accounts in Switzerland in the names of various Nominees. . . ." (Cplt. ¶ 54). The mere motive to earn normal fees is not sufficient to allege scienter. "Motives that can be ascribed to 'virtually all corporate insiders,' or 'any publicly owned, for profit endeavor' are not sufficient to support a claim of fraud." *In re Alstom SA Sec. Litig.*, 406 F. Supp. 2d 433, 446 (S.D.N.Y. 2005) (quoting *Kalnit v. Eichler*, 264 F.3d 131, 138-139 (2d Cir. 2001); *Cellular S., Inc. v. J.P. Morgan Sec., Inc. (In re J.P. Morgan Auction Rate Secs. (ARS) Mktg. Litig.)*, No. 10 MG 2157, 2014 U.S. Dist. LEXIS 141022, at *33-34 (S.D.N.Y. Sept. 30, 2014) ("The fact that [Defendant] earned fees in connection with the sale . . . is not sufficient to establish its motive to commit fraud."); *Vogel v. Sands Bros. & Co.*, 126 F. Supp. 2d 730, 739 (S.D.N.Y. 2001) (Defendant's "alleged desire to realize greater transaction fees and its close relationship with [financial services holding company] are insufficient to show an improper motive.").

The Complaint does not allege how much Erbek was paid, and it would be unreasonable to infer that he was paid more than the standard rates charged by his employer for the services provided. Moreover, the Complaint does not allege that Erbek received shares in any of the

Nominees or that he profited from the purchase and sale of any of the securities at issue. In sharp contrast, the Complaint alleges that Robert "Newman's work for the NYGG Clients accounted for eighty to ninety percent of his law firm's business between 2009 and 2011, and at least fifty percent of his firm's business as late as 2012." (Cplt. ¶ 25). Similarly, the Complaint alleges that William "Uchimoto's legal practice was dominated by his representation of Wey's NYGG clients, which accounted for three of his top five clients, and the majority of his billing for a significant portion of the Relevant Period." (Cplt. ¶ 27). The Weys are alleged to have received millions of dollars in illicit profits.[5] Especially in light of the allegations about the other defendants, the lack of any evidence of Erbek's motive speaks volumes.

### 2. The Complaint Fails to Allege Facts Giving Rise to a Strong Inference of Conscious Misbehavior or Recklessness

In the absence of any evidence of motive for participating in a securities fraud scheme, the Complaint "must produce a *stronger* inference of recklessness." *SEC v. Syron*, 934 F. Supp. 2d 609, 361 (S.D.N.Y. 2013). In sum, the Complaint alleges that (i) Erbek's underlined employer received unspecified telephone calls that are not linked in any way to any action at all (let alone an action in furtherance of the alleged schemes)[6] (Cplt. ¶ 56); (ii) Erbek obtained for an underwriter a Certification as to which there is no indication of the source of Erbek's awareness of its falsity (Cplt. ¶ 76); (iii) Erbek communicated a limit order to a financial institution (Cplt. ¶ 100); and (iv) Erbek received email instructions that incompletely explained the "five percent rule" and wrote an email indicating an intent to comply with an instruction that complied with the rule as it was described to him. (Cplt. ¶¶ 104-05). None of these allegations provide evidence of the kind

---

[5] *See* Cplt. ¶¶ 2, 4, 10, 19, 59, 112-15 (Benjamin Wey); ¶¶ 2, 10, 23, 59, 112-15 (Michaela Wey); ¶¶ 2, 10, 21, 59, 112-15 (Tianyi Wei).

[6] Such "general assertions" do not suffice. *See SEC v. Cedric Kushner Promotions, Inc.*, 417 F. Supp. 2d 326, 335 (S.D.N.Y. 2006) (dismissing claims against a company's former director for aiding and abetting misstatements in an SEC filing where the SEC made "general assertions" that the defendant "must have known of material misstatements" because of his "constant e-mail and telephonic communication with members of the . . . team that prepared, reviewed and filed the [forms]."

of "deliberate illegal behavior" that is required to show knowledge or recklessness, *see Novak*, 216 F.3d at 308, nor do they satisfy the "correspondingly greater" standard of recklessness applicable in the absence of motive. *SEC v. Egan*, 994 F. Supp. 2d 558, 565 (S.D.N.Y. 2014).

### C.   The Complaint Fails to Adequately Allege Erbek's Awareness of, Involvement in, and Assistance to the Weys' Schemes

For each of the aiding and abetting claims against Erbek, the Complaint must allege facts supporting a plausible inference of: "(1) the existence of a securities law violation by the primary (as opposed to the aiding and abetting) party; (2) 'knowledge' of this violation on the part of the aider and abettor; and (3) 'substantial assistance' by the aider and abettor in the achievement of the primary violation." *SEC v. Apuzzo*, 689 F.3d 204, 206 (2d Cir. 2012) (citations omitted) (in the context of aiding and abetting an alleged violations of Section 10(b)); *see also SEC v. Wyly*, 950 F. Supp. 2d 547, 561 (S.D.N.Y. 2013) (applying this standard to aiding and abetting violations of Section 13(d)). "Substantial assistance means that the aider and abettor 'consciously assisted the commission of the [primary violation] in some active way.'" *Id*. at 562-63 (quoting *Apuzzo*, 689 F.3d at 212 n.8). "[M]ere awareness and approval of the primary violation is insufficient to make out a claim for substantial assistance." *SEC v. Treadway*, 430 F. Supp. 2d 293, 339 (S.D.N.Y. 2006). "Conscious or reckless violation of a duty to act" may also satisfy the substantial assistance prong. *Id.*

The Complaint fails to allege: a single specific meeting, telephone call, or email between Erbek and any of the Weys, Newman or Uchimoto; any basis to infer that Erbek should have known that any communication he received was, in fact, from Wey or sent at the direction of Wey; or, any communication from which Erbek should have known that a scheme to violate the

U.S. securities laws was afoot.[7] Moreover, the Complaint fails to allege that Erbek did anything more than perform ministerial acts which are, under the circumstances, more reasonably understood to be innocent than to be evidence of knowledge of, or conscious active assistance with, any violation of the securities laws. Accordingly, all three claims should be dismissed.

        **1.**      **The Complaint Fails to Allege Adequately Erbek's Awareness of, or Substantial Assistance in, Making Material Misstatements and Omissions to Conceal Control of the Nominees and, Thereby, the NYGG Clients**

                **i.**      **The Allegation Concerning the Certification is Fatally Flawed**

The Complaint alleges that Benjamin Wey failed to disclose conflicts of interest in connection with the underwriting of certain public offerings. One such alleged conflict related to ACL—one of the companies for which Erbek allegedly provided fiduciary services. (Cplt. ¶¶ 28, 31). The sole allegation pertaining to Erbek states:

> Eventually Benjamin Wey directed the primary underwriter to Erbek as a contact person for ACL. Erbek then directed the primary underwriter to a Bahamian consulting company that Erbek identified as ACL's sole director. At the primary underwriter's request, Erbek procured signatures from the Bahamian consulting company on the Certification. Newman and Erbek participated in the process of obtaining the ACL Certification, which they knew was false in numerous material respects, including the certification that ACL was 'comprised solely of non-U.S. persons that are located outside of United States.'

(Cplt. ¶¶ 75-76). The Certification, which is attached to Erbek's moving papers, consists of nearly three single-spaced typed pages and makes 16 separate representations covering a wide variety of subjects.[8] Fifteen of the sixteen representations specify the entity and/or individuals about which the representation is being made: 10 concern solely "ACL";[9] one concerns an

---

[7] The lack of such allegations is especially notable in light of the fact that unlike Michaela Wey and Robert Newman, who lived and worked in close physical proximity to Wey, and Uchimoto, who resided in Pennsylvania, Erbek resided nearly 4,000 miles away, in Switzerland, at all relevant times. (Cplt. ¶¶ 16, 22, 24-26, 28.)

[8] A movant may submit exhibits referred to in a plaintiff's complaint in support of its 12(b)(6) motion if the documents might be considered "integral" to the complaint. A document is considered integral under several circumstances, including if "the complaint relies heavily upon [the document's] terms and effect" or if that reliance "is a necessary prerequisite to the court's consideration of the document on a dismissal motion." *Chambers v. Time Warner*, 282 F.3d 147, 153-154 (2d Cir. 2002).

[9] See Litt Decl. ¶ 5 and Ex. D, pp 2-3 at ¶¶ 1, 2, 5-6, 8-12, and 16.

agreement between ACL and another company;[10] one concerns ACL's "offices or employees";[11] one concerns "ACL . . . [and] its officers, directors, employees, affiliates, agents or associated persons";[12] one concerns ACL's "officers, directors and employees";[13] and one concerns ACL and its "affiliates."[14]

The sole representation that the Complaint specifically alleges was false is the only one of the 16 representations in the Certification that does not clearly identify the categories of entities or individuals about which the representation is being made. The Certification does not define a key term ("comprised") in the allegedly false representation, which reads: "ACL is comprised solely of non-U.S. persons that are located outside the United States."[15] For that reason alone, the allegation concerning the Certification is fatally flawed.

### ii.    An Entity is Not "Comprised" of its Controlling Party

The Complaint fails to allege what aspect of the representation was materially false, thereby leaving the reader to speculate. At least two possibilities seem to be suggested: ACL was "comprised" of a U.S. person because Wey controlled ACL either through NYGG (ACL was "NYGG's BVI company," (Cplt. ¶ 72)) or through his sister, Tianyi Wei. (Cplt. ¶¶ 2, 72-76).

Under either theory, it is far from clear that anyone, without additional information, would understand that "comprised" was meant to include any owner or person with direct or indirect control over ACL. Indeed, the very definition of the verb "to comprise" requires those who use it to provide the parameters of its intended scope. *See* Webster's Third New International Dictionary (Merriam-Webster, Philip Babcock Gove, ed., 1993) ("to include, *esp. within a particular scope*") (emphasis added). Without a defined scope, it is far more reasonable

---

[10] Id. at 2, ¶ 3.
[11] Id. ¶ 4.
[12] Id. ¶ 7.
[13] Id. at 3, ¶ 14.
[14] Id. ¶ 15.
[15] *Id.* ¶ 13. The word "comprised" is neither used nor defined anywhere else in the Certification.

to understand the word "comprised" to include the constituent elements of a corporation (*e.g.*, its subsidiaries, officers, employees), but not elements that are larger than, or exogenous to, the corporation (such as its "parent" or one who owns or indirectly controls it).[16] This is especially so given the context here: wherever necessary, the Certification specifically identified categories of individuals outside of ACL (*e.g.*, employees, officers, directors, affiliates, associated persons).[17]

### iii.    The Complaint Fails to Adequately Allege Erbek's Knowledge of Wey's Control of ACL

Furthermore, nothing in the Complaint suggests that Erbek knew or should have known that Wey owned or controlled ACL, if in fact he did, as we suspect is the gravamen of the allegation. The Complaint's purely conclusory allegation that Erbek knew the ACL Certification was false, without more, does not meet Rule 9(b)'s heightened standard of particularity. There is neither evidence nor allegation that Erbek received or was aware of the written statement concerning NYGG's connection to ACL which allegedly was provided to Newman. (*See* Cplt. ¶ 72). The only other evidence on which the SEC appears to rely is the electronic copy of an unsigned letter dated in 2009 which purported to grant Wey trading authority over at least one account in the name of ACL (the "Unsigned Authorization"). (Cplt. ¶ 31). The Unsigned Authorization was recovered during the execution of search warrants at the offices of NYGG and Benjamin and Michaela Wey's residence in New York. (*Id.*). There is no allegation that the Unsigned Authorization even existed in September 2009, when the Certification was sought. Nor is there any allegation that it was ever executed, that Erbek ever saw it or was otherwise aware of its existence, or that it ever served as a basis for any of his actions. Even were the Court to infer

---

[16] The SEC's argument seems to be that it would be false to certify that New York City is comprised of solely Brooklyn, the Bronx, Manhattan, Queens and Staten Island, but fail to include New York State or the United States of America.
[17] See Litt Decl. ¶ 5 and Ex. D, pp 2-3 at ¶¶ 4, 7, 14, 15.

that Erbek was aware of this document and that it was in force at the time the Certification was sought, it would be unwarranted to make the leap of logic that one who has authority over a company's brokerage account of unspecified size and significance, may be understood to control the company itself.

### iv.    Erbek's Ministerial Act Did Not Constitute Substantial Assistance in Submitting a False Certification

As for Erbek's assistance, the Complaint alleges that Erbek performed the mere ministerial act of forwarding an underwriter's inquiry about ACL to ACL's director, obtained a response, and provided the response to the requestor. There is no "red flag" in the Complaint's allegations that Erbek ignored, or should have investigated. *Goplen v. 51job, Inc.*, 453 F. Supp. 2d 759, 775 (S.D.N.Y. 2006) ("That [defendant] signed the SEC filing—without specific allegations of reasonably available facts that should have put him on notice that the reported financial results were false—does not give rise to a strong inference of scienter."). In the absence of any non-conclusory allegation about Erbek's knowing involvement in Benjamin Wey's alleged scheme, his purely ministerial act of assisting an underwriter with obtaining the Certification may not serve as the basis for any charge alleging a violation of the anti-fraud provisions of the securities laws. "If the alleged aider and abettor conducts what appears to be a transaction in the ordinary course of his business, more evidence of his complicity is essential." *Woodward v. Metro Bank of Dallas*, 522 F.2d 84, 94 (5th Cir. 1957).[18]

In sum: the SEC alleges Erbek's substantial assistance in making multiple material misstatements in the ACL Certification; however, the Complaint identifies with specificity only

---

[18] The Complaint fails to identify any of the other "numerous material respects" in which the ACL Certification was false—much less Erbek's knowledge of those alleged falsities. This conclusory allegation should be given no weight at all. Surely, if the SEC could have alleged more specific facts against Erbek, it would have done so. *See, e.g.*, *O'Brien v. DiGrazia*, 544 F.2d 543, 546 n.3 (1st Cir. 1976) (affirming District Court's dismissal for failure to state a claim, while noting that "when a complaint omits facts that, if they existed, would clearly dominate the case, it seems fair to assume that those facts do not exist"). In any event, Erbek's alleged conduct occurred prior to November 2009 (*see* Cplt. ¶ 72) and, accordingly, as discussed in parts D and E, the SEC can neither use this conduct as the basis of its Section 17(a) claim, nor may it seek civil penalties based on that conduct under any of its other theories.

one false statement, about ACL's composition, and does not explicitly state what part of that representation was false. The Certification fails to define "comprise," and the natural reading of the statement at issue does not incorporate within its scope those who exercised control over ACL. The Complaint also fails to allege the source of Erbek's knowledge as to what U.S. person controlled ACL. Finally, Erbek's ministerial acts are insufficient to support an aiding and abetting claim. Accordingly, any claim based on this conduct should be dismissed.

##### 2.    The Complaint Fails to Adequately Allege Erbek's Awareness of, or Substantial Assistance in, the Alleged Manipulation

###### i.    The Allegedly Manipulative Order Was a Commonplace Limit Order

The Complaint asserts that, "[a]s part of the fraudulent scheme to illegally profit from his control of the NYGG Clients, Benjamin Wey, *with the assistance of Erbek*, Newman, Tianyi Wei, and Michaela Wey, manipulated the market for the securities of Deer and CleanTech." (Cplt. ¶ 91) (emphasis added). The Complaint describes an allegedly manipulative match trade in CleanTech securities in July 2010 through a U.S. brokerage firm. (Cplt. ¶¶ 51, 99). That trade was designed to achieve a share price of above $5 so that Wey could tout the increased price to potential investors. (*Id*.). Aside from the bare assertion of "assistance," (*see* Cplt. ¶ 91) the sole mention of Erbek in relation to any market manipulation is in paragraph 100:

> Similarly, a February 2011 email recovered during execution of the Search Warrants and sent from Benjamin Wey or someone else at his direction to Erbek revealed an intention to maintain the share price of CleanTech at $5.00. It read, "Dogan, Cleantech just traded at $4.50 per share. Please make sure the trader buys the stock at $5 per share, stay at $5 per share bid price, not less. Please make sure this happens right away." Erbek responded, "I did. Obviously, we need to be careful to give such orders / make such comments. I may explain it over the phone; please call me if you have time." Trading records for the Swiss accounts managed by Erbek indicate that he executed the orders as instructed in the email, showing purchases on February 7, 2011, of CleanTech shares in 100 to 198 share tranches at $4.86 and $4.93. These purchases were part of Benjamin Wey's effort to drive the stock's price upward.

(Cplt. ¶ 100; *see also* Litt Decl. at ¶ 6 and Ex. E). The Complaint offers no hint as to why Wey sought to manipulate CleanTech's share price higher, let alone how or why Erbek knew or should have known of Wey's plan or motive.

Fairly read, the email refers to a commonplace limit order: a type of order routinely executed in markets all over the world. (Cplt. ¶ 100).[19] That the email concerns a request to purchase shares of CleanTech at a price of up to $5 per share is borne out by the allegation that shares were bought at prices below, but not exceeding, $5 per share, not "at $5.00, not less" as the email literally directs. (*Id.*). It is also confirmed by the very trading records cited in the Complaint. (*See* Litt Decl. at ¶ 8-9 and Ex. G-H (Credit Suisse confirmation of a limit order placed by York Capital Management Ltd. on February 3, 2011 to purchase 50,000 shares of CleanTech at up to $5.00 per share)).

Importantly, the February 7 email was not a new order, as the Complaint would have the reader believe. The order was not placed when the price of the stock was $4.50 per share; rather, it was a reminder to execute an unfilled limit order that had been previously entered on February 3 when the stock was trading at between $5.20 and $5.50 per share, significantly above the limit price. (Litt Decl. at ¶ 8-9 and Ex. G-H). The attached trading records, and the Bloomberg historical price data (of which we request the Court to take judicial notice), show that no shares were purchased on February 3, when the stock traded between $5.20 and $5.50, and only 1,074 shares were purchased on February 4 at $4.98, when the stock traded between $4.91 and $5.50. (*See* Litt Decl. at ¶ 10 and Ex. I). There were no trades over the February 5-6 weekend, and February 7 was the first time after February 3 when the stock traded below the $5.00 limit.

---

[19] *See* Office of Investor Education and Advocacy, Sec. & Exch. Comm'n, SEC Pub. No. 141, Trading Basics: Understanding the Different Ways to Buy and Sell Stock (2011), Litt Decl. ¶ 7 and Ex. F ("The two most common order types are the market order and limit order.").

Read in its vital context, which was deliberately omitted from the Complaint, it becomes obvious that the cherry-picked trading records and February 7 email do not represent a new order intending to manipulate the stock price upward, but rather show the writer asking Erbek to remind the trader of the outstanding unfilled order entered when the price was above $5, and to urge the trader to execute that order while the stock was trading in a favorable range. In light of this context, the Complaint does not allege a scheme to manipulate, let alone the required scienter on the part of Erbek. The Complaint offers no hint at why Erbek should have understood this email, whether viewed in isolation or in context, to be part of an unawful scheme.[20]

### ii.    The Complaint Fails to Adequately Allege Erbek's Knowledge of a Scheme to Manipulate

In an apparent attempt to invite its reader to infer knowledge, the Complaint cites Erbek's emailed response, in which he urged the writer to "be careful to give such orders / make such comments" and wrote that he "may explain over the phone; please call me if you have time." (Cplt. ¶ 100). It is far more plausible from the context that the "orders" to which he is referring is not the substance of the email (the limit order), but rather its martial tone ("make sure this happens right away") and that Erbek was not troubled in any way by the limit order to which the email referred (*Id.*). Indeed, every aspect of Erbek's emailed response is inconsistent with his playing a knowing role in a scheme to violate the securities laws. Had Erbek been a knowing part of a manipulation scheme and had understood the trade order to be nefarious, why would he question the "mastermind" of the scheme about it? Why would he draw attention to it in writing? If Erbek had an urgent need to correct the "mastermind's" mistake and to prevent him from sending more incriminating emails, why would he casually suggest a call "if you have time"?

---

[20] Like its complaint in *SEC v. Espuelas*, the SEC's Complaint here fails to allege "knowledge of the impropriety" of the relevant transaction. 579 F. Supp. 2d 461, 480-481 (S.D.N.Y. 2008). The court dismissed the complaint in *Espuelas* for failure to plead with particularity. *Id.* at 481. *See also SEC v. Morris*, No. H-04-3096, 2005 U.S. Dist. LEXIS 42106, at *30 (S.D. Tex. 2005) (dismissing aiding and abetting claims where the SEC's allegations were about "ordinary business activities, without specifying facts that would show [defendant's] knowledge of participation in improper activity").

Why wouldn't he have picked up the phone and called Wey, rather than putting another "incriminating" communication in writing? Erbek's response is completely inconsistent with the actions of someone knowingly taking part in a scheme like the one alleged in the Complaint; rather, his email reflects the natural reaction of someone unconcerned with hiding anything, but interested in conveying to the sender that communicating the tone of the email would risk provoking a negative reaction from the very trader on whom the sender was relying for execution. Especially in light of the fact that the email concerned a legitimate limit order entered when the stock was trading above the limit price of $5 per share, this completely benign explanation is far more plausible than the more sinister and illogical one the Complaint seems to suggest.

Even more basically, the Complaint contains no allegation that Erbek knew that the instruction originated with Wey, or that he knew of any plan by Wey or anyone else to manipulate the price of CleanTech stock or to "drive the stock's price upward." In sum, whether the Court interprets the February 2011 email as a new order, as the Complaint misleadingly suggests, or in its proper context, the Complaint does not support an inference that Erbek knew or recklessly disregarded knowing that the email was sent as part of a plan to manipulate the price of CleanTech shares. These allegations fail to establish a strong inference that Erbek was reckless. *See, e.g., In re AOL Time Warner, Inc. Sec. Litig.*, 381 F. Supp. 2d 192, 226 (S.D.N.Y. 2004) ("The Amended Complaint does not establish that Defendant [] had knowledge of the nature of the allegedly fraudulent deals, but merely establishes that he participated on a telephone call where, *inter alia*, certain aspects of the deal were discussed."). In the absence of a non-conclusory allegation of either an underlying intent to manipulate or the knowing provision of assistance to an attempt to manipulate, the routine ministerial act of assisting with the execution of a limit order simply cannot be a violation of the law. Were it otherwise, brokers and

others across the globe would be subject to SEC securities fraud charges for executing routine

trading instructions regardless of whether they were aware of the motives for those instructions.

### iii.    The Complaint Does Not Adequately Allege Erbek's Substantial Assistance in a Manipulation Scheme

The SEC has failed to plead knowledge; correspondingly, its burden to prove substantial

assistance is even higher. *See SEC v. Apuzzo*, 689 F.3d at 214 ("Where . . . the SEC plausibly

alleges a high degree of actual knowledge, this lessens the burden it must meet in alleging

substantial assistance."). Merely alleging that Erbek received an email referring to a routine limit

order and possibly assisted in executing it (Cplt. ¶ 100),[21] does not come close to alleging—as it

must—that he "associate[d] himself with the venture, that [the defendant] participate[d] in it as in

something that he wishe[d] to bring about, [and] that he [sought] by his action to make it

succeed." *Id.* at 212 (quoting *United States v. Peoni*, 100 F.2d 401, 402 (2d Cir. 1938)).

The Complaint does not even mention Erbek in connection with the alleged manipulation

of the market for shares of Deer. The relevant paragraphs refer to activities in the "Swiss

Accounts" which the Complaint elsewhere alleges he was responsible for "maintain[ing]" (Cplt.

¶ 54) or "manag[ing]" (Cplt. ¶ 100).[22] Even assuming for purposes of the motion that Erbek had

any such responsibility, the Complaint merely asserts that Benjamin Wey had a reason to

maintain the price of Deer above $11 per share, and that there was a pattern of purchases and

sales of Deer shares in those accounts that "appear to have been aimed at and had the effect of

supporting the share price of Deer at $11.00." (Cplt. ¶ 102). Notably absent is any allegation that

Erbek knowingly received any instruction from Benjamin Wey with respect to these purchases

---

[21] Although the Complaint describes Erbek as a "broker," he is not alleged to have been a trader or an employee of a broker dealer or financial institution that executes trades. No inference should be drawn from the SEC's allegation that he "executed the orders as instructed in the email." (Cplt. ¶ 100). At most, any "execution" indicates only that Erbek performed the ministerial act of passing on a clients order to Credit Suisse, which was responsible for executing the order.

[22] Of course, the Complaint does not allege that Erbek had any discretion over the accounts and no doubt the SEC would have made such an allegation if it could. Accordingly, the only reasonable inference to be drawn from the Complaint's description of Erbek as a "manager" or "administrator" is that he performed the ministerial acts of passing on instructions from his client to the traders at the financial institution(s) at which the relevant accounts were custodied.

and sales (either directly or indirectly), let alone any allegation that he knew or had reason to know of Benjamin Wey's alleged ulterior motive with respect to such transactions. With the benefit of hindsight, the fruits of nearly five years of investigation, and three efforts to allege facts supporting a multi-year, multi-million dollar, cross-border, sophisticated scheme, the SEC now asserts that transactions in certain accounts that were established with Erbek's assistance "appear" to have been executed with the intent and effect of accomplishing one of Benjamin Wey's alleged objectives. There are no allegations that Erbek knew of, or had access to, any of the evidence on which the SEC rests this transparently weak conclusion. There are no allegations that Erbek did anything other than undertake innocuous ministerial acts. Such superficial allegations are plainly inadequate to meet the pleading requirements of Rules 12(b)(6) and 9(b) and insofar as the Complaint relies on these allegations, it should be dismissed.

> **3.    The Complaint Fails Adequately to Allege Erbek's Awareness of, or Substantial Assistance in, a Violation of Section 13(d)**

> **i.    The Alleged Scheme Is Not Unlawful**

The Complaint's allegations concerning Erbek's purported involvement in a scheme to violate Section 13(d) are illogical, internally inconsistent, contrary to law and regulation and unsupported by specific allegations. Accordingly, Claim Ten (and Claims Two and Seven to the extent that they are based on this scheme) must be dismissed.

The statute and regulation at issue require any individual or entity with a greater-than-five-percent beneficial ownership interest to disclose that interest on an SEC form. (Cplt. ¶ 103). Rule 13d-3 makes clear that the filing requirement exists for the beneficial owner(s) regardless of the number of accounts among which that interest is divided, and that the beneficial owners are

those that have ultimate control over the voting and/or disposition of the shares.[23] Indeed, an essential point of the regulation, which speaks in terms of "arrangements" and "understandings", not what may exist in the form of formal documentation, is to render inconsequential such "structuring" of holdings by placing a filing obligation squarely on the shoulders of the ultimate beneficial owner(s) of securities.

The Complaint alleges that "Benjamin Wey, Tianyi Wei, and Michaela Wey, "with the assistance of Erbek," structured the Nominees' holdings in an effort to ensure that no one entity or individual ever had a greater-than-five-percent beneficial ownership interest in any NYGG Client to avoid triggering the beneficial ownership disclosure requirements." (Cplt. ¶ 104). That statement is illogical and inconsistent with the other allegations in the Complaint. Because those who ultimately control the securities at issue have an obligation to file Schedules 13D or 13G, the titular or beneficial owner of the account(s) in which those securities are custodied does not affect the obligations of those who have the power to vote and/or dispose of the shares. Accordingly, allocating holdings to ensure that no one account or Nominee held more than five percent of a NYGG Client's shares could not have eliminated the alleged obligations of Benjamin and Michaela Wey to file Schedules 13D or 13G, and Erbek's alleged "assistance" could have done nothing to eliminate their filing obligations.[24]

ii.     The Allegations Concerning Erbek's Participation in a
        Section 13(d) Violation Are Insufficient

---

[23] "For the purposes of sections 13(d) and 13(g) of the Act a beneficial owner of a security includes any person who, directly or indirectly, through any contract, arrangement, understanding, relationship, or otherwise has or shares: (1) Voting power which includes the power to vote, or to direct the voting of, such security; and/or, (2) Investment power which includes the power to dispose, or to direct the disposition of, such security." 17 C.F.R. § 240.13d-3(a).

[24] Furthermore, even if the Court were to find that such "structuring" may be a violation of the securities laws, at no point does the Complaint allege that Erbek had any affirmative duty to act and, as previously noted, "mere awareness" of a primary violation does not constitute substantial assistance absent such duty. *Treadway*, 430 F. Supp 2d at 339; *see also SEC v. Sandifur*, No. C05-1631C, 2006 U.S. Dist. LEXIS 12243, at *37-38 (W.D. Wash. 2006) (in the context of the allegedly illegal structuring of a transaction, the court dismissed the case because allegations were insufficient to infer that the defendant had knowledge that the restructuring was being done for "improper or fraudulent" purposes).

Even were the Court to find that such "structuring" may be a violation of the securities laws, the Complaint does not allege facts sufficient to support an aiding and abetting charge against Erbek. The only non-conclusory allegations relating to Erbek are that: (1) on or about July 21, 2010, someone sent him an email directing him to "allocate on your end [in the Swiss accounts Erbek managed]: 1) Strong [Growth]: 1,000,000 shares. 2) A[CL]: 400,000 shares. 3) Y[ork Capital]: 351,610 shares. Since five percent limit at each account is 1.6 million . . . the above will be fine."; (2) on or about September 20, 2010, someone sent Erbek another email stating, "Under SEC filing requirements, any individual or entity owning more than 5% of a company's total outstanding shares must file SEC 13D or 13G forms." (Cplt. ¶ 104); and (3) Erbek explained in an email that "a recently purchased tranche of Deer stock would be deposited in the York Capital account rather than the Futmon account because 'all but F are within the 1.6 million limit.'" (Cplt. ¶ 105).

Neither of the emails Erbek received, sent two months apart, contains any statement alerting the reader of the sender's intent to improperly avoid Section 13(d)'s reporting requirements. Moreover, the Complaint does not make a single allegation that Erbek acted upon either email. Specifically, the Complaint fails to allege that Erbek allocated the shares as directed in the July 21, 2010 email. The Complaint alleges only that, at some point, Erbek explained via email that some Deer stock "would be" deposited in a certain account that was within the 1.6 million limit, and does not allege that the deposit actually occurred. At most, Erbek's email shows his understanding of, and intent to comply with, the instructions as they had been explained to him.[25] That the "mastermind" of the scheme found it necessary to mislead Erbek

---

[25] Unlike Newman and Michaela Wey, both New York-licensed lawyers also alleged to have aided and abetted a violation of Section 13(d), the Complaint neither alleges that Erbek had any familiarity whatsoever with U.S. securities laws, nor that he or his employer served any other U.S. client, or had any other client that traded U.S. securities as part of its business.

about the requirements of the SEC rule on multiple occasions hardly shows Erbek's knowing participation in a scheme to violate the securities laws.

The Complaint fails to allege that Erbek knew or was reckless in not knowing that: (i) Benjamin Wey, Tianyi Wei and Michaela Wey had an obligation to file any particular SEC forms; (ii) "the investing public routinely used such disclosures . . ., thereby relying on them in making investment decisions"; or (iii) Benjamin Wey, Tianyi Wei and Michaela Wey had failed to comply with SEC rules and regulations with respect to such filings. (*See* Cplt. ¶¶ 108-11). The SEC knew how to make those allegations when it thought it could—having at least asserted them in a conclusory way against the Weys and Robert Newman (a U.S.-licensed attorney who assisted Wey with securities transactions)—but studiously avoided making even such conclusory allegations against Erbek. (*See* Cplt. ¶ 111).[26] The only "knowledge" fairly attributable to Erbek is the description of the disclosure requirement contained in the two emails referenced in paragraph 104 of the Complaint, neither of which accurately reflects the applicable definition of "beneficial owner." Indeed, both emails are fully consistent with an understanding that there would be nothing improper about failing to disclose the beneficial owners of the shares because filing requirements are triggered by titular account ownership, not the beneficial ownership definition actually applicable to Section 13(d). The email cited in paragraph 105 merely reflects a corresponding understanding that allocating shares so that they remained under the 1.6 million limit would not violate filing requirements as they had been explained to him on at least two occasions. At most, it is consistent with his following a seemingly knowledgeable client's consistent instructions. Thus, the Complaint fails to meet the "at least as compelling as any opposing inference of nonfraudulent intent" standard that it must. *Tellabs*, 551 U.S. at 323.

---

[26] The only reference to Erbek's alleged knowledge or recklessness is in Claim Ten which merely tracks the statutory language in conclusory fashion. (Cplt. ¶ 157).

Even were the Court to draw the unwarranted inference that Erbek *did* anything to further the alleged Section 13(d) scheme, the mere allocation of shares among accounts is a ministerial action of the kind undertaken by financial intermediaries millions of times a day. Absent any specific allegation of knowledge about the purpose of the scheme, a fraud claim that relies on this theory must be dismissed. In essence, the Complaint alleges a securities fraud claim based on the mere receipt of facially valid instructions. If permitted, one reasonably would expect that financial institutions and professionals across the globe would take note and that markets would grind to a halt. No rational person would be willing to take the risk that they too would be charged by the SEC for being the unwitting recipient of an instruction sent at the direction of an unknown third party harboring an undisclosed intent to violate the securities laws.

*       *       *

In sum, the Complaint alleges numerous schemes directed by Benjamin Wey from which the Weys profited handsomely. The few allegations in the Complaint that pertain to Erbek describe ministerial conduct of a kind routinely undertaken by financial professionals on a daily basis. Erbek or his employer is alleged to have received telephone calls, trading instructions and emails. Erbek is alleged to have put an underwriter in touch with the sole director of a company, and to have received an instruction to allocate shares among certain accounts—something that would not violate the law if it had been executed. Throughout, the Complaint conclusorily asserts that Erbek knew of Wey's alleged schemes, and implicitly asserts that he knew that the communications he received came from, or were directed by, Wey. The allegations contained in the Complaint do not support those conclusions.

During its investigation, the SEC has collected voluminous records and evidence. "At this stage, inference, innuendo, resort to the passive voice, group pleading, and vague conclusory language all tend to suggest that the SEC does not have, and has little hope of finding, evidence

23

necessary to support its claims." *SEC v. Patel*, No. 07 Civ 39, 2009 U.S. Dist. LEXIS 90558, at

*45-46 (D.N.H. 2009). Erbek continues to suffer grievous damage to his reputation and business

as a consequence of these unsupported allegations—the very imposition of "enormous social and

economic costs absent some factual basis" that Rule 9(b) is designed to prevent. *Rombach*, 355

F.3d at 171 (quoting *In re Stac Elecs. Sec. Litig.*, 89 F.3d 1399, 690-691 (9th Cir. 1996). If the

pleading standards are to impose any burden at all on the SEC, this Complaint must be dismissed.

### D.    The SEC's Claims for Civil Penalties Arising from Erbek's Alleged Actions Prior to September 10, 2010 are Time-Barred

The SEC alleges that Erbek aided and abetted violations of Section 10(b), Section 17(a),

and Section 13(d) of the Exchange Act. Because these statutes do not set forth a limitations

period, the Court should apply 28 U.S.C. § 2462. Under 28 U.S.C. § 2462, civil penalties are

subject to a five-year statute of limitations. *Gabelli v. SEC*, 133 S. Ct. 1216, 1220 & n.1, 185 L.

Ed. 2d 297 (2013). In *Gabelli*, the Court held that a claim generally accrues "when it comes into

existence," or "when the plaintiff has a complete and present cause of action." *Id.* at 1220. The

limited exception to this (the "discovery rule") is not applicable in this case, as the government,

rather than a defrauded victim, is bringing an enforcement action for civil penalties. *Id.* at 1221.

The SEC filed its initial Complaint on September 10, 2015. Accordingly, claims for civil

penalties arising from Erbek's alleged actions prior to September 10, 2010 are time-barred.

### E.    Claims Arising From Actions in Violation of Section 15(b) Prior to July 21, 2010 Should Be Dismissed

The SEC alleges that Erbek violated Section 15(b) of the Securities Act by aiding and

abetting violations of Section 17(a). (Cplt. ¶¶ 141-42). Prior to July 21, 2010, when Congress

amended the Securities Act to grant a right of action to the SEC for aiding and abetting

violations of the Securities Act, there was no such liability.[27] All claims for aiding and abetting violations of the Securities Act based in conduct prior to July 21, 2010 must be dismissed; application of Section 15(b) would be an impermissibly retroactive application of Dodd-Frank. *See Landgraf v. USI Film Products*, 511 U.S. 244, 280 (1994) (Where a statute would "increase a party's liability for past conduct, or impose new duties with respect to transactions already completed . . . our traditional presumption teaches that it does not govern absent clear congressional intent favoring such a result"); *Koch v. SEC*, 793 F.3d 147, 158 (D.C. Cir. 2015) (barring retroactive application by SEC of remedies created by Dodd-Frank because the statute "does not expressly authorize retroactive application").

## IV.   CONCLUSION

In light of the overwhelming deficiencies of this third effort to plead violations of the securities laws and in accordance with the Court's June 8th Scheduling Order, no further amendment should be permitted, and the Complaint should be dismissed with prejudice.

Dated: August 26, 2016
       New York, New York

                          BAKER & McKENZIE LLP


                          By: _____s/Marc Litt_____
                                     Marc Litt

                          Attorneys for Defendant Seref Doğan Erbek

                          452 Fifth Avenue
                          New York, New York  10018
                          Tel:  (212) 626-4454
                          Fax:  (212) 310-1802
                          Email:  marc.litt@bakermckenzie.com

---

[27] The SEC requested that Congress expand "the SEC's statutory authority to allow the SEC to bring actions for aiding and abetting violations of the Securities Act" on October 16, 2009. *A Joint Report of the SEC and the CFTC on Harmonization of Regulation*, 92-93 (Oct. 16, 2009). Congress amended the Securities Act on July 21, 2010. Dodd-Frank, Pub. L. No. 111-203, 124 Stat. 1376 § 929M(a) (July 21, 2010) (codified at 15 U.S.C. § 77o(b)).