UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>BENJAMIN WEY, *et al.*<br><br>Defendants,<br><br>and<br><br>ADVANTAGE CONSULTANTS, LTD., *et al.*<br><br>Relief Defendants. | Civil Action No. 15-7116-PKC<br>ECF CASE |

PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANT ERBEK'S MOTION TO DISMISS

Derek S. Bentsen
Joshua Braunstein
U.S. Securities and Exchange Commission
100 F Street, N.E.
Washington, DC 20549
202.551.6426 (Bentsen)
202.772.9245 (facsimile)
bentsend@sec.gov

*Counsel for Plaintiff*

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ..................................................................................................1

FACTS ............................................................................................................................................1

       Misleading an Underwriter of a SmartHeat Public Offering ...........................................3

       Concealment of Ownership to Avoid Reporting Requirements ......................................3

       Manipulative Trading of Deer and CleanTech Shares......................................................4

ARGUMENT ..................................................................................................................................5

   I.      The SEC Has Sufficiently Pled Claims that Erbek Aided and Abetted Violations of Sections 10(b) and Rule 10b-5 of the Exchange Act, Section 17(a) of the Securities Act, and Section 13(d) and Rule 13d-1 of the Exchange Act ....................5

       A.  The SEC Has Adequately Pled that Erbek Aided and Abetted Violations of Section 10(b) and Rule 10b-5 of the Exchange Act and Section 17(a) of the Securities Act. .................................................................................................7

       B.  The SEC Has Adequately Pled that Erbek Aided and Abetted Violations of Section 13d and Rule 13d-1........................................................................11

   II.     The Statute of Limitations Bars No Claims Against Erbek......................................12

   III.    The SEC Has Adequately Pled Violations of Section 15(b) Based on Actions after July 21, 2010. ...............................................................................................................13

   IV.    Conclusion .................................................................................................................14

# **TABLE OF AUTHORITIES**

**Cases**                                                                                                                           Page(s)

*Acito v. IMCERA Grp., Inc.*,
47 F.3d 47 (2d Cir. 1995)...................................................................................................7

*Burt v. Maasberg*,
2014 WL 1291834 (D. Md. March 28, 2014)..................................................................10

*Gabelli v. SEC*,
133 S. Ct. 1216 (2013).......................................................................................................12

*In re Elevator Antitrust Litig.*,
502 F.3d 47 (2d Cir. 2007)..................................................................................................6

*In re Lululemon Sec. Litig.*,
14 F. Supp. 3d 553 (S.D.N.Y. 2014) ............................................................................6, 11

*Nigerian Nat'l Petroleum Corp. v. Citibank, N.A.*,
1999 WL 558141 (S.D.N.Y. July 30, 1999)....................................................................11

*Novak v. Kasaks*,
215 F.3d 300 (2d Cir. 2000)........................................................................................7, 10

*Pension Committee of Univ. of Montreal Pension Plan v. Banc of America Securities, LLC*,
652 F. Supp. 495 (S.D.N.Y.)..............................................................................................9

*Rolf v. Blyth, Eastman Dillon & Co., Inc.*,
570 F.2d 38 (2d Cir. 1978)..................................................................................................7

*SEC v. Apuzzo*,
689 F.3d 204 (2d Cir. 2012).....................................................................................6, 7, 11

*SEC v. Aragon Capital Advisors, LLC*,
07 CIV 919 (FM) 2011 WL 3278907 (S.D.N.Y. July 26, 2011)......................................6

*SEC v. Aronson*,
11 Civ. 7033, 2013 WL 4082900 (S.D.N.Y. Aug. 6, 2013).........................................6-7

*SEC v. DiBella*,
587 F.3d 553 (2d Cir. 2009)................................................................................................6

*SEC v. Landberg*,
836 F. Supp. 2d 148 (S.D.N.Y. 2011)................................................................................6

*SEC v. Straub*,
921 F. Supp. 2d 244 (S.D.N.Y. 2013)..................................................................................13

*SEC v. Treadway*,
430 F. Supp. 2d 293 (S.D.N.Y. 2006)....................................................................................6

*SEC v. U.S. Envtl., Inc.*,
155 F.3d 107 (2d Cir. 1998)...................................................................................................9

*United States v. Peioni*,
100 F.2d 401 (2d Cir. 1938)...................................................................................................7

*Vladimir v. Bioenvision Inc.*,
606 F.Supp. 2d 473 (S.D.N.Y. 2009)...................................................................................10

**Statutes**

15 U.S.C. § 78t(e)......................................................................................................................6
28 U.S.C. § 2462......................................................................................................................12

The Securities and Exchange Commission ("SEC" or "Commission") respectfully submits this opposition to Defendant Seref Dogan Erbek's Motion to Dismiss.

## PRELIMINARY STATEMENT

Defendant Erbek is charged with aiding and abetting violations of Section 10(b) and Rule 10b-5 of the Exchange Act, Section 17(a) of the Securities Act, and Section 13(d) and Rule 13d-1 of the Exchange Act. He has moved to dismiss the SEC's Second Amended Complaint ("SAC") claiming various factual inadequacies. His claims amount, however, to nothing more than Erbek's efforts to explain away the damning evidence against him. He aided and abetted the fraudulent scheme in multiple ways, including placing manipulative stock trades and structuring securities holdings to help conceal his co-defendant Benjamin Wey's control over certain companies through Wey's beneficial ownership of a large percentage of those companies' freely-trading shares. Nor does the statute of limitations provide Erbek any relief because he was not in the United States, and the statute has, therefore, not run. The SEC has pled facts that adequately allege that Erbek aided and abetted violations within the five-year statute of limitations, and after the Securities Act was amended to include Section 15(a). Erbek's motion must be denied.

## FACTS

Erbek engaged in deceptive conduct in furtherance of an international scheme orchestrated by Benjamin Wey and others to gain an undisclosed controlling interest in several Chinese companies that hired Wey and his company, New York Global Group ("NYGG"), to become United States issuers. SAC ¶¶ 1-2. Wey, with the assistance of his co-defendants, would identify and gain secret control of a publicly traded U.S. shell company and then merge one of the Chinese companies that were NYGG clients into the U.S. shell company he

1

controlled. *Id.* ¶ 3. After the merger, Wey and his co-defendants divided shares of the newly-merged company into several nominee accounts to try to avoid disclosing that their beneficial interest exceeded five percent.[1] *Id.* Wey and his co-defendants would then convince the management of the Chinese companies to enter into "lock up" agreements that prevented the management from trading their shares for a period of time during which Wey would be in control of the vast majority of publicly trading shares. *Id.* ¶ 4. This control allowed Wey and those who aided him to manipulate the market for those securities and profit from the scheme. *Id.*

Erbek substantially assisted the fraudulent scheme by:

- Structuring securities holdings in an attempt to evade reporting requirements; *id*. ¶¶ 103-05;
- Placing manipulative trades in Deer securities; *id.* ¶¶ 101-02;
- Placing manipulative trades in CleanTech securities; *id.* ¶¶ 100; and
- Misleading an underwriter about Benjamin Wey's relationship to one of the nominees used in the scheme. *Id.* ¶ 76.

Erbek was at all relevant times an employee of a firm based in Geneva, Switzerland that provided "financial and fiduciary services." *Id.* ¶ 28. Benjamin Wey, his wife, Michaela Wey, and his sister, Tianyi Wei, hired and paid Erbek to open and maintain brokerage accounts in the names of various nominees to hold and trade the shares of NYGG clients. *Id.* ¶ 54. The nominees included: Advantage Consultants, Ltd. ("ACL"), York Capital Management, Ltd. ("York Capital"), Strong Growth Capital, Ltd. ("Strong Growth"), Futmon Holdings, Ltd. ("Futmon"), Bicornio Real Estate S.A. ("Bicornio"), Roosen Commercial Corp. ("Roosen"), and Wolf Enterprises, Ltd. ("Wolf"). *Id.* ¶¶ 31-32, 34, 38-41.

---

[1] Beneficial owners of five percent or more of an issuer's securities are required to report such ownership to the SEC.

2

**Misleading an Underwriter of a SmartHeat Public Offering**

In November 2009, Erbek assisted Wey in concealing Wey's affiliation with ACL from the primary underwriter for a SmartHeat public offering of securities. *Id.* ¶ 76. SmartHeat's underwriter performed due diligence in an effort to determine whether Wey, NYGG, or anyone associated with the offering had a relationship with ACL. SAC ¶ 73. Wey lied and told the underwriter that neither he nor NYGG had any affiliation with ACL and directed the underwriter to speak to Erbek. SAC ¶¶ 74, 76. When contacted by the underwriter, Erbek was aware that Wey had investment authority over an ACL brokerage account, but did not disclose this information. *Id.* ¶¶ 31, 54. Instead, Erbek misleadingly identified a Bahamian consulting company as ACL's "sole director" and assisted in obtaining signatures from that consulting company on a certification on behalf of ACL. *Id.* ¶ 76. Erbek participated in the preparation of the certification and knew that many of the representations in the certification were false, including a representation that ACL was comprised solely of non-U.S. persons. This was false because Wey, a U.S. citizen, effectively controlled ACL.

**Concealment of Ownership to Avoid Reporting Requirements**

On numerous occasions during at least 2010 and 2011, Wey, or someone else at his direction, sent emails to Erbek with instructions for placing manipulative trades in the securities of NYGG clients and for the allocation of securities among the brokerage accounts held by the nominees in amounts to avoid required disclosure. *Id.* ¶ 56. For example, in 2010, Wey emailed Erbek instructions to structure the shares of one of NYGG's clients, Deer, among accounts in the names of Strong Growth, ACL, York Capital, and Futmon so that no single individual or entity owned more than five percent of the Deer's shares, which amounted to 1.6 million shares. SAC ¶¶ 104, 105. Similarly, in September 2010, Erbek received another email explicitly explaining

that, "Under SEC filing requirements, any individual or entity owning more than 5% of a company's total outstanding shares must file SEC 13D or 13G forms." *Id.* ¶104.

At the time, Erbek was aware of certain of his co-defendants' common investment authority over the nominee brokerage accounts. *Id.* ¶¶ 31-34, 104. In 2008, Erbek learned that Michaela Wey possessed trading authority over the brokerage accounts of two of the nominees, Bicornio and Roosen. *Id.* ¶¶ 39-40. Similarly, in 2009, Tianyi Wei informed Erbek she was granting Benjamin Wey trading authority over the ACL, York Capital, and Strong Growth brokerage accounts. *Id.* ¶¶ 31, 32, 34.

Erbek heeded the instructions he received in these emails and emailed Wey that the recently purchased Deer stock would be deposited in the York Capital account rather than the Futmon because "all but F[utmon] are with the 1.6 million limit." *Id.* ¶ 105. Prior to this email, Erbek had been informed that 1.6 million shares was the 5% threshold for Deer. *Id.* ¶ 104.

**Manipulative Trading of Deer and Cleantech Shares**

Erbek also assisted Wey in using the nominee brokerage accounts opened and managed by Erbek to manipulate the share prices of the NYGG issuers, including Deer in 2010 and CleanTech in 2011. *Id.* ¶¶ 100-102. On December 10, 2009, Deer conducted a public offering of 6,000,000 shares at a price of $11 per share. *Id.* ¶ 101. In the fall of 2010, Wey was attempting to secure an underwriter for a financing for CleanTech and was touting the quality of the companies he was advising. *Id.* Specifically, on October 14, 2010, Wey emailed the primary underwriter of the Deer offering noting that Deer was "trading at $11.40 last trade, above the offering price in December 2009." *Id.*

During this same period, while Wey was looking to secure an underwriter for a CleanTech financing, the nominee accounts under his and Erbek's control sold over a million

4

shares of Deer for a profit at prices between $11.40 and $12.00 per share. *Id* ¶ 102. On eight occasions during this period, the price of Deer dropped below the $11 per share price of its prior public offering. *Id.* ¶¶ 101, 102. When the price dropped below $11 per share, nominee accounts managed by Erbek that had been selling substantial amounts of Deer shares reversed course and began purchasing large amounts of Deer in concert with each other. *Id.* ¶¶ 100, 102. These purchases constituted a significant amount of the daily volume of the stock traded. *Id.* ¶ 102. The trades had the effect of supporting the share price of Deer at $11. *Id.*

Erbek also assisted Wey in manipulating the price of CleanTech shares. In 2011, Wey instructed Erbek to assist in artificially maintaining the price of CleanTech shares by having Wey's nominees purchase them for well above their market value. *Id.* ¶ 100. Wey emailed Erbek to "make sure the trader buys the stock at $5 per share, stay at $5 per share price, not less." *Id.* Erbek responded, "I did," and warned Wey, "we need to be careful to give such orders/ make such comments . . . I may explain it over the phone; please call me when you have the time." *Id*. Records show that the accounts then purchased shares and raised the price to $4.93. *Id.*

## ARGUMENT

I. **The SEC Has Sufficiently Pled Claims that Erbek Aided and Abetted Violations of Sections 10(b) and Rule 10b-5 of the Exchange Act, Section 17(a) of the Securities Act, and Section 13(d) and Rule 13d-1 of the Exchange Act.**

Erbek is charged with aiding and abetting violations of Section 10(b) and Rule 10b-5of the Exchange Act, Section 17(a) of the Securities Act, and Section 13(d) and Rule 13d-1 of the Exchange Act. To adequately allege a charge of aiding and abetting a violation of the federal securities laws, the Commission must plead: "(1) the existence of a securities law violation by the primary (as opposed to the aiding and abetting) party; (2) knowledge of this violation on the

5

part of the aider and abettor; and (3) 'substantial' assistance by the aider and abettor in the achievement of the primary violation." *SEC v. Apuzzo*, 689 F.3d 204, 211 (2d Cir. 2012); *SEC v. DiBella*, 587 F.3d 553, 566 (2d Cir. 2009).  In evaluating the pleading on a motion to dismiss, all non-conclusory, factual allegations are accepted as true and all reasonable inferences are drawn in favor of the Commission. *In re Elevator Antitrust Litig.*, 502 F.3d 47, 50 (2d Cir. 2007); *SEC v. Landberg*, 836 F. Supp. 2d 148, 152 (S.D.N.Y. 2011).  Finally, the facts must be considered in their totality, not in isolation. *In re Lululemon Sec. Litig.*, 14 F. Supp. 3d 553, 573 (S.D.N.Y. 2014) (court must evaluate "all facts taken together—that is, collectively" when evaluating scienter on a motion to dismiss).

The knowledge and substantial assistance requirements "cannot be considered in isolation," and a strong showing on one prong lessens the burden on the other. *DiBella*, 587 F.3d at 566; *Apuzzo*, 689 F.3d at 215 ("[A] high degree of knowledge may lessen the SEC's burden in proving substantial assistance, just as a high degree of substantial assistance may lessen the SEC's burden in proving *scienter*.").  For all conduct after July 20, 2010 (the effective date of Dodd-Frank Wall Street Reform and Consumer Protection Act), a "reckless state of mind [] is plainly sufficient to impose liability on an aider and abettor under Section 20(e)." *SEC v. Aragon Capital Advisors, LLC*, Case No. 07 CIV 919 (FM), 2011 WL 3278907 at *16 (S.D.N.Y. July 26, 2011); 15 U.S.C. § 78t(e).  Although there has been some disagreement, this Court has concluded that "[t]he scienter standard in this Circuit included recklessness prior to Dodd-Frank." *SEC v. Landberg*, 836 F. Supp. 2d 148, 157 (S.D.N.Y. 2011) (Castel, J.) (citing *DiBella*); *SEC v. Treadway,* 430 F. Supp. 2d 293, 339 (S.D.N.Y. 2006) ("To hold [Defendants] liable for aiding and abetting, the SEC must show that [Defendants] knew or were reckless with respect to any primary violations."); *but see, e.g., SEC v. Aronson,* 11 Civ. 7033, 2013 WL

4082900, *10 (S.D.N.Y. Aug. 6, 2013) (acknowledging post-*Apuzzo* disagreement on the issue but concluding that the SEC must show actual knowledge for aiding and abetting claims premised on pre-Dodd-Frank conduct).

In pleading scienter, the Commission must "alleged facts that give rise to a strong inference of fraudulent intent." *Novak v. Kasaks*, 216 F.3d 300, 306 (2d Cir. 2000) (quoting *Acito v. IMCERA Grp., Inc.*, 47 F.3d 47, 52 (2d Cir. 1995)). A "strong inference" of fraudulent intent "may be established either (a) by alleging facts to show the defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Novak*, 216 F.3d at 307 (internal quotations omitted). Reckless conduct is "'at the least, conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care . . . to the extent that danger was either known to the defendant or so obvious that the defendant must have been aware of it.'" *Id*. at 308 (ellipsis in original) (quoting *Rolf v. Blyth, Eastman Dillon & Co., Inc.*, 570 F.2d 38, 47 (2d Cir. 1978)).

Substantial assistance requires that the "defendant 'in some sort associated himself with the venture, that he participated in it as in something that he wished to bring about, and that he sought by his action to make it succeed.'" *Apuzzo*, 689 F.3d at 206 (quoting *United States v. Peioni*, 100 F.2d 401, 402 (2d Cir. 1938)).

> **A.** **The SEC Has Adequately Pled that Erbek Aided and Abetted Violations of Section 10(b) and Rule 10b-5 of the Exchange Act and Section 17(a) of the Securities Act.**

Erbek is charged in the SEC's Third and Seventh Claim for Relief with aiding and abetting violations of the antifraud provisions of the federal securities laws, namely Section 10(b) and Rule 10b-5 of the Exchange Act, and Section 17(a) of the Securities Act. The SAC

alleges that Erbek provided substantial assistance to the fraudulent scheme by, among other things, engaging in market manipulation and structuring Wey's holdings in an effort to evade the reporting requirements. Any of Erbek's alleged actions would be sufficient to establish his substantial assistance; but when viewed as a whole, the allegations overwhelmingly show that Erbek aided and abetted primary violations of the antifraud provisions. Because Erbek is charged with aiding and abetting a scheme, the question is whether his actions in total aided and abetted the scheme, not, as Erbek suggests, whether each of his actions in isolation are on their own sufficient. The question before the Court is whether the facts alleged as a whole show that Erbek aided and abetted the scheme. As demonstrated below, they do.

Although Erbek argues that the SAC does not allege his knowledge of the scheme or his scienter in assisting it, such arguments ignore the well-pleaded allegations. Instead of acknowledging that all reasonable inferences must be drawn in the Commission's favor at the motion to dismiss stage, Erbek argues his own self-serving interpretation of the evidence against him. That is proper for his closing argument, but not a motion to dismiss. When read fairly, the SAC easily alleges Erbek's knowledge of the scheme and his scienter in assisting it.

For example, the manipulative intent behind the instructions Erbek received and acted upon in Wey's February 2011 email is clear on the face of the email. Wey instructs Erbek, "Cleantech just traded at $4.50. Please make sure the trader buys the stock at $5 per share, stay at $5 per share bid price, ***not less***." SAC ¶ 100 (emphasis added). The only reasonable inference to be drawn from an instruction to buy shares at $5, a price above what the shares were currently trading, and to not buy at a lower price, is that the trading was intended to manipulate the share price. Erbek's response, warning, "Obviously, we need to be careful to give such orders / make such comments," is additional evidence that Erbek understood Wey's instruction to be a request

for him to place manipulative trades and was cautioning him against putting such obviously illegal instructions in writing. This is evidence of Erbek's consciousness of guilt. The SAC sufficiently alleges facts that show conscious misbehavior by Erbek and direct knowledge of the scheme.

Because Erbek executed Wey's instructions to engage in market manipulation, he provided substantial assistance to the scheme. By executing on Wey's instructions to engage in market manipulation, he participated in the venture and sought to bring about a successful outcome and thus provided the necessary substantial assistance. Given that Erbek's conduct by itself could be a primary violation, it strains credulity to contend that a broker placing manipulative orders is not providing substantial assistance. *Cf. SEC v. U.S. Envtl., Inc.*, 155 F.3d 107, 108 (2d Cir. 1998) (broker liable for primary violation for executing manipulative trades). Erbek's argument that his acts were "ministerial" is irrelevant and ignores the applicable standard for substantial assistance. *Cf. Pension Committee of Univ. of Montreal Pension Plan v. Banc of America Securities, LLC*, 652 F. Supp. 2d 495, 511 (S.D.N.Y.) (rejecting argument that acts were merely clerical and instead applying substantial assistance test to acts). By executing Wey's instructions to place the manipulative order, Erbek substantially assisted the primary violation.

In addition, it is reasonable to infer based on his control and management of the accounts that Erbek was the person executing the manipulative trades in Deer described in paragraphs 101 and 102 of the SAC. *See* SAC ¶ 29, 54, 56, 91. Although the nominee accounts that Erbek managed were selling substantial amounts of Deer stock during the relevant period, on at least eight occasions, the price dropped below the level Wey desired. *Id.* ¶ 101, 102. Each time the price dropped too low, the nominee accounts that Erbek was handling reversed course from

selling and began buying to support the price. *Id*. ¶ 102. That repeated course of conduct, particularly with Swiss nominee accounts working "in concert," constitutes "strong circumstantial evidence of recklessness or conscious misbehavior," *Novak*, 216 F.3d at 309-310, knowledge of the scheme and substantial assistance in furthering it.

Additionally, Erbek aided and abetted violations of the anti-fraud provisions by assisting Wey and Tianyi Wei in structuring securities holdings to conceal their ownership of more than five percent of several companies and the resulting failure to file required Schedule 13D reports with the Commission. *See Vladimir v. Bioenvision Inc.*, 606 F. Supp. 2d 473, 491 (S.D.N.Y. 2009) ("[P]laintiff can point to a violation of section 13(d) as the predicate for a 10b-5 claim."); *Burt v. Maasberg*, 2014 WL 1291834 at *17 (D. Md. March 28, 2014) ("The failure to file or amend a Schedule 13D, as required, serves as a predicate for liability under § 10(b) and Rule 10b–5(b).").

Once again Erbek's attempts to explain away the allegations are foiled by a plain reading of the SAC's description of correspondence between Wey and Erbek that directly advised Erbek that any individual or entity that owned more than 5% of a company's outstanding shares was required to disclose that position in a filing with the SEC. SAC ¶ 104. Erbek also received explicit instructions on how to allocate shares of Deer among the nominee accounts he maintained to avoid a position held by any one nominee that would trigger the 5% reporting threshold. *Id.* As these allegations demonstrate, Erbek had actual knowledge that his client owned well more than 5% of a U.S. issuer, and he was structuring those holdings among nominal accounts in an effort to avoid disclosing a controlling position as required by the securities laws. This is sufficient to allege Erbek's conscious misbehavior or, at a minimum, his recklessness.

In structuring the positions and allocating the shares among the nominee accounts according to Wey's instructions, Erbek "associated himself with the venture," "participated in it as in something he wished to bring about," and "sought by his action to make it succeed." *Apuzzo*, 689 F.3d at 206 (internal quotations omitted); *see also Nigerian Nat'l Petroleum Corp. v. Citibank, N.A.*, 1999 WL 558141, at *8 (S.D.N.Y. July 30, 1999) (aider and abetter can provide substantial assistance if they "help[] conceal" the fraud).

While these factual allegations, even when viewed in isolation, sufficiently plead the SEC's claims, they are even more overwhelming when viewed together. *In re Lululemon Sec. Litig.*, 14 F. Supp. 3d at 573. Erbek repeatedly received direct email instructions, which he followed, to engage in multiple instances of fraudulent conduct–including executing manipulative trades and structuring securities positions in an attempt to skirt the reporting requirements of the securities laws of the United States. The facts alleged in the SAC show that Erbek had knowledge of the primary violation and engaged in conscious misconduct that substantially assisted the scheme. The SEC has easily met its burden in pleading that Erbek aided and abetted violations of Section 10b-5 of the Exchange Act and Rule 10b-5 thereunder and Section 17(a) of the Securities Act.

### B. The SEC Has Adequately Pled that Erbek Aided and Abetted Violations of Section 13(d) and Rule 13d-1.

Erbek aided and abetted Benjamin Wey's and Tianyi Wei's violations of Section 13(d) and Rule 13d-1 by structuring their holdings to help conceal their control over certain companies and evade reporting requirements. Erbek argues initially that because it is not illegal to structure transactions in the manner that he did, his conduct cannot be a cognizable claim. That is a non-sequitur. The failures of Benjamin Wey and Tianyi Wei to file the required forms with the SEC

are the primary violations that Erbek is alleged to have aided and abetted.  Erbek does not challenge these primary violations.

The SAC plainly alleges that the primary violators were structuring their holdings in an attempt to evade the reporting requirements of Section 13(d) and Rule 13d-1.  SAC ¶ 103.  While the structuring did not relieve them of their legal obligations to report their collective positions, it did work to conceal their violations and the fraudulent scheme.[2]  The relevant question is whether the SAC has alleged that Erbek had the requisite knowledge of the primary violation and provided substantial assistance to the violation of Section 13(d) and Rule 13d-1.

As described above (since this conduct also substantially assisted violations of the antifraud provisions), Erbek's arguments are undermined by any fair reading of the allegations regarding his correspondence detailed in the SAC.  In detailed email communications, Wey informed Erbek that he wanted his holdings allocated among nominee accounts maintained by Erbek to avoid the reporting requirements of Section 13(d).  SAC ¶¶ 104, 105.  Erbek then followed those instructions to the letter.  As explained above, Erbek's compliance with Wey's instructions, coupled with his knowledge of the motivation behind them, shows Erbek's scienter and his knowing and substantial assistance, in aiding and abetting violations of the antifraud provisions.  It shows the same with regard to his aiding and abetting the violations of the disclosure requirements of Section 13(d) and Rule 13d-1.  Erbek's motion fails as a result.

## II.     The Statute of Limitations Bars No Claims Against Erbek.

Commission actions for civil penalties are subject to a five-year statute of limitations pursuant to 28 U.S.C. § 2462.  *See Gabelli v. SEC*, 133 S.Ct. 1216, 1220 (2013).  That

---

[2] Rule 13d-3 makes clear that regardless of the arrangement being used to try to avoid the reporting requirements Benjamin Wey, Tianyi Wei, and Micheala Wey were subject to them and required to report their beneficial ownership.

limitations period, however, applies only "if, within the same period, the offender . . . is found within the United States." 28 U.S.C. § 2462.  As noted in the SAC and Erbek's brief, he does not reside in the United States, and he makes no claim to have ever been in the United States.  SAC ¶ 28; Erbek Br. at 10 at n.7 (ECF No. 128).  Thus, under the plain language of the statute, the five-year statute has not run.  *SEC v. Straub*, 921 F. Supp. 2d 244, 260-61 (S.D.N.Y. 2013).  Additionally, even assuming the statute of limitations applied to Erbek, the Commission has alleged conduct that falls within the limitations period.  SAC ¶ 100.

### III. The SEC Has Adequately Pled Violations of Section 15(b) Based on Actions after July 21, 2010.

Section 15(b) of the Securities Act became effective July 21, 2010, and is pled as the Seventh Claim for Relief.  Erbek argues that "all claims for aiding and abetting violations of the Securities Act based in conduct prior to July 21, 2010 must be dismissed."  Erbek Br. at 25 (ECF No. 128).  Erbek does not, however, identify a claim that fails because, as described above, the Commission has plead that Erbek violated this provision in multiple ways and has alleged conduct after July 21, 2010.  SAC ¶¶ 100, 104, 105.  There is thus no basis to dismiss the Commission's Seventh Claim for Relief.

## IV. Conclusion

For the reasons stated above the Commission respectfully requests that the Court deny Erbek's motion to dismiss.

Dated:   September 30, 2016

                                              Respectfully submitted,

                                              /s/ Derek Bentsen
                                              Derek Bentsen (DB8369)
                                              Joshua Braunstein
                                              UNITED STATES SECURITIES AND EXCHANGE COMMISSION
                                              100 F St., N.E.
                                              Washington, D.C. 20549-5985
                                              202-551-6426 (Bentsen)
                                              BentsenD@sec.gov

## **CERTIFICATE OF SERVICE**

I certify that on September 30, 2016, I caused the foregoing to be filed using the Court's CM/ECF system, which will send notification of such filing to each counsel of record.

/s/ Derek Bentsen
*Counsel for Plaintiff*