# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

UNITED STATES SECURITIES AND
EXCHANGE COMMISSION,

Plaintiff,

v.

BENJAMIN WEY, *et al.*

Defendants,

and

ADVANTAGE CONSULTANTS, LTD., *et al.*

Relief Defendants.

Civil Action No. 15-7116-PKC
ECF CASE

## PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF ITS OPPOSITION TO DEFENDANT NEWMAN'S MOTION TO DISMISS

Derek S. Bentsen
Joshua E. Braunstein
U.S. Securities and Exchange Commission
100 F Street, N.E.
Washington, DC 20549
202.551.8470 (Braunstein)
202.772.9245 (facsimile)
braunsteinj@sec.gov

*Counsel for Plaintiff*

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................1

FACTS ....................................................................................................................................2

    1.  Newman helped Wey and his other co-defendants gain undisclosed control of the NYGG clients' companies.................................................................................................3

    2.  Newman took steps to conceal Wey's affiliation with nominees and the NYGG clients .....5

        a.  Newman deceived underwriters in connection with secondary financings. ...................5

        b.  Newman participated in the fraudulent scheme by deceiving NASDAQ.......................7

    3.  Newman participated in the manipulation of the market for Deer securities. .......................8

ARGUMENT .........................................................................................................................10

    I.  None of the SEC's charges against Newman are barred by the statute of limitations...........10

    II.  Newman cannot show that an injunction against him would be punitive or untimely. .........11

    III.  The SEC has properly pled that Newman aided and abetted violations of the Securities Act..................................................................................................................................12

    IV.  The SEC has properly pled that Newman knowingly or recklessly aided and abetted violations of the Exchange Act. ......................................................................................13

    V.  In alleging his intimate knowledge of, and participation in, Wey's scheme, the SEC has adequately pled Newman's scienter ................................................................................14

        a.  Newman may not proffer his own facts or put his own gloss on the SAC's allegations.15

        b.  The SEC has amply pled Newman's scienter. ...............................................................19

    VI.  The SEC has adequately pled that Newman received money or property............................24

    VII.  The SEC has adequately pled that Newman engaged in deceptive conduct.........................24

    VIII.  Conclusion ....................................................................................................................25

# **TABLE OF**
# **AUTHORITIES**

**Cases**                                                                                           **Page(s)**

*Aaron v. SEC,*
446 U.S. 680 (1980).............................................................................................................17

*Abu Dhabi Commercial Bank v. Morgan Stanley & Co. Inc.,*
651 F. Supp. 2d 155 (S.D.N.Y. 2009)....................................................................................20

*Aeronca, Inc. v. Gorin,*
561 F. Supp. 370 (S.D.N.Y. 1983).........................................................................................14

*Alternative Green Techs., Inc.,*
2012 WL 4763094...................................................................................................................22

*Brass v. American Film Technologies, Inc.,*
987 F.2d 142 (2d Cir. 1993)....................................................................................................16

*Chemical Bank v. Arthur Andersen & Co.,*
552 F. Supp. 439 (S.D.N.Y. 1982).........................................................................................14

*Chemical Bank v. Arthur Andersen & Co.,*
726 F.3d 930 (2d Cir. 1984)....................................................................................................14

*Gabelli v. SEC,*
133 S. Ct. 1216 (2013)......................................................................................................10, 12

*Goldman v. Belden,*
754 F.2d 1059 (2d Cir. 1985)............................................................................................15, 18

*Grandon v. Merrill Lynch & Co.,*
147 F.3d 184 (2d Cir. 1998)....................................................................................................15

*In re Lululemon Sec. Litig.,*
14 F. Supp. 3d 553 (S.D.N.Y. 2014)................................................................................15, 24

*IIT v. Cornfield,*
619 F.2d 909 (2d Cir. 1980)....................................................................................................14

*Lerner v. Fleet Bank, N.A.,*
459 F.3d 273 (2d Cir. 2006)....................................................................................................16

*Muller-Paisner v. TIAA*,
446 F. Supp. 2d 221 (S.D.N.Y. 2006)......................................................................15

*Novak v. Kasaks*,
215 F.3d 300 (2d Cir. 2000)...........................................................................17, 20

*Peter F. Gaito Architecture LLC v. Simone Dev. Corp.*,
602 F.3d 57 (2d Cir. 2010)...................................................................................16

*Riordan v. SEC*,
627 F. 3d 1230 (D.C. Cir. 2015)...........................................................................11

*Rolf v. Blyth, Eastman Dillon & Co., Inc.*,
570 F.2d 38 (2d Cir. 1978)...................................................................................17

*Ryder Energy Distrib. Corp. v. Merrill Lynch Commodities, Inc.*,
748 F.2d 774 (2d Cir. 1984)...........................................................................15, 17

*SEC v. Alternative Green Techs., Inc.*,
2012 WL 4763094 (S.D.N.Y. Sept. 24, 2011)....................................................21

*SEC v. Apuzzo*,
689 F.3d 204 (2d Cir. 2012).................................................................................13

*SEC v. DiBella*,
587 F.3d 553 (2d Cir. 2009).................................................................................13

*SEC v. Egan*,
994 F. Supp. 2d 558 (S.D.N.Y. 2014)..............................................................13-14

*SEC v. Gabelli*,
653 F. 3d 49 (2d Cir. 2011)..................................................................................12

*SEC v. Gabelli*,
518 F. App'x 32 (2d Cir. 2013).............................................................................12

*SEC v. Gruss*,
859 F. Supp. 2d 653 (S.D.N.Y. 2012)..................................................................16

*SEC v. Kokesh*,
_F.3d_, 2016 WL 4437585 (10th Cir. Aug. 23, 2016).........................................11

*SEC v. Landberg*,
836 F. Supp. 2d 148 (S.D.N.Y. 2011)..................................................................14

*SEC v. Mudd,*
885 F. Supp. 2d 654 (S.D.N.Y. 2012)............................................................................16, 19, 20

*SEC v. Tourre,*
10 Civ. 3229 (KBF), 2014 WL 61864 (S.D.N.Y. Jan. 7, 2014).....................................................24

*SEC v. Wyly,*
950 F. Supp. 2d 547 (S.D.N.Y. 2013)...........................................................................11, 12

*Sperber Adams Associates v. JEM Management Associates Corp.,*
1992 WL 138344 (S.D.N.Y. June 4, 1992)...........................................................................14

*Szulik v. Tagliaferri,*
966 F. Supp. 2d 339 (S.D.N.Y. 2013)...........................................................................21

*The Limited, Inc. v. McCrory Corp.,*
683 F. Supp. 387 (S.D.N.Y. 1988)...........................................................................14

**Statutes**

28 U.S.C. § 2462...........................................................................10, 11

iv

The Securities and Exchange Commission ("SEC" or "Commission") respectfully submits this opposition to Defendant Newman's Motion to Dismiss.

## <u>PRELIMINARY STATEMENT</u>

Newman is charged with primary and aiding and abetting violations of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder and Section 17(a) of the Securities Act, and with aiding and abetting violations of Section 13(d) of the Exchange Act and Rule 13d-1 thereunder. He seeks dismissal of the Second Amended Complaint on a variety of grounds.  First, he challenges, on statute of limitations grounds, any claim accruing before July 21, 2010; but he fails to actually identify any claim for which civil penalties would be foreclosed.  Nor can he. That is because the SEC has alleged conduct by Newman within the statute of limitations period to meet the requirements of each claim against him.

Second, Newman contends that the SEC may not obtain an injunction against him because injunctive relief here would be punitive and would otherwise be beyond the limitations period.  Again, his arguments fail.  As discussed below, the requested injunctive relief is not punitive and it is at best premature to evaluate the propriety of injunctive relief on a motion to dismiss.

Third, Newman is charged with knowingly and recklessly aiding and abetting others' violations; and he contends that the SEC's inclusion of the word "recklessly" requires the Court to dismiss the aiding and abetting claims against him.  He draws this conclusion after asserting that before the Dodd-Frank amendments to Section 20(e) of the Exchange Act, aiding and abetting liability was limited to cases alleging the defendant had "actual knowledge."  Newman then reasons that because the SEC has pled that he acted both "knowingly" and "recklessly," these claims cannot survive.  Second Circuit law holds otherwise.

Newman then seeks dismissal of all claims against him because, in his view, they "are not pleaded with the particularity required by Federal Rule of Civil Procedure 9(b)."  Although he words this challenge broadly, Newman takes issue only with the allegations as they pertain to his scienter to engage in the fraudulent scheme and the acts of misconduct that enabled it. Again, Newman misses the mark.  Newman's motion fails to acknowledge that at the pleading stage he may not insert his preferred facts or put his preferred gloss on the facts the SEC alleges. Moreover, the SAC contains a surfeit of factual allegations demonstrating that, as Wey's handpicked lawyer for a massive and persistent fraudulent scheme, Newman was well aware of his participation in the fraud, and he participated fully.  The Court should therefore deny Newman's motion.

## FACTS

Newman, a corporate attorney, played an integral role in an international scheme Wey and other co-defendants orchestrated.  The first step of the scheme was gaining an undisclosed controlling interest in several Chinese companies that used Wey's company, New York Global Group ("NYGG"), to become United States issuers.  Second Amended Complaint ("SAC") ¶¶ 1-2.  Wey, with the assistance of Newman and the other co-defendants, would identify and gain control of a publicly traded U.S. shell company and then merge one of the Chinese companies (*i.e.,* NYGG clients) into the U.S. shell company Wey secretly controlled.  *Id.* ¶ 3.  After the merger, Wey and his co-defendants divided shares of the newly-merged company between several nominee accounts to try to avoid disclosing that their beneficial interest exceeded five percent.[1]  *Id.*  Wey, Newman and other co-defendants would then convince the management of the NYGG client companies to enter "lock up" agreements that prevented the management from

---

[1] Beneficial owners of five percent or more of an issuer's securities are required to report such ownership to the SEC.

trading their shares for a period of time, during which Wey would be in control of the vast majority of publicly trading shares. *Id.* ¶ 4. This control allowed Wey to more easily manipulate the market for those securities and profit from the scheme. *Id.*

Newman was an essential part of the fraudulent scheme in his role as corporate counsel for the NYGG clients. Although Newman and his law firm purported to independently represent the NYGG clients, at all relevant times he answered to Wey. *Id.* ¶ 8. Indeed, the success of Newman's practice depended largely on Wey and NYGG, as Newman's work for the NYGG clients accounted for eighty to ninety percent of his law firm's business between 2009 and 2011—and at least fifty percent of his firm's business as late as 2012. *Id.* ¶ 25. Newman's practice was so intertwined with NYGG's business that at times he shared office space with NYGG or maintained offices in the same building as NYGG. *Id.* While putatively representing Wey's Chinese clients, Newman knowingly or recklessly helped Wey and his other co-defendants:

- gain undisclosed control of NYGG client companies,

- deceive underwriters and NASDAQ about Wey's association with NYGG's clients and the various nominees that held large numbers of their shares; and,

- manipulate the market for the securities of Deer and CleanTech.

Newman's specific participation in the fraudulent scheme is set forth in detail below.

**1. Newman helped Wey and his other co-defendants gain undisclosed control of the NYGG client companies.**

The NYGG clients were Chinese companies that engaged NYGG to help them obtain access to the U.S. equity markets. *Id.* ¶¶ 60-62. Newman, Wey, and NYGG helped them accomplish their aims by arranging reverse mergers between these client companies and U.S. shell companies. *Id.* As part of the fraudulent scheme, Wey obtained (in advance of the reverse

merger) secret control of the shell companies, and later, the publicly-traded shares of each company that emerged from the reverse merger. *Id.*

Newman was instrumental from early on in the fraudulent scheme. For instance, at Wey's direction, Newman located a publicly-traded shell company, Everton Capital Corporation ("Everton") that he and Wey later reverse-merged into the NYGG client that would become CleanTech. *Id.* ¶ 65. At Wey's direction, Newman negotiated the purchase price of Everton with its owners. *Id.* After Wey approved the purchase price for Everton, funds for the purchase of the shell were wired into Newman's attorney trust account from a bank account maintained in the name of Four Tong, a nominee company owned by Wey's sister. *Id.* ¶¶ 33, 65. In or about April 2009, Newman completed the purchase of Everton by transferring the Four Tong funds from his trust account to accounts for the benefit of Everton's shareholders. *Id.* ¶ 65

Wey then installed Newman as corporate counsel for Everton, and Newman instructed Everton's transfer agent to transfer 5,000,000 shares of Everton from its original President to Everton's purported new CEO, President, CFO, Treasurer, and Secretary. *Id.* ¶ 66. According to a Form 8-K Everton filed with the SEC in July 2010, the purported CEO was a 29-year-old "independent business consultant" from China who had purchased 90.89 percent of Everton's outstanding common stock. *Id.* Although Newman represented Everton by that time, and he prepared the July 2010 Form 8-K, he never met the purported CEO—indeed, he received the CEO's biographical information for the SEC filings from Wey. *Id.* Newman communicated with the putative CEO solely through Wey or through an email address Wey provided Newman. *Id.* Newman also instructed Everton's transfer agent to cancel shares belonging to the other Everton shareholders and to issue in their place shares to various nominees controlled by Wey, Tianyi Wei, and Michaela Wey. *Id.*

During the CleanTech reverse merger, Newman provided legal representation for both Everton (the shell company) and the Chinese operating company, without receiving a waiver of conflicts from either party.  *Id.* ¶ 68.  Newman also failed to disclose his dual representation in either the July 2, 2010 Form 8-K filed with the SEC announcing the CleanTech reverse merger or in the merger agreement that was filed as an exhibit to the Form 8-K.  *Id.*

**2. Newman took steps to conceal Wey's affiliation with nominees and the NYGG clients.**

As corporate counsel for the NYGG clients, Newman took steps to conceal Wey's affiliation with the nominees and the NYGG clients.  This enabled Wey and other defendants to profit from the scheme by securing and maintaining NASDAQ listings and secondary financings for the NYGG clients.

**a. Newman deceived underwriters in connection with secondary financings.**

In 2009, SmartHeat secured an underwriting for a public offering of its securities.  *Id.* ¶ 72.  In April 2009, before the offering, Wey persuaded SmartHeat to hire Advantage Consultants Ltd. ("ACL"), a nominee entity that he controlled—to provide strategic business consulting services to— SmartHeat.  *Id.*  Pursuant to the strategic consulting agreement, SmartHeat agreed to pay ACL $3.9 million in connection with SmartHeat's public offering.  *Id.*  At the time the agreement was drafted, Newman knew that Wey and other co-defendants controlled ACL.  *Id.* ¶ 79.  Indeed, Newman prepared the agreement in April 2009 for Wey to sign on ACL's behalf. *Id.*  During the same period when Newman was drafting the consulting contract, Newman also received emails, in which SmartHeat's CEO referred to ACL as "NYGG's BVI company."  *Id.*

Later that year, in an effort to determine how to properly disclose the fee to ACL in SmartHeat's offering materials, the primary underwriter for the SmartHeat offering asked what, if any, affiliation Wey had to ACL.  *Id.* ¶ 73.  In addition, the primary underwriter asked ACL to

execute a certification representing, among other things, that ACL was comprised *solely of non-U.S. persons* because of restrictions on foreign broker dealers soliciting U.S. investors.  *Id.*  The primary underwriter also pressed Newman and Wey for information about the identities of ACL's owners.  *Id.*

Wey falsely told the primary underwriter that neither he nor NYGG had any affiliation with ACL.  *Id.* ¶ 74.  Newman also personally misled the underwriter, directing its employee to contact a person in China who Wey claimed was ACL's CFO.  *Id.* ¶ 75.  The purported CFO of ACL falsely denied to the underwriter that ACL had any contacts in the United States, but later failed to respond to the primary underwriter's request that he execute the certification affirming this representation.  *Id.*

Newman participated in the process of obtaining the ACL certification, knowing that it was false in numerous material respects, including the representation that ACL was "comprised solely of non-U.S. persons that are located outside of United States."  *Id.*  The misrepresentations in the certification caused the offering documents for the SmartHeat public offering to be materially misleading by failing to disclose Wey's affiliation with ACL.  *Id*. ¶ 78.

Newman and Wey continued to knowingly misrepresent and conceal Wey's affiliation with ACL in connection with a December 2009 capital financing for Deer.  *Id.* ¶ 77.  For this transaction, Deer used the same primary underwriter that SmartHeat had used for its November 2009 public financing, discussed above.  *Id.*  The primary underwriter conducted similar due diligence relating to ACL's role in the Deer offering as it did in connection with the SmartHeat offering.  *Id*.  As part of that due diligence, the primary underwriter had ACL execute a certification that repeated the assertions in the SmartHeat offering certification, including the misrepresentation that ACL was comprised solely of non-U.S. persons.  *Id.*  As with the

SmartHeat offering, this certification misled the underwriter regarding Wey's affiliation with ACL and caused the offering documents for the Deer public offering to be materially misleading. SAC ¶78.

### b.  Newman participated in the fraudulent scheme by deceiving NASDAQ.

Newman also participated in the fraudulent scheme by misleading NASDAQ about Wey's affiliation with the NYGG clients.  For instance, in 2011, Newman misled NASDAQ about Wey's relationship with Deer and SmartHeat. *Id.* ¶ 79.  Early that year, NASDAQ sent letters to Newman, as counsel for Deer and SmartHeat, asking the companies to disclose "any and all relationships, past or present, between the Compan[ies]" and Wey, Tianyi Wei, NYGG, Strong Growth, and others. *Id.*  After discussing with Wey how to respond, Newman signed and sent letters to NASDAQ that failed to disclose that Wey controlled substantial holdings of Deer and SmartHeat through the nominees, including Strong Growth. *Id.*  Instead, Newman falsely described a limited relationship that included introducing underwriters to Deer and SmartHeat and being acquainted with officers or directors of Deer and SmartHeat. *Id.*

At the time he wrote the letters to NASDAQ, Newman knowingly or recklessly misled NASDAQ about Wey's affiliation with Deer and SmartHeat. *Id.* ¶ 80.  Beyond the limited relationship Newman described to NASDAQ, Newman also knew that Wey and NYGG had significantly more involvement with Deer and SmartHeat, including conducting financial modeling, choosing their lawyers and accountants, reviewing drafts of their SEC filings, identifying and recommending individuals to serve as their directors, advising about pending litigation, and discussing non-public information with a company officer. *Id.*

**3.  Newman participated in the manipulation of the market for Deer securities.**

In the summer of 2010, Newman engaged in deceptive conduct as part of efforts to manipulate the price of Deer stock in connection with a stock repurchase program.  *Id.* ¶ 92. This manipulation allowed Wey and Tianyi Wei to profit by liquidating significant positions in Deer held by Tianyi Wei and a nominee that she and Wey controlled, while the stock repurchase plan orchestrated by Wey supported the share price.  *Id.*

Deer initiated the repurchase program upon Wey's recommendation and with his assurance that the company would not have to spend any money to fund it.  *Id*. ¶ 93.  Funding for the stock repurchase program ostensibly came from the exercise of warrants held by various nominees that entitled them to purchase Deer stock.  *Id.*  These nominees included Advantage Consultants, Ltd. ("ACL"), York Capital Management, Ltd. ("York Capital"), Strong Growth Capital, Ltd. ("Strong Growth"), Futmon Holdings, Ltd. ("Futmon"), Bicornio Real Estate S.A. ("Bicornio"), Roosen Commercial Corp. ("Roosen"), and Wolf Enterprises, Ltd. ("Wolf").  *Id.* Wey, however, used the nominees interchangeably, and in fact, the funds to purchase the Deer shares pursuant to those nominees' exercise of warrants were provided only by Strong Growth and Tianyi Wei.  *Id.*

To effectuate the stock repurchase program, Wey instructed Newman to open a brokerage account in Deer's name to enable Wey and Newman to execute the market repurchases. Newman opened the account and held trading authority over it.  *Id.* ¶ 94.  The funds provided by Strong Growth and Tianyi Wei that were used to fund the exercise of Deer warrants that were held by ACL, Strong Growth, Bicornio, Roosen, Futmon, and Wolf, were transferred to Newman's trust account.  *Id.* ¶ 95.  Newman then transferred those proceeds to the brokerage account he controlled to use for repurchasing Deer's stock.  *Id.*  Newman knew that Tianyi Wei

was Wey's sister and an employee of NYGG and that Wey and NYGG "advised" Deer; but Newman nonetheless did not question why Tianyi Wei was involved in funding Deer's stock repurchase program. *Id.*

Pursuant to Deer's stock repurchase program, in June 2010, Deer's brokerage account expended $6,951,478 for nineteen repurchases of Deer stock. *Id.* ¶ 96. This exact amount was transferred from the Strong Growth and Tianyi Wei accounts through the Newman trust account, and into the brokerage account Newman established at Wey's direction, to fund the stock repurchase.

During this period, as Deer was repurchasing its own shares in the market, foreign brokerage accounts in the names of Strong Growth and Tianyi Wei sold at least 640,000 shares of Deer for over $5.5 million in proceeds. *Id.* ¶ 97. The average daily closing price for Deer was $8.75 in June 2010, the month during which the company was repurchasing its shares. In contrast, the daily average for May 2010 was $8.33, and the daily average for July 2010 was $7.93. *Id.* The result of the stock repurchase aspect of the fraudulent scheme was that while Tianyi Wei and Strong Growth, a nominee controlled by Wey and Tianyi Wei, were selling hundreds of thousands of shares of Deer stock, the stock repurchase plan, recommended by Wey and funded by Tianyi Wei and Strong Growth using warrants owned by nominees, helped to maintain Deer's share price. *Id.*

Wey arranged for the shares purchased pursuant to the warrant exercise to be divided and distributed among nominees in amounts that did not match the number of warrants that each nominee possessed or exercised. *Id.* ¶ 98. On or about July 28, 2010, pursuant to Wey's instructions, Newman requested issuance of 1,000,000 shares to Strong Growth; 400,000 to ACL; and 351,610 to Guo Sheng. *Id.* Both Strong Growth and ACL received more shares than

they were entitled to receive based on their possession and exercise of warrants; and Guo Sheng received shares even though it held no warrants at all.  *Id.*  Those shares were actually from the exercise of warrants owned by Bicornio and Roosen, two Nominees for which Michaela Wey , Benjamin Wey's wife, exercised investment authority.  The interchangeability of these Nominees—which were supposedly independent and distinct investors—for purposes of exercising warrants and issuing shares, demonstrates that Wey and his associates controlled all of them and treated them as parts of a whole.  *Id.*

As described above and discussed below, the Commission has adequately pled Newman's participation in the fraudulent scheme.

## ARGUMENT

### I.  None of the SEC's charges against Newman are barred by the statute of limitations.

Without mentioning which specific claims he takes issue with, Newman contends that "all claims for civil penalties that accrued outside the five year limit must be dismissed." Newman Mot. at 9 (ECF. No. 125).  Newman appears to reason that because "most of [his] alleged misconduct occurred beyond five years from the date when the claim first accrued" some unspecified claims fail as to civil penalties.  Newman Mot. at 8 (citation omitted).  Notably, Newman cites no law to support the proposition that every event or act constituting a claim for relief must occur within the statute of limitations.  His argument is without merit.

Newman correctly observes that 28 U.S.C. § 2462 provides that "an action, suit or proceeding for the enforcement of any civil fine, penalty, or forfeiture, pecuniary or otherwise, shall not be entertained unless commenced within five years from the date when the claim first accrued."  In general, with respect to government enforcement actions which seek civil penalties,

this "five-year clock begins to tick—when a defendant's allegedly fraudulent conduct occurs." *Gabelli v. SEC*, 133 S. Ct. 1216, 1220 (2013).

Here, Newman ignores that the SEC has pled considerable conduct that occurred within five years of the initiation of the lawsuit against him.  *See*, *e.g.,* SAC ¶¶ 58, 79, 80.  For example, the SEC alleged that "Newman continued to assist Benjamin Wey in concealing [] Wey's true role in the fraudulent scheme.  For instance, in 2011, Newman misled NASDAQ about Benjamin Wey's relationship with Deer and SmartHeat."  *Id.* ¶ 79.  The SEC also alleged Newman's role—over a four-year period—in helping Wey attain the objectives of the scheme.  To that end the SAC contends that "[f]rom 2008 through 2012—either directly or through Newman or an NYGG employee—Benjamin Wey repeatedly directed the NYGG Clients' transfer agent to transfer shares to and from various Nominees."  These allegations describe specific misconduct by Newman, as well as his participation in the scheme—conduct that unquestionably falls within the statute of limitations period.  Therefore Newman's argument fails.

## II.     Newman cannot show that an injunction against him would be punitive or untimely.

Newman contends in a cursory manner that the Court should dismiss the SEC's request for injunctive relief against him.  In his view, an injunction would be punitive (and not to prevent future harm)—and is thereby subject to, and barred by, the five-year statute of limitations discussed above.  Newman Mot. at 10.

As to whether the injunction would be punitive as he contends, Newman's argument is, at the very least, premature.  It is true that an injunction under the securities laws "cannot be to penalize—it must be to protect against future harms."  *SEC v. Wyly*, 950 F. Supp. 2d 547, 558 (S.D.N.Y. 2013); *see also SEC v. Kokesh*, __ F.3d __, 2016 WL 4437585, at *3 (10th Cir. Aug. 23, 2016) ("We fail to see how an order to obey the law is a penalty"); *Riordan v. SEC*, 627 F.3d

11

1230, 1234-35 (D.C. Cir. 2015) ("The cease and desist order is not a 'fine, penalty, or forfeiture' covered by the five year statute of limitations in 28 U.S.C. § 2462.").  Thus, "the statute of limitations question merges with the substantive requirements for obtaining an injunction under the securities laws—if the substantive claim is viable, then it is, by definition, not subject to a statute of limitations."  *Wyly*, 950 F. Supp. 2d at 558.

Based on the allegations in the SAC, it "would be premature to find that injunctive relief is not warranted prior to determining the merits of the SEC's claims."  *Id.*  Indeed, in *SEC v. Gabelli*, the Second Circuit held where—as in Newman's case—there are allegations of intentional violations of the federal securities laws "it is most unusual to dismiss a prayer for injunctive relief at th[e] preliminary stage of the litigation, since determining the likelihood of future violations is almost always a fact-specific inquiry."  *SEC v. Gabelli*, 653 F.3d 49, 61 (2d Cir. 2011), *rev'd on other grounds*, *Gabelli v. SEC*, 133 S. St. 1216 (2013); *SEC v. Gabelli*, 518 F. App'x 32, 33 (2d Cir. 2013) (noting on remand that the Supreme Court's decision did "not affect this Court's other holdings in its prior opinion").  And here, just as in *Gabelli*, Newman "is unable to point to a single case where the SEC's prayer for an injunction against further violations was dismissed at the motion to dismiss stage based upon a finding of non-likelihood of further violations."  653 F.3d at 61.

There is simply no basis to dismiss the SEC's request for equitable injunctive relief at this stage of the litigation.

## III.    The SEC has properly pled that Newman aided and abetted violations of the Securities Act.

Newman correctly notes that Section 15(a) of the Securities Act became operative on July 21, 2010.  He asserts that the Court should dismiss the SEC's Seventh Claim for Relief "to the extent that claim relates to events prior to July 21, 2010."  Newman Mot. at 11.  Newman

does not argue that the SEC has failed to plead any violation of Section 15(a) that occurred after July 21, 2010.  And indeed, as discussed above, the SEC has pled facts showing that Newman engaged in violative conduct after July 21, 2010, the effective date of Section 15(a).  *See*, *e.g.,* SAC ¶¶ 58, 79, 80.  Accordingly, there is no basis to dismiss that claim.

## IV.    The SEC has properly pled that Newman knowingly or recklessly aided and abetted violations of the Exchange Act.

Newman first asserts that prior to the Dodd-Frank amendments to Section 20(e) of the Exchange Act, aiding and abetting liability was limited to cases with a showing of "actual knowledge" rather than recklessness.  Newman Mot. at 12.  He then observes that the SEC pled in its Third and Tenth Claims for Relief that Newman "knowingly or recklessly" provided substantial assistance in aiding and abetting violations of the Exchange Act.  *Id.*  Newman then reasons that because the SEC has pled that Newman acted both "knowingly" and "recklessly," these claims cannot survive.  Newman is incorrect.

To allege a charge of aiding and abetting as a violation of the federal securities laws the SEC must plead: "(1) the existence of a securities law violation by the primary (as opposed to the aiding and abetting) party; (2) knowledge of this violation on the part of the aider and abettor; and (3) 'substantial' assistance by the aider and abettor in the achievement of the primary violation."  *SEC v. Apuzzo*, 689 F.3d 204, 211 (2d Cir. 2012); *SEC v. DiBella*, 587 F.3d 553, 566 (2d Cir. 2009).  The knowledge and substantial assistance requirements "cannot be considered in isolation," and a strong showing on one prong lessens the burden on the other.  *DiBella*, 587 F.3d at 566; *Apuzzo*, 689 F.3d at 215 ("[A] high degree of knowledge may lessen the SEC's burden in proving substantial assistance, just as a high degree of substantial assistance may lessen the SEC's burden in proving *scienter*.").

13

Regarding the scienter requirement for pre-Dodd-Frank conduct, although Newman presents the issue as if it were settled, there is a split in this Circuit as to whether actual knowledge was required pre-Dodd-Frank or if recklessness could satisfy the requirements of aiding and abetting. *See SEC v. Egan*, 994 F. Supp. 2d 558, 556 (S.D.N.Y. 2014) (citing cases); *SEC v. Landberg*, 836 F. Supp. 2d 148, 157 (S.D.N.Y. 2011) ("The scienter standard in this Circuit included recklessness prior to Dodd-Frank.").

Although recklessness almost certainly satisfied the "knowledge" prong of aiding and abetting pre-Dodd-Frank, the Court need not address that issue because the "Second Circuit has flatly rejected" the argument that disjunctive pleading of this kind is insufficient. *Sperber Adams Associates v. JEM Management Associates Corp.*, Case No. 90 CIV 7405 (JSM), 1992 WL 138344, at *5 (S.D.N.Y. June 4, 1992) (citing *IIT v. Cornfield*, 619 F.2d 909, 923-24 (2d Cir. 1980)).

In *IIT v. Cornfield*, the Court addressed the argument that—when knowing is the applicable standard—pleading knowing or reckless conduct ("knew, or should have known") was insufficient. 619 F.3d at 923-24. The Court concluded that because the plaintiff had alleged knowledge disjunctively, the complaint was sufficient because "as a matter of pleading, more is not required." *Id*. at 924. "'As a matter of pleading . . . allegations in the disjunctive, when one of the alternatives is legally sufficient, is [sic] permissible.'" *The Limited, Inc. v. McCrory Corp.*, 683 F. Supp. 387, 394 n.4 (S.D.N.Y. 1988) (quoting *Chemical Bank v. Arthur Andersen & Co.*, 552 F. Supp. 439, 456 n.33 (S.D.N.Y. 1982), *rev'd on other grounds*, 726 F.3d 930 (2d Cir. 1984)); *Aeronca, Inc. v. Gorin*, 561 F. Supp. 370, 373 (S.D.N.Y. 1983) (same). Thus, even if the Court were to conclude that an actual knowledge standard applies, Newman's argument fails, as the SEC's disjunctive pleading is permissible.

14

**V.     In alleging his intimate knowledge of, and participation in, Wey's scheme, the SEC has adequately pled Newman's scienter.**

Newman contends that the SEC inadequately alleges his intent to engage in Wey's fraudulent scheme.  Newman's arguments fail.  The SAC contains detailed allegations which amply demonstrate that Newman knew about, and was an active participant in, the fraudulent scheme.

**a.     Newman may not proffer his own facts or put his own gloss on the SAC's allegations.**

As a preliminary matter, Newman's motion is laden with both self-serving counter-interpretations of the SEC's allegations and additional factual contentions that are not part of the SAC.  These are not appropriate for the Court to consider at this point because, on a motion to dismiss, the allegations in the complaint are accepted as true, and all reasonable inferences are drawn in favor of the plaintiffs.  *Grandon v. Merrill Lynch & Co.,* 147 F.3d 184, 188 (2d Cir. 1998).

In addition, the totality of the facts must be considered—not each fact in isolation.  *In re Lululemon Sec. Litig.*, 14 F. Supp. 3d 553, 573 (S.D.N.Y. 2014) (court must evaluate "all facts taken together—that is, collectively" when evaluating scienter on a motion to dismiss).  Thus, at this stage, the Court's task is "not to weigh the evidence that *might be* presented at trial but merely to determine whether the complaint itself is legally sufficient."  *Goldman v. Belden,* 754 F.2d 1059, 1067 (2d Cir. 1985) (emphasis added).  Therefore, Newman's motion to dismiss should be granted only if it appears that the SEC can prove no set of facts in support of its claims that would entitle it to relief.  *Ryder Energy Distrib. Corp. v. Merrill Lynch Commodities, Inc.,* 748 F.2d 774, 779 (2d Cir. 1984).

Moreover, when deciding a motion to dismiss for failure to state a claim, the Court may consider only "the factual allegations in the complaint . . . documents attached to the complaint as exhibits or incorporated by reference . . . matters of which judicial notice might be taken, and . . . documents either in plaintiff's possession or of which plaintiffs had knowledge and relied on in bringing suit." *Muller–Paisner v. TIAA*, 446 F. Supp. 2d 221, 226–227 (S.D.N.Y. 2006) (citing *Brass v. American Film Technologies, Inc.*, 987 F.2d 142, 150 (2d Cir. 1993) (internal citations omitted)); *see also Peter F. Gaito Architecture, LLC v. Simone Dev. Corp.*, 602 F.3d 57, 64 (2d Cir. 2010) (when ruling on a motion to dismiss for failure to state a claim under Rule 12(b)(6), a "court may consider the facts as asserted within the four corners of the complaint together with the documents attached to the complaint as exhibits, and any documents incorporated in the complaint by reference").

Under Federal Rule of Civil Procedure 9(b), scienter may be "alleged generally." Indeed, "[c]onclusory allegations of scienter are sufficient if there exist[s] a minimal factual basis giving rise to a strong inference of fraudulent intent." *SEC v. Alternative Green Techs., Inc.,* Case No. 11 CIV 9056 (SAS), 2012 WL 4763094, at *3 (S.D.N.Y. Sept. 24, 2011*)* (internal quotation omitted); *see also SEC v. Gruss*, 859 F. Supp. 2d 653, 669 (S.D.N.Y. 2012) ("Rule 9(b) does not require that a complaint plead fraud with the detail of a desk calendar or a street map.  Nor should the word 'particularity' be used as a talisman to dismiss any but a finely detailed fraud allegation brought in a federal court.") (internal citation omitted)).  Such a strong inference may be established "'either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness.'" *S.E.C. v. Mudd*, 885 F. Supp. 2d 654, 661 (S.D.N.Y. 2012) (quoting *Lerner v. Fleet Bank*, N.A., 459 F.3d 273, 290-91

16

(2d Cir. 2006)).  Reckless conduct is "'at the least, conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care . . . to the extent that danger was either known to the defendant or so obvious that the defendant must have been aware of it.'"  *Novak v. Kasaks*, 216 F.3d 300, 308 (2d Cir. 2000) (internal quotations omitted) (quoting *Rolf v. Blyth, Eastman Dillon & Co., Inc.*, 570 F.2d 38, 47 (2d Cir. 1978)).[2]

The Court may deny Newman's motion without reaching the specific allegations in the SAC.  Throughout his motion, Newman ignores that at the pleading stage, all inferences must resolved in the SEC's favor, and that he is therefore not free to: (1) propose and argue facts that are not before the Court or (2) argue his preferred interpretation of the facts that *are* alleged in the SAC.

The thrust of Newman's argument is that, although the SEC's allegations all "sound in fraud," the facts alleged in the SAC describe him as merely an unwitting attorney working "for companies referred to him by Mr. Wey," who was unaware of, and who had no reason to suspect, the audacious and massive fraud.  Newman Mot. at 3.  Newman repeatedly asserts that the acts attributed to him are "simply those of a diligent lawyer" and that they "prove nothing about [his] alleged scienter."  Newman Mot. at 3-4, 6, 7, 15-18, 21, 23.[3]  This may be Newman's preferred interpretation of the allegations, but it falls far short of demonstrating that the SEC "can prove no

---

[2] The requirements for alleging a charge of aiding and abetting a violation of the federal securities laws are discussed above.  Newman challenges only the scienter requirement for the aiding and abetting claims in the SAC, so we do not address the issue of substantial assistance.  Additionally, Newman observes that "[t]he SEC's Fifth Claim for Relief charges Newman and others with knowingly, recklessly or negligently engaging in a fraudulent scheme in connection with a sale of securities."  Newman Mot. at 13.  He does not, however, contend that the SAC fails to demonstrate that he was negligent, which is all that is required to properly allege violations of Sections 17(a)(2) and (3).  *See Aaron v. SEC*, 446 U.S. 680, 701-02 (1980).  Thus, the Court should find that the Fifth Claim for Relief is adequately pled.

[3] *See, e.g.,* Newman Mot. at 6 ("Newman's actions are entirely routine, and are consistent with his role as an attorney" and "Newman's actions are nothing more than the ordinary actions of an attorney responding to a regulator's inquiry."), Newman Mot. at 7 ("Newman's actions in connection with the Deer stock repurchase program are consistent with his role as attorney for Deer.").

set of facts in support of its claims that would entitle the agency to relief." *Ryder Energy Distrib.*

*Corp.* 748 F.2d at 779.  More problematic for Newman are all the putative facts he asserts, which

are simply not in the SAC or otherwise before the Court at this stage.  Newman asserts, for

example, as follows:

> Mr. Newman had no reason whatsoever to suspect that the Wey
> Defendants and the Chinese companies Mr. Wey represented were
> involved in illegitimate transactions. NYGG and Mr. Wey were
> experienced in taking Chinese companies public long before Mr.
> Wey introduced Mr. Newman to SmartHeat, Deer and CleanTech.
> Mr. Newman traveled to China and saw both his clients'
> operations and the operations of NYGG Asia; he communicated
> with his Chinese clients' English speaking staff, both through
> correspondence and orally, and through their consultant NYGG,
> including Mr. Wey and NYGG staff; and his clients never gave
> Newman any reason to suspect the Wey Defendants' bona fides. In
> fact, Newman's clients were never themselves charged with any
> wrongdoing.

(Newman Mot. at 15-16).  Similarly, he provides his interpretation of the SAC's description of

communications between Newman and Wey:

> But the fact is that Newman does not speak Chinese, and therefore
> often had to communicate with his clients—who were Chinese—
> through their consultant, Mr. Wey, and other members of NYGG's
> staff.  Mr. Newman also regularly communicated with his clients'
> own English-speaking staff.  At the time of the communications,
> Newman had no reason to suspect that Mr. Wey was anything
> other than a legitimate business man, and Newman had no idea that
> Mr. Wey was controlling the free trading shares in the merged
> companies through a network of undisclosed nominees.

(*Id.* at 18-19).

Newman will have the opportunity to persuade the trier of fact that these contentions,

and the inferences he wishes to be drawn from them, are true; but it is premature to do so in a

motion to dismiss for failure to state a claim for relief under Federal Rule of Civil Procedure

18

12(b)(6).  The Court should therefore disregard Newman's preferred gloss on these and other similar assertions, which Newman interposes at various places in his motion to dismiss.  *See Belden*, 754 F.2d at 1067 (finding that Court's role at pleading state is "merely to determine whether the complaint itself is legally sufficient").  The Court may reject Newman's scienter arguments for these reasons alone.

    **b.**  **The SEC has amply pled Newman's scienter.**

    The SAC amply alleges Newman's intimate involvement with—and knowledge of— the fraudulent scheme as both a primary violator and an aider and abettor of the fraudulent misconduct by Wey and others.  Here, the SAC alleges facts that demonstrate that Newman had both the motive and opportunity to commit fraud and that he engaged in conscious misbehavior or recklessness.  *Mudd*, 885 F. Supp. 2d at 661.  Indeed, contrary to Newman's argument, the SAC on its face establishes that Newman's role went far beyond his provision of legal services in the ordinary course of representing his clients.

    The SAC contends that "[w]hile Newman attempted to maintain the facade that he and his law firm were independent of Wey and NYGG and independently represented the NYGG clients, his practice was almost wholly dependent on Wey's largess."  SAC ¶ 25.  The SAC further asserts that: (1) "Newman's work for the NYGG clients accounted for eighty to ninety percent of his law firm's business between 2009 and 2011, and at least fifty percent of his firm's business as late as 2012" and (2) "Newman's practice was so intertwined with NYGG's business that at times he shared office space with NYGG and established his offices in the building occupied by NYGG."  *Id.* ¶ 25.

    Contrary to Newman's assertions, this physical proximity and financial dependence support an inference that Newman had both the motive and opportunity to engage in the

fraudulent scheme.  As to his motive, Newman contends that "there appears to be very little evidence that Newman had a motive to join in the alleged fraudulent scheme."  Newman Mot. at 15.  He apparently reaches this conclusion "because there is no allegation that Newman 'benefitted in some concrete and personal way from the purported fraud,' apart from his legal fees."  *Id.* (citation omitted).  This is not required.

While a general desire to earn fees or make a profit is an insufficient motive on which to predicate scienter, under circumstances like those pled here, where Newman would have no legal business in the absence of the fraud, his desire to earn fees is sufficient to establish his motive. *See Abu Dhabi Commercial Bank v. Morgan Stanley & Co. Inc.,* 651 F. Supp. 2d 155, 180 (S.D.N.Y. 2009) (finding facts sufficient to raise a plausible inference of scienter when receipt of fees was *dependent* on the perpetration of the fraud at issue) (emphasis added).  Indeed, the SAC describes how co-dependent Newman, Wey, and NYGG were in perpetrating the scheme.  In order for the scheme to succeed, it required an attorney like Newman who would willingly prepare fraudulent documents and mislead regulators and others.  By alleging that Newman was Wey's handpicked attorney who earned most of his fees through his work for Wey's fraudulent enterprise, the SEC has alleged that Newman "benefitted in some concrete and personal way from the purported fraud."  *Novak,* 216 F.3d at 307–08.

Regarding the opportunity to commit fraud, Newman concedes that he engaged in considerable work on matters for Wey that he acknowledges "sound in fraud."  And for periods relevant to this case, his law practice was co-located with Wey's fraudulent enterprise at NYGG. It does not require a great inferential leap to conclude that Newman had the *opportunity* to commit fraud.

Although the Court should reject Newman's challenge because the SAC adequately pleads motive and opportunity, alternatively, the SAC also adequately pleads scienter "'by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness.'" *Mudd*, 885 F. Supp. 2d at 661 (quoting *Lerner*, 459 F.3d at 290-91).  As previously noted, "[c]onclusory allegations of scienter are sufficient if there exist[s] a minimal factual basis giving rise to a strong inference of fraudulent intent."  *Alternative Green Techs., Inc.,* 2012 WL 4763094, at *3.  The SAC is replete with allegations that Newman was a knowing participant in multiple aspects of the fraudulent scheme.

The SAC asserts broadly that Wey directed the fraudulent scheme with Newman and others.  SAC ¶ 3.  It asserts that Wey acted in "concert" with Newman to "obtain[] secret control of the shell companies and later the publicly-traded shares of each company that emerged from the reverse merger."  *Id.* ¶ 60.  It contends further that after he secretly obtained control of a shell company, "Wey—working closely with attorney Defendant Robert Newman—arranged for one of the NYGG Clients to reverse merge with the shell company Benjamin Wey and some of his family members directly or indirectly owned."  *Id.* ¶ 3.  This is coupled with the allegation that "[n]either Benjamin Wey nor Newman, who was ostensibly serving as counsel for the NYGG Clients, disclosed that Benjamin Wey, Tianyi Wei, and Michaela Wey ultimately owned and controlled those shell companies."  *Id.*

After describing Newman's participation in the scheme generally, as further detailed above in the fact section, the SAC goes into additional detail about his role in: (1) helping Wey obtain undisclosed control over the NYGG clients; (2) aiding Wey in concealing his relationship with the nominees and the NYGG issuers by deceiving the underwriters and NASDAQ; and (3) assisting Wey in his control of the market for Deer securities.

21

For example, the SAC alleges that, as part of the scheme, Newman located the publicly-traded shell company, Everton.  *Id.* ¶ 65.  He then participated in the reverse merger that resulted in CleanTech.  His involvement included negotiating the price with an unknown buyer, conducting transfers of money from an unknown source in China to finance the transaction, and transferring shares to CleanTech's purported new CEO and to off-shore nominees controlled by certain of Newman's co-defendants.  *Id.* ¶ 66.  Significantly, throughout this process Newman acted as corporate counsel for both the shell company and the Chinese operating company—without receiving a waiver of conflicts from either party.   And he conducted all communications with his client through Wey, or via an email Wey provided to him.  *Id.* ¶¶ 66, 68.

The SAC also specifically alleges that Newman "misled underwriters, NASDAQ, and others by presenting a false version of their activities and involvement with NYGG Clients and nominees."  *Id.* ¶ 5.  One example of this occurred in April 2009, when Newman concealed Wey's affiliation with ACL from an underwriter.  Wey had previously persuaded SmartHeat to hire ACL to provide strategic business consulting services for SmartHeat.  Newman prepared the contract—for Wey's signature *on behalf of ACL*—in which SmartHeat agreed to pay ACL $3.9 million in connection with the November 2009 public offering of SmartHeat's stock in the United States.  *Id.*  ¶ 5, 6.  As the SAC alleges, Newman had also been informed in writing by SmartHeat's CEO that ACL was "NYGG's BVI company."  *Id.* ¶ 72.  Later, Wey falsely told the primary underwriter that neither he nor NYGG had any affiliation with ACL; and, Newman further misled the underwriter, directing its employee to contact a person in China who Wey claimed was ACL's CFO.  *Id.*  ¶¶ 74-75. Thus, there is no question that the allegations in the

SAC demonstrate that Newman knew that Wey was affiliated with ACL.  There is also no

question, therefore, that Newman's assertion to the contrary is mistaken.[4]

As detailed further above, it is also reasonable to infer from the SAC's allegations

that Newman had knowledge of the part of the scheme involving the manipulation of Deer

securities.  Specifically, the SAC states, "Newman knew that Tianyi Wei was Benjamin

Wey's sister and an employee of NYGG and that Benjamin Wey and NYGG 'advised' Deer,

but Newman did not question why Tianyi Wei was involved in funding Deer's stock

repurchase program."  *Id.* ¶ 95.

Finally, the SAC unambiguously—and in considerable detail—describes Newman's

continued role in helping Wey conceal his true role in the fraudulent scheme by knowingly

making misleading statements—in writing—to NASDAQ relating to Wey's relationships with

Deer and SmartHeat.  *Id.* ¶¶ 79-80.  As detailed in the SAC, Newman responded to letters

NASDAQ sent to him, as counsel for Deer and SmartHeat, seeking disclosure of "any and all

relationships, past or present, between the Compan[ies]" and Benjamin Wey, Tianyi Wei,

NYGG, Strong Growth, and others.  *Id.*  After discussing the response with Wey, Newman

signed and sent letters to NASDAQ that failed to disclose that Wey controlled substantial

holdings of Deer and SmartHeat through the nominees, *including* Strong Growth.  *Id.*  Rather

than provide appropriate disclosures about these relationships, Newman instead falsely described

Wey's role as a limited one that included introducing underwriters to Deer and SmartHeat and

being acquainted with officers or directors of those companies.  *Id.* ¶ 79.  The SAC alleges that

---

[4] Newman asserts that "[t]here are no facts stated in the [SAC] to suggest that Newman knew that Benjamin Wey
was affiliated with ACL . . . ."  Newman Br. at 20.  He then contends that the SAC "is replete with factual
allegations that tend to undermine an inference that Newman knew of Benjamin Wey's affiliation with ACL,
including ACL's certification that it was 'comprised solely of non-U.S. persons.'"  *Id.* These statements are
incorrect.

in his letters, Newman "knowingly or recklessly misled NASDAQ about Wey's affiliation with Deer and SmartHeat." *Id.* ¶ 80.

In sum, the SAC adequately alleges Newman's significant role in the fraudulent enterprise. Accepting the allegations in the SAC as true, and drawing all reasonable inferences in favor of the SEC, the totality of the facts demonstrate that Newman had the requisite scienter for each of the securities law violations with which he is charged. *In re Lululemon Sec. Litig.*, 14 F. Supp. 3d at 573.

**VI.    The SEC has adequately pled that Newman received money or property.**

As explained in the SEC's Opposition to Defendant Uchimoto's Motion to Dismiss ("SEC Uchimoto Opp."), ECF 135 at 16, receiving regular fees for conducting the alleged fraudulent activities satisfies the element of a violation of Section 17(a)(2) of the Securities Act that the defendant "obtain money or property." The SAC alleges that Newman was receiving legal fees for his misconduct. That is sufficient to satisfy Section 17(a)(2). *See, e.g., SEC v. Tourre*, No. 10 Civ. 3229 (KBF), 2014 WL 61864, at *3-4 (S.D.N.Y. Jan. 7, 2014).

**VII.   The SEC has adequately pled that Newman engaged in deceptive conduct.**

Newman contends, in conclusory fashion, that the SEC's claims of scheme liability fail for lack of pleading deceptive acts in addition to misrepresentations. Newman Mot. at 23. As explained in the SEC opposition to Defendant Uchimoto's Motion to Dismiss misstatements can support a claim under Rule 10b-5(a) and (c). *See* SEC Uchimoto Opp. at 13. However, as in Uchimoto's case, the Court need not address whether the SEC must plead conduct beyond a misstatement to support for liability under Rule 10b-5(a) and (c). That is because the SEC has alleged that Newman engaged in deceptive acts in addition to making misrepresentations,

including his role in the fraudulent repurchase of Deer stock, which was done to artificially support the price of the stock while Wey was selling shares.  SAC ¶¶ 92-98.

## VIII.   Conclusion

For the reasons stated above the SEC respectfully requests that the Court deny Newman's motion to dismiss.

Dated:   September 30, 2016

Respectfully submitted,

/s/ Joshua Braunstein
Derek S. Bentsen
Joshua Braunstein
UNITED STATES SECURITIES AND
EXCHANGE COMMISSION
100 F St., N.E.
Washington, D.C. 20549-5985
202-551-8470 (Braunstein)
BraunsteinJ@sec.gov

## CERTIFICATE OF SERVICE

I certify that on September 30, 2016, I caused the foregoing to be filed using the Court's

CM/ECF system, which will send notification of such filing to each counsel of record.


/s/ Joshua Braunstein
*Counsel for Plaintiff*