UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

UNITED STATES SECURITIES AND
EXCHANGE COMMISSION,

              Plaintiff,

              v.

BENJAMIN WEY,
NEW YORK GLOBAL GROUP,
TIANYI WEI,
MICHAELA WEY,
ROBERT NEWMAN,
WILLIAM UCHIMOTO, and
SEREF DOĞAN ERBEK,

              Defendants,

       and

ADVANTAGE CONSULTANTS, LTD.,
YORK CAPITAL MANAGEMENT, LTD.,
FOUR TONG INVESTMENTS, LTD.,
STRONG GROWTH CAPITAL, LTD.,
MEDIAN ASSETS INVESTMENTS, LTD., and
HAN HUA, LTD.,

              Relief Defendants.

Civil Action No. 15-7116 (PKC)

**ORAL ARGUMENT REQUESTED**

---

**DEFENDANT SEREF DOĞAN ERBEK'S REPLY BRIEF
IN FURTHER SUPPORT OF HIS MOTION TO DISMISS THE SECOND AMENDED
COMPLAINT**

BAKER & MCKENZIE LLP
452 Fifth Avenue
New York, NY 10018

*Attorneys for Defendant Seref Doğan Erbek*

October 21, 2016

**TABLE OF CONTENTS**

I.    PRELIMINARY STATEMENT ........................................................................................ 1

II.   ARGUMENT ................................................................................................................ 1

    A.   The Complaint Does Not Support The Inference That Erbek Aided And Abetted A Misrepresentation To An Underwriter ...................................................... 1

    B.   The Complaint Does Not Support The Inference That Erbek Aided And Abetted A Manipulation Scheme In Violation of Section 10b or Section 17(a) ... 4

    C.   The Complaint Does Not Support The Inference That Erbek Aided And Abetted Failures to File SEC Forms 13D And 13G ................................................ 8

III.  CONCLUSION ........................................................................................................... 10

# TABLE OF AUTHORITIES

**Cases**

*O'Brien v. DiGrazia*, 544 F.2d 543 (1st Cir. 1976) ........................................................... 6

*Pension Committee of Univ. of Montreal Pension Plan v. Banc of America Securities, LLC*, 652 F. Supp. 2d 495 (S.D.N.Y. 2009) .................................................................... 7

*SEC v. Apuzzo*, 689 F.3d 204 (2d Cir. 2012) ................................................................... 7

*SEC v. Czarnik*, 2010 U.S. Dist. LEXIS 125463 (S.D.N.Y. Nov. 29, 2010) ............................. 1, 5

*SEC v. U.S. Envtl., Inc.*, 155 F.3d 107 (2d Cir. 1998) ...................................................... 7

*SEC v. Wyly, et al.*, 10 Civ. 5760 (SAS) (S.D.N.Y.) ......................................................... 9

**Statutes**

17 C.F.R. § 240.13d-3(a) .................................................................................................. 8

**Rules**

Fed. R. Civ. P. 12(b)(6)..................................................................................................... 1

Fed. R. Civ. P. 9(b) .......................................................................................................... 1

I.      PRELIMINARY STATEMENT

In an effort to save its inartfully drafted complaint from dismissal, the SEC ignores the patent defects described in our moving papers, improperly relies on an email exchange ripped out of context, and advances interpretations of allegations that are flatly contradicted by the Complaint itself.[1] A close reading reveals that Erbek performed a handful of ministerial acts of a kind routinely performed by financial services professionals. Of course, there is no "ministerial acts" exception to anti-fraud provisions of the securities laws; however, the Complaint lacks sufficient non-conclusory allegations that Erbek knew of and substantially assisted such a scheme. Because the Complaint does not sufficiently allege knowledge or recklessness, it does not satisfy scienter requirements. *SEC v. Czarnik*, 2010 U.S. Dist. LEXIS 125463, at *26 (S.D.N.Y. Nov. 29, 2010). The totality of Erbek's innocent acts, and the reasonable inferences that may be drawn therefrom, are therefore insufficient to meet the requirements of Fed. R. Civ. P. 12(b)(6) and 9(b), and the Complaint should be dismissed with prejudice.

II.     ARGUMENT

A.      The Complaint Does Not Support The Inference That Erbek Aided And Abetted A Misrepresentation To An Underwriter

The SEC contends that Erbek assisted Wey in concealing Wey's affiliation with ACL and defends that conclusion based on the following allegations in the Complaint: (1) SmartHeat's underwriter conducted due diligence to determine whether Wey or anyone associated with the offering had a relationship with ACL; (2) Wey lied and told the underwriter that he had no affiliation with ACL; (3) Erbek was aware that Wey had investment authority over an ACL brokerage account, but did not disclose this information when contacted by the underwriter;

---

[1] This reply brief employs the same defined terms used in the moving papers. "SEC Br." refers to Plaintiff's Memorandum of Law in Opposition to Defendant Erbek's Motion to Dismiss (ECF No. 136). This reply focuses solely on the failure of the Complaint to state a claim and does not address the SEC's arguments concerning the applicable statute of limitations or the viability of any claims based on conduct prior to July 21, 2010. By doing so, we do not concede any legal or factual argument raised by the SEC and do not waive any argument based on these grounds.

(4) Erbek misleadingly identified a Bahamian consulting company as ACL's "sole director";

(5) Erbek participated in the preparation of the Certification; (6) Erbek knew that many of the

representations in the Certification were false; (7) Erbek knew that a representation that ACL

was comprised solely of non-U.S. persons was false because Wey, a U.S. citizen, effectively

controlled ACL; and (8) Erbek assisted in obtaining signatures from the Bahamian consulting

company on the Certification. *Id.*  A detailed examination of the Complaint reveals that those

allegations are not sufficiently pled to support the inferences asserted by the SEC.

*First*, there are no allegations from which it reasonably may be inferred that Erbek played

any role in the due diligence process beyond receiving the unexecuted Certification from the

underwriter, sending it to the company's sole director, receiving the executed Certification, and

sending it back to the underwriter. Moreover, there is no basis to conclude that he knew that the

underwriter was trying to ascertain whether Wey had "a relationship" with ACL.

*Second*, there are no allegations from which it reasonably may be inferred that Erbek was

aware that Wey had made any statement, let alone that Wey had lied, to the underwriter.

*Third*, the only evidence the SEC cites to support its claim that Erbek was aware of Wey's

alleged investment authority over an ACL brokerage account is an electronic version of the

Unsigned Authorization found at either the office of NYGG or at Benjamin and Michaela Wey's

residence in New York. The SEC cites no evidence that the Unsigned Authorization even existed

in September 2009 when the Certification was sought, much less that Erbek (in Switzerland) was

aware of its existence. In short, there are no allegations in the Complaint on which to base the

inference that Erbek was aware that Wey had investment authority over an ACL account.[2]

---

[2] The SEC also ignores our argument that even were the Court to find that the Complaint sets forth allegations sufficient to support Erbek's awareness of Wey's authority over a brokerage account, it would be illogical to conclude that an individual with trading authority over an account of unknown significance to a corporation has "effective control" over that corporation. An investment adviser with trading authority over a small fraction of a company's assets does not effectively control that company.

Moreover, there is no allegation that the underwriter ever asked Erbek *any* question, let alone one that would have called for him to disclose any awareness of Wey's investment authority.

*Fourth*, the Complaint offers no support for the assertion that the Bahamian consulting company was *not* ACL's "sole director" and, even more important for this motion, that Erbek was aware of this. Companies generally must have one or more designated directors and whether one is designated as a director is a binary question: one either is or isn't. The SEC has not offered any authority for the remarkable proposition that an individual who "effectively controls" a company should automatically be considered its "director." The Complaint also fails to allege who (whether Wey or anyone else) or what (other than the Bahamian consulting company) was ACL's director at the time the Certification was sought, thereby making it impossible to assess whether Erbek properly could be deemed to have understood that "fact."

*Fifth*, the Complaint provides no support for the conclusion that Erbek played any role in the "preparation" of the Certification. He received it in unexecuted form, sent it to ACL's sole director of record, and returned the executed Certification back to the underwriter.

*Sixth*, the Complaint fails to identify which of the "many" representations in the Certification were false, much less allege the source of Erbek's knowledge of any such alleged falsity. This broad-brush, conclusory smear should be ignored.

*Seventh*, the SEC ignores the arguments raised in the motion to dismiss concerning its novel view that, in common usage, a corporation should be understood to be "comprised" of those who "effectively control" it. This interpretation of the meaning of the word "comprised" defies logic. It is astonishing that the SEC relies on such a strained usage to support its claims.

The sole well-pleaded allegation related to the Certification is that Erbek assisted with obtaining signatures on the Certification; however, the act of transmitting a document for

signature, without more, is merely a ministerial act. That innocent act provides no evidence of

Erbek's knowledge of a scheme. Any claim dependent on those allegations should be dismissed.

**B.      The Complaint Does Not Support The Inference That Erbek Aided And
Abetted A Manipulation Scheme In Violation of Section 10b or Section 17(a)**

The SEC claims that Erbek knowingly or recklessly substantially assisted with

manipulative trades of Deer based on the following allegations in the Complaint: (1) in the fall of

2010, Wey was attempting to secure an underwriter for a CleanTech financing; (2) Wey was

touting the quality of the companies he was advising; (3) Wey emailed the primary Deer

underwriter and stated that Deer was "trading at $11.40 last trade, above the offering price . . . .";

(4) nominee accounts "under the control of" Wey *and Erbek* (SEC Br. 4-5) (emphasis added)

sold over one million shares of Deer for a profit at prices between $11.40 and $12.00 per share in

the fall of 2010; and (5) on eight occasions in the fall of 2010, when the price of Deer dropped

below its public offering price of $11 per share, the nominee accounts "managed" by Erbek

purchased "large amounts of Deer in concert with each other", which "had the effect of

supporting the share price of Deer at $11." *Id*. at 5.

In its opposition brief, the SEC makes statements directly at odds with the allegations of

the Complaint, adds unwarranted and misleading gloss on the language of the Complaint, and

again asks the Court to draw unwarranted inferences from its insufficiently supported pleading.

*First*, there are no allegations in the Complaint from which it could be inferred that Erbek

was aware that Wey was seeking an underwriter for a CleanTech financing in the fall of 2010.

*Second*, there are no allegations from which it is reasonable to infer that Erbek was aware

that Wey was touting the quality of the companies that he was advising.

*Third*, there are no allegations from which it is reasonable to infer that Erbek was aware

that Wey was specifically touting the fact that Deer was trading above its offering price to an

underwriter. In sum, there are no allegations from which it is reasonable to infer that Erbek knew, or should have known, that Wey had any motive to keep the price of Deer stock above $11. The SEC fails to allege when or how Erbek became aware of Wey's representations, or why he should have been on notice as to Wey's intentions; thus, it has failed to adequately plead scienter. *See Czarnik*, 2010 U.S. Dist. LEXIS 125463, at \*22-27.

*Fourth*, the SEC's new claim, that Erbek "controlled" the nominee accounts, is squarely contradicted by the Complaint, which alleges that they were "at least nominally controlled by Tianyi Wei" (Cplt. ¶ 10), or "controlled by Benjamin Wey, Tianyi Wei, and Michaela Wey" (Cplt. ¶ 48, and *see* Cplt. ¶¶ 60, 62, 63, 108 (Weys controlled the Nominees, who owned the accounts)), or were the subject of trading instructions from Wey (Cplt. ¶ 56), or were subject to the control of Wey through Unexecuted Authorizations addressed by Tianyi Wei to Erbek (Cplt. ¶¶ 31, 32, 34, 38), or were subject to Michaela Wey's trading authority (Cplt. ¶¶ 23, 39, 40, 98), or were subject to Tianyi Wei's and Michaela Wey's control (Cplt. ¶ 81). The Complaint fails to allege that Erbek had discretion over the accounts or control over the activities in those accounts, which were, according to the Complaint, controlled by the Weys. This mischaracterization of the allegations in the Complaint should be rejected.

*Fifth*, given the paucity of detail in the Complaint—detail contained in the trading records, which have been available to the SEC for quite some time—it would be improper to draw the inference that Erbek knew or should have known that he was aiding and abetting a manipulation scheme from eight purchases of unspecified numbers of shares, at unspecified prices, at unspecified times relative to the alleged sales, spread over a four-week period in 2010. There are no allegations from which it would be reasonable to infer that Erbek should have understood that this trading pattern was anything other than a commonplace "buy low, sell high" strategy.

Likewise, there is no allegation that the financial institution involved, which has obligations to detect potentially manipulative trading patterns, found anything amiss; accordingly, it would be unreasonable to draw the inference that Erbek should have detected it. Moreover, the sparseness of the allegations makes it is impossible to assess when he could or should have detected any manipulative pattern. The only reasonable inference to be drawn from the SEC's failure to use the information in its possession in drafting the otherwise extraordinarily thin Complaint is that the information would not, in fact, support the SEC's theory. *See O'Brien v. DiGrazia*, 544 F.2d 543, 546 n.3 (1st Cir. 1976) ("when a complaint omits facts that, if they existed, would clearly dominate the case, it seems fair to assume that those facts do not exist"). Accordingly, the Court should not accept the SEC's invitation to draw the worst possible inferences against Erbek.

With respect to the alleged manipulation of CleanTech shares, the SEC continues to ignore the context of the February 7 email exchange cited in the Complaint.[3] This email relates to a prior, unfilled, limit order entered when the stock was trading at above $5 per share. The SEC offers no evidence supporting an inference that this email, understood in its proper context, is evidence of knowledge or intent with respect to a manipulation scheme. To the contrary, the email exemplifies Erbek's ministerial role: reminding a trader to buy shares while the price was below the pre-existing limit order. Financial intermediaries perform such acts countless times each day, in the absence of reason to question their clients' motives. Likewise, here, where there is no evidence that Erbek knew or was reckless in failing to understand that the email was part of an alleged manipulation scheme, these emails cannot bear the weight placed on them by the SEC.

Rather than address the arguments raised in our motion, the SEC instead misconstrues our motion to set up a straw man argument only to knock it down. We don't contend that the SEC is

---

[3] Although the Complaint alleges that the email came from "Benjamin Wey *or someone else at his direction*," the opposition brief ignores the deliberate vagueness of the Complaint and instead attributes the email directly to Wey in an apparent effort to tie Erbek more closely to Wey than the SEC saw fit to allege in the Complaint. Compare Cplt. ¶ 100 with SEC Br. at 5 ("Wey emailed Erbek ..."), 8 ("Wey's February 2011 email"), 9 ("Wey's instructions to engage in market manipulation").

foreclosed in all cases from bringing a securities fraud action against an individual who performed only ministerial actions. Our motion is focused on whether the SEC has sufficiently pleaded a securities fraud action against Erbek. The SEC has not carried that burden. A complaint that only alleges unremarkable ministerial actions and conclusory allegations of "knowledge" and "substantial assistance", as defined in *Apuzzo*, cannot survive a motion to dismiss. *SEC v. Apuzzo*, 689 F.3d 204 (2d Cir. 2012). The fact that in another case the SEC was able to allege non-conclusory facts from which it was found appropriate to infer a primary violation by a registered trader who knew that the trades that he was executing were intended to be manipulative is irrelevant to this case, where no such non-conclusory allegations have been made. *See* SEC Br. at 9; *SEC v. U.S. Envtl., Inc.*, 155 F.3d 107 (2d Cir. 1998) (evidence of pre-arranged trades and wash sales). Indeed the contrast between that case and the allegations here strongly supports our argument for dismissal. Similarly, we don't contend that "clerical" services may not, in some circumstances, constitute "substantial assistance." The SEC's reliance on *Pension Committee of Univ. of Montreal Pension Plan v. Banc of America Securities, LLC*, 652 F. Supp. 2d 495, 511 (S.D.N.Y. 2009) is likewise inapposite. There, the court denied summary judgment and found substantial assistance where employees of the prime broker/custodian helped the primary violator to artificially and deceptively increase the value of its portfolio by recording information reflecting investment gains that it knew to be extraordinary and probably too good to be true and by generating account statements reflecting those gains to the detriment of those relying on those statements. The conclusory allegations of Erbek's knowledge of the scheme which his ministerial acts allegedly assisted simply don't compare; they provide no evidence that he "consciously assisted the commission of the [primary violation] in some active way." *Apuzzo*, 689 F.3d at 212 n.8. Accordingly, the Complaint should be dismissed.

### C.       The Complaint Does Not Support The Inference That Erbek Aided And Abetted Failures to File SEC Forms 13D And 13G

The Complaint likewise fails sufficiently to allege Erbek's knowledge of a primary

violation and substantial assistance to any failure to file SEC Forms 13D and 13G.

The SEC states that the primary violation was "[t]he failures of Benjamin Wey and Tianyi

Wei to file the required forms with the SEC." SEC Br. at 11-12. Accordingly, to survive the

motion, the Complaint would have to include non-conclusory allegations sufficient to draw the

inferences that Erbek was aware that: (1) SEC rules required 13D and/or 13G forms to be filed

by Wey and Wei; and (2) the required forms were not filed.

The only allegation supporting Erbek's knowledge of the applicable rule, and the Weys'

intent to thwart it, consists of two sentences in two emails received two months apart. On July 21,

2010, Erbek was told to allocate shares among three accounts and was told, "[s]ince five percent

limit *at each account* is 1.6 million . . . the above will be fine." (Cplt. ¶ 104) (emphasis added).

There is no mention of an SEC rule or regulation, and the email identifies a limit related to

holdings calculated on an account-by-account basis, not on beneficial ownership or any other

basis. Two months later, Erbek was told: "Under SEC filing requirements, any individual or

entity *owning* more than 5% of a company's total outstanding shares must file SEC 13D or 13G

forms." *Id.* (emphasis added).[4] This was not a "detailed" communication (SEC Br. at 12); indeed,

it was a superficial note that misrepresented the rule, which in fact applies not just to nominal

owners (as stated in the email), but also to beneficial owners and those with ultimate investment

control. *See* 17 C.F.R. § 240.13d-3(a). It is unreasonable to infer from those few words

misdescribing the rule that Erbek had knowledge of the rule or anyone's intent to violate it. There

---

[4] Although the Complaint alleges that the July 21, 2010 and September 20, 2010 emails came from "Benjamin Wey or someone else at his direction," the opposition brief ignores the deliberate vagueness of the Complaint and instead attributes the emails directly to Wey in an apparent effort to tie Erbek more closely to Wey than the SEC saw fit to allege in the Complaint. Compare Cplt. ¶ 104 with SEC Br. at 3 ("Wey emailed Erbek ..."), 10 ("correspondence between Wey and Erbek", 11 ("Wey's instructions"), 12 ("Wey informed Erbek", "Wey's instructions") market manipulation").

is no basis to infer that Erbek, a non-lawyer, in Switzerland, lacking in any prior experience with U.S. securities laws, should have understood the word "owning" in the email to convey anything more than nominal ownership.[5] That understanding is reinforced not only by the description of a five percent limitation applicable on an account-by-account basis that he had received in the July 21, 2010 email, but also by the very allegations in the Complaint that Tianyi Wei was listed as the beneficial owner of all the accounts. *See* Cplt. ¶ 10 ("accounts that were at least nominally controlled by Tianyi Wei") and ¶ 21 ("Accounts in the names of Tianyi Wei and nominees *for which she was listed as a controlling person . . .*") (emphasis added). In that context, the email's direction that staying below 5% "will be fine" fully comports with an understanding that the 5% limit is measured on an account-by-account basis and is inconsistent with an understanding that the limit is measured by beneficial ownership or control. Finally, the Complaint does not allege that Erbek was aware of, or in any position to know whether, any required form was ultimately filed or not.

Second, it remains unclear how Erbek's actions—which the SEC concedes "did not relieve Wey or Tianyi Wei of their legal obligations to report their collective positions"—nevertheless substantially assisted the primary violation of failing to file the SEC forms. *See* SEC Br. at 12. The SEC argues, without explanation, that the fact that Erbek followed the allocation instructions that he received "work[ed] to conceal their violations and the fraudulent scheme." *Id.* Erbek did not have an obligation to file anything, and he had nothing to do with the Weys' apparent eventual decision not to file certain SEC forms. Erbek interacted with a financial institution and is not alleged to have concealed anything from that institution. Indeed, the Complaint alleges that Erbek disclosed to the bank that Tianyi Wei was the beneficial owner of

---

[5] This stands in sharp contrast to the complaint in *SEC v. Wyly, et al.,* 10 Civ. 5760 (SAS) (S.D.N.Y.) in which it was alleged that individuals with 20 years' experience as public company directors and Schedule 13D filers or 20 years' experience as a federal securities lawyer had allocated shares to multiple trust accounts managed by numerous different trustees to create a fiction to justify their non-filing of 13D forms, and had aided and abetted each others' violations. *See Wyly* Complaint at ¶¶ 47-65.

all of the alleged nominee accounts. The only concealment alleged was the Weys' concealment

of their beneficial ownership and control of certain companies from the trading public through

their failure to file required forms. Erbek did nothing to substantially assist that violation and,

therefore, the Tenth Claim and any claim relying on its associated allegations must be dismissed.

## III.   CONCLUSION

The Court should reject the SEC's attempt to shoehorn Erbek into the Complaint by

willfully ignoring the context of critical emails to manipulate their meaning, relying on

unwarranted inferences from vague allegations that omitted key evidence in the SEC's possession,

advancing illogical arguments about the common meaning of words, and making conclusory

allegations, particularly as to Erbek's knowledge, to fill in the gaps in the Complaint. The Court

must determine whether the Complaint sufficiently alleges that the few acts actually attributed to

Erbek—sending a document to a company director for signature, sending commonplace trade

instructions to a financial institution for execution, and allocating shares among accounts at the

direction of an authorized party—amounted to the conscious assistance of a primary violation of

the securities laws in an active way. We submit that a close reading of the Complaint shows that

there are no allegations from which it is reasonable to infer that Erbek was aware of the Weys'

alleged scheme, nor is there evidence that he consciously aided and abetted that scheme, seeking

by his actions to make it succeed. Accordingly, the Complaint should be dismissed in its entirety.

Dated: October 21, 2016
New York, New York

BAKER & McKENZIE LLP

By:       s/Marc Litt
                Marc Litt

Attorneys for Defendant Seref Doğan Erbek

452 Fifth Avenue
New York, New York 10018
Tel: (212) 626-4454
Fax: (212) 310-1802
Email: marc.litt@bakermckenzie.com