UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
UNITED STATES SECURITIES AND
EXCHANGE COMMISSION,

                     Plaintiff,                         15-cv-7116 (PKC)

        -against-                           MEMORANDUM
                                                             AND ORDER

BENJAMIN WEY, NEW YORK GLOBAL
GROUP, TIANYI WEI, MICHAELA WEY,
ROBERT NEWMAN, WILLIAM UCHIMOTO,
and SEREF DOGAN ERBEK,

                    Defendants,

          and

ADVANTAGE CONSULTANTS, LTD., YORK
CAPITAL MANAGEMENT, LTD., FOUR TONG
INVESTMENTS, LTD., STRONG GROWTH
CAPITAL, LTD., MEDIAN ASSETS
INVESTMENTS, LTD., and HAN HUA, LTD.,

                    Relief Defendants.
-----------------------------------------------------------x

CASTEL, U.S.D.J.,

         The Securities and Exchange Commission ("SEC") brings this action for

violations of the Securities Act of 1933 ("Securities Act"), the Securities and Exchange Act of

1934 ("Exchange Act"), and the rules promulgated thereunder, against New York Global Group

("NYGG"), a New York-based company and several individual defendants.  The SEC's

allegations relate to an alleged fraudulent scheme orchestrated primarily by Benjamin Wey, the

founder of NYGG.  Wey established NYGG to help Chinese companies access public markets in

the United States, often through reverse mergers with publicly-traded U.S. shell companies.  In

addition to NYGG, Wey and his family members controlled a number of other corporations,

referred to in the complaint as "nominees."  Wey used these nominees to secretly gain controlling interests in the Chinese companies who were clients of NYGG and then manipulated the securities markets in order to profit from these controlling interests.  As a result of the scheme, defendants Benjamin Wey, his sister Tianyi Wei, and his wife Michaela Wey (together the "Weys"), allegedly received millions of dollars in illicit profits while defendants William Uchimoto, Robert Newman, and Seref Dogan Erbek received fees for legal and brokerage services rendered in furtherance of the scheme.  The Second Amended Complaint (the "complaint") charges the individual defendants with personally violating the securities laws as well as aiding and abetting the violations of other defendants.  Defendants Uchimoto, Newman, and Erbek have moved to dismiss the claims against them.  For the reasons set forth below, defendants' motions are granted in part and denied in part.

BACKGROUND

The following facts are derived from the SEC's complaint and are accepted as true for the purpose of this motion.  See Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).  All reasonable inferences are drawn in favor of the SEC as the non-movant.  See In re Elevator Antitrust Litig., 502 F.3d 47, 50 (2d Cir. 2007).

I.      The Defendants.

Benjamin Wey was the founder and principal of NYGG and exercised ultimate decision-making authority and control over NYGG.  (Compl. ¶ 16).

NYGG is a Delaware corporation headquartered in New York with a second office in Beijing, China.  (Compl. ¶ 17).  Wey established NYGG to help Chinese companies (the "NYGG clients") raise capital and access public markets in the United States, often through reverse mergers with publicly-traded U.S. shell companies.  (Compl. ¶ 18).  Among the NYGG

clients at issue in this motion are Deer Consumer Products, Inc. ("Deer"), SmartHeat, Inc.

("SmartHeat"), and CleanTech Innovations, Inc. ("CleanTech").  (Compl. ¶¶ 44-46).

Tianyi Wei, who resides in China, is Benjamin Wey's sister and manager of the

NYGG office in Beijing.  (Compl. ¶ 20).

Michaela Wey is Benjamin Wey's wife and resides in New York where she is a

licensed attorney.  (Compl. ¶ 22).

Robert Newman is an attorney who is licensed to practice in New York.  (Compl. ¶

24).  He was hired by several NYGG clients as corporate counsel at the direction of Benjamin

Wey.  (Compl. ¶ 25).

William Uchimoto is an attorney who is licensed to practice in Pennsylvania.

(Compl. ¶ 26).  At the direction of Benjamin Wey, he was hired by two NYGG clients, Deer and

SmartHeat, to assist them in obtaining listings on the NASDAQ.  (Compl. ¶¶ 11, 27).

Seref Dogan Erbek resides in Switzerland and worked for a Geneva-based firm that

provided "financial and fiduciary services" to several of the nominees controlled by the Weys.

(Compl. ¶ 28).  Erbek also facilitated stock trades in Deer and CleanTech, both clients of NYGG.

(Compl. ¶ 29).

## II.  The Alleged Fraudulent Scheme.

### a.  Creating a Network of Nominees.

According to the SEC, the first step in Benjamin Wey's scheme involved creating a

network of corporate entities and individuals, referred to in the complaint as "nominees," that

were controlled by Benjamin Wey, his sister Tianyi Wei, and/or his wife Michaela Wey.

(Compl. ¶¶ 3, 30).  These nominees included Michaela Wey's mother, father, and sister, Tianyi

Wei's then-minor child, and Advantage Consultants, Ltd. ("ACL"), York Capital Management,

Ltd. ("York Capital"), Four Tong Investments, Ltd. ("Four Tong"), Strong Growth Capital, Ltd. ("Strong Growth"), Median Assets Investments, Ltd. ("Median Assets"), Han Hua, Ltd. ("Han Hua"), Guo Sheng, Ltd. ("Guo Sheng"), Futmon Holding, Ltd., ("Futmon"), Bicornio Real Estate SA, ("Bicornio"), Roosen Commercial Corporation, ("Roosen"), Wolf Enterprises, Ltd., ("Wolf"),  Harlesden Assets, Ltd., ("Harlesden"), and Finchley International Investments, Ltd. ("Finchley").  (Compl. ¶ 30).

The corporate nominees were incorporated abroad and controlled by Benjamin Wey, Tianyi Wei, and Michaela Wey.  (Compl. ¶¶ 31-43).  For example, the complaint explains that ACL is a limited liability corporation incorporated in the British Virgin Islands.  (Compl. ¶ 31).  From mid-2007 to late 2008, Tianyi Wei was the director, sole owner, and signatory for ACL's corporate actions as well as a bank account in ACL's name.  Id.  Documents show that Tianyi Wei granted Benjamin Wey trading authority over a Swiss brokerage account in ACL's name managed by Erbek.  Id.

      b.  Controlling the NYGG Clients.

The SEC claims that Benjamin Wey used the nominees to gain control over large blocks of the NYGG client corporations' securities.  (Compl. ¶ 48).  This was accomplished in two ways: (1) by issuing shares to Benjamin Wey and his associates, and (2) through reverse mergers.

The first way Benjamin Wey secretly gained control of the NYGG clients' stock was by causing those clients to issue shares to his relatives and to NYGG employees which were then deposited into accounts controlled by the Weys.  Id.  For example, according to the SEC, between 2008 and 2012, Benjamin Wey himself, through Newman, or through an NYGG employee, directed the NYGG clients' transfer agents to transfer shares to and from various

nominee brokerage accounts.  (Compl. ¶ 58).   The Weys opened these brokerage accounts in the names of nominees, but they were actually controlled by Benjamin Wey who used the accounts to trade, and profit, from shares of NYGG clients.  (Compl. ¶¶ 50-57).  Benjamin Wey and his associates also paid Erbek to open and maintain similar brokerage accounts in Switzerland. (Compl. ¶ 54).

Not only did Benjamin Wey profit from the sales of these NYGG client shares, he also caused the NYGG clients to pay millions of dollars in fees to nominees that he and his family controlled for services that were never meaningfully rendered.  (Compl. ¶¶ 59, 112, 113). These fees were paid by the NYGG clients without Benjamin Wey ever having disclosed his relationship to the nominees.  (Compl. ¶ 59).

The second way Benjamin Wey allegedly gained control of the NYGG clients was by arranging reverse mergers between the clients and U.S. shell companies which he secretly controlled, leaving him with control of significant holdings in the public companies that resulted from the merger.  (Compl. ¶ 60).  First, Benjamin Wey, with the help of Tianyi Wei and Newman, who was hired by the NYGG clients as corporate counsel, would locate a publicly-traded shell company in the U.S. and purchase that shell company by "arranging ownership" in the names of individuals associated with Benjamin Wey, Tianyi Wei, and NYGG.  Id.  Then, they would arrange for shares to be transferred from the shell company's original shareholders to nominees controlled by the Weys.  Id.  Finally, Benjamin Wey, along with Newman and NYGG employees, would arrange for an NYGG client to reverse merge with the shell company, now controlled, secretly, by the Weys' nominees.  Id.

By virtue of their ownership interests in the nominees, and therefore the shell companies, Benjamin Wey and his family members ended up with undisclosed control of more

than 10 percent of the publicly-traded shares of the newly formed companies.  (Compl. ¶ 62).  In order to make this ownership interest particularly profitable, Benjamin Wey and Newman convinced the NYGG clients to enter into lock-up agreements that prevented the companies' officers and directors from selling their shares for a three year period.  (Compl. ¶ 63).  This left the nominees, controlled by the Weys, with control over the majority of the freely-traded NYGG client stock which in turn allowed the Weys to manipulate the market for those shares with the help of Erbek and Newman.  (Compl. ¶ 63).

        c.   <u>Concealing Control Over the NYGG Clients.</u>

In order to conceal the connection between the Weys, the nominees, and the NYGG clients, Benjamin Wey and Newman, with the help of Erbek and others, made material misstatements and misrepresentations to NASDAQ, underwriters and others.

        i.   <u>Misstatements to Underwriters.</u>

In April 2009, Benjamin Wey persuaded SmartHeat, an NYGG client, to hire ACL as a strategic business consultant in connection with a public offering of SmartHeat stock in November 2009.  (Compl. ¶ 72).  However, Wey did not disclose the fact that his sister, Tianyi Wei, was the sole director and owner of ACL or that he himself had trading authority over ACL brokerage accounts.  (Compl. ¶¶ 31, 72).  SmartHeat agreed to pay ACL $3.9 million and a contract was prepared by Newman in April 2009 for Benjamin Wey to sign on ACL's behalf.  (Compl. ¶ 72).

When the primary underwriter for the SmartHeat offering inquired as to the identities of ACL's owners and as to Benjamin Wey's affiliation to ACL so as to properly disclose the ACL consulting fee in SmartHeat's offering documents, Wey and Newman both mislead the underwriter.  (Compl. ¶¶ 73-75).  Instead of disclosing that his sister, Tianyi Wei, who was an

NYGG manager in Beijing, had served as the sole director and owner of ACL, Wey falsely told

the underwriter that neither he nor NYGG had any affiliation with ACL.  (Compl. ¶ 74).

Newman allegedly knew of Benjamin Wey's connections to ACL but instead of disclosing those

connections, he directed the underwriter to contact a person in China who Benjamin Wey

identified as ACL's Chief Financial Officer.  (Compl. ¶ 75).  That person then falsely denied that

ACL had any contacts in the United States but failed to respond to the underwriter's request that

he execute a certification to that effect.  (Compl. ¶ 75).

   The underwriter also requested that ACL execute a certification representing that it

was comprised solely of non-U.S. persons located outside of the United States.  (Compl. ¶¶ 73,

76).  In response, Benjamin Wey directed the underwriter to Erbek who then directed the

underwriter to a Bahamian consulting company that Erbek claimed was ACL's sole director.

(Compl. ¶ 76).  Both Erbek and Newman helped to get the certification signed by the Bahamian

company and sent to the underwriter, despite allegedly knowing that the claim that ACL was

comprised solely of non-U.S. persons outside of the United States was materially false.  Id.

   The complaint alleges that Benjamin Wey and Newman similarly mislead the same

underwriter in connection with a December 2009 capital financing for Deer in which Deer paid

ACL over $3 million in fees.  (Compl. ¶ 77).  As in the SmartHeat offering, ACL executed a

certification that contained the same misrepresentation that it was comprised solely of non-U.S.

persons.  Id.  These misrepresentations and omissions by Benjamin Wey and Newman allegedly

caused the offering documents for both Deer and SmartHeat to be materially misleading because

they did not disclose Wey's association with ACL.  (Compl. ¶ 78).

ii.   Misstatements to NASDAQ.

In 2011, NASDAQ requested, through Newman, as counsel for Deer and SmartHeat, that Deer and SmartHeat both disclose any relationships, past or present, between each company and Benjamin Wey, Tianyi Wei, NYGG, Strong Growth and other entities.  (Compl. ¶ 79).  In letters that Newman signed and sent to NASDAQ he described a "limited relationship that included introducing underwriters to Deer and SmartHeat and being acquainted with officers and directors of Deer and SmartHeat."  Id.  Newman sent these letters despite allegedly knowing that Benjamin Wey and NYGG were considerably more involved with Deer and SmartHeat having conducted financial modeling for both companies, chosen their lawyers and accountants, reviewed drafts of their SEC filings, identified and recommended individuals to serve as directors, advised as to pending litigation and discussed non-public information with company officers.  (Compl. ¶ 80).  Newman also failed to disclose to NASDAQ that the Weys controlled substantial holdings of Deer and SmartHeat stock through the nominees.  (Compl. ¶ 79).

d.   Obtaining NASDAQ Listings for Deer and SmartHeat.

In order to develop the market for the shares of the newly-public NYGG clients, and thereby maximize profits from the scheme, Benjamin Wey fraudulently obtained NASDAQ listings for SmartHeat and Deer with the help of Uchimoto.  (Compl. ¶ 82).  SmartHeat and Deer sought to be listed on the NASDAQ in 2008 and 2009 respectively.  (Compl. ¶ 83).  At the time, NASDAQ Rule 4310(c)(6) required that a company have at least 300 "round-lot shareholders" or shareholders owning at least 100 shares of common stock.  Id.  However, neither SmartHeat nor Deer satisfied this requirement.  Id.  Therefore, Benjamin Wey, with the help of Tianyi Wei and Uchimoto, artificially inflated the number of Deer and SmartHeat round-lot shareholders by directing the Deer and SmartHeat transfer agents to transfer shares held by Tianyi Wei, her

minor child, and Wolf to Benjamin Wey's friends, family members, business associates (including Newman, Uchimoto, and Uchimoto's wife) in round-lot increments.  (Compl. ¶¶ 83-84).

Once these transfers were complete, SmartHeat and Deer reported to NASDAQ in September 2008 and June 2009 respectively that they each satisfied the round-lot shareholder requirement.  (Compl. ¶ 87).  However, in order to evaluate trading interest, NASDAQ asked Uchimoto, as Deer and SmartHeat's listing counsel, about the circumstances by which many of the round-lot shareholders had received their shares.  Id.  Uchimoto explained that he, his spouse, and others each owned 100 shares which were gifted to him "by a social friend in China," who he later identified as Tianyi Wei, "who [was] a shareholder and not an affiliate of the Company." (Compl. ¶ 88).  Uchimoto later stated that he had met Tianyi Wei on one occasion, briefly at an airport, and that the social friend he originally referred to was actually Benjamin Wey rather than Tianyi Wei.[1]  Id.  The SEC claims that Uchimoto's statements to NASDAQ were alternatively misleading – because if he had met Tianyi Wei only once at an airport he did not have a social relationship with her – or false – because Benjamin Wey was affiliated with "the Company" at all relevant times.[2]  Id.

NASDAQ then informed Uchimoto that it did not count gifted shares towards its minimum shareholder requirement, apparently because they do not establish the trading interest necessary to provide the liquidity needed to promote fair and orderly markets.  (Compl. ¶¶ 87, 89).  As a result, Uchimoto allegedly suggested to Benjamin Wey that they have the previously gifted shares placed into brokerage accounts which had the effect of aggregating the shares such that it was no longer evident to NASDAQ that many of the shareholders held only 100 share

---

[1] The complaint does not indicate whether these statements were made to NASDAQ or to some other entity.
[2] The complaint does not identify whether this reference to "the Company" refers to Deer or SmartHeat.

round lots.  (Compl. ¶ 89).  According to the SEC, Uchimoto then falsely reported to NASDAQ that Deer and SmartHeat satisfied the round-lot shareholder requirement without counting the gifted shares, when in reality the gifted shareholders, whose shares were now held in brokerage accounts, were still included in the total shareholder count submitted to NASDAQ.  (Compl. ¶ 90).  NASDAQ ultimately approved SmartHeat and Deer for listing on January 29, 2009 and July 16, 2009 respectively.  Id.

  e. Market Manipulation.

   In order to profit from his control of the freely-traded shares of the newly-public NYGG clients, Benjamin Wey, with the help of Erbek, Newman, Tianyi Wei, and Michaela Wey, manipulated the market for Deer and CleanTech securities.  (Compl. ¶ 91).

   i. Manipulation of Deer Market.

   In 2010, Benjamin Wey convinced Deer to initiate a stock repurchase program by assuring the company that it would not have to spend any money to fund it.  (Compl. ¶ 93). Instead, the funding was to be provided by the exercise of warrants held by nominees including ACL, Strong Growth, Bicornio, Roosen, Futmon, and Wolf.  Id.  In reality, Benjamin Wey treated the nominees interchangeably and the funding came only from Strong Growth and Tianyi Wei.  Id.  This funding was transferred into Newman's trust account and then transferred into a brokerage account in Deer's name that Newman had set up so that he and Benjamin Wey could execute the repurchases.  (Compl. ¶ 94).  Although Newman allegedly knew that Tianyi Wei was Benjamin Wey's sister and an employee of NYGG, and that Benjamin Wey and NYGG had advised Deer, he did not question Tianyi Wei's involvement in the Deer repurchase plan. (Compl. ¶ 95).

While the Deer brokerage account repurchased its own stock using the funds provided by Tianyi Wei and Strong Growth, other brokerage accounts in the names of Tianyi Wei and Strong Growth sold hundreds of thousands of shares of Deer stock for over $5.5 million dollars.  (Compl. ¶ 97).  During this time, the repurchase plan helped to maintain the share price of Deer shares.  Id.

Benjamin Wey had Newman distribute the Deer shares purchased using the nominees' warrants among several nominees in amounts that did not match the number of warrants each nominee possessed or exercised.  (Compl. ¶ 98).  In fact, one nomine, Guo Sheng, received Deer shares despite possessing no warrants at all.  Id.

On another occasion, nominee brokerage accounts in Switzerland acted together to maintain the price of Deer stock above $11.00 per share by selling large amounts of Deer stock at a profit while also purchasing Deer stock whenever the price dropped to $11.00. (Compl. ¶¶ 101-02).

ii.   <u>Manipulation of CleanTech Market.</u>

Benjamin Wey and his associates also worked to manipulate the market for CleanTech securities by maintaining a share price over $5.00.  (Compl. ¶ 99).  In 2010, a brokerage account in Tianyi Wei's name executed the first trades in CleanTech stock by purchasing 1,000 shares from a brokerage account in the name of Guo Sheng, a nominee which Tianyi Wei controlled.  Id.  Although nothing had happened to justify a price increase between the offering and this first sale on the secondary market, the purchase price jumped from $3.00 at offering to $5.10.  Id.  According to the SEC, Benjamin Wey "touted" this 70 percent price increase in communications with potential investors.  Id.

In February 2011, Benjamin Wey, or someone else acting at his direction, also instructed Erbek to make sure that shares of CleanTech traded at $5.00.  (Compl. ¶ 100).  Erbek followed these instructions by using the Swiss brokerage accounts that he controlled to purchase CleanTech shares at prices close to $5.00 allegedly in an effort to drive the price upward.  Id.

f.   Evading Disclosure Requirements.

Beneficial owners of more than five percent of any issuer's shares are legally required to report their total holdings in that issuer to the SEC using Schedules 13D or 13G. (Compl. ¶ 103).  These requirements apply to single investors and to multiple investors acting as a group for the purpose of "acquiring, holding, or disposing of securities of an issuer."  Id.  The Weys avoided these disclosure requirements by directing Erbek to structure the nominees' holdings such that no one entity or individual ever held more than a five percent beneficial ownership interest in any NYGG client.  (Compl. ¶ 104).  Based on emails obtained through a search warrant, the SEC claims that Erbek knew about the SEC reporting requirements and understood that his job was to structure the nominees' holdings so as to avoid triggering those requirements.  (Compl. ¶ 105).

However, even if no one nominee or individual held a beneficial interest greater than five percent in any NYGG client, the Weys were still obligated to report their holdings because, by virtue of their control over the nominees, they effectively controlled more than five percent of the outstanding shares in several NYGG clients.  (Compl. ¶¶ 106-07).  In addition, the Weys, and the nominees were also "sufficiently interrelated that they constituted a group for the purposes of the filing requirements of Exchange Act Section 13(d) and Regulation 13D-G." (Compl. ¶ 108).  Yet Benjamin Wey, Tianyi Wei, and Michaela Wey repeatedly failed to file the required forms with the SEC.  Id.

Benjamin Wey did have Newman file Schedule 13Ds in two instances although both filings were materially false.  (Compl. ¶ 109).  Newman filed a Schedule 13D for Futmon in 2010 that failed to disclose that Benjamin Wey and Tianyi Wei were beneficial owners of some Deer stock described in the disclosure.  Id.  Newman filed another Schedule 13D in 2010 on behalf of Tianyi Wei which explained that she had sole voting and dispositive power over shares of Deer stock without including shares of Deer held by nominees for which she was the sole shareholder, officer, or director.  Id.  According to the SEC, Newman knew or was reckless in not knowing that these two 13D filings were materially false.  (Compl. ¶ 111).

III.    Procedural History.

The SEC filed this action on September 10, 2015.  (Dkt. 1).  The complaint was amended for the first time on November 9, 2015.  (Dkt. 5).  At a conference held on June 8, 2016, the Court stayed the action against Benjamin Wey pending the resolution of the criminal case against him.  (Dkts. 102-03).  Defendants Uchimoto, Newman, and Erbek then moved to dismiss the amended complaint.  (Dkts. 106, 108, 111).  Thereafter, the SEC sought, and was granted permission to amend the complaint a second time in response to the arguments raised in the defendants' motions to dismiss.  (Dkt. 118).  The defendants did not oppose this amendment. (Dkt. 121).  The SEC filed a Second Amended Complaint on August 5, 2016.  (Dkt. 123). Defendants then filed their motions to dismiss the Second Amended Complaint, (Dkts. 124, 127, 130), and the SEC subsequently voluntarily dismissed its claim against Uchimoto for aiding and abetting violations of Section 17(a) of the Securities Act on October 5, 2016.  (Dkt. 138).

DISCUSSION

I.    Legal Standards on Motion to Dismiss.

        Pursuant to Rule 12(b)(6), Fed. R. Civ. P., to survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Iqbal, 556 U.S. at 678 (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)). The Court must examine only the well-pleaded factual allegations, ignoring any legal conclusions, "and then determine whether they plausibly give rise to an entitlement to relief." Id. at 679. When reviewing a motion to dismiss pursuant to Rule 12(b)(6), a court "may consider any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference, legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit." ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 98 (2d Cir. 2007).

        In addition, Rule 9(b) of the Federal Rules of Civil Procedure imposes a heightened pleading standard on complaints alleging securities fraud. Novak v. Kasaks, 216 F.3d 300, 306 (2d Cir. 2000). The SEC need not, however, satisfy the pleading requirements of the Private Securities Litigation Reform Act ("PSLRA"). SEC v. China Ne. Petroleum Holdings Ltd., 27 F. Supp. 3d 379, 387 (S.D.N.Y. 2014) (citing SEC v. Dunn, 587 F. Supp. 2d 486, 501 (S.D.N.Y. 2008)). Under Rule 9(b), parties alleging fraud must "state with particularity the circumstances constituting fraud." For example, a plaintiff alleging fraudulent misstatements satisfies Rule 9(b) by: (1) specifying the fraudulent statements, (2) identifying the speaker, (3) stating where and when the statements were made, and (4) explaining why the statements were fraudulent. See Novak, 216 F.3d at 306. Rule 9(b) further provides that "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally."

II.      Claims Pursuant to Section 10(b), Rule 10b-5, and Section 17(a).

Section 10(b) of the Exchange Act, in relevant part, makes it unlawful "for any person . . . [t]o use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe."  15 U.S.C. § 78j(b).  Rule 10b–5 implements Section 10(b) and provides that it shall be unlawful:

> (a) To employ any device, scheme, or artifice to defraud,
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, or
> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R, § 240.10b–5.  Section 17(a) of the Securities Act similarly prohibits fraud in the "offer or sale of any securities."  15 U.S.C. § 77q(a).

To violate Section 10(b) and Rule 10b–5, "a party must have (1) made a material misrepresentation or a material omission as to which he had a duty to speak, or used a fraudulent device; (2) with scienter; (3) in connection with the purchase or sale of securities."  SEC v. Pentagon Capital Mgmt. PLC, 725 F.3d 279, 285 (2d Cir. 2013) (citation and quotation marks omitted).  The elements of a claim under Section 17(a) of the Securities Act are "essentially the same" as those required to prove fraud under Section 10(b).  SEC v. Monarch Funding Corp., 192 F.3d 295, 308 (2d Cir. 1999).  However, the SEC need not prove that the defendants acted with scienter to succeed on a claim under subsections 17(a)(2) or 17(a)(3).  See Aaron v. SEC,

446 U.S. 680, 697 (1980).  Instead, "[a] showing of negligence is sufficient."  SEC v. Ginder,

752 F.3d 569, 574 (2d Cir. 2014).[3]

    A.  William Uchimoto.

        According to the SEC, Benjamin Wey directed the NYGG clients to hire

Uchimoto to provide legal services.  (Compl. ¶ 11).  Uchimoto's practice was "dominated" by

representation of NYGG clients.  (Compl. ¶ 27).  During the relevant period, NYGG clients

accounted for three of Uchimoto's top five clients and the majority of his billings.  Id.

Additionally, Uchimoto's billing records allegedly reflect extensive communication with

Benjamin Wey about the shareholder count for SmartHeat's NASDAQ application.  (Compl. ¶

86).

        The SEC claims that Uchimoto violated Section 10(b) and Rule 10b-5 of the

Exchange Act, and Section 17(a) of the Securities Act in two ways.  First, by making a material

misrepresentation to NASDAQ that his clients met the round-lot shareholder requirement

without counting gifted shareholders despite knowing that those shareholders were still included

in the total number submitted to NASDAQ.  (Compl. ¶ 90).  Second, by allegedly participating

in a fraudulent scheme by (1) misleading NASDAQ about the relationship between himself and

the individual who had given him and others shares as gifts (2) by suggesting that the gifted

shares to be placed in brokerage accounts which had the effect of concealing the identities and

holdings of each shareholder from NASDAQ; and (3) by falsely representing to NASDAQ that

his clients met the minimum shareholder requirement for listing on NASDAQ without counting

shareholders who had received shares as gifts.  (Compl. ¶¶ 88-90).

---

[3] The Court notes that despite the fact that claims under Section 17(a)(2) and (3) do not require a showing of
scienter, none of the parties have urged that Rule 9(b) should not apply to those claims.  Therefore, because all of
the SEC's claims sound in fraud, the Court will apply the standards of Rule 9(b) to all claims.

    a.   <u>Misrepresentation Claims Under Rule 10b-5(b) and Section 17(a)(2).</u>

         i.   <u>Rule 10b-5(b) and Section 17(a)(2): Particularity.</u>

As an initial matter, Uchimoto contends that the SEC has failed to plead the underlying conduct on which it bases its misrepresentation claims with sufficient particularity.

Although the Court must assume all well-pleaded factual allegations in the complaint are true, the SEC must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." <u>Iqbal</u>, 556 U.S. at 678. In addition, a "complaint alleging securities fraud must satisfy Rule 9(b) . . . which requires that 'the circumstances constituting fraud . . . be stated with particularity.'" <u>ATSI</u>, 493 F.3d at 99 (quoting Rule 9(b), Fed. R. Civ. P.). This rule "serves to provide a defendant with fair notice of a plaintiff's claim, safeguard his reputation from improvident charges of wrongdoing, and protect him against strike suits." <u>Id.</u> (citing <u>Rombach v. Chang</u>, 355 F.3d 164, 171 (2d Cir. 2004)).

Rule 9(b) requires a complaint alleging securities fraud based on misstatements to "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." <u>Id.</u> (citing <u>Novak</u>, 216 F.3d at 306). However, "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Rule 9(b), Fed R. Civ. P. In the course of his representation of SmartHeat and Deer, the SEC alleges that Uchimoto made a material misstatement by telling NASDAQ that his clients met the minimum shareholder requirement without counting shareholders who had received their shares as gifts, when those shareholders were in fact still included in the total count. (Compl. ¶¶ 88, 90).

This allegation fails to meet the heightened standard of pleading imposed by Rule 9(b) principally because the complaint fails to identify whether this statement, and in fact all of Uchimoto's allegedly fraudulent conduct, was made in connection with the SmartHeat listing application or the Deer application.  SmartHeat and Deer went through the listing process at different times and SmartHeat was successfully listed on the NASDAQ in January 2009, several months before Deer even began the listing process.  (Compl. ¶¶ 87, 90).  However, the complaint does not indicate whether Uchimoto's statements were made in connection with the SmartHeat listing application, the Deer listing application, or both.  Similarly, while the complaint alleges that Uchimoto suggested that Benjamin Wey move shares into brokerage accounts after being told that NASDAQ would not count the gifted shareholders towards the minimum shareholder requirement, (Compl. ¶ 89), the complaint does not specify whether Uchimoto was referring to shares held by SmartHeat or Deer shareholders.

In addition, the facts alleged in the complaint indicate that the misrepresentation and accompanying conduct occurred at some point between September 2008, when SmartHeat began the listing process, (Compl. ¶ 87), and July 2009, when NASDAQ approved Deer for listing.  (Compl. ¶ 90).  However, the SEC does not allege in any meaningful way when the misstatement was made within that nearly two-year period of time which encompassed the listing process for both SmartHeat and Deer.  These critical deficiencies cause certain of the claims to fail to meet the heightened pleading requirements of Rule 9(b); the misrepresentation claims under Rule 10b-5(b) and Section 17(a)(2) are dismissed.

The allegations in the complaint are otherwise sufficient under Rule 9(b). Uchimoto cites no authority for the proposition that Rule 9(b) requires the pleader to specify whether the misstatement was made orally or in writing.  The complaint identifies the statement

the SEC alleges was fraudulent, who made that statement and the entity to which the statement was made.  (Compl. ¶ 90).  The SEC also sufficiently alleges facts making the statement false or misleading.  <u>Id.</u>  The adequacy of the scienter allegation will be addressed below.  Aside from the deficiencies already identified, the complaint contains sufficient detail to "provide [Uchimoto] with fair notice of [the SEC's] claim, safeguard his reputation from improvident charges of wrongdoing, and protect him against strike suits."  <u>ATSI</u>, 493 F.3d at 99 (citing <u>Rombach</u>, 355 F.3d at 171).

ii.  <u>Rule 10b-5(b): Scienter.</u>

Although Rule 9(b) provides that a defendant's state of mind may be alleged generally, "the relaxation of the particularity requirement for conditions of mind must not be mistaken for a 'license to base claims of fraud on speculation and conclusory allegations.'"  <u>SEC v. Egan</u>, 994 F. Supp. 2d 558, 564–65 (S.D.N.Y. 2014) (quoting <u>Acito v. IMCERA Grp., Inc.</u>, 47 F.3d 47, 52 (2d Cir. 1995)).  Therefore, a plaintiff alleging securities fraud must "allege facts that give rise to a strong inference of fraudulent intent."  <u>Novak</u>, 216 F.3d at 306 (internal quotation marks omitted).

A "strong inference" of fraudulent intent "may be established either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness."  <u>Id.</u> at 307 (citation and internal quotation marks omitted).  Reckless conduct is defined as, "at the least, conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care . . . to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it."  <u>Id.</u> at 308 (citation and quotation marks omitted).  "[A]n allegation that a defendant merely ought to have

known is not sufficient to allege recklessness," Hart v. Internet Wire, Inc., 145 F. Supp. 2d 360,

368 (S.D.N.Y. 2001) (internal quotation marks omitted), however, "[a]n egregious refusal to see

the obvious, or to investigate the doubtful, may in some cases give rise to an inference of . . .

recklessness." Novak, 216 F.3d at 308 (quoting Chill v. General Elec. Co., 101 F.3d 263, 269

(2d Cir. 1996)).   "[A]n express allegation of deliberate misconduct can [also] be sufficient to

plead scienter."  SEC v. Collins & Aikman Corp., 524 F. Supp. 2d 477, 487 (S.D.N.Y. 2007)

(citing Suez Equity Inv'rs v. Toronto–Dominion Bank, 250 F.3d 87, 100 (2d Cir. 2001)).

      The SEC does not allege that Uchimoto had an improper motive and instead

pleads scienter under the theory of conscious misbehavior or recklessness.  See Kalnit v. Eichler,

264 F.3d 131, 142 (2d Cir. 2001) (quoting Beck v. Mfrs. Hanover Trust Co., 820 F.2d 46, 50 (2d

Cir. 1987), overruled on other grounds by United States v. Indelicato, 865 F.2d 1370 (2d Cir.

1989) (en banc)) ("Where motive is not apparent, it is still possible to plead scienter by

identifying circumstances indicating conscious behavior by the defendant, though the strength of

the circumstantial allegations must be correspondingly greater.").

      The complaint alleges that upon being told that NASDAQ did not count gifted

shareholders towards its minimum shareholder requirements, Uchimoto worked to conceal the

identity of the shareholders by suggesting that the shares be moved into brokerage accounts, and

then lied to NASDAQ by claiming that his clients satisfied the minimum shareholder

requirements without the gifted shareholders.  (Compl. ¶¶ 89-90).  As this raises a strong

inference of conscious misbehavior and thereby fraudulent intent, the SEC has adequately plead

scienter as to the Rule 10b-5(b) misrepresentation claim.

iii.   Section 17(a)(2): Negligence.

Unlike claims brought under Section 10(b), Rule 10b-5, and Section 17(a)(1), the SEC need only allege that a defendant acted with negligence in order to plead violations of Sections 17(a)(2) and 17(a)(3).  See Aaron, 446 U.S. at 695-97; Ginder, 752 F.3d at 574. Although the Second Circuit "has not had occasion to consider what standard of care governs a negligence claim under Sections 17(a)(2)-(3)," Ginder, 752 F.3d at 574, some district courts have said that "[u]nder these provisions, the definition of negligence is 'the failure to use reasonable care, which is the degree of care that a reasonably careful person would use under like circumstances.'" SEC. v. Cole, No. 12 Civ. 8167 (RJS), 2015 WL 5737275, at *6 (S.D.N.Y. Sept. 19, 2015) (quoting Instructions of Law to the Jury at 13, SEC v. Stoker, No. 11 Civ. 7388 (JSR) (S.D.N.Y. July 31, 2012), ECF No. 89 [hereinafter "Stoker Instructions"]).  "Such negligence 'may consist either of *doing* something that a reasonably careful person *would not do* under like circumstances, or in *failing* to do something that a reasonably careful person *would do* under like circumstances.'" Id. (quoting Stoker Instructions at 13).  However, because the Court finds that the SEC has properly plead the higher standard of scienter in connection with its misrepresentation claim, Uchimoto's motion to dismiss the Section 17(a)(2) claim for a failure to plead negligence is denied.

iv.   Rule 10b-5(b) and Section 17(a)(2): Nexus Requirement.

Section 10(b) and Rule 10b-5 require that the alleged fraud be "in connection with the purchase or sale" of a security, 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5, while Section 17(a) similarly requires that the fraud occur "in the offer or sale" of a security.  15 U.S.C. § 77q(a).  Uchimoto claims that because his alleged statement was made to NASDAQ in connection with a listing application, the statement did not satisfy this nexus requirement.

However, in discussing Section 17(a), the Supreme Court held that the language "in the offer or sale of any securities" was "expansive enough to encompass the entire selling process." United States v. Naftalin, 441 U.S. 768, 773 (1979). The language of the statute "does not require that the fraud occur in any particular phase of the selling transaction." Id. Getting a company listed on a national stock exchange like the NASDAQ is an integral step in the selling process, and there is no reason to seek a NASDAQ listing other than to facilitate the sale of a company's securities. Therefore, Uchimoto's misrepresentation to NASDAQ during the listing process may constitute a violation of the securities laws.

Additionally, the Court in Naftalin explained that "neither this Court nor Congress has ever suggested that investor protection was the *sole* purpose of the Securities Act." Id. at 775. "Prevention of frauds against investors was surely a key part of that program, but so was the effort to achieve a high standard of business ethics . . . *in every facet of the securities industry.*" Id. (internal quotation marks omitted); SEC v. Zandford, 535 U.S. 813, 819 (2002) ("Among Congress' objectives in passing the [Securities and Exchange] Act was to insure honest securities markets and thereby promote investor confidence.") (internal quotation marks omitted). Just as this language encompasses statements made to issuer transfer agents, see SEC v. Czarnik, No. 10 Civ. 745 (PKC), 2010 WL 4860678, at *4 (S.D.N.Y. Nov. 29, 2010), the statute is broad enough to cover misrepresentations made to another critical component of the securities industry, a national exchange.

Even though the Court in Naftalin addressed Section 17(a), the statutory language there—"in the offer or sale of any securities"—is virtually identical to the language in Section 10(b) of the Securities Exchange Act—"in connection with the purchase or sale of any security." Compare 15 U.S.C. § 77q(a)(1), with 15 U.S.C. § 78j(b). In Naftalin, the Court noted that the

terms "in" and "in connection with" have on occasion been used interchangeably.  441 U.S. at 773 n.4.  Moreover, the Supreme Court has "espoused a broad interpretation" of the phrase "in connection with" in the context of Section 10(b) and Rule 10b–5.  Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit, 547 U.S. 71, 85 (2006).  "Under our precedents, it is enough that the fraud alleged 'coincide' with a securities transaction – whether by the plaintiff or by someone else." Id. (citing United States v. O'Hagan, 521 U.S. 642, 651, 658 (1997) ("[Section 10(b)] requires deception 'in connection with the purchase or sale of any security,' not deception of an identifiable purchaser or seller.") and Zandford, 535 U.S. at 819–20, 822 ("[Section 10(b) and Rule 10b-5] should be construed not technically and restrictively, but flexibly to effectuate its remedial purposes.") (internal quotation marks omitted)).

v.   Rule 10b-5(b) and Section 17(a)(2): Materiality.

"At the pleading stage, a plaintiff satisfies the materiality requirement of Rule 10b–5 by alleging a statement or omission that a reasonable investor would have considered significant in making investment decisions."  Ganino v. Citizens Utils. Co., 228 F.3d 154, 161 (2d Cir. 2000) (citing Basic Inc. v. Levinson, 485 U.S. 224, 231 (1988)).  In other words, there must be a "substantial likelihood" that the misstated or omitted fact "would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available."  IBEW Local Union No. 58 Pension Tr. Fund and Annuity Fund v. Royal Bank of Scotland Grp., PLC, 783 F.3d 383, 390 (2d Cir. 2015) ("IBEW") (quoting ECA & Local 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co., 553 F.3d 187, 196 (2d Cir. 2009)). "On a motion to dismiss, a complaint may not be properly dismissed unless the misstatements are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance."  Id. (internal quotation marks omitted).  Whether an alleged

statement or omission is material depends on the relevant circumstances of the case.  Ganino,

228 F.3d at 162.

    Uchimoto contends that his alleged statement as to source of the gifted shares

given to him and others was "obviously unimportant" and therefore cannot serve as the basis for

a misrepresentation claim against him.  IBEW, 783 F.3d 390.  However, the SEC is not basing its

misrepresentation claim on Uchimoto's statements regarding the source of the gifted shares but

rather on his allegedly false statement to NASDAQ that his clients met the round lot shareholder

requirement without counting shareholders who had received their shares as a gift.  (SEC Mem.

in Opp'n to Uchimoto Mot. to Dismiss 11).  No argument is advanced by the defendant

regarding the materiality of this statement.  Because the SEC does not seek to base its

misrepresentation claim on Uchimoto's statement about the source of the shares, Uchimoto's

motion to dismiss the Rule 10b-5(b) and Section 17(a)(2) claims on materiality grounds is

denied.

    vi. <u>Section 17(a)(2): Money or Property.</u>

    Uchimoto maintains that the Section 17(a)(2) claim against him must be

dismissed because the complaint alleges only that Uchimoto obtained fees for his law firm but

not that he personally obtained money or property as a result of the alleged misrepresentations.

Section 17(a)(2) of the Securities Act provides that it is unlawful "for any person in the offer or

sale of securities . . . directly or indirectly . . . to obtain money or property by means of any

untrue statement of a material fact."  15 U.S.C. § 77q(a).  Some cases in this district hold that it

is sufficient that the defendant obtain money or property on behalf of his employer in order to

violate Section 17(a)(2), while others hold that a defendant must personally gain money or

property from the fraud.  <u>Compare</u> <u>SEC v. Stoker</u>, 865 F. Supp. 2d 457, 463 (S.D.N.Y. 2012)

(Rakoff, J.) (concluding that defendant may be liable where he obtained money or property for his employer while acting as its agent), with SEC v. Syron, 934 F. Supp. 2d 609, 637–39 (S.D.N.Y. 2013) (Sullivan, J.) (disagreeing with the analysis in Stoker and holding that an individual defendant must personally gain money or property from the fraud), and SEC v. DiMaria, No. 15 Civ. 7035 (GHW), 2016 WL 4926200, at *10-11 (S.D.N.Y. Sept. 15, 2016) (Woods, J.) (agreeing with Syron).

   The Court is inclined to agree with Syron.  The essence of the Section 17(a)(2) claim is that the person, in the offer or sale of securities, obtained money or property by means of an untrue statement of material fact.  15 U.S.C. § 77q(a).  It is not sufficient that a materially untrue statement was made and the person also made money, such as the incidental payment of a scheduled salary and bonus.  It must be plausibly alleged that the money was obtained "by means of" the false statement.  15 U.S.C. § 77q(a).  Thus, regardless of the manner of compensation, if the person would have earned the same fees or compensation regardless of whether the statement was false, a Section 17(a)(2) claim does not lie.  See, DiMaria, 2016 WL 4926200, at *10-11 (dismissing 17(a)(2) claim against executive who signed off on fraudulent financial statements in part because there were no allegations that defendant's compensation was increased in any way by the fraud); Syron, 934 F. Supp. 2d at 637–38 (rejecting argument that employee "obtains money or property" by engaging in fraudulent activity that is within the scope of his employment and for which he is compensated by his employer, without allegations that employee's compensation was affected in some way by the fraud).

   Very little can be learned from the complaint about Uchimoto's compensation and how any false statement may have benefited him.  It is a fair inference from the complaint that Uchimoto was a partner in a law firm hired by certain NYGG clients, a fact confirmed by

Uchimoto's submission to this court.  (Compl. ¶¶ 11, 27; Uchimoto Mot. to Dismiss 2).  But, one is left to guess whether, and to what extent, he had an equity stake in the firm and how financially significant the billings from any NYGG clients were to the firm, and, ultimately, to him.  Nor has the SEC plausibly alleged that Uchimoto's overall compensation was affected in any non-trivial manner by making a false statement rather than a true statement.

Because the complaint fails to allege that Uchimoto obtained money or property by means of his alleged misrepresentation to NASDAQ, his motion to dismiss the Section 17(a)(2) claim is granted.

    b.  <u>Scheme Liability Claims Under Section 10b-5(a) and (c) and Section 17(a)(1) and (3).</u>

        i.  <u>Rule10b-5(a) and (c) and Section 17(a)(1) and (3): Particularity.</u>

"Section 17(a)(1) and (3) of the Securities Act and Section 10(b) of the Securities Exchange Act and Rules 10b–5(a) and (c) thereunder create what courts have called 'scheme liability' for those who, with scienter, engage in deceitful conduct."  <u>SEC v. Jean-Pierre</u>, No. 12 Civ. 8886 (LGS), 2015 WL 1054905, at *8 (S.D.N.Y. Mar. 9, 2015); <u>see also</u>, <u>Stoneridge Inv. Partners, LLC v. Sci.-Atlanta</u>, 552 U.S. 148, 159–60 (2008) (recognizing that some courts refer to securities fraud claims based on deceptive conduct rather than statements as "scheme liability"); <u>Pac. Inv. Mgmt. Co. LLC v. Mayer Brown LLP</u>, 603 F.3d 144, 158 (2d Cir. 2010) (referring to Rule 10b–5(a) and (c) claims as "scheme liability'); <u>Pentagon Capital Mgmt. PLC</u>, 725 F.3d at 287 (same).  In order to state a claim for scheme liability, an SEC complaint must include an "allegation that the defendant (1) committed a manipulative or deceptive act (2) in furtherance of the alleged scheme to defraud, (3) [with] scienter."  <u>See</u> <u>SEC v. Lee</u>, 720 F. Supp. 2d 305, 325 (S.D.N.Y. 2010) (internal quotation marks omitted).  As claims of fraud, these

allegations are also subject to the heightened pleading requirements of Rule 9(b).  See, e.g., SEC v. PIMCO Advisors Fund Mgmt. LLC, 341 F. Supp. 2d 454 (S.D.N.Y. 2004) (applying Rule 9(b) to Section 17(a)(3) claim); SEC v. Power, 525 F. Supp. 2d 415 (S.D.N.Y 2007) (applying Rule 9(b) to Section 17(a)(2) and (3) claims); SEC v. Kelly, 663 F. Supp. 2d 276 (S.D.N.Y. 2009) (same).

The same problems regarding the lack of particularity that plague the SEC's misrepresentation claims also affect the claims for scheme liability.  The SEC asserts that Uchimoto participated in a fraudulent scheme in three ways, by misleading NASDAQ as to the source of his gifted shares, suggesting that shares be placed in brokerage accounts so as to conceal the shareholders' identities, and lying to NASDAQ about whether those gifted shareholders were included in the minimum shareholder count.  (Compl. ¶¶ 88-90).  However, the complaint does not link any of this activity to a particular listing application leaving the reader to guess whether these allegations refer to the SmartHeat listing application, the Deer listing application, or both.  Similarly, the complaint does not explain when any of this conduct took place other than at some point between when SmartHeat began the listing process in September 2008 and when Deer was successfully listed in July 2009.  As with the misrepresentation claim, these allegations fail to meet the heightened pleading requirements of Rule 9(b).

Therefore, the scheme liability claims under Rule 10b-5(a) and (c) and Section 17(a)(1) and (3) are dismissed.

Uchimoto argues that the scheme liability claims also fail under Rule 9(b) because the complaint does not allege that he took any actions specifically to further a stock manipulation scheme.  However, as the SEC correctly points out, the SEC is not required to allege that

Uchimoto participated in each and every aspect of the fraudulent scheme.  Instead, they have alleged deceptive actions by Uchimoto which contributed to the larger fraudulent scheme orchestrated by Benjamin Wey and which included many types of misconduct aside from obtaining fraudulent listings on NASDAQ for NYGG clients.  This is enough to adequately allege a claim for scheme liability under Rule 10b-5(a) and (c) and Section 17(a)(1) and (3).

        ii.   Rule 10b-5(a) and (c) and Section 17(a)(1): Scienter.

Like misrepresentation claims under Rule 10b-5(b), claims for scheme liability under Rule 10b-5(a) and (c) and Section 17(a)(1) require a showing that the defendant acted with scienter or a "strong inference of fraudulent intent."  Novak, 216 F.3d at 306 (internal quotation marks omitted); Aaron, 446 U.S. at 697.  Again, this may be established "either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness."  Novak, 216 F.3d at 307 (citation and internal quotation marks omitted).

The SEC has adequately plead scienter as to Uchimoto's participation in a fraudulent scheme under a theory of conscious misbehavior or recklessness.  According to the complaint, upon learning that NASDAQ did not count gifted shareholders towards its minimum shareholder requirements, Uchimoto worked to conceal the identity of the shareholders by suggesting that the shares be moved into brokerage accounts, and then lied to NASDAQ by claiming that his clients satisfied the minimum shareholder requirements without the gifted shareholders.  (Compl. ¶¶ 89-90).  While the complaint does not plead facts that would support a strong inference that Uchimoto knew or had reason to know that Benjamin Wey was affiliated with SmartHeat and Deer when he told NASDAQ that he had received his shares from a social

friend who was unaffiliated with "the Company,"[4] the fact that Uchimoto changed his story as to the identity of the social friend, (see Compl. ¶ 88), combined with Uchimoto's other deceptive conduct and knowing misstatements, creates a strong inference of conscious misbehavior.  See Collins & Aikman Corp., 524 F. Supp. 2d at 487 ("The inquiry . . . is whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard.") (quoting Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322-23 (2007)).  Therefore, Uchimoto's motion to dismiss the SEC's claims for scheme liability under Rule 10b-5(a) and (c) and Section 17(a)(1) for lack of scienter is denied.

### iii.   Section 17(a)(3): Negligence.

Unlike other forms of scheme liability, claims brought under Section 17(a)(3) of the Securities Act do not require a showing of scienter but are instead satisfied by allegations that the defendant acted negligently.  See Aaron, 446 U.S. at 697; Ginder, 752 F.3d at 574.  However, as the Court has already found that the SEC has properly plead the higher standard of scienter in connection with the scheme liability claims, Uchimoto's motion to dismiss the Section 17(a)(3) claim for a failure to establish negligence is denied.

### iv.   Rule 10b-5(a) and (c) and Section 17(a)(1) and (3): Nexus Requirement.

As with the misrepresentation claim, Uchimoto argues that because his alleged participation in a fraudulent scheme only involved work on NASDAQ listing applications, the SEC has not plead a scheme "in connection with the purchase or sale" of securities or "in the

---

[4] In its opposition, the SEC claims that Uchimoto knew that Benjamin Wey was "affiliated" with "the Company" because he had extensive conversations with Benjamin Wey about SmartHeat's shareholder numbers.  (SEC Mem. in Opp'n to Uchimoto Mot. to Dismiss 4 (citing Compl. ¶ 86)).  However, this thin allegation does not support a strong inference of fraudulent intent.  Even if it were sufficient, it shows only that Uchimoto may have had reason to know that Benjamin Wey was somehow affiliated with SmartHeat but it does nothing to support the inference that he knew of Benjamin Wey's links to Deer.

offer or sale" of a security.  15 U.S.C. §§ 77q(a), 78j(b); 17 C.F.R. § 240.10b-5.  However, for

the same reasons that the Court denied Uchimoto's motion to dismiss the misrepresentation

claim on this ground, the motion to dismiss the scheme liability claim for failure to plead the

nexus requirement is similarly denied.

> v.  Rule 10b-5(a) and (c) and Section 17(a)(1) and (3): Deceptive Conduct in
>     Addition to Misrepresentation.

Claims for scheme liability "hinge[] on the performance of an inherently

deceptive act that is distinct from an alleged misstatement."  SEC v. Kelly, 817 F. Supp. 2d 340,

344 (S.D.N.Y. 2011); see also Lentell v. Merrill Lynch & Co., 396 F.3d 161, 177 (2d Cir. 2005)

("[W]here the sole basis for such claims is alleged misrepresentations or omissions, plaintiffs

have not made out a market manipulation claim under Rule 10b–5(a) and (c)."); WPP Lux.

Gamma Three Sarl v. Spot Runner, Inc., 655 F.3d 1039, 1057 (9th Cir. 2011) ("A defendant may

only be liable as part of a fraudulent scheme based upon misrepresentations and omissions under

Rules 10b–5(a) or (c) when the scheme also encompasses conduct beyond those

misrepresentations or omissions.").  "Defendants must have participated in an illegitimate, sham

or inherently deceptive transaction where their conduct or role had the purpose and effect of

creating a false appearance."  SEC v. CKB168 Holdings, Ltd., No. 13 Civ. 5584 (RRM)(RLM),

2016 WL 6915859, at *17 (E.D.N.Y. Sept. 28, 2016) (quoting SEC v. Sullivan, 68 F. Supp. 3d

1367, 1377 (D. Colo. 2014)) (internal quotation marks omitted).

Uchimoto cites TCS Capital Mgmt., LLC v. Apax Partners, L.P., No. 06 Civ.

13447 (CM), 2008 WL 650385, at *22 (S.D.N.Y. Mar. 7, 2008) for the proposition that his

alleged suggestion that the gifted shares be moved to brokerage accounts is merely a reiteration

of the lie to NASDAQ that forms the basis of the SEC's misrepresentation claims and therefore

does not constitute a separate deceptive act.  (Uchimoto Reply 8).  TCS Capital Mgmt., LLC

involved a deal made between the defendants and a third party, the details of which were not

disclosed to the plaintiff.  TCS Capital Mgmt., LLC, 2008 WL 650385, at *5-6.  As the court

noted, the deal itself was not deceptive, rather it was the failure to disclose the terms of the deal

that constituted the deception.  Id. at *22.  However, this amounted to nothing more than a re-

labeling of the plaintiff's disclosure claim as "manipulative and deceptive conduct" and therefore

the deal did not qualify as a distinct deceptive act.  Id. (dismissing claim for scheme liability

under Rule 10b-5(a) and (c)).

      Here, Uchimoto's plan to move gifted shares into brokerage accounts was

intended to facilitate the misrepresentation to NASDAQ as to number of shareholders, by

making it harder for NASDAQ to evaluate the shareholder base and thereby catch Uchimoto in

his lie.  It did more than merely reiterate the original misrepresentation.  Unlike in TCS Capital

Management, 2008 WL 650385, at *22, the deception was not a failure to disclose that the shares

had been placed in brokerage accounts but the knowingly false statement that SmartHeat and/or

Deer met the minimum shareholder requirement without counting the gifted shareholders.

      Uchimoto's suggested course of conduct may not have been inherently unlawful,

but it was deceptive.  The complaint alleges that Uchimoto proposed placing the gifted shares in

brokerage accounts, which had the effect of concealing the identities of the shareholders,

specifically in response to NASDAQ's statement that it would not count gifted shareholders

towards to minimum shareholder requirement.  (Compl. ¶ 89).  Therefore, this is not a case in

which the allegedly deceptive conduct only became deceptive when the misrepresentation was

made.  See generally SEC v. Penn, No. 14 Civ. 0581 (VEC), 2016 WL 7413518, at *5 (S.D.N.Y.

Dec. 21, 2016) (discussing the possibility that "[c]onduct that is deceptive only because of a

subsequent material misstatement may be actionable under Section 10b-5(b) but cannot be shoehorned into a claim for scheme liability under Section 10b-5(a) and (c).").  Rather, Uchimoto's proposal was deceptive even without the later misrepresentation to NASDAQ, and can support a claim for scheme liability under Rule 10b-5(a) and (c) and Section 17(a)(1) and (3).

B.  Robert Newman.

According to the SEC, Benjamin Wey directed the NYGG clients to hire Newman as corporate counsel, (Compl. ¶ 25), and his work for NYGG clients "accounted for eighty to ninety percent of his law firm's business between 2009 and 2011, and at least fifty percent of his firm's business through 2012."  Id.  At various points, Newman set up his offices in the building occupied by NYGG and shared office space with NYGG.  Id.  Although Newman ostensibly served as corporate counsel for the NYGG clients, at all relevant times he allegedly took direction from, and answered to, Benjamin Wey.  (Compl. ¶ 8).

The SEC claims that Newman violated Section 10(b) and Rule 10b-5 of the Exchange Act, and Section 17(a) of the Securities Act in several ways.  First, the SEC alleges that he made material misstatements in SEC filings and in letters to NASDAQ that misrepresented his own actions and the relationship between Benjamin Wey, the nominees, and NYGG clients.  (Compl. ¶¶ 68, 79-80, 109-111).  Second, the SEC charges Newman with participating in a fraudulent scheme by facilitating reverse mergers between shell companies and NYGG clients, misrepresenting Benjamin Wey's relationship with the nominees and NYGG clients to underwriters, and helping Benjamin Wey manipulate the market for Deer securities. (Compl. ¶¶ 60-66, 73-78, 91-98).

a. <u>Facilitating Reverse Mergers.</u>

The first step in Benjamin Wey's fraudulent scheme was to use the nominees to gain control of publicly-traded shell companies in the U.S. and then arrange for those companies to merge with the Chinese clients of NYGG. (Compl. ¶ 60). Newman allegedly participated in this portion of the fraud by helping to locate shell companies and then facilitating the reverse mergers, without ever disclosing that the Wey family controlled the shell companies. (Compl. ¶¶ 60, 65).

For example, at Benjamin Wey's direction, Newman located a publicly-traded shell company called Everton Capital Corporation ("Everton") for the purpose of a reverse merger with an undetermined future client of NYGG. (Compl. ¶ 65). Newman negotiated a purchase price for Everton with its owners which Benjamin Wey then approved. <u>Id.</u> Newman then completed the purchase by transferring funds from his attorney trust account which had been provided by Four Tong, a Wey nominee, to an account for the benefit of Everton's shareholders. <u>Id.</u>

At the same time, Newman instructed Everton's transfer agent to transfer five million shares of Everton stock from the company's original President to a person who was purportedly Everton's new President, CEO, CFO, Treasurer, and Secretary. (Compl. ¶ 66). Everton filed a Form 8-K with the SEC in July 2010 that described this new CEO as a "29-year-old independent business consultant from China who had purchased 90.89 percent of Everton's outstanding common stock." <u>Id.</u> Newman also instructed Everton's transfer agent to cancel the remaining 9.11 percent of Everton shares and in their place, to issue shares to nominees controlled by the Weys. <u>Id.</u>

The complaint alleges that Newman had been hired as Everton's corporate counsel by the time the July 2010 Form 8-K was filed but that he had never met the purported new CEO, and received the biographical information he used for SEC filings from Benjamin Wey.  Id.  In addition Newman allegedly communicated with this new CEO exclusively through Benjamin Wey, or through an email address that Wey had given to him.  Id.

Once an NYGG client was identified for a reverse merger with Everton, Everton's new purported CEO signed an agreement cancelling his Everton shares, totaling 90.89 percent of outstanding common stock, in exchange for a price well below their actual value.  (Compl. ¶¶ 66-67).  The remaining Everton shareholders, who were almost all Wey nominees, kept their shares, meaning that once the reverse merger was complete, the nominees were beneficial owners of more than ten percent of the new company, CleanTech.  (Compl. ¶ 67).

As a result of the reverse mergers, the management of the NYGG clients received a majority of the shares in the newly-formed public companies.  (Compl. ¶ 61).  However, by virtue of their ownership interests in the nominees, and therefore the shell companies, the Weys also received large amounts of the shares in the post-merger companies.  (Compl. ¶ 62).  After the reverse mergers were complete, Newman and Benjamin Wey would convince the management of the newly-public NYGG clients to enter into lock-up agreements that prevented the officers and directors of the company from selling their shares for three years.  (Compl. ¶ 63).  This left the majority of the freely-traded shares in each NYGG client in the control of the Wey family through their control of the shell companies and nominees.  Id.

b.  Transferring Shares Among Nominees.

The SEC also alleges that Newman helped Benjamin Wey create and control a network of nominees by facilitating share transfers.  Specifically, the complaint alleges that

between 2008 and 2012, Newman, or an NYGG employee, repeatedly carried out Wey's instructions to have NYGG clients' transfer agents transfer shares to and from various nominees. (Compl. ¶ 58).  Wey also allegedly directed Newman to have the transfer agents send share certificates in the names of nominees to Wey for distribution rather than to the nominees' address of record.  Id.

      c.   <u>Misrepresentations to the SEC.</u>

The complaint charges Newman with filing two Schedule 13Ds with the SEC, at Benjamin Wey's direction, which were both materially false.  (Compl. ¶ 109).  Newman allegedly filed a Schedule 13D for Futmon in 2010 that failed to disclose that Wey and his sister Tianyi Wei were beneficial owners of Deer stock described in the disclosure.  <u>Id.</u>  Newman allegedly filed another Schedule 13D in 2010 on behalf of Tianyi Wei which explained that she had sole voting and dispositive power over shares of Deer stock but did not include shares of Deer held by nominees for which she was the sole shareholder, officer, or director.  <u>Id.</u> According to the SEC, Newman knew or was reckless in not knowing that these two 13D filings were materially false.  (Compl. ¶ 111).

      d.   <u>Misrepresentations to NASDAQ.</u>

Early in 2011, NASDAQ sent letters to Newman, as counsel for both SmartHeat and Deer, which asked that both companies disclose any and all relationships with Benjamin Wey, Tianyi Wei, NYGG, Strong Growth, and others.  (Compl. ¶ 79).  After conferring with Benjamin Wey about how to respond, Newman signed and sent letters to NASDAQ that described a "limited relationship" between the two companies, NYGG, and the Weys that included "introducing underwriters to Deer and SmartHeat and being acquainted with officers and directors of Deer and SmartHeat."  <u>Id.</u>  According to the SEC these letters were misleading

because they failed to disclose the fact that Benjamin Wey "controlled substantial holdings of Deer and SmartHeat through the nominees, including Strong Growth." Id.  In addition, the SEC claims that Newman's description of the relationship between Benjamin Wey, NYGG, and the two companies was knowingly or recklessly misleading because Newman knew that Wey and NYGG were considerably more involved in the companies than Newman's letter let on.  (Compl. ¶ 80).  At the time, Newman allegedly knew that Wey and NYGG's relationship with the two companies had involved "conducting financial modeling, choosing [] lawyers and accountants, reviewing drafts of . . . [SEC] filings, identifying and recommending individuals to serve as [] directors, advising as to pending litigation, and discussing non-public information with company officers." Id.

   e. <u>Misleading Underwriters.</u>

   The SEC alleges that Newman also mislead underwriters for SmartHeat and Deer offerings.  (Compl. ¶¶ 75-77).  According to the complaint, at some point in the second half of 2009, the primary underwriter for the SmartHeat offering asked Benjamin Wey and Newman about ACL so as to properly disclose a consulting fee paid to ACL in SmartHeat's offering documents.  (Compl. ¶ 73).  Specifically, the underwriter asked (1) for information about the identities of ACL's owners, and (2) what, if any, affiliation Benjamin Wey had to ACL.  Id.  In addition, the underwriter requested that ACL execute a certification representing that ACL was comprised solely of non-U.S. persons "because of restrictions on foreign broker dealers soliciting U.S. investors." Id.

   In response, Newman allegedly mislead the underwriter by directing the underwriter to contact a person in China who Benjamin Wey claimed to be ACL's Chief Financial Officer.  (Compl. ¶ 75).  This person falsely denied that ACL had any contacts in the

U.S. but failed to respond to the underwriter's request that he sign a certification to that effect. Id.  In addition, Newman helped to get a certification from ACL representing that it was comprised only of non-U.S. persons located outside of the U.S.  (Compl. ¶ 76).  However, Newman allegedly knew that this certification was materially false because he "knew that Benjamin Wey was affiliated with ACL," and had been informed by SmartHeat's CEO that ACL was "NYGG's BVI company."  (Compl. ¶¶ 72, 75-76).

Finally, the complaint alleges that Newman "continued to knowingly misrepresent and conceal Benjamin Wey's affiliation with ACL in connection with a December 2009 capital financing for Deer."  (Compl. ¶ 77).  According to the complaint, Deer used the same underwriter from the SmartHeat offering for this capital financing and the underwriter conducted similar due diligence on the relationship between ACL and Benjamin Wey, including seeking another certification from ACL representing that it was comprised solely of non-U.S. persons. Id.  The complaint does not however contain any specific allegations regarding Newman's role in responding to these inquiries.  Ultimately, the complaint alleges that Benjamin Wey's misrepresentations to the underwriter, aided by Newman, "caused the offering documents for the Deer and SmartHeat public offerings to be materially misleading by failing to disclose Benjamin Wey's affiliation with ACL," and that had the underwriter known about this affiliation, "it would not have agreed to underwrite the deals."  (Compl. ¶ 78).

f.   Manipulating the Market for Deer Securities.

The complaint also alleges that Newman was involved in the manipulation of the market for Deer securities in the summer of 2010.  (Compl. ¶¶ 91-92).  This was allegedly accomplished through a stock repurchase program that Deer agreed to undertake at Benjamin Wey's recommendation.  (Compl. ¶ 93).  In order to facilitate the stock repurchase program,

Wey had Newman open a brokerage account in Deer's name, over which Newman held trading authority, which allowed Newman and Wey to execute the stock repurchases in Deer's name. (Compl. ¶ 94).

The funds to be used to repurchase the stock were transferred into Newman's attorney trust account and then transferred to the brokerage account Newman had opened in Deer's name. (Compl. ¶ 95). Although this funding was supposed to come from the exercise of warrants held by various nominees, including ACL, Strong Growth, Bicornio, Roosen, Futmon, and Wolf, the funding actually came exclusively from Strong Growth and Tianyi Wei. (Compl. ¶ 93). Although Newman allegedly knew that Tianyi Wey was Benjamin Wey's sister and an employee of NYGG, and that Benjamin Wey and NYGG advised Deer, Newman did not question why Tianyi Wei was involved in funding the stock repurchase program. (Compl. ¶ 95).

On July 28, 2010, at Benjamin Wey's direction, Newman arranged for the shares purchased pursuant to the exercise of the warrants to be distributed among the nominees in amounts that did not match the number of warrants that each nominee had possessed or exercised. (Compl. ¶ 98). Newman had shares issued to Strong Growth, ACL and Guo Sheng, id., despite the fact he had received the funding for the repurchase only from Strong Growth and Tianyi Wei, (Compl. ¶ 93), and the fact that the warrants that had been executed had actually been owned by Bicornio and Roosen. (Compl. ¶ 98). According to the SEC, "[t]he interchangeability of these [n]ominees – which were supposedly independent and distinct investors – for the purposes of exercising warrants and issuing shares, demonstrates that Benjamin Wey and his associates controlled all of them and treated them as parts of a whole." Id.

g.   <u>Helping Benjamin Wey Profit From Fees Paid to Nominees.</u>

One way that the Weys profited from the scheme was by having NYGG clients pay fees to nominees controlled by the Weys.  Newman allegedly participated in this aspect of the scheme by drafting a contract between SmartHeat and ACL whereby SmartHeat agreed to pay ACL $3.9 million for strategic business consulting services in connection with a November 2009 public offering of SmartHeat stock.  (Compl. ¶ 72).  Newman allegedly prepared the contract for Benjamin Wey to sign on ACL's behalf in April 2009.  <u>Id.</u>

h.   <u>All Claims Under Section 10(b), Rule 10b-5, and Section 17(a): Mental State.</u>

i.   <u>Rule 10b-5 and Section 17(a)(1): Scienter.</u>

Newman primarily attacks the complaint on the grounds that it fails to plead that he acted with scienter.  In order to adequately plead scienter in the context of securities fraud, the SEC must "allege facts that give rise to a strong inference of fraudulent intent."  <u>Novak</u>, 216 F.3d at 306 (citation and internal quotation marks omitted).  This "strong inference" of fraudulent intent "may be established either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness."  <u>Id.</u> at 307 (citation and internal quotation marks omitted).  Here the SEC asserts that they have adequately plead scienter under either theory.

In order to show a "motive and opportunity" to defraud, the SEC must allege that Newman "benefitted in some concrete and personal way from the purported fraud."  <u>Id.</u> at 307–08.  Newman argues that the complaint alleges no personal benefit to him other than routine legal fees.

It is true that a general desire to earn fees for professional services does not sufficiently allege a motive, see Dobina v. Weatherford Int'l Ltd., 909 F. Supp. 2d 228, 253, 253 n.130 (S.D.N.Y. 2012) (citing Friedman v. Ariz. World Nurseries, 730 F. Supp. 521, 532 (S.D.N.Y. 1990), aff'd 927 F.2d 594 (2d Cir. 1991) and Ganino, 228 F.3d at 170 ("General allegations that the defendants acted in their economic self-interest are not enough.")), however, the complaint alleges that Newman had more than just a "generalized profit-seeking motive." Cohen v. Stevanovich, 722 F. Supp. 2d 416, 429 (S.D.N.Y. 2010) (citing Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc., 531 F.3d 190, 196 (2d Cir. 2008)); see Chill, 101 F.3d at 268 (generalized motives that could be imputed to any for-profit endeavor insufficient for scienter). Instead the complaint claims that Newman's practice was "entirely dependent on Wey's largess." (Compl. ¶ 25). Wey specifically instructed the NYGG clients to hire Newman as corporate counsel and Newman's work for these NYGG clients allegedly accounted for "eighty to ninety percent of his law firm's business between 2009 and 2011, and at least fifty percent of his firm's business as late as 2012." Id. A fair inference can be drawn from the complaint that Newman's legal practice would have ceased to exist without the work he did for Benjamin Wey and the NYGG clients in that time period. In this way, Newman's "economic motives were extraordinary," ABF Capital Mgmt. v. Askin Capital Mgmt., L.P., 957 F. Supp. 1308, 1331 (S.D.N.Y. 1997) (extremely high fees along with other factors sufficient to allege motive), and "encompass[ed] larger and longer-term financial ends." Sharette v. Credit Suisse Int'l, 127 F. Supp. 3d 60, 96 (S.D.N.Y. 2015) (finding that a complaint had sufficiently alleged motive where the alleged fraud allowed the defendants to "improve their ability to access a specific and extremely profitable market, potentially worth billions of dollars."). The SEC's

allegations of Newman's complete financial dependence on Benjamin Wey and his NYGG

clients are sufficient to allege a motive to commit fraud.

The complaint also adequately alleges that Newman had the opportunity to

participate in the fraudulent scheme.  According to the SEC, his practice "was so intertwined

with NYGG's business" that at various times he had his office located in the building occupied

by NYGG and shared office space with NYGG.  (Compl. ¶ 25).  His position as corporate

counsel for several NYGG clients allowed him to file false and misleading documents with

NASDAQ and the SEC and facilitate the market manipulation of his clients' securities.  (Compl.

¶¶ 68, 79-80, 91-98).  Taken together, the allegations in the complaint are sufficient to raise a

strong inference of fraudulent intent by showing that Newman had both a motive and an

opportunity to commit fraud.[5]

   i.   Misrepresentation Claims Under Rule 10b-5(b) and Section 17(a)(2).

      i.   Rule 10b-5(b) and Section 17(a)(2): Particularity.

Although Newman directs the bulk of his arguments towards the SEC's claims of

scienter, he also alleges that some of the allegations in the complaint fail to allege fraud with

sufficient particularity.  As noted, Rule 9(b) requires a complaint alleging securities fraud based

on misstatements to "(1) specify the statements that the plaintiff contends were fraudulent, (2)

identify the speaker, (3) state where and when the statements were made, and (4) explain why the

statements were fraudulent."  ATSI, 493 F.3d at 99 (citing Novak, 216 F.3d at 306).  However,

"[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally."

Rule 9(b), Fed R. Civ. P.

---

[5] Because the Court finds that the SEC has satisfied the "strong inference" standard under the motive and
opportunity theory, it declines to address the SEC's alternative argument that the complaint also pleads facts
constituting strong circumstantial evidence of conscious misbehavior or recklessness.

The complaint alleges that Newman made several misrepresentations to various entities, including NASDAQ.  (Compl. ¶ 25).  Specifically the complaint alleges that in response to inquiries from NASDAQ in 2011, Newman signed and sent letters to NASDAQ that failed to disclose that Benjamin Wey controlled substantial holdings of Deer and SmartHeat stock through the nominees.  (Compl. ¶ 79).  The SEC also alleges that these letters were misleading because Newman described the relationship between Deer, SmartHeat, Benjamin Wey, Tianyi Wei, and Strong Growth as a limited one despite knowing that Benjamin Wey and NYGG had extensive involvement in the operations of both companies.  (Compl. ¶ 80).

The SEC's claim that these letters were sent at some unspecified time in 2011 does not, as Newman would have the Court find, violate the requirement that a securities fraud complaint "state where and when the [mis]statements were made."  ATSI, 493 F.3d at 99.  A fair reading of the complaint is that these letters were responses to specific NASDAQ inquiries made in early 2011.  (Compl. ¶ 79).  The complaint contains significant detail about the content and context of these letters and no more is required.  Newman's motion to dismiss the misrepresentation claims against him for a lack of particularity is denied.

ii.   Section 17(a)(2): Money or Property.

Newman joins in Uchimoto's argument that the Section 17(a)(2) claim against him must be dismissed because the complaint alleges only that Newman obtained ordinary legal fees for his law firm but not that he personally obtained money or property as a result of the alleged misrepresentations.  15 U.S.C. § 77q(a)(2) (making it unlawful "for any person in the offer or sale of securities . . . directly or indirectly . . . to obtain money or property by means of any untrue statement of a material fact.").  As was the case with Uchimoto, the complaint alleges little about Newman's compensation and how any false statement may have benefited him.  Nor

- 42 -

does the complaint plausibly allege that Newman's overall compensation was affected in any material way by making a false statement rather than a true statement.

Because the complaint fails to allege that Newman obtained money or property by means of any alleged misrepresentation, his motion to dismiss the Section 17(a)(2) claim is granted.  See DiMaria, 2016 WL 4926200, at *10-11; Syron, 934 F. Supp. 2d at 637–38.

j.   Scheme Liability Claims Under Rule 10b-5(a) and (c) and Section 17(a)(1) and (3).

i.   Rule 10b-5(a) and (c) and Section 17(a)(1) and (3): Particularity.

 "A plaintiff pleading fraud based on deceptive conduct 'must specify what deceptive or manipulative acts were performed, which defendants performed them, when the acts were performed, and the effect the scheme had on investors in the securities at issue.'"  In re Refco, Inc. Sec. Litig., 609 F. Supp. 2d 304, 310 (S.D.N.Y. 2009), aff'd sub nom. Pac. Inv. Mgmt. Co. LLC v. Mayer Brown LLP, 603 F.3d 144 (2d Cir. 2010) (quoting In re Parmalat Sec. Litig., 383 F. Supp. 2d 616, 622 (S.D.N.Y. 2005)).  Newman claims that some of the allegations in the complaint fail to satisfy the requirements of Rule 9(b).  In particular, he takes issue with the allegations that he helped to transfer shares of NYGG clients to and from various nominees.

Specifically the SEC alleges that between 2008 and 2012, Newman, or an NYGG employee, repeatedly carried out Benjamin Wey's instructions to have the transfer agents of the NYGG clients transfer shares to and from various nominees and send share certificates in the names of nominees to Benjamin Wey for distribution rather than to the nominees' address of record.  (Compl. ¶ 58).  These vague allegations do not satisfy Rule 9(b) because they fail to allege how many transactions occurred, which transactions involved Newman as opposed to Benjamin Wey himself, or the unnamed "NYGG employee," and when the specific transactions

occurred during the four year time period. Therefore, to the extent the SEC's claim for scheme liability rests on the allegations regarding these share transfers, the SEC's claim fails because that conduct has not been plead with sufficient particularity. However, to the extent that the claim for scheme liability it premised on other deceptive acts and manipulative devices which the defendant does not attack on particularity grounds, the motion to dismiss is denied.

        ii.  <u>Rule 10b-5(a) and (c) and Section 17(a)(1) and (3): Deceptive Conduct in Addition to Misrepresentation.</u>

Claims for scheme liability require the SEC to plead deceptive conduct distinct from any alleged misrepresentations. See <u>Kelly</u>, 817 F. Supp. 2d at 344. As the complaint is replete with allegations of Newman's participation in the fraudulent scheme apart from his alleged misstatements, including his role in facilitating the reverse mergers and the Deer stock repurchase plan, (Compl. ¶¶ 60-66, 92-98), misleading underwriters, (Compl. ¶¶ 73, 75-77), and drafting a consulting agreement between SmartHeat and ACL, (Compl. ¶ 72), Newman's motion to dismiss the scheme liability claims for failure to plead deceptive conduct is denied.

III.  <u>Aiding and Abetting Violations of Section 10(b), Rule 10b-5, Section 17(a), Section 13(d), and Rule 13d-1.</u>

In Count Three of the complaint, the SEC alleges that Uchimoto, Newman and Erbek violated Section 20(e) of the Exchange Act by aiding and abetting violations of Section 10(b) and Rule 10b-5 by Benjamin Wey, Tianyi Wei, and NYGG. (Compl. ¶¶ 124-26). Count Seven charges Newman and Erbek with violating Section 15(b) of the Securities Act by aiding and abetting violations of Section 17(a) by Benjamin Wey, Tianyi Wei, and NYGG. (Compl. ¶¶ 140-42). Finally, Count Ten alleges that Newman and Erbek violated Section 20(e) of the

Exchange Act by aiding and abetting violations of Section 13(d) and Rule 13d-1 by Benjamin Wey and Tianyi Wei.[6]  (Compl. ¶¶ 155-58).

Both Section 20(e) of the Exchange Act and Section 15(b) of the Securities Act provide that in actions brought by the SEC "any person that knowingly or recklessly provides substantial assistance to another person in violation of a provision of this chapter, or of any rule or regulation issued under this chapter, shall be deemed to be in violation of such provision to the same extent as the person to whom such assistance is provided."  15 U.S.C. §§ 77o(b), 78t(e).[7] To establish liability for aiding and abetting in the context of a securities law violation, the SEC must show: "(1) the existence of a securities law violation by the primary (as opposed to the aiding and abetting) party; (2) knowledge of this violation on the part of the aider and abettor; and (3) substantial assistance by the aider and abettor in the achievement of the primary violation."  SEC v. DiBella, 587 F.3d 553, 566 (2d Cir. 2009) (internal quotation marks omitted). "The three requirements cannot be considered in isolation from one another."  Id.  "Satisfaction of the knowledge requirement will depend on the theory of primary liability, and there may be a nexus between the degree of knowledge and the requirement that the alleged aider and abettor render substantial assistance."  Id. (internal quotation marks omitted).

a.   Knowledge of a Primary Violation.

Both Uchimoto and Newman urge that actual knowledge of the primary violation must be shown for any aiding and abetting claims premised on conduct occurring before the Dodd–Frank Act took effect on July 21, 2010.  Prior to Dodd-Frank, Section 20(e) of the

---

[6] Section 13(d) of the Exchange Act mandates that any person who indirectly or directly acquires beneficial ownership of more than five percent of the stock of an issuer file a statement disclosing that ownership and other information to the SEC.  15 U.S.C. §78m(d).  Rule 13d-1 requires that this information be submitted on a Schedule 13D or Schedule 13G.  See 17 C.F.R. § 240.13d-1.

[7] The Dodd-Frank Act of 2010, which became effective on July 21, 2010, added the words "or recklessly" to section 20(e) of the Exchange Act.  Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203, 124 Stat. 1376, § 9290 (codified at 15 U.S.C. § 78t(e)) ("Dodd-Frank").

Exchange Act provided only that "any person that knowingly provides substantial assistance" could be held liable as an aider and abettor.  15 U.S.C. § 78t (2009).  Dodd–Frank amended that provision to provide that "any person that knowingly *or recklessly* provides substantial assistance" would face aiding and abetting liability.  15 U.S.C. § 78t (2012).  The SEC contends that the scienter standard for aiding and abetting liability included recklessness even before the enactment of Dodd-Frank.

Courts in this District have disagreed as to whether recklessness is sufficient for the imposition of aiding and abetting liability in the securities fraud context both before and after Dodd-Frank.  Compare SEC v. Landberg, 836 F. Supp. 2d 148, 157 (S.D.N.Y. 2011), and Power, 525 F. Supp. 2d at 422, with SEC v. Aronson, No. 11 Civ. 7033 (JSR), 2013 WL 4082900, at *11 (S.D.N.Y. Aug. 6, 2013), on reconsideration in part, No. 11 Civ. 7033 (JSR), 2013 WL 6501324 (S.D.N.Y. Dec. 11, 2013), and SEC v. Espuelas, 579 F. Supp. 2d 461, 484 (S.D.N.Y. 2008).  However, the court finds persuasive the analysis in SEC v. Aronson, 2013 WL 4082900, at *11, and its reliance on Judge Cote's discussion of the state of the law on this issue prior to Dodd-Frank in SEC v. KPMG LLP, 412 F. Supp. 2d 349 (S.D.N.Y. 2006).  Judge Cote, in a pre-Dodd-Frank decision, had held that the SEC must prove that the would-be aider and abettor had actual knowledge of the primary violation.  KPMG, 412 F. Supp. 2d at 382.  This Court agrees.

The SEC relies primarily on this Court's decision in SEC v. Landberg where the Court held that "[t]he scienter standard in this Circuit included recklessness prior to Dodd-Frank."  836 F. Supp. 2d 148, 157 (S.D.N.Y. 2011).  However, that case involved a defendant who had breached a fiduciary duty in aiding and abetting a violation of the securities laws, and followed in a long line of cases recognizing that "in the Second Circuit, if the alleged aider and abettor owes a fiduciary duty to the plaintiff, recklessness is enough."  Armstrong v. McAlpin,

699 F.2d 79, 91 (2d Cir. 1983) (citing IIT, An Int'l Inv. Tr. v. Cornfeld, 619 F.2d 909, 923 (2d

Cir. 1980)). However, "[i]f there is no fiduciary duty, the 'scienter' requirement scales

upward—the assistance rendered must be knowing and substantial." Id. (citing Edwards &

Hanly v. Wells Fargo Sec. Clearance Corp., 602 F.2d 478, 484 (2d Cir. 1979)); see also Ross v.

Bolton, 904 F.2d 819, 824 (2d Cir. 1990) ("[i]f there is no fiduciary duty . . . the *scienter*

requirement increases, so that [a plaintiff] need[s] to show that [the defendant] acted with actual

intent."). In fact, many of the cases in this District that have found recklessness to be applicable

to pre-Dodd-Frank conduct have done so in the context of a breach of fiduciary duty. See, e.g.,

SEC v. Treadway, 430 F. Supp. 2d 293, 339 (S.D.N.Y. 2006); Power, 525 F. Supp. 2d at 422;

PIMCO Advisors Fund Mgmt. LLC, 341 F. Supp. 2d at 468.

   The Court joins Judge Cote and Judge Rakoff in declining to follow those cases

that have found that "recklessness satisfies the scienter requirement where the plaintiffs were

third parties whose reliance on the defendant's fraudulent conduct was foreseeable or where the

defendant owed a duty of disclosure to the defrauded party." SEC v. Lybrand, 200 F. Supp. 2d

384, 400 (S.D.N.Y. 2002); see KPMG, LLP, 412 F. Supp. 2d at 384 (noting that many cases

cited for this foreseeable reliance exception found the existence of a fiduciary relationship and

declining to find that an auditor's awareness that the general public will rely on its audit opinion

is sufficient to import the recklessness standard into an aiding and abetting claim); Aronson,

2013 WL 4082900, at *14 n.11 ("The Court declines to read so broad a standard of

'recklessness' into the knowledge element of Section 20(e) given the prevailing rule that 'where

there is no fiduciary relationship, the scienter requirement scales upward-the assistance rendered

must be knowing and substantial.'") (quoting Lybrand, 200 F. Supp. 2d at 400).

Therefore, as the complaint does not allege that Uchimoto, Newman, or Erbek breached a fiduciary duty, the Court concludes that the SEC must allege actual knowledge of the primary violation on the part of the defendant for claims under Section 20(e) based on conduct that occurred prior to the enactment of Dodd-Frank.  See In re Amaranth Nat. Gas Commodities Litig., 730 F.3d 170, 183 n.15 (2d Cir. 2013) (suggesting in dicta that a recklessness standard did not apply to pre-Dodd-Frank conduct).

b.   Substantial Assistance.

To satisfy the "substantial assistance" element of aiding and abetting, the SEC need not show that a defendant proximately caused the harm on which the primary violation was predicated.  SEC v. Apuzzo, 689 F.3d 204, 213 (2d Cir. 2012).  Rather, "the SEC must show that the defendant 'in some sort associated himself with the venture, that he participated in it as something that he wished to bring about, and that he sought by his action to make it succeed.'" Id. at 206 (quoting United States v. Peoni, 100 F.2d 401, 402 (2d Cir. 1938) (Hand, J.)).

c.   William Uchimoto.

i.   Knowledge of Primary Violation.

All of the alleged misconduct attributed to Uchimoto in the complaint occurred at some point prior to July 16, 2009, the day Deer was approved for listing on the NASDAQ. (Compl. ¶ 90).  Therefore, all of Uchimoto's alleged conduct also occurred before the passage of Dodd-Frank such that an actual knowledge standard applies to the SEC's aiding and abetting claims.

In its opposition, the SEC does not identify which primary violations Uchimoto allegedly knew about, and the complaint contains no allegations that would support a strong inference that Uchimoto knew of any of these violations.  There are no allegations that support

an inference that Uchimoto knew about or was aware of Benjamin Wey's market manipulation of Deer stock, his failure to file Schedule 13D forms, the network of nominees or Benjamin Wey's control of them.  Nor are there facts alleged that would support an inference that Uchimoto knew or must have known of Benjamin Wey's false and misleading statements to NASDAQ, the SEC and others.  The fact that Uchimoto was willing to engage in deceptive conduct and make false statements to NASDAQ is not enough to show that Uchimoto had actual knowledge of any violations aside from his own, or that he understood his "overall role" in Benjamin Wey's scheme.  Espuelas, 905 F. Supp. 2d at 518.  While the SEC urges that a defendant need not know every aspect of a fraudulent scheme to be liable for aiding and abetting it the complaint fails to allege that Uchimoto knew of *any* part of the scheme apart from his own actions.  Therefore, Uchimoto's motion to dismiss the aiding and abetting claims under Section 20(e) is granted.[8]

> d.   Robert Newman.

The SEC brings claims against Newman under Section 20(e) of the Exchange Act and Section 15(b) of the Securities Act.  Section 15(b), which creates liability for knowingly or recklessly aiding and abetting violations of the Securities Act, including violations of Section 17(a), became effective on July 21, 2010.  See Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203, 124 Stat. 1861, Title IX, § 929M(a) (codified at 15 U.S.C. § 77o).  Newman argues, and the SEC does not dispute, that Dodd-Frank and Section 15(b) should not be retroactively applied to pre-Dodd-Frank conduct.  Therefore, aiding and abetting claims premised on Newman's conduct prior to July 21, 2010 may only be brought under Section 20(e) and are subject to an actual knowledge standard.  Aiding and abetting claims premised on

---

[8] Because the Court finds that the SEC has failed to plead actual knowledge of any primary violation, the Court does not address Uchimoto's arguments related to substantial assistance.

Newman's conduct after July 2010 may be brought under Section 20(e) or Section 15(b) and are subject to a knowing or recklessness standard.

i.   Disjunctive Pleading.

Claims Three and Ten of the complaint allege that Newman "knowingly or recklessly" aided primary violations by Benjamin Wey and others.  (Compl. ¶ 124-26, 155-58). However, even though the Court finds that to the extent these Section 20(e) claims are based on pre-Dodd-Frank conduct they must meet an actual knowledge standard, these claims need not be dismissed simply because the words "or recklessly" were included in the pleading.  Newman cites no authority for his argument to the contrary, and as the SEC points out, this kind of disjunctive pleading is permissible.  See IIT, 619 F.2d at 924, abrogated on other grounds by Morrison v. Nat'l Australia Bank Ltd., 130 S. Ct. 2869 (2010).  A complaint may plead two theories, only one of which need be legally viable.  See The Limited, Inc. v. McCrory Corp., 683 F. Supp. 387, 394 n.4 (S.D.N.Y. 1988) (allegations that the defendant knew or should have known of the fraud do not render the complaint deficient under Rule 9(b)).  This is particularly true here where the mental state requirement is not settled in this circuit and courts in this district have applied both knowing and recklessness standards.  See Treadway, 430 F. Supp. 2d at 339 (applying a recklessness standard) and KPMG, 412 F. Supp. 2d at 382 (applying actual knowledge standard).

ii.   Claims Under Section 20(e).

In evaluating the aiding and abetting claims, the Court is mindful of the fact that the two prongs of scienter and substantial assistance, must not be considered in isolation.  See DiBella, 587 F.3d at 566.  "A high degree of substantial assistance may lessen the SEC's burden in proving scienter" and vice versa.  Apuzzo, 689 F.3d at 215.  In this case, the SEC's scienter

burden is lessened significantly because the complaint is replete with allegations describing Newman's participation in almost every stage of the scheme from facilitating reverse mergers, to the concealment of the Wey's control over the nominees and NYGG clients, to the market manipulation of Deer securities.  Newman's alleged conduct was critical to the success of the fraudulent scheme.

The complaint includes extensive circumstantial evidence of Newman's knowledge of, and willing participation in, the fraud.  For example, at Benjamin Wey's direction he had shares of NYGG clients transferred to and from various nominees.  (Compl. ¶ 58). Newman also negotiated the purchase price of Everton, which Benjamin Wey approved. (Compl. ¶ 65).  The funds for the purchase came from Four Tong and Everton was ultimately merged with a NYGG client to become CleanTech.  (Compl. ¶¶ 65, 67).  CleanTech then retained Newman as corporate counsel, yet he never met the purported CEO and communicated with his client exclusively through Benjamin Wey or an email address Wey had given him. (Compl. ¶ 66).  When asked by an underwriter about Wey's affiliation with ACL, Newman did not disclose the fact that he had previously prepared a consulting contract between ACL and SmartHeat that Benjamin Wey had signed on ACL's behalf.  (Compl. ¶¶ 72-75 ).  He received funding from Tianyi Wei and Strong Growth for the Deer repurchase program but then distributed the Deer shares purchased with that funding to several different nominees.  (Compl. ¶¶ 95, 98).  At Wey's direction, he filed schedule 13Ds on behalf of Tianyi Wei and Futmon that omitted substantial holdings in NYGG clients.  (Compl. ¶ 109).  And when asked about the relationship between his clients, Benjamin Wey, and NYGG, Newman mislead NASDAQ about the extent of that relationship, describing it only as a "limited one."  (Compl. ¶ 79-80).  These allegations of Newman's extensive work – ostensibly for his independent NYGG clients, but

always at Wey's direction, and which frequently involved one or more nominees – are sufficient to raise a strong inference that he knew that the Weys were using a network of nominees to conceal and profit from their control of NYGG clients' securities.

Newman vigorously disputes the SEC's interpretation of the facts alleged in the complaint, particularly the implications of the email Newman allegedly received from the SmartHeat CEO which describes ACL as "NYGG's BVI company."  (Compl. ¶ 72).  Newman attaches the email chain in which this phrase appears to his reply memorandum and raises a host of arguments, all of which he maintains undermine the SEC's unequivocal allegation that Newman "had been informed in writing by SmartHeat's CEO that ACL was '"NYGG's BVI Company."'[9] (Compl. ¶ 72).  However, the facts plead in the complaint are sufficient to allege that Newman knew that Benjamin Wey was involved with ACL, (see Compl. ¶ 72 (describing contract Newman drafted for Wey to sign on ACL's behalf)), and that Newman knew about the scheme as a whole.

Taken together and drawing all inferences in favor of the nonmoving party, the complaint contains sufficient allegations to support an inference that Newman was not just reckless but knew about Benjamin Wey's scheme, understood his critical role in it, and "sought by his action[s] to make it succeed."  Apuzzo, 689 F.3d at 212.  His motion to dismiss the Section 20(e) claims is denied.

### iii.   Claims Under Section 15(b).

Newman argues that his alleged post-Dodd Frank conduct is insufficient to support a claim for aiding and abetting under Section 15(b).  Although the bulk of the allegations against Newman may relate to pre-Dodd-Frank conduct, there is still ample factual support for

---

[9] The Court may consider this email chain as it was specifically quoted in the complaint and therefore incorporated by reference.  See ATSI, 493 F.3d at 98.

the inference that Newman knowingly or recklessly provided substantial assistance to Benjamin

Wey's scheme after July 21, 2010.  For example, the complaint alleges that on July 28, 2010

Newman carried out Benjamin Wey's instructions to have Deer shares distributed to Strong

Growth, ACL, and Guo Sheng despite the funding for those shares having come from only

Strong Growth and Tianyi Wei.  (Compl. ¶ 98).  The complaint also alleges that in September

2010, Wey had Newman file a Schedule 13D on behalf of Tianyi Wei that omitted significant

Deer holdings that Tianyi Wei controlled.  (Compl. ¶ 109).  And in 2011, Newman allegedly sent

misleading letters to NASDAQ describing a limited relationship between Benjamin Wey, NYGG

and two NYGG clients, SmartHeat and Deer, despite knowing that Benjamin Wey and NYGG

were in fact intimately involved in the operations of the two companies.  (Compl. ¶¶ 79-80).

      These actions helped Benjamin Wey and his associates to create a network of

nominees with secret control over shares of NYGG clients, conceal that control from regulators,

exchanges and others, evade mandatory reporting requirements, and profit from the scheme.

These allegations are also sufficient at this stage to show that Newman knew or was reckless in

not knowing of the securities fraud that his conduct was supporting.

      Newman will have a chance to present his alternative interpretation of the facts at

summary judgment or at trial, but at the motion to dismiss state, the Court must rely on the facts

as alleged in the complaint.  See Iqbal, 556 U.S. at 678.  Taking all of the facts in the complaint

as true, it adequately alleges support for claims of aiding and abetting liability under Section

20(e) of the Exchange Act and Section 15(b) of the Securities Act.

    e.  Seref Dogan Erbek.

      The complaint alleges that Erbek participated in Benjamin Wey's fraudulent

scheme in three ways.  First by misleading an underwriter about Benjamin Wey's connections to

ACL, second by structuring the holdings of the nominees so as to evade mandatory reporting requirements, and third by carrying out manipulative trades in Deer and CleanTech securities. According to the SEC, by conducting manipulative trades and helping Benjamin Wey and his associates conceal their ownership interests in the NYGG clients, Erbek aided and abetted violations of Section 10(b), Rule 10b-5, Section 17(a), Section 13(d), and Rule 13d-1.

       i.   <u>Aiding and Abetting Mental State Requirements.</u>

As was the case for the claims against Newman, aiding and abetting claims premised on Erbek's conduct prior to July 21, 2010 may only be brought under Section 20(e) and are subject to an actual knowledge standard.  SEC claims for aiding and abetting liability premised on Erbek's conduct after July 2010 may be brought under Section 20(e) or Section 15(b) and are subject to a knowing or recklessness standard.  <u>See</u> Section II(d) <u>supra</u>.

      ii.   <u>Aiding and Abetting Violations of Section 10(b), Rule 10b-5 and Section 17(a).</u>

According to the SEC, Erbek aided and abetted a fraudulent scheme by (1) misleading an underwriter about Benjamin Wey's connections to ACL, (2) by structuring securities holdings of the nominees so as to evade mandatory reporting requirements, and (3) by placing manipulative trades in Deer and CleanTech securities.  (Compl. ¶¶ 76, 100-05).

The complaint alleges that Erbek was an employee of a Swiss company that provided "financial and fiduciary services."  (Compl. ¶ 28).  He was hired by the Weys to open and maintain brokerage accounts in the names of several nominees.  (Compl. ¶ 54).  These accounts held and traded shares of NYGG clients.  <u>Id.</u>  Beginning in 2009, Erbek opened and maintained accounts on behalf of ACL, York Capital, Strong Growth, Futmon, Bicornio, Roosen and Wolf.  (Compl. ¶¶ 31-32, 34, 38-41, 54).  Letters were allegedly sent to Erbek granting

Benjamin Wey, Tianyi Wei, and Michaela Wey trading authority over these accounts.  (Compl. ¶¶ 31-32, 34, 38-40).

Towards the end of 2009, the primary underwriter for a SmartHeat offering inquired as to Benjamin Wey's affiliation with ACL so as to determine how to properly disclose a payment made to ACL in SmartHeat's offering documents.  (Compl. ¶ 73).  After falsely assuring the underwriter that neither he nor NYGG had any affiliation with ACL, Benjamin Wey directed the underwriter to contact Erbek.  (Compl. ¶¶ 74, 76).  Erbek told the underwriter to contact a Bahamian consulting firm that Erbek identified as being ACL's only director.  (Compl. ¶ 76).  Despite allegedly having received a letter granting Benjamin Wey trading authority over the ACL brokerage account that Erbek managed, Erbek did not provide this information to the underwriter.  (Compl. ¶¶ 31, 76).  In addition, Erbek procured signatures from the Bahamian consulting firm on a document certifying that ACL was comprised only of non-U.S. persons which he allegedly knew to be a false statement.  (Compl. ¶ 76).  The SEC maintains that this certification was false because Wey, who was a U.S. citizen, effectively controlled ACL.

The complaint also alleges that Erbek assisted the fraudulent scheme by structuring the nominees' holdings of NYGG clients so as to avoid mandatory reporting requirements.  (Compl. ¶ 104).  As the complaint explains, beneficial owners of greater than five percent of an issuer's outstanding shares must report their total holdings in that issuer to the SEC on Schedules 13D or 13G.  (Compl. ¶ 103).  These requirements apply to both single investors and to multiple investors acting as a group for the purpose of acquiring, holding or disposing of an issuer's shares.  Id.

According to the SEC, Erbek "understood that one of his roles in Wey's fraudulent scheme was to ensure that the nominees held less than five percent of the NYGG

- 55 -

clients." (Compl. ¶ 105). On or about July 21, 2010, Benjamin Wey or someone at his direction allegedly sent Erbek an email instructing Erbek to divvy up a tranche of recently obtained Deer stock among accounts for ACL, York Capital, and Futmon so that no single nominee held more 1.6 million shares, or five percent, of Deer's stock. (Compl. ¶ 104). In September 2010, Erbek received another email from Benjamin Wey or someone at his direction explaining that the SEC required any individual or entity owning more than five percent of a company's outstanding shares to file a Schedule 13D or 13G. Id. Erbek allegedly followed these instructions, noting in an email that instead of depositing another recently purchased set of Deer shares in the Futmon account, he would allocate them to the York Capital account so as to avoid crossing the five percent/1.6 million share threshold for Deer stock. (Compl. ¶ 105). The SEC argues that at the time, Erbek knew of the Weys' common investment authority over the nominee brokerage accounts that he managed because of the letters he had received granting Michaela Wey and Benjamin Wey trading authority over the accounts for Bicornio, Roosen, ACL, York Capital, and Strong Growth. (Compl. ¶¶ 31-32, 34, 39-40).

Finally, the SEC claims that Erbek assisted Benjamin Wey's fraudulent scheme by using the nominee brokerage accounts that he managed to manipulate the prices for Deer and CleanTech securities. (Compl. ¶¶ 100-02). In 2010, the Swiss nominee accounts managed by Erbek acted "in concert" to maintain the share price of Deer stock above $11.00 per share. (Compl. ¶¶ 54, 101). Between October 2010 and November 2010, these accounts sold over a million shares of Deer for a profit at prices between $11.40 and $12.00 per share. (Compl. ¶ 102). However, anytime the price of Deer stock dropped below $11.00 during this period, the same nominee accounts would "temporarily reverse course and purchase[] large amounts of Deer shares." Id. This coordinated back and forth trading "appear[s] to have been aimed at and had

the effect of supporting the share price of Deer at $11.00." Id.  Benjamin Wey then touted

Deer's performance when he was seeking an underwriter for a CleanTech financing.  Id.

Later, in 2011, Benjamin Wey enlisted Erbek's help to maintain the share price of

CleanTech at $5.00.  (Compl. ¶ 100).  An email sent from Benjamin Wey or someone at his

direction to Erbek read "CleanTech just traded at $4.50 per share.  Please make sure the trader

buys the stock at $5 per share, stay at $5 per share bid price, not less.  Please make sure this

happens right away." Id.  In response, Erbek wrote: "I did.  Obviously, we need to be careful to

give such orders / make such comments. I may explain it over the phone; please call me if you

have time." Id.  Records allegedly show that the nominee brokerage accounts under Erbek's

management then purchased CleanTech shares at $4.86 and $4.93.  Id.

The complaint does not plead facts that give rise to a strong inference that that

Erbek knew that Wey had lied to the SmartHeat underwriter regarding his connections to ACL.

(Compl. ¶ 73).  Nor does it plead facts supporting a strong inference that Erbek knowingly

assisted that misrepresentation.  While the complaint alleges that the underwriter "pressed"

Benjamin Wey and Newman for information about ACL's owners, it does not allege that Erbek

was asked the same questions.  Id.  The complaint also does not allege that Erbek knew or should

have known that the Bahamian consulting company was not actually ACL's director.  (Compl. ¶

76).  Finally, the allegation that Erbek knew that Wey held trading authority over an ACL

brokerage account, (Compl. ¶ 31), is not enough to create a strong inference that he therefore

also knew that Wey effectively controlled ACL, or that Wey's effective control of ACL rendered

the certification regarding ACL's composition false.

However, read as a whole, the complaint adequately alleges Erbek's knowledge

of other parts of the scheme and his understanding of his role within it.  Erbek was told about the

SEC reporting requirements and made sure to structure the holdings of each nominee account

that he managed so as to avoid triggering the five percent reporting threshold.  (Compl. ¶ 104-

05).  It is reasonable to infer from the allegations in the complaint that Erbek knew that Benjamin

Wey and his family members were avoiding the reporting requirements of Section 13(d) and

Rule 13d-1 because it was Wey who specifically directed Erbek to allocate shares of Deer among

nominee accounts so that no one account held more than 1.6 million shares.  (Compl. ¶ 104).

Erbek confirmed his understanding of his role when he wrote in an email that he was moving

shares to York Capital as opposed to Futmon because Futmon would otherwise hold more than

five percent of Deer's outstanding stock.  (Compl. ¶ 105).

Erbek also executed manipulative trades in Deer and CleanTech stocks in order to

maintain certain target share prices.  (Compl. ¶¶ 100-02).  The coordinated buying and selling of

Deer securities by the various nominee accounts in 2010, the specific directions from Benjamin

Wey that he received and carried out regarding a strategy for buying and selling CleanTech

shares, and the fact that Erbek warned Benjamin Wey that they needed to be careful when

communicating about these orders all raise a strong inference that Erbek knew that he was

participating in a fraudulent scheme to conceal the Wey's ownership interests in the NYGG

clients and manipulate the securities market.

Erbek's alleged conduct also substantially assisted the scheme.  His actions

allowed the Weys to hide their substantial holdings in the NYGG clients from regulators and

then profit from those concealed ownership interests.  In addition, the Court notes that the

complaint alleges sufficient conduct occurring after July 21, 2010, including the manipulation of

the CleanTech market in 2011, (Compl. ¶ 100), to state a claim for aiding and abetting liability

under Section 15(b).  Erbek associated himself with Benjamin Wey's fraudulent scheme,

participated in it as something he wished to bring about, and sought by his actions to make it succeed.  See Apuzzo, 689 F.3d at 206.

   Erbek's motion to dismiss the Section 20(e) and Section 15(b) claims for aiding and abetting violations of Section 10(b), Rule 10b-5 and Section 17(a) is denied.

   iii. Aiding and Abetting Violations of 13(d) and 13d-1.

   The complaint also adequately alleges that Erbek aided and abetted Benjamin Wey's and Tianyi Wei's failure to file required Schedule 13Ds with the SEC.  Erbek allegedly knew that Benjamin Wey and Tianyi Wei both held trading authority or other authority over many of the nominee accounts that he managed.  (Compl. ¶¶ 21-32, 34, 38).  Benjamin Wey or someone working for him specifically sent Erbek an explanation of the SEC reporting rule for those who owned over five percent of any issuer's securities.  (Compl. ¶ 104).  Erbek also allegedly knew that he was being directed by Benjamin Wey to move shares of NYGG clients among different nominees so that no one account triggered the five percent threshold.  Id.  He confirmed his understanding of this goal when he wrote in an email that he planned to place Deer stock in a York Capital Account rather than a Futmon account because Futmon was already close to the 1.6 million share limit.  (Compl. ¶ 105).  Drawing all reasonable inferences in favor of the SEC, the complaint plausibly alleges that Erbek knew that Benjamin Wey and Tianyi Wei were actively avoiding reporting their substantial holdings of NYGG clients, and he helped make that easier by ensuring that none of the accounts that he managed triggered the reporting requirements.  Therefore, Erbek's motion to dismiss the Section 20(e) claim for aiding and abetting violations of Section 13(d) and Rule 13d-1 is denied.

IV.   <u>Remedies.</u>

        The complaint seeks civil monetary penalties, disgorgement of illegal profits, and permanent injunctions against Uchimoto, Newman and Erbek.  (Compl. ¶¶ B-D).  Because no claims against Uchimoto survive the motion to dismiss, the SEC's claims for civil penalties, disgorgement and injunctive relief against him are similarly dismissed.  The claims for relief against Newman and Erbek are discussed below.

        a.   <u>Civil Penalties.</u>

        The complaint seeks civil monetary penalties against Newman and Erbek pursuant to Section 20(d)(2) of the Securities Act and Section 21(d)(3) of the Exchange Act. (Compl. 48).  Under 28 U.S.C. § 2462, any action by the SEC "for the enforcement of any civil fine, penalty, or forfeiture, pecuniary or otherwise," must be "commenced within five years from the date when the claim first accrued if, within the same period, the offender or the property is found within the United States in order that proper service may be made thereon."  The five year limitations period "begins to tick" when the allegedly fraudulent conduct occurs rather than when it is discovered.  <u>Gabelli v. SEC</u>, 133 S. Ct. 1216, 1220, 1224 (2013).  Both defendants argue that the SEC's claims for civil penalties against them are time barred by Section 2462.

        i.   <u>Robert Newman.</u>

        The SEC's complaint was filed on September 10, 2015, therefore the SEC may only base its claims for civil penalties on conduct occurring after September 10, 2010.  <u>See</u> 28 U.S.C. § 2462.  There are two allegations in the complaint that fall within the statute of limitations period: Newman's 2011 misleading statement to NASDAQ about the relationship between Benjamin Wey and Deer and SmartHeat, and the claim that between 2008 and 2012

Benjamin Wey himself, through Newman, or through an NYGG employee, had the NYGG

clients' transfer agents transfer shares to and from various nominees.  (Compl. ¶¶ 58, 79-80).

As the Court has already explained, the allegations regarding the transfer of

shares among nominees fails to meet the particularity requirements of Rule 9(b) because the

complaint fails to allege how many transactions occurred, which transactions involved Newman

as opposed to Benjamin Wey himself, or the unnamed "NYGG employee," and when the

specific transactions occurred during the four year time period.  The lack of detail is particularly

problematic here because if Newman was not involved with any transfers after September 10,

2010, his conduct would not fall within the five year statute of limitations period.  Therefore this

allegation may not support the SEC's claim for civil penalties.

This leaves the allegation that Newman sent misleading letters to NASDAQ in

2011 regarding the relationship between Wey, SmartHeat and Deer as the only adequately plead

allegation as to which the statute of limitations has not run.  (Compl. ¶¶ 79-80).  The statue of

limitations has run on any claims based on conduct occurring before September 10, 2010.  28

U.S.C. § 2462.  However,  as the SEC has adequately plead at least one timely allegation on

which it may base its claims for civil penalties, Newman's motion to dismiss the claim for civil

penalties is denied.

ii.   <u>Seref Dogan Erbek.</u>

Erbek similarly argues that the SEC's claims against him for civil penalties must

be dismissed to the extent that they arise from his alleged conduct prior to September 10, 2010.

However, the five year limitations period of Section 2462 applies only "if, within the same

period, the offender . . . is found within the United States in order that proper service may be

made thereon."  28 U.S.C. § 2462.  As neither the SEC nor Erbek make any claim that he has

been located within the United States at any point during the five year period, the statute of

limitations has not run on the claims against him.  (Compl. ¶ 28 ("At all times relevant to the

Second Amended Complaint, Erbek resided in Switzerland."); Erbek Mot. to Dismiss 10 n.7

("Erbek resided . . . in Switzerland, at all relevant times")).

        While there is very little authority on Section 2462's requirement that a defendant

be present within the United States, one court in this district has thoughtfully considered the

issue.  In SEC v. Straub, 921 F. Supp. 2d 244, 259-61 (S.D.N.Y. 2013) ("Straub I") and SEC v.

Straub, No. 11 Civ. 9645 (RJS), 2016 WL 5793398 *15-19 (S.D.N.Y. Sept. 30, 2016) ("Straub

II"), Judge Sullivan found that a defendant must be physically present in the United States at

some point during the five year period for the state of limitations to apply.  See Straub I, 921 F.

Supp. 2d at 260; Straub II, 2016 WL 5793398 at *19.  In Straub I, Judge Sullivan reasoned that

"'found within the United States' means physically present within the United States and

construed the phrase 'if, within the same period, the offender . . . is found within the United

States' as the statute's operative language, and the phrase 'in order that proper service may be

made thereon' as a statement of purpose that might resolve an ambiguity in the operative clause

but does not limit or expand the scope of the operative clause." Straub II, 2016 WL 5793398, at

*15 (summarizing Straub I) (internal quotations marks omitted).  He also found that this reading

of the statute was consistent with the legislative history and prior case law interpreting the

precursor to Section 2462.  See Straub I, 921 F. Supp. 2d at 260-261.  For the reasons cited in

Judge Sullivan's opinions, the Court finds that the limitations period has not run as to claims for

civil penalties against Erbek as he has not been present in the United States during the five year

period.  Erbek's motion to dismiss the claim for civil penalties is denied.

b.  Injunction.

The weight of the case law in this Circuit supports the SEC's argument that injunctions are not subject to the Section 2462 limitations period.  See, e.g., SEC v. Saltsman, No. 07 Civ. 4370 (NGG) (RML), 2016 WL 4136829, at *29 (E.D.N.Y. Aug. 2, 2016); Straub II, 2016 WL 5793398 at * 13-14; SEC v. Wyly, 950 F. Supp. 2d 547, 558-59 (S.D.N.Y. 2013).  However, courts in this district have drawn a distinction between "civil penalties and equitable relief that seeks to punish" which are covered by Section 2462, and "equitable relief which seeks to remedy a past wrong or protect the public from future harm" to which Section 2462 does not apply.  SEC v. Jones, 476 F. Supp. 2d 374, 380-81 (S.D.N.Y. 2007).  Newman asserts that because the SEC has not plead facts showing that he is likely to reoffend and present a future danger to society, any injunction would be purely punitive and therefore time-bared by Section 2462.

To seek an injunction in the Second Circuit, the SEC must "go beyond the mere facts of past violations and demonstrate a realistic likelihood of recurrence."  Id. at 383 (quoting SEC v. Commonwealth Chem. Sec., Inc., 574 F.2d 90, 99 (2d Cir. 1978)).  Because "determining the likelihood of future violations is almost always a fact-specific inquiry," the Second Circuit has said that "where, as here, the complaint plausibly alleges that defendants intentionally violated the federal securities laws, it is most unusual to dismiss a prayer for injunctive relief at this preliminary stage of the litigation."  SEC v. Gabelli, 653 F.3d 49, 61 (2d Cir. 2011), rev'd on other grounds, 133 S. Ct. 1216 (2013).  As in Gabelli, Newman has not "point[ed] to a single case where the SEC's prayer for injunctions against further violations was dismissed at the motion to dismiss stage based upon a finding of non-likelihood of further violations."  Id.

For these reasons, Newman's motion to dismiss the claims for injunctive relief is denied.

    c.  <u>Disgorgement.</u>

"[T]he limitations period in § 2462 applies to civil penalties and equitable relief that seeks to punish, but does not apply to equitable relief which seeks to remedy a past wrong or protect the public from future harm." <u>Jones</u>, 476 F. Supp. 2d at 381.  Defendants rely on a recent Eleventh Circuit decision in urging that disgorgement is no different than forfeiture and is therefore punitive and subject to the five year statute of limitations in Section 2462.  <u>See</u> <u>SEC v. Graham</u>, 823 F.3d 1357, 1364 (11th Cir. 2016) (reasoning that because the Supreme Court has used the terms forfeiture and disgorgement interchangeably and both involve turning over money or property because of wrongdoing, disgorgement is simply a subset of forfeiture and therefore covered by Section 2462).  However, <u>Graham</u> has been called an outlier by many of the courts to have considered the issue, <u>see</u> <u>SEC v. Ahmed</u>, No. 15 Civ. 675 (JBA), 2016 WL 7197359, at *8 n.20 (D. Conn. Dec. 8, 2016) (collecting cases), and this Court declines to follow it here.

"While the Second Circuit has not addressed the issue of whether disgorgement constitutes a *civil* forfeiture, it has specifically held that, due to its remedial nature, disgorgement does not constitute a penalty," <u>SEC v. Wyly</u>, 56 F. Supp. 3d 394, 402 (S.D.N.Y. 2014) ("<u>Wyly II</u>") (citing <u>Pentagon Capital Mgmt. PLC</u>, 725 F.3d at 288 n.8), "and is not analogous to *criminal* forfeiture," <u>id.</u> (citing <u>SEC v. Contorinis</u>, 743 F.3d 296, 306-07 (2d Cir. 2014)).  Therefore, as several district courts have noted, "the great weight of the case law in this jurisdiction supports the SEC's contention that equitable remedies [such as disgorgement] are exempted from [S]ection 2462's limitations period." <u>Kelly</u>, 663 F. Supp. 2d at 286 (collecting cases); <u>see</u> <u>Ahmed</u>, 2016 WL 7197359, at *6 n.13 (collecting cases); <u>Wyly II</u>, 56 F. Supp. 3d at 402–03.  As

the Graham decision is inconsistent with the weight of authority in this Circuit, absent clearer guidance from the Second Circuit, this Court finds that the SEC's claims for disgorgement are not subject to the five year statute of limitations in Section 2462.  See Straub II, 2016 WL 5793398, at *15.

Newman also argues that the SEC may not seek disgorgement because he did not receive any ill-gotten profits.  "Unlike other remedies, disgorgement is not designed to compensate victims or to punish wrongdoers . . . but is instead meant to deter wrongdoing by 'forcing a defendant to give up the amount he was unjustly enriched.'"  SEC v. Amerindo Inv. Advisors Inc., No. 05 Civ. 5231 (RJS), 2014 WL 2112032, at *4 (S.D.N.Y. May 6, 2014), aff'd, 639 F. App'x 752 (2d Cir. 2016) (quoting SEC v. Cavanagh, 445 F.3d 105, 117 (2d Cir. 2006)) (internal citation omitted).  "[B]ecause disgorgement is not punitive, the securities violations and the allegedly unlawful gains must be causally connected." Wyly II, 56 F. Supp. 3d at 404. Newman maintains that the fees he received for his legal work were not causally connected to the fraudulent scheme because they were paid by the NYGG clients rather than out of profits from Benjamin Wey's scheme.

However, the source of the fees is not relevant in determining whether the SEC may seek disgorgement.  See DiBella, 587 F.3d at 572 (disgorgement of finder's fee was appropriate even though fee was paid by an investment firm and not the pension fund that was ultimately defrauded).  In this case, it is alleged that Newman billed, and was compensated for, time spent engaged in fraudulent activities and were therefore unjustly enriched by his participation in the fraudulent scheme.  (Compl. ¶ 11); see DiBella, 587 F.3d at 572.  Therefore, the SEC may seek disgorgement of any legal fees he received as a result of his fraudulent conduct.

CONCLUSION.

For the above mentioned reasons, defendants' motions to dismiss the Second Amended Complaint are DENIED in part and GRANTED in part.  Specifically, all claims against William Uchimoto are dismissed.  The SEC's claims against Robert Newman for violations of Section 17(a)(2) are similarly dismissed.  All other claims against the defendants survive.  If the SEC seeks to replead any portion of the complaint, it shall move to amend within 21 days of this Order annexing a proposed amended complaint marked to show changes.

SO ORDERED.

P. Kevin Castel
United States District Judge

Dated: New York, New York
       March 27, 2017